1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8

EASTERN DISTRICT OF CALIFORNIA

9

10 | TEDDY BRIAN SANCHEZ, | Case No. 1:97-CV-06134-AWI-SAB

11 | Petitioner, | <u>DEATH PENALTY CASE</u>

12 | v. | MEMORANDUM AND ORDER (1) DENYING PETITION FOR WRIT OF

13 | KEVIN CHAPPELL, Warden of San Quentin | HABEAS CORPUS, and (2) ISSUING CERTIFICATE OF APPEALABILITY FOR

14 | State Prison, | CLAIMS 8, 59 AND 61 (ECF No. 38 )

15 | Respondent. |

16 | | ORDER DENYING MOTION FOR EVIDENTIARY HEARING (ECF No. 120)

17 | |

18 | | ORDER DENYING MOTION AND REWEWED MOTION TO PRESERVE TESTIMONY

19 | | (ECF No. 150 & 160)

20 | | ORDER DENYING MOTION FOR CASE MANAGEMENT CONFERENCE

21 | | (ECF No. 159)

22 | | ORDER GRANTING REQUEST TO SEAL AND PROTECT SUPPLEMENTAL LODGED

23 | | DOCUMENTS (ECF No. 162)

24 | |

25 | | CLERK TO FILE DOCUMENTS UNDER SEAL

26 | | CLERK TO SUBSTITUTE RON DAVIS AS RESPONDENT AND ENTER JUDGMENT

27

28

1

Petitioner is a state prisoner, sentenced to death, proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is represented in this action by Nina Rivkind, Esq., California Bar Number 79173, and David Harshaw III, Esq. of the Office of the Federal Defender.

Respondent Kevin Chappell[1] is named as Warden of San Quentin State Prison.  He is represented in this action by Jamie Scheidegger, Esq., and Rachelle Newcomb, Esq., of the Office of the California Attorney General.

Before the court for a decision on the merits is the petition (ECF No. 38).  Also before the Court are Petitioner's motions for evidentiary hearing (ECF No. 120) and to preserve testimony (ECF No. 150).

# I.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by court trial on August 3, 1988 of the first degree murders of Juan Bocanegra  ("Mr. Bocanegra") and Juanita Bocanegra ("Mrs. Bocanegra") (Cal. Pen. Code § 187), and of the separate (non-capital) first degree murder of Woodrow Tatman ("Mr. Tatman") (Cal. Pen. Code § 187).  The multiple-murder special-circumstance allegation (Cal. Pen. Code § 190.2, subd. (a)(3)) as to the murders of Mr. Bocanegra and Mrs. Bocanegra was found true. The trial court also found Petitioner used a deadly and dangerous weapon in the murders of the Mr. Bocanegra and Mrs. Bocanegra (Cal. Pen. Code § 12022, subd. (b)), and that Petitioner was guilty of the robbery of Mr. Tatman.  (Cal. Pen. Code § 211.)

On September 21, 1988, a penalty phase jury was empaneled.  During the penalty phase, the prosecution introduced evidence (see Cal. Pen. Code § 190.3) that in 1982 Petitioner was involved in the use of, or attempted use of, force or violence against a store owner, Mr. Ammarie, and against a friend, Mr. Pena.  Defendant in turn offered evidence of his

---

[1] Pursuant to Fed. R. Civ. Proc. 25(d), Ron Davis, Acting Warden of San Quentin State Prison, is substituted as Respondent in place of his predecessor wardens.

1 dysfunctional and impoverished upbringing and use of drugs and alcohol and mental issues and

2 conditions.

3      On October 6, 1988, the jury returned a verdict of death.  On October 31, 1988, the trial

4 court denied Petitioner's motion to modify the verdict (Cal. Pen. Code § 190.4) and sentenced

5 Petitioner to death for aiding and abetting the stabbing deaths of Mr. & Mrs.  Bocanegra; to 25

6 years to life for the Tatman murder; to 5 years for the Tatman robbery; and to 2 years for the

7 weapon enhancement.

8      On December 14, 1995, the California Supreme Court affirmed the judgment and

9 sentence on direct appeal.  People v. Sanchez, 12 Cal.4th 1 (1995).  The California Supreme

10 Court denied petition for rehearing but modified its opinion on February 21, 1996.  People v.

11 Sanchez, 12 Cal.4th 825b (1996).  Petitioner's petition for writ of certiorari was denied by the

12 United States Supreme Court on October 7, 1996.  Sanchez v. California, 519 U.S. 835 (1996).

13      Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  The

14 state petition was summarily denied on October 22, 1997.  In re Sanchez, S049502.

15      On September 17, 1998, Petitioner filed his federal petition for writ of habeas corpus

16 arguing insufficient evidence, actual innocence, prosecutorial misconduct and ineffective

17 assistance of counsel based on allegations he did not assist Joey Bocanegra ("Joey") in killing

18 Mr. Bocanegra, Joey's father, and that his assistance in the murder of Mrs. Bocanegra, Joey's

19 mother, does not make him eligible for the death penalty.

20      Respondent filed an answer on October 19, 1998 and an amended answer on February 8,

21 1999, admitting jurisdictional and procedural allegations (except paragraphs, 1, 16, 18-20),

22 asserting procedural defenses, and denying all claims 1 through 61.

23      On December 9, 1998, the Court found all claims to be fully exhausted.

24      On April 5, 1999, Petitioner filed a memorandum of points and authorities in support of

25 the petition.  On July 1, 1999, Respondent filed a memorandum of points and authorities in

26 support of his answer.   On August 16, 1999, Petitioner filed a reply to Respondent's

27 memorandum.

28

Petitioner was granted discovery of law enforcement records relating to: the Bocanegra crime scene, Petitioner's jail records, jailhouse informants Charles Seeley ("Seeley") and Rufus Hernandez ("Hernandez"), and coroner Dr. Holloway's autopsy notes. Petitioner was also authorized to take the deposition of Kern County District Attorney Investigator Dwight Pendleton regarding Seeley, and the deposition of Bakersfield Police Detective Stratton regarding Hernandez's heroin use.

Petitioner's request to expand the record was granted (ECF No. 134) for Exhibits 144-151 (declarations), Exhibits 421-434 (law enforcement records), Exhibits 527-528 (depositions), Exhibits 529-532 (Kern County court records), Exhibits 604-608 (Kern County jail records), and Exhibits 818-819 (other documents regarding Charles Seeley). Expansion of the record was denied for Exhibits 524-526 (court orders), but with judicial notice to be taken of proceedings in the Northern District of California in Ashmus v. Woodford, Case No. C93-0594 THE regarding the constitutionality of California's death penalty statute.

Petitioner filed a motion for evidentiary hearing on March 18, 2003 (ECF No. 120), seeking a hearing on forty-one of the sixty-one claims in his petition, twenty-six guilt and special circumstance phase claims and fifteen penalty phase claims.[2]

On March 3, 2004, Petitioner filed a second motion to expand the record to rebut Respondent's arguments in opposition to the motion for evidentiary hearing. The motion to expand the record was granted on September 27, 2005 (ECF No. 145) as to the supplemental declaration of defense psychologist, Dr. Froming, and as to records of Mr. Huffman, who was Petitioner's lawyer on unrelated burglary charges.

On June 25, 2014, Petitioner filed a motion to preserve testimony (ECF No. 150), seeking to depose seven witnesses, each of whom filed a declaration in support of instant petition. Petitioner filed a renewed motion to preserve testimony on May 1, 2015.

On May 1, 2015, Petitioner filed a motion requesting a case management conference

---

[2] The claims for which Petitioner seeks evidentiary hearing are: 2, 4, 6 - 18, 20 - 22, 24, 25, 28, 30 - 34, 36 - 38, 40, 43 - 48, 50 - 52, 54 and 60.

1  (ECF No. 159) to discuss the above motion for evidentiary hearing.

2      On June 23, 2015, Respondent filed a supplemental notice of lodging newly obtained

3  state court documents, California Penal Code § 987.9 records # EE through # QQ,  (ECF No.

4  161), and filed notice of his request to seal lodged documents # II and # QQ,  (ECF No. 162).

5                                          **II.**

6                              **STATEMENT OF FACTS**

7      This factual summary is taken from the California Supreme Court's summary of the facts

8  in its December 14, 1995 opinion.  Pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1), the state court's

9  summary of facts is presumed correct.  Petitioner does not present clear and convincing evidence

10  to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court.

11  See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state

12  appellate court's decision for our summary of the facts of the crime.").

13      A.   *Guilt Phase Facts*

14      1.   *The Bocanegra Murders*

15  On the afternoon of February 3, 1987, the police found the bodies of Juan and
Juanita Bocanegra in their home. Juanita was found in her sewing room, and Juan
16  was found in the kitchen. Both had sustained extensive stab wounds and head
injuries. A piece of fabric was tied loosely around Juanita's neck, and another
17  piece of cloth was found on her right wrist.

18  Kern County Sheriff's criminalist Gregory Laskowski analyzed the blood found at
the scene and concluded that both victims were killed where their bodies were
19  found. The blood splatter evidence showed that the attack began in the hallway
near the bathroom. The fight then moved to the kitchen where large amounts of
20  blood indicated that a struggle took place throughout the room. The evidence
indicated a fierce struggle occurred throughout the house. Small amounts of
21  diluted blood in the bathroom suggested that someone cleaned up after the attack.

22  Laskowski also found evidence of two types of shoe tracks on the floor of the
Bocanegra kitchen; one print had a "chevron pattern" and another, partial print,
23  contained a "wavy sole design." A full wavy design shoe track in the bathroom
was consistent with the print found in the kitchen. Both victims were found
24  without shoes; Juanita's bloodstained slippers were found in the hallway.

25  Police found a knife block with four empty spaces in the kitchen. Two knives,
without bloodstains, were in the kitchen sink. There were slash marks on the
26  cabinets directly above the knife holder. That same evening, the police recovered
a knife and sharpening stone that appeared to have blood on them. No fingerprints
27  were found on these items. But police did find a bloody palm print belonging to
defendant's accomplice Robert Reyes on the doorknob inside the Bocanegra front

28

door. Autopsies performed on both Juan and Juanita revealed that they died as a result of massive hemorrhaging due to multiple stab wounds, although the type of instrument that inflicted the wounds could not be conclusively determined.

On February 4, 1987, the Bocanegras' Dodge Colt station wagon was found abandoned. There were extensive bloodstains on both the interior and exterior of the car. Fingerprints belonging to Joey Bocanegra were found on the interior driver's and right rear door windows and on the right rear door handle.

Two items of evidence linked defendant to the crimes. The missing Bocanegra television set was found in the same room at the Bakersfield Inn where defendant stayed at the time of the murders, and defendant sold the Bocanegras' vacuum cleaner to Maria Rodriguez, a clerk employed by the inn. The remaining evidence used to convict defendant was based primarily on the circumstances of the crime, and incriminating statements made by defendant to police investigator Bob Stratton, jailhouse informant Rufus Hernandez, and newspaper reporter Michael Trihey.

2. *The Tatman Murder*

Woodrow Wilson Tatman was a frail, undernourished, 72-year-old man who often drank alcohol and was confined to a wheelchair. He rented a room at the Bakersfield Inn, and spent his days drinking alcohol and watching television. Rose McGrew was employed by the inn as a maid and she also lived on the premises. She helped care for Tatman and had last been in his room on February 1, 1987. Maria Charboneau also worked and lived at the inn, and she took care of Tatman's Social Security checks, and managed his finances. In the first week of February, Tatman received two Social Security checks. On February 2, Charboneau gave Tatman between $80 and $100. That was the last time she saw him alive.

On the afternoon of February 4, 1987, McGrew noticed that Tatman's drapes were still drawn and that he had not yet picked up his mail, which included his Social Security check. McGrew entered the room and found Tatman's body, lying on the floor near his bed. He was covered with a bedspread. Tatman's television, radio and electric skillet were missing from the room.

The autopsy report indicated that Tatman was killed by "massive blunt force injury to the left chest" which collapsed his left lung and caused substantial hemorrhaging. The blow to the chest was consistent with a heel stomp or with the application of an instrument approximately two inches by three inches in size.

Tatman also sustained several superficial stab wounds to the chest and lower abdomen, as well as a head injury. It appeared that the superficial injuries had been inflicted intra or post mortem, and none contributed to death. It could not be determined what instrument caused the lower abdominal injuries, although it appeared that the chest wounds were inflicted by a screwdriver. Dr. John Holloway, the forensic pathologist who performed the autopsy, could not determine whether the wounds were caused by one or more individuals.

a. *Statements Made to Jailhouse Informant Hernandez*

Rufus Hernandez was incarcerated with defendant for two months during 1987. He had been charged with receiving stolen property and second degree burglary. Defendant spoke to Hernandez about the Bocanegra murders and Hernandez entered into a plea bargain whereby he received six months in county jail and

6

three years' probation in exchange for his testimony.

Hernandez testified that defendant told him he went with Joey Bocanegra to the
Bocanegra house. Hernandez's testimony was inconsistent as to whether
defendant said they went with the plan of robbing the Bocanegras or only with the
plan of borrowing money from Juan Bocanegra. Defendant waited outside for
Joey, but entered the house when he heard Joey and Juan arguing in the hallway.
Defendant claimed he tried unsuccessfully to stop the fight by hitting Juan with a
curved metal bar. He thereafter threw the bar in the front yard. Defendant did not
say whether Joey had stabbed Juan before or after defendant hit him.

Juanita, who heard the commotion from another room, came out of the bedroom
yelling. Defendant slipped in a puddle of blood as he jumped over Juan to reach
Juanita. He thereafter grabbed Juanita and told Joey that he should "shut up" his
mother. Joey then stabbed his mother repeatedly and pushed her into the sewing
room, where she was found. Defendant did not tell Hernandez that he did
anything other than hold Juanita; instead defendant claimed that he saw Joey stab
both victims with a kitchen knife. Defendant ended his story with the comment
that after the murders he threw the bar into the front yard, and that the knife was
thrown into a canal. Defendant noted that Joey took the television, a toolbox, and
his parents' hatchback automobile. Hernandez thereafter reported defendant's
statements to police investigator Stratton.

b. *Statements Made to Police Investigator Stratton*
On February 19, 1987, Stratton met with defendant in the Kern County jail.
Defendant had contacted the police through his attorney because he wished to
offer statements about the Bocanegra crimes. Before commencing the interview,
defendant waived his right to counsel after receiving the admonitions required by
Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S. Ct. 1602, 10
A.L.R.3d 974]. Thereafter, he told Stratton that about 10 a.m., on the day of the
Bocanegra murders, he met Joey Bocanegra on the street and spoke to him for a
few minutes before Joey walked home. Defendant then walked by the Bocanegra
house and observed Joey leaving the home. At that point, the interview with
Stratton ended.

One week later, Stratton again spoke to defendant. At this point, defendant asked
Stratton a series of hypothetical questions, including: "What if I was present in the
house; what if Joey hit his dad after his dad had refused to give him some money;
and what if Joey's dad hit him back and what if Joey got real mad and grabbed a
knife and started stabbing his dad; what if Joey's mother didn't know what was
happening because she was in another room?"

c. *Statements Made to Homicide Detective Boggs*
On March 27, 1987, after waiving his *Miranda* rights, defendant was interviewed
about the Tatman murder by Homicide Detective Boggs. Defendant had already
been arrested for the Bocanegra murders and agreed to talk to the officer because
he believed he could be spending the rest of his life in prison.

Boggs testified that defendant told him he wanted to rob Tatman of his
refrigerator because he needed one. Defendant told Boggs that, because he was so
intoxicated (from ingesting alcohol and drugs) at the time of the robbery, he could
not remember the sequence of events.

According to Boggs, defendant asked Reyes to pry open Tatman's bathroom
window with Reyes's screwdriver. Once inside, Reyes removed the contents of

7

Tatman's refrigerator, and defendant moved it to a room next door that had been rented by Vicky Ornalez, a friend of the perpetrators.

Defendant told Boggs that when he returned to Tatman's room, Tatman was awake and Reyes was standing over him with a screwdriver in his hand. Defendant claimed he had no idea why Reyes was acting this way because both men had discussed trying not to awaken Tatman while they removed his property. Reyes then hit Tatman in the chest, pulled Tatman off the bed and onto the floor, and made multiple lunging movements downward with the screwdriver in his hand. Defendant asserted that the bed partially blocked his view, but he nonetheless believed Reyes was stabbing Tatman. After Reyes completed the murder, both defendant and Reyes returned to Vickie Ornalez's room.

d. *Defendant's Post-Arrest Comments to Michael Trihey*
Michael Trihey was a reporter for the <u>Bakersfield Californian</u>. Prior to trial, he interviewed defendant five times about the charges pending against him. On April 25, 1988, the paper published a Trihey article entitled, *Accused Asks for Own Death, System Says No*. According to Trihey, defendant told him that he was a "triple murderer" and that the Bocanegras and Tatman were killed for their Social Security checks.

B. *Penalty Phase Evidence*

The prosecution introduced evidence of defendant's criminal activity involving the use or attempted use of force or violence. (§ 190.3, factor (b).) On May 7, 1982, defendant assaulted store owner Hassan Ahmad Ammarie after defendant asked Ammarie to "get him some bacon" and Ammarie refused. Defendant stabbed Ammarie in the left shoulder and neck. Ammarie was hospitalized for two weeks following the attack.

On June 2, 1982, defendant attacked an acquaintance, Arthur Melendez Pena, after Pena refused to comply with defendant's demand for money.

Several witnesses who had testified at the preliminary hearing also testified at the penalty phase. Homicide Detective Boggs testified defendant had told him that after removing Tatman's possessions to Ornalez's room, he and Reyes "kicked back, drank some whiskey, smoked some dope, ate some food and just relaxed for the rest of the evening." Informant Rufus Hernandez and Police Detective Stratton also testified that defendant told Hernandez that he took an active role in the Bocanegra and Tatman slayings-including beating Juan and Juanita Bocanegra, and beating and assisting Reyes in stabbing Tatman. Stratton repeated Hernandez's statements to him that defendant and Joey Bocanegra went to Juan and Juanita's house and planned to rob them and that Tatman was robbed for his Social Security check. Rose McGrew, the Bakersfield Inn maid, repeated her guilt phase testimony about how she discovered Tatman's body.

With regard to the Bocanegra murders, Hernandez testified that defendant entered the house with a bar and "ran up to Joey's father and grabbed him and held him there until Joey went and got the knife and they just beat him and stabbed him." When Juanita walked out of her sewing room, defendant "rushed" her: "That's when they both started killing her.... They just stabbed her numerous times and hit her in the head a few times with the bar, and the time, at the same time of doing that I guess Joey somehow managed to get her back inside the room, I guess, while he was hitting her...." The prosecution also introduced six color photographs of the victims and forty-eight other color photographs of the

8

Bocanegra and Tatman crime scenes. Criminalist Greg Laskowski testified that the blood splatter in the hallway of the Bocanegra house was consistent with the prosecution's theory that multiple stabbings occurred there.

Defendant's penalty phase evidence consisted of testimony by friends, relatives, and a social anthropologist to the effect that defendant's dysfunctional and poverty-stricken, migratory family life severely hampered his ability to live a productive life. Defendant was rejected by his mother following his birth and was sent to live with his grandparents. When he was three years old, defendant's mother and stepfather unexpectedly wrenched defendant from his grandparents' home to move to Arkansas. Shortly thereafter, defendant's mother left defendant's stepfather, and took defendant and his half-brother to California. Defendant's mother remarried a man with three children, and the couple thereafter had five additional children.

Defendant's mother and his stepfather were alcoholics and drug abusers who were violent with each other and the children. His grandparents, who were often in charge of defendant, also drank heavily and abused drugs. Both defendant's mother and stepfather died in their middle 30's of acute alcoholism. Defendant tried to take care of his siblings, but took drugs to escape his difficult life. He eventually turned to crime because he had no marketable job skills to prepare him for life as an adult.

Penalty phase defense counsel Gary Frank attempted to persuade the jury that defendant should receive a sentence of life without the possibility of parole and "spend the remainder of his life in prison."

Sanchez, 12 Cal.4th 1, 17-23 (1995).

## III.

## JURISDICTION

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

This action was initiated on November 20, 1997. Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Van Tran v. Lindsey, 212 F.3d 1143, 1148 (9th Cir. 2000), overruled on other grounds by

1    Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

2                                    **IV.**

3                          **STANDARDS OF REVIEW**

4    **A.     Legal Standard - Habeas Corpus**

5          Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

6    barred unless a petitioner can show that the state court's adjudication of his claim:

7          (1) resulted in a decision that was contrary to, or involved an unreasonable
           application of, clearly established Federal law, as determined by the Supreme
8          Court of the United States; or

9          (2) resulted in a decision that was based on an unreasonable determination of the
           facts in light of the evidence presented in the State court proceeding.
10

11   28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 98 (2011); Lockyer, 538 U.S. at 70-71;

12   Williams, 529 U.S. at 413.

13         As a threshold matter, this Court must "first decide what constitutes 'clearly established

14   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at

15   71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law,"

16   this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions

17   as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "In other words,

18   'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

19   set forth by the Supreme Court at the time the state court renders its decision."  Id.  In addition,

20   the Supreme Court decision must "'squarely address [] the issue in th[e] case'; otherwise, there is

21   no clearly established Federal law for purposes of review under AEDPA."  Moses v. Payne, 555

22   F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); see also

23   Panetti v. Quarterman, 551 U.S. 930, 949 (2007); Carey v. Musladin, 549 U.S. 70, 74 (2006).  If

24   no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the

25   state court's decision.  Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.  In

26   addition, the Supreme Court has recently clarified that habeas relief is unavailable in instances

27   where a state court arguably refuses to extend a governing legal principle to a context in which

28

                                          10

1    the principle should have controlled.  White v. Woodall, --- U.S. ---, 134 S. Ct. 1697, 1706

2    (2014).  The Supreme Court stated: "'[I]f a habeas court must extend a rationale before it can

3    apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time

4    of the state-court decision.'"  Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)).

5            If the Court determines there is governing clearly established Federal law, the Court must

6    then consider whether the state court's decision was "contrary to, or involved an unreasonable

7    application of," [the] clearly established Federal law."  Lockyer, 538 U.S. at 72 (quoting 28

8    U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ

9    if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

10   question of law or if the state court decides a case differently than [the] Court has on a set of

11   materially indistinguishable facts."  Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

12   72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite

13   in character or nature,' or 'mutually opposed.'"  Williams, 529 U.S. at 405 (quoting Webster's

14   Third New International Dictionary 495 (1976)).  "A state-court decision will certainly be

15   contrary to [Supreme Court] clearly established precedent if the state court applies a rule that

16   contradicts the governing law set forth in [Supreme Court] cases."  Id.

17           "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

18   the state court identifies the correct governing legal principle from [the] Court's decisions but

19   unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at

20   413.  "[A] federal court may not issue the writ simply because the court concludes in its

21   independent judgment that the relevant state court decision applied clearly established federal

22   law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411;

23   see also Lockyer, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit

24   precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of

25   the state court's decision."  Richter, 562 U.S. at 101, citing Yarborough, 541 U.S. at 664.  The

26   Supreme Court stated:

27

28           As a condition for obtaining habeas corpus from a federal court, a state prisoner

11

1
2

must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

3

4  Id. at 103.  In other words, so long as fair-minded jurists could disagree on the correctness of the

5  state courts decision, the decision cannot be considered unreasonable.  Id. at 101.  In applying

6  this standard, "a habeas court must determine what arguments or theories supported . . . or could

7  have supported the state court's decision; and then it must ask whether it is possible fair-minded

8  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

9  decision of [the Supreme Court]."  Id. at 102.  This objective standard of reasonableness applies

10  to review under both subsections of 28 U.S.C. § 2254(d).  See Hibbler v. Benedetti, 693 F.3d

11  1140, 1146-47 (9th Cir. 2012).  If the Court determines that the state court decision is objectively

12  unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the

13  error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619,

14  637 (1993).

15       Petitioner has the burden of establishing that the decision of the state court is contrary to

16  or involved an unreasonable application of United States Supreme Court precedent.  Baylor v.

17  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

18  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

19  state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669 n.6

20  (9th Cir. 2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

21       The AEDPA requires considerable deference to the state courts.  "[R]eview under §

22  2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

23  the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review."

24  Cullen v. Pinholster, __ U.S. __, __, 131 S. Ct. 1388, 1398-99 (2011).  "Factual determinations

25  by state courts are presumed correct absent clear and convincing evidence to the contrary."

26  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a

27  state court factual finding is not entitled to deference if the relevant state court record is

28

1  unavailable for the federal court to review.  <u>Townsend v. Sain</u>, 372 U.S. 293, 319 (1963),

2  <u>overruled</u> <u>by</u> <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1 (1992).

3      If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court

4  considers that claim de novo.  <u>See</u> <u>Panetti</u>, 551 U.S. at 953 (when section 2254(d) is satisfied,

5  "[a] federal court must then resolve the claim without the deference AEDPA otherwise

6  requires."); <u>Frantz v. Hazey</u>, 533 F.3d 724, 737 (9th Cir. 2008).

7      In this case, many of Petitioner's claims were raised and rejected by the California

8  Supreme Court on direct appeal.  However, many of his claims were raised in his state habeas

9  petition to the California Supreme Court, and summarily denied on the merits.  In such a case

10 where the state court decision is unaccompanied by an explanation, "the habeas petitioner's

11 burden still must be met by showing there was no reasonable basis for the state court to deny

12 relief." <u>Richter</u>, 562 U.S. at 98.  The Supreme Court stated that "a habeas court must determine

13 what arguments or theories supported or . . . *could have supported*, the state court's decision; and

14 then it must ask whether it is possible fair-minded jurists could disagree that those arguments or

15 theories are inconsistent with the holding in a prior decision of this Court."  <u>Id.</u> at 786 (emphasis

16 added).  Petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the

17 state court to deny relief.'"   <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013) (<u>quoting</u>

18 <u>Richter</u>, 562 U.S. at 98).  "Crucially, this is not a de novo review of the constitutional question,"

19 <u>id.</u>, as "even a strong case for relief does not mean the state court's contrary conclusion was

20 unreasonable," <u>Id.</u> (quoting <u>Richter</u>, 562 U.S. at 102); (<u>see also</u> <u>Murray v. Schriro</u>, 745 F.3d 984,

21 996-97, (9th Cir. 2014)).

22     When reviewing the California Supreme Court's summary denial of a petition, this Court

23 must consider that the California Supreme Court's summary denial of a habeas petition on the

24 merits reflects that court's determination that:

26    [T]he claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief. It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also review the record of the trial ... to assess the merits of the petitioner's claims.

13

1    Pinholster, 131 S. Ct. at 402 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993) (citing People

2    v. Duvall, 9 Cal. 4th 464, 474 (1995)).  Accordingly, if this Court finds Petitioner has unarguably

3    presented a prima facie case for relief on a claim, the state court's summary rejection of that

4    claim would be unreasonable.  Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004); Nunes v.

5    Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003).

6         For any habeas claim that has not been adjudicated on the merits by the state court, the

7    federal court reviews the claim de novo without the deference usually accorded state courts

8    under 28 U.S.C. § 2254(d)(1).  Chaker v. Crogan, 428 F.3d 1215, 1221 (9th Cir.2005); Pirtle v.

9    Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  In such instances, however, the provisions of 28

10   U.S.C. § 2254(e) still apply.  Pinholster, 131 S. Ct at 1401 ("Section 2254(e)(2) continues to

11   have force where § 2254(d)(1) does not bar federal habeas relief."); Pirtle, 313 F.3d at 1167–68

12   (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal

13   review is de novo).

14                                                **V.**

15                                      **PROCEDURAL BARS**

16        All of Petitioner's claims have been raised to the California Supreme Court and denied on

17   the merits.  In addition, some of his claims were denied as procedurally barred.  As to those

18   claims, Respondent has argued that California's timeliness rule for state habeas petitions,

19   California's rule barring claims on state habeas that could have been presented on direct appeal,

20   and California's contemporaneous objection rule are all adequate and independent state grounds

21   that bar federal habeas review.  The Court will not address procedural default with this order

22   because all of the claims lack merit, and the Court finds the question of procedural default to be

23   relatively complicated in this case.  See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002)

24   (Courts may reach the merits of a case prior to addressing procedural default); Bell v. Cone, 543

25   U.S. 447, 451 n.3 (2005); Loggins v. Thomas, 654 F.3d 1204, 1215 (11th Cir. 2011).

26                                               **VI.**

27                                     **REVIEW OF CLAIMS**

28

                                                14

1          **A.      Claims Relating to Conviction and Sentence**

2          1.      <u>Sufficiency of the Evidence - Claims 1[3] and 3[4]</u>

3          In claims 1 and 3, Petitioner states that he was convicted and sentenced for the first

4    degree murders of Mr. Bocanegra and Mrs. Bocanegra on insufficient evidence that he acted

5    with deliberation and premeditation, <u>see</u> <u>People v. Anderson</u>, 70 Cal.2d 15, 26-27 (1968),

6    depriving him of due process under the Fourteenth Amendment.

7          **a.      Clearly Established Law**

8          A federal habeas court reviews challenges to the sufficiency of the evidence by

9    determining whether in "viewing the evidence in a light most favorable to the prosecution, any

10   rational trier of fact could have found the essential elements of the crime beyond a reasonable

11   doubt." <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990).  "A reviewing court must consider all of the

12   evidence admitted by the trial court, regardless whether that evidence was admitted erroneously."

13   <u>McDaniel v. Brown</u>, 558 U.S. 120, 131 (2010).  Sufficiency of the evidence claims raised in §

14   2254 proceedings must be measured with reference to substantive requirements as defined by

15   state law. <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 n.16 (1979). In cases where the evidence is

16   unclear or would support conflicting inferences, the federal court "must presume -- even if it

17   does not affirmatively appear in the record -- that the trier of fact resolved any such conflict in

18   favor of the prosecution, and must defer to that resolution." <u>Id.</u> at 326.  To prevail here,

19   Petitioner must show "that the prosecution's case against him "was so lacking that the trial court

20   should have entered a judgment of acquittal." <u>McDaniel</u>, 558 U.S. at 131.

21         The AEDPA adds another layer of deference over the already deferential <u>Jackson</u>

22   standard. Under the AEDPA, the federal court may not grant a habeas petition unless it finds that

23   the state court unreasonably applied the principles underlying the <u>Jackson</u> standard when

24   reviewing the petitioner's claim. <u>See</u> <u>e.g.</u>, <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1275 n.12 (9th Cir.

25   2005); <u>Jones v. Wood</u>, 114 F.3d 1002, 1013 (9th Cir. 1997) (en banc) (recognizing that

26   "unreasonable application" standard applies to insufficient evidence claim). "Expressed more

27   _____

28   [3] The legal bases of the Fifth, Sixth and Eighth Amendments were stricken as unexhausted. ECF No. 60 at 8:25-26.
     [4] The legal bases of the Fifth, Sixth and Eighth Amendments were stricken as unexhausted. ECF No. 60 at 9:1-3.

1    fully, this means a reviewing court faced with a record of historical facts that supports conflicting

2    inferences must presume -- even if it does not affirmatively appear in the record -- that the trier

3    of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

4    McDaniel, 558 U.S. at 133.

5         Evidence is sufficient under the due process clause where "after viewing the evidence in

6    the light most favorable to the prosecution, any rational trier of fact could have found the

7    essential elements of the crime beyond a reasonable doubt."   Jackson, 443 U.S. at 319; see also

8    Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).

9         **b.     Review of Claims 1 and 3**

10        The state supreme court, on direct appeal, considered claimed insufficiency of the

11   evidence and rejected Petitioner's claim of "wading into [the] fight" and being ineffectual in the

12   assaults; finding instead that the evidence clearly reflects that defendant aided and abetted Joey

13   in killing both Mr. Bocanegra and Mrs. Bocanegra, as follows:

> [S]ubstantial evidence supports the trial court's finding that Joey Bocanegra
> intended to kill his parents, that he premeditated and deliberated the murders, and
> that defendant can be found vicariously liable for the murders as an aider and
> abettor. As we have observed, an aider and abettor must act with knowledge of
> the criminal purpose of the perpetrator and with an intent either of committing, or
> of encouraging or facilitating commission of, the offense. [Citation] We have also
> recognized that if the aider and abettor undertakes acts "with the intent that the
> actual perpetrator's purpose be facilitated thereby, he is a principal and liable for
> the commission of the offense." [Citation] Thus, the basis of liability for the
> perpetrator applies to the aider and abettor and extends to "the natural and
> reasonable consequences of the acts he knowingly and intelligently aids and
> encourages." [Citation] As we explain, we conclude that defendant shared Joey's
> intent to kill, and in assisting Joey in committing the crimes, understood, and
> facilitated, the full extent of Joey's criminal purpose.
>
> Hernandez testified, and defendant admitted to Detective Stratton, that defendant
> initially waited outside while Joey entered his parents' house. Defendant then
> entered the house after hearing the sounds of a fight between Joey and Juan.
> Defendant told Hernandez that he went inside the house to break up the fight
> between Joey and his father, but the facts belie his stated intent. When defendant
> entered the house, he saw Joey fighting with his father. Rather than come to
> Juan's aid, defendant grabbed a curved metal bar and commenced beating Juan.
>
> Joey's actions, according to defendant's statements to prosecution witnesses,
> indicated that Joey deliberated over his father's killing. Joey initially struck Juan
> in the hallway and then, in the kitchen, obtained a knife that he used to stab Juan.
> In our view, Joey formed a clear intent to kill, at the latest, during the altercation
> with his father, and obtained a kitchen knife to carry out that plan. Our cases hold

16

that planning activity occurring over a short period of time is sufficient to find premeditation. "'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly ....'" [Citation]

There was also ample evidence of motive. The evidence supports a strong inference that Joey entered his parents' house to rob them. When his father resisted the robbery, Joey was motivated to murder him in order to gain access to both money and tangible goods, including a television set. Substantial evidence supports a finding that Joey believed Juan stood in the way of his plan.

Finally, the trial court could infer from the evidence that the manner of killing tended to demonstrate Joey acted with premeditation and deliberation. The attack occurred in a series of rooms, indicating that Juan's repeated attempts to break away from his murderers were consistently thwarted by the attackers' relentless pursuit of him, even after he was gravely wounded. A rational finder of fact could infer that the manner of killing, when combined with Joey's retrieval of the knife in the kitchen, and defendant's retrieval of a metal bar used in clubbing a defenseless Juan, is sufficient to support the trier of fact's implied finding that Joey formed the plan to kill his parents during the altercation, located the murder weapon, and along with defendant, deliberately murdered his father. [Citation]

The same evidence supports the trial court's finding that defendant shared Joey's intent and plan to kill Juan, and thus was liable, as an aider and abettor, for Juan's murder. [Citation] The killing of Juan ended after a prolonged knife attack and beating from which Juan attempted to defend himself. Defendant's personal involvement in the murder was substantial. Far from merely acting as a lookout, or beating Juan after he was already dead, defendant was actively involved in assisting Joey in Juan's murder. Defendant's admitted act of arming himself with a curved metal bar before joining the altercation between Joey and Juan indicates he shared Joey's plan. [Citation] From this evidence, the trier of fact could reasonably infer defendant knowingly engaged or assisted in Juan's murder as an aider and abettor. [Citation]

As to Juanita's murder, defendant asserts the evidence similarly does not support the conviction. He claims that he "did not personally kill Juanita [because] she was stabbed to death by Joey." He asserts that there is "no evidence in the record that [he] held Juanita down, helped push her back to the sewing room, or had any contact with her while Joey was stabbing her." He contends that there is no evidence to support the People's theory that defendant aided Joey by hitting Juanita with a bar and that "[t]here is simply no evidence that [his] initial grabbing of Juanita actually aided, or even was intended to aid, Joey's subsequent stabbing of his mother." Finally, defendant asserts in his reply brief that his "efforts to tie and gag Juanita are altogether inconsistent with an intent to kill her."

Again, the evidence supports the court's verdicts and refutes defendant's contention. Hernandez testified defendant told him that during the murder of Juan, Juanita screamed. Defendant grabbed Juanita and told Joey to "shut her up." Joey then stabbed his mother 26 times. A bloodstained garment was wrapped around Juanita's neck, and her wrists had been tied together with a piece of fabric. The pathologist (Holloway) opined that Juanita died of the stab wounds and that the ligature constriction of her neck was a possible contributing cause. She also had severe scalp injuries that Holloway concluded were consistent with those inflicted

17

by a long bar or pipe less than one-half inch in diameter, similar to the instrument used by defendant to inflict Juan's scalp wounds. The trial court could reasonably infer from the evidence that Juanita was killed in order to keep her from being a percipient witness to the murder of her husband. Thus, viewing the evidence in the light most favorable to the People, we conclude a "rational trier of fact" could have been persuaded "that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." [Citation] Defendant's participation in Juanita's murder, like his aiding and abetting in Juan's killing, clearly supports a finding that defendant aided and abetted her murder. [Citation]

Sanchez, 12 Cal.4th at 33-36.

Under California law, "[m]urder is the unlawful killing of a human being . . . with malice aforethought." Cal. Pen. Code § 187, subd. (a). "[A]ll murder which is perpetrated . . . by any kind of willful, deliberate, and premeditated killing . . . is murder of the first degree . . . ." Cal. Pen. Code § 189; see People v. Berryman, 6 Cal.4th 1048, 1085) (1993) (overruled on other grounds, People v. Hill, 17 Cal.4th 800, 822-23 (1998). Premeditation and deliberation are generally established by proof of (1) planning activity; (2) motive (established by a prior relationship and/or conduct with the victim); and (3) manner of killing. People v. Anderson, 70 Cal.2d 15, 26-27 (1968). The California Supreme Court "sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." Id., at 27.

A person "aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." People v. Beeman, 35 Cal.3d 547, 561 (1984).

The state court could reasonably have concluded that the fight with Mr. Bocanegra resulted from pursuit of the joint motive of Joey and Petitioner to obtain money from Mr. Bocanegra, the stated reason for their going to the Bocanegra home. (See Clerk's Transcript on Appeal, hereinafter "CT", 502-504.) After the murders, in furtherance of this motive, Petitioner assisted Joey in removing property from the Bocanegra home (CT 484.) Some of this property

18

1  was later found in Petitioner's room, or sold by him. (Reporter's Transcript on Appeal,

2  hereinafter "RT", 25-29, 35-37, 67-69.)

3        Petitioner disclaims premeditation and deliberation in the murders, claiming Joey, and by

4  extension Petitioner, acted rashly and on impulse. But the extended nature and duration of the

5  struggles with Mr. Bocanegra and Mrs. Bocanegra, with Joey taking time to get a kitchen knife

6  (CT 504; RT 2854), and Petitioner attempting to subdue and restrain each of the victims during

7  Joey's assault on them, seeing Joey stab them, along with the multiple stab and blunt force

8  wounds inflicted during room to room struggle with the victims, could reasonably suggest a plan

9  to kill them. (CT112-120; 149-153; 181; 192-194; 357-383; 479-483; 488.)  Each victim suffered

10  multiple stab wounds, Mrs. Bocanegra was stabbed at least 26 times and had 6 scalp wounds and

11  Mr. Bocanegra was stabbed at least eight times and had nine scalp wounds.  (Id.)  Both victims

12  were left unassisted to bleed to death. (CT 112-114, 117-119.)   There was evidence Mrs.

13  Bocanegra's wrists had been tied together and that she had been gagged. (CT 113, 149-150,

14  153.)   Jailhouse informant Hernandez consistently testified Petitioner told him that when

15  fighting broke out between Joey and Mr. Bocanegra (CT 479-505), in the hallway (id.; RT 2843,

16  2852-2853), Petitioner responded by hitting Mr. Bocanegra on the head nine times with a curved

17  bar (CT 479-505; CT 112-114; 117-119), that when Mrs. Bocanegra came out of a back bedroom

18  and started yelling Petitioner grabbed her and told Joey to "shut her up."  (CT 483, 488, 504.)

19  Petitioner's claim that it was Joey who stabbed his parents to death (CT 488; RT 121-122), does

20  not undermine evidence above that Petitioner aided and abetted Joey to that end.

21        The physical evidence is consistent with Hernandez's testimony.  The evidentiary record

22  reasonably suggests that Mr. Bocanegra was initially assaulted in the hallway and then murdered

23  in the kitchen (CT 355-381).   The coroner, Dr. Holloway, opined Mr. Bocanegra died from

24  multiple stab wounds and that other conditions were the multiple blunt force trauma wounds to

25  Mr. Bocanegra's head (CT 117-119); that Mrs. Bocanegra died from multiple stab wounds and

26  had six wounds to her scalp (CT 112-115;, 153-154); that the scalp wounds were caused by an

27  instrument different from that used to inflict the stab wounds; and that ligature construction was

28

1  a possible contributing cause.  (CT 112-119.)

2       Both at the preliminary hearing and the penalty phase, Hernandez testified that Petitioner

3  struck Mr. Bocanegra with a bar (CT 479-482, 500-501, RT 2843-2844, 2854), and that he

4  grabbed or "rushed" Mrs. Bocanegra, a witness to Mr. Bocanegra's murder (id.; RT 153, 189)

5  and told Joey to "shut her up" (CT 483, 504; RT 2844).  Hernandez testimony that the altercation

6  between Mr. Bocanegra and Joey started in the hallway and moved to the kitchen is consistent

7  with the bloodstain pattern evidence, (CT 355-383; 479, 487-488, 500-501; RT 2843-2845) and

8  other crime scene evidence.  (Id.)  Petitioner's claim that a third person, Robert Reyes ("Reyes"),

9  was in the house during the murders and may have aided Joey in the murders, is not substantially

10  supported by the evidentiary record.  (Id.; CT 131-133)

11       Petitioner attempts to discount testimony that he intended to rob the Bocanegras prior to

12  their murder.  Petitioner correctly notes that the trial court did not find him guilty of robbing the

13  Bocanegras and found the robbery-murder special circumstance untrue on grounds Petitioner's

14  intent to rob arose after the murders.  (CT 906; RT 235-237.)  Even so, Petitioner has not

15  controverted evidence that he used a metal bar during the murders.  (CT 479-482, 500-501, RT

16  2843-2844, 2854RT 236).  The trial court rejected Hernandez testimony, favorable to Petitioner,

17  that Petitioner merely grabbed Mrs. Bocanegra.  (CT 483.)

18       No facts or discrepancies between the testimony and the physical evidence establish or

19  compel the conclusion that Hernandez, by virtue of his alleged substance addiction, his plea deal,

20  or otherwise, was motivated to and did testify falsely or inaccurately.  For reasons discussed in

21  claim 7, the state court could reasonably have found Hernandez received no undisclosed sentence

22  concession in return for his testimony.  (State Habeas Corpus Petition, hereinafter "SHCP", Ex.

23  900, pp. 4, 11; State Court Response to Petition, hereinafter "SResp.", Ex. B.)

24       The state court could reasonably conclude that Petitioner, sharing Joey's motive of

25  obtaining money from Mr. Bocanegra, took Joey's side in the struggles with Mr. Bocanegra and

26  Mrs. Bocanegra, verbally assisting and encouraging him and physically restraining and

27  assaulting both victims. Petitioner's statements to Hernandez, Detective Stratton and reporter

28

1  Trihey, and the physical evidence in the Bocanegra home are evidence of his guilt.   Any

2  inconsistencies in Hernandez's preliminary hearing testimony and his penalty phase testimony

3  are not substantially material or probative of and do not preclude the possibility of his guilt and

4  sentence to death.

5  Moreover, Petitioner inculpated himself in the murders.  He asked Bakersfield detective

6  Stratton "what if [he] was present at the Bocanegra home during the murders."  (CT 77-78).  He

7  told newspaper reporter Trihey he was a "triple murderer."  (RT 16-18.)

8  A rational trier of fact could have found the essential elements of the crime beyond a

9  reasonable doubt based on the evidence in the record.  The state court's denial of these claims

10  was not contrary to, or an unreasonable application of, clearly established federal law, or based

11  on an unreasonable determination of the facts in light of the evidence presented in the state court

12  proceeding.  28 U.S.C. § 2254(d); Jackson, 443 U.S. at 319.

13  Claims 1 and 3 are denied.[5]

14  2.   Actual Innocence - Claims 2 and 4

15  In claims 2 and 4, Petitioner claims actual innocence of the first degree murders of Mr.

16  Bocanegra and Mrs. Bocanegra based on evidence existing before trial and later discovered

17  evidence, such that his conviction and sentence represent a fundamental miscarriage of justice

18  violating the Fifth, Sixth, Eighth and Fourteenth Amendments.

19  **a.    Clearly Established Law**

20  *i.    Actual Innocence*

21  The showing required for a free standing claim of actual innocence, i.e., a claim

22  irrespective of constitutional error at trial or sentencing, is "extraordinarily high" and must be

23  "truly persuasive."   Herrera v. Collins, 506 U.S. 390, 417, (1993).   To carry this burden

24  Petitioner must affirmatively prove he is innocent.  See Carriger v. Stewart, 132 F.3d 463, 476-

25  77 (9th Cir. 1997).

---

26  [5] Reyes pled guilty to first degree murder in the three homicides and to the robberies of Tatman and the Bocanegras
and was sentenced to three consecutive terms of 25 years to life.  People v. Robert Gabriel Reyes, Kern County
27  Superior Court Case No. 34638.  Charges against Joey Bocanegra were dismissed for insufficient evidence.  People
v. Jose Juan Bocanegra, Kern County Superior Court Case No. 34638.

28

1          In Schlup v. Delo, 513 U.S. 298 (1995) the Supreme Court reached actual innocence as a

2   gateway claim to consideration of otherwise barred Constitutional claims.  "If a habeas petitioner

3   . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome

4   of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional

5   error, the petitioner should be allowed to pass through the gateway and argue the merits of his

6   underlying claims."  Schlup at 316.  The Schlup court held that the proper standard is that a

7   procedurally defaulted petitioner must show that a constitutional violation has *probably* resulted

8   in the conviction of one who is actually innocent. Schlup at 326.

9          "The petitioner must show that it is more likely than not that no reasonable juror would

10   have convicted him in the light of the new evidence."  Schlup at 327.  Petitioner's burden is to

11   demonstrate that more likely than not, any reasonable juror would have reasonable doubt.  House

12   v. Bell, 547 U.S. 518, 538 (2006).  See Sawyer v. Whitley, 505 U.S. 333, 346 (1992) (holding

13   that in order to prove actual innocence, petitioner must show fair probability that rational trier of

14   fact would have entertained reasonable doubt regarding the existence of facts which are

15   prerequisites under state or federal law for imposition of the death penalty).

16          *ii.*    *State Law Aider/Abettor*

17          California law requires an aider and abettor to share the specific intent of the perpetrator.

18   Beeman, 35 Cal.3d at 560.  An aider and abettor shares the perpetrator's specific intent by

19   knowing the full extent of the perpetrator's criminal purpose and giving aid or encouragement

20   with the intent or purpose of facilitating the commission of the crime.  Id.  California's 1978

21   death penalty statute requires finding an independent intent to kill as part of the special

22   circumstance for an aider or abettor of felony-murder.  People v. Anderson, 43 Cal. 3d 1104,

23   1141-42 (1987).  This is consistent with the Eighth Amendment which prohibits the death

24   penalty for an aider and abettor of felony murder who does not actually kill, attempt to kill,

25   intend that a killing or lethal force occur, or act with reckless indifference to human life.

26   Enmund v. Florida, 458 U.S. 782, 797 (1982); Tison v. Arizona, 481 U.S. 137, 157-58 (1987).

27   Federal court review of instructional error under Beeman is subject to the standard from Brecht,

28

507 U.S. at 637, whether the error had a substantial or injurious effect on the verdict.

b.      **Review of Claims 2 and 4**

The California Supreme Court denied these claims as raised in Petitioner's state petition for habeas corpus (State Petition for Habeas Corpus, hereinafter "SHCP" or "SPet.", Claims A & B), to the extent they duplicated sufficiency of evidence claims rejected on appeal.

To the extent Petitioner's actual innocence claims are free standing claims based on the state record, they fail for the reasons stated in claims 1 and 3.  To the extent these claims are free standing claims based on alleged newly discovered evidence, the claims not cognizable (see Herrera, 506 U.S. at 400) (the Supreme Court held that free standing claims of "actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.").

The actual innocence claims also fail as gateway claims because it is not likely any reasonable juror would have reasonable doubt that the essential elements of the criminal counts could have been found beyond a reasonable doubt.  Petitioner's statements to jailhouse informant Hernandez, Detective Stratton and reporter Trihey, and the physical evidence in the Bocanegra home all are substantial evidence of his guilt.

Hernandez's testimony at both preliminary hearing and penalty phase that the altercation between Mr. Bocanegra and Joey started in the hallway and moved to the kitchen is consistent with the bloodstain evidence.  (CT 355-383; 479, 487-488, 500-501; RT 2843-2845) and other crime scene evidence.  (CT 355-380.)  His preliminary hearing testimony that Petitioner heard Joey and Mr. Bocanegra arguing, "walked into the house, tried to break 'em up" (CT 479) and that he (Petitioner) hit Mr. Bocanegra with the bar is not materially inconsistent with Hernandez's penalty phase testimony that Petitioner grabbed and held Mr. Bocanegra until Joey got the knife and that Petitioner beat Mr. Bocanegra with a bar.

Hernandez testimony at the preliminary hearing and the penalty phase was consistent that during Joey's struggles with Mr. Bocanegra,  Petitioner struck Mr. Bocanegra with a bar (CT

1   479-482, 500-501, RT 2843-2844, 2854), and that he grabbed or "rushed" Mrs. Bocanegra and

2   told Joey to "shut her up" during his struggles with Mrs. Bocanegra (CT 483, 504; RT 2844).

3   Petitioner saw Joey wield a knife during these assaults. (CT 483, 487-489, 504; SPet. Ex. 419, 5,

4   17; RT 121-122.)  Mr. Bocanegra and Mrs. Bocanegra succumbed to the multiple stab wounds.

5   (CT 112-119.)

6        As to the Tatman homicide, Hernandez's preliminary hearing testimony that Petitioner

7   and Joey "hit a black guy in an alley" (CT 488, 497-99) is not, as Petitioner alleges, inconsistent

8   with penalty phase testimony that Petitioner and two other men entered Mr. Tatman's room at

9   the Bakersfield Inn, and beat him, and the other two stabbed Mr. Tatman with a screwdriver, and

10  that they took Mr. Tatman's money.  There is no evidence Hernandez's testimony at the

11  preliminary hearing related to the same incident he testified to at the penalty phase.

12       Petitioner's assertion that there were actually 3 non-victim shoeprints in the kitchen

13  where Mr. Bocanegra was murdered, so as to implicate Reyes in the Bocanegra murders is not

14  sufficiently supported in the record.  As discussed in claims 8 and 10, *post*, the state court could

15  reasonably have found that the bloodstain evidence and testimony of Hernandez contradicts

16  jailhouse informant Seeley's account that Petitioner observed Mr. Bocanegra's murder from the

17  hallway.

18        No facts or discrepancies between the testimony and the physical evidence establish or

19  compel the conclusion that Hernandez, by virtue of his alleged substance addiction, his plea deal,

20  or otherwise, was motivated to and did testify falsely or inaccurately. (See claim 7, *ante*.)

21  Petitioner has not demonstrated Hernandez received undisclosed sentence concession(s).  (SPet.

22  Ex. 900, pp. 4, 11; SResp. Ex. B.)

23       In contrast, the testimony of jailhouse informant Seeley inculpating Reyes in the murders,

24  is inconsistent with the physical evidence.  Seeley's testimony that the altercation with Mr.

25  Bocanegra started and ended in the kitchen (SPet. Ex. 419, pp.5-6, 17-20) is not reasonably

26  consistent with the blood stain patterns that suggest the assault on Mr. Bocanegra began in the

27  hallway.  (CT 355-383.)

28

The physical evidence, Petitioner's statements to Detective Stratton, and Petitioner's statements to Reporter Trihey are not persuasive of actual innocence for the reasons discussed in claims 10, 12, 15 and 27, *post*.

Petitioner alleges his severe neurological and psychiatric impairments precluded him from planning the murder and carrying out the plan. But as explained in claim 6, there is no sufficient evidence that Petitioner suffered from neurological or psychiatric impairment precluding, as an aider and abettor, his knowingly and intentionally assisting Joey in the Bocanegra murders.

Finally, Petitioner's assertion that he merely restrained Mrs. Bocanegra is nonetheless sufficient to support a first degree murder conviction as an aider and abettor, especially given that Petitioner had just observed Joey stab his father to death. (CT 483; RT 2843-2854.) It could reasonably be concluded that Petitioner's restraining Mrs. Bocanegra just after Mr. Bocanegra's murder satisfied the requirement that an aider or abettor knows the full extent of the perpetrator's criminal purpose and gives aid to facilitate the commission of the crime. Beeman, 35 Cal. 3d at 560.

For the reasons stated, a fair-minded jurist could conclude it unlikely any reasonable juror would have reasonable doubt that the essential elements of the criminal counts against Petitioner could have been found beyond a reasonable doubt.

The California Supreme Court's denial of these claims was not contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claims 2 and 4 are denied.

3.     State Appellate Error - Claim 5

In this claim Petitioner alleges that the California Supreme Court committed appellate review error by making an unconstitutional change in the definition of first degree murder (Cal. Pen. Code 189) violating the Fifth, Sixth, Eighth and Fourteenth Amendments.

1  **a.  Clearly Established Law**

2  A defendant has a due process right to fair notice of the elements of the crime for which

3  he was convicted. Bouie v. City of Columbia, 378 U.S. 347, 352 (1964).

4  A state's capital punishment scheme must "minimize the risk of wholly arbitrary and

5  capricious action." Gregg v. Georgia, 428 U.S. 153, 189 (1976).

6  Absent specific constitutional error, federal habeas review is limited to determining

7  whether the state supreme court's statutory review was "so arbitrary and capricious as to

8  constitute an independent due process or Eighth Amendment violation." Lewis v. Jeffers, 497

9  U.S. 764, 780 (1990), citing Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1974) (absent a

10  specific constitutional violation, federal habeas review of trial error is limited to whether the

11  error "so infected the trial with unfairness as to make the resulting conviction a denial of due

12  process). The essential function of state appellate court jurisdiction is to ensure "evenhanded,

13  rational, and consistent imposition of death sentences under law." Campbell v. Blodgett, 997

14  F.2d 512, 522 at n.12 (9th Cir. 1992), citing Pulley v. Harris, 465 U.S. 37, 45 (1984).

15  **b.  Review of Claim 5**

16  Petitioner contends that the state supreme court retroactively eliminated the distinction

17  between intentional first and second degree murders. He reasons this is so because, prior to his

18  appeal, California law required that premeditated and deliberated first degree murder be shown

19  to be the "result of careful thought and weighing of considerations," and that conversely "a

20  sudden killing in the course of an argument and struggle" would not be premeditated and

21  deliberated murder. See People v. Lasko, 23 Cal.4th 101, 104 (2000); see Anderson, 70 Cal. 2d

22  at 26-27 (stating types of evidence which might support a finding of premeditation and

23  deliberation). Yet here, he claims, the trial court found the murder of Mr. Bocanegra satisfied

24  the premeditation and deliberation standard even though the killer formed the intent to kill during

25  the fatal altercation and killed with a weapon found at hand. Petitioner alleges there was no

26  evidence of planning activity, no evidence of a preexisting motive, and that multiple stab wounds

27  alone are insufficient to prove premeditation and deliberation. See People v. Caldwell, 43 Cal.

28

2d 864, 869 (1955).

The state supreme court denied this claim when raised in "supplement to existing habeas corpus petition" (claim ZZ), In re Sanchez, S049502, (DD), because that court found substantial evidence that Joey intended to kill his parents and that Petitioner could be found vicariously liable for these murders as an aider and abettor, as follows:

> Joey's actions, according to defendant's statements to prosecution witnesses, indicated that Joey deliberated over his father's killing. Joey initially struck Juan in the hallway and then, in the kitchen, obtained a knife that he used to stab Juan. In our view, Joey formed a clear intent to kill, at the latest, during the altercation with his father, and obtained a kitchen knife to carry out that plan. Our cases hold that planning activity occurring over a short period of time is sufficient to find premeditation. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citation]

> There was also ample evidence of motive. The evidence supports a strong inference that Joey entered his parents' house to rob them. When his father resisted the robbery, Joey was motivated to murder him in order to gain access to both money and tangible goods, including a television set. Substantial evidence supports a finding that Joey believed Juan stood in the way of his plan.

> Finally, the trial court could infer from the evidence that the manner of killing tended to demonstrate Joey acted with premeditation and deliberation. The attack occurred in a series of rooms, indicating that Juan's repeated attempts to break away from his murderers were consistently thwarted by the attackers' relentless pursuit of him, even after he was gravely wounded. A rational finder of fact could infer that the manner of killing, when combined with Joey's retrieval of the knife in the kitchen, and defendant's retrieval of a metal bar used in clubbing a defenseless Juan, is sufficient to support the trier of fact's implied finding that Joey formed the plan to kill his parents during the altercation, located the murder weapon, and along with defendant, deliberately murdered his father. [Citation]

> The same evidence supports the trial court's finding that defendant shared Joey's intent and plan to kill Juan, and thus was liable, as an aider and abettor, for Juan's murder. [Citation] The killing of Juan ended after a prolonged knife attack and beating from which Juan attempted to defend himself. Defendant's personal involvement in the murder was substantial. Far from merely acting as a lookout, or beating Juan after he was already dead, defendant was actively involved in assisting Joey in Juan's murder. Defendant's admitted act of arming himself with a curved metal bar before joining the altercation between Joey and Juan indicates he shared Joey's plan. [Citation] From this evidence, the trier of fact could reasonably infer defendant knowingly engaged or assisted in Juan's murder as an aider and abettor.

Sanchez, 12 Cal.4th at 33-34.

The Court finds that, contrary to Petitioner assertion, and for the reasons discussed in

27

claims 1-4, the state court's analysis could reasonably rely upon evidence before it of a pre-existing motive to obtain money from Mr. Bocanegra, involving a joint criminal design of multiple and prolonged stab wounds, aided and abetted by Petitioner's participation with the metal bar, sufficient to find premeditation and deliberation both by Joey and Petitioner.  Id. Given the state court's analysis and the record, there appears to be no risk of arbitrary and capricious verdict.

This Court does not find the state court rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, viewed most favoring the prosecution, Jackson, 443 U.S. at 319.  See 28 U.S.C. § 2254(d); Lewis, 497 U.S. at 780 (absent a specific constitutional error, federal habeas review is limited to determining whether the state Supreme Court's performance of its statutory review was "so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation.")

Claim 5 is denied.

4.    Ineffective Assistance of Counsel in Guilt And Special Circumstance Phase - Claims 6 through 18

In claims 6 through 18, Petitioner alleges various instances during the guilt and special circumstance phase where defense counsel provided ineffective assistance.

Eugene Toton ("Toton") was appointed as lead defense counsel. Gary Frank ("Frank") was appointed as defense co-counsel.  By their agreement, Toton was responsible for the guilt and special circumstance phase and Frank was responsible for the penalty phase.  (SHCP Exhs. 113, ¶ 4; 137, ¶ 3.)  The record before the state court does not demonstrate that defense attorney Frank performed any substantial defense function during the guilty and special circumstance phase.

a.    **Clearly Established Law**

The Sixth Amendment right to effective assistance of counsel, applicable to the states

28

1    through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing

2    phase of a trial.  See Murray, 745 F.3d at 1010-11: U.S. Const. amend. VI; U.S. Const. amend.

3    XIV, § 1; Gideon v. Wainwright, 372 U.S. 335, 343–45 (1963); Silva v. Woodford, 279 F.3d

4    825, 836 (9th Cir. 2002).

5         The Supreme Court explained the legal standard for assessing a claim of ineffective

6    assistance of counsel in Strickland v. Washington, 466 U.S. 668, 685–87 (1984).  Strickland

7    propounded a two prong test for analysis of claims of ineffective assistance of counsel.  First, the

8    petitioner must show that counsel's performance was deficient, requiring a showing that counsel

9    made errors so serious that he or she was not functioning as the "counsel" guaranteed by the

10   Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that "counsel's

11   representation fell below an objective standard of reasonableness," and must identify counsel's

12   alleged acts or omissions that were not the result of reasonable professional judgment

13   considering the circumstances. Richter, 562 U.S. at 104 (citing Strickland, 466 U.S. at 688);

14   United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).

15        Petitioner must show that counsel's errors were so egregious as to deprive defendant of a

16   fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  Judicial scrutiny of counsel's

17   performance is highly deferential, and the habeas court must guard against the temptation "to

18   second-guess counsel's assistance after conviction or adverse sentence."  Id. at 689.  Instead, the

19   habeas court must make every effort "to eliminate the distorting effects of hindsight, to

20   reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

21   counsel's perspective at the time."  Id.; see also Richter, 562 U.S. at 107.  A court indulges a

22   "'strong presumption' that counsel's representation was within the 'wide range' of reasonable

23   professional assistance." Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 687); Sanders

24   v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).  This presumption of reasonableness means that

25   not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively

26   entertain the range of possible reasons [defense] counsel may have had for proceeding as they

27   did." Pinholster, 131 S. Ct. at 1407.

28

1   The Supreme Court has "declined to articulate specific guidelines for appropriate

2   attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney

3   performance remains simply reasonableness under prevailing professional norms.'" Wiggins v.

4   Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 688).   However, "general

5   principles have emerged regarding the duties of criminal defense attorneys that inform [a court's]

6   view as to the 'objective standard of reasonableness' by which [a court must] assess attorney

7   performance, particularly with respect to the duty to investigate." Summerlin v. Schriro, 427

8   F.3d 623, 629 (9th Cir. 2005).   "[S]trategic choices made after thorough investigation of law and

9   facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690.

10   However, strategic choices made after less than complete investigation are reasonable

11   precisely to the extent that reasonable professional judgments support the limitations on

12   investigation. In other words, counsel has a duty to make reasonable investigations or to make a

13   reasonable decision that makes particular investigations unnecessary.   In any ineffectiveness

14   case, a particular decision not to investigate must be directly assessed for reasonableness in all

15   the circumstances, applying a heavy measure of deference to counsel's judgment.  Wiggins, 539

16   U.S. at 521 (quoting Strickland, 466 U.S. at 690–91); see also Thomas v. Chappell, 678 F.3d

17   1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered

18   tactical if he had "sufficient information with which to make an informed decision"); Reynoso v.

19   Giurbino, 462 F.3d 1099, 1112–1115 (9th Cir. 2006) (counsel's failure to cross-examine

20   witnesses about their knowledge of reward money cannot be considered strategic where counsel

21   did not investigate this avenue of impeachment); Jennings v. Woodford, 290 F.3d 1006, 1016

22   (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not

23   reasonable strategy where counsel failed to investigate possible mental defenses).

24   Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a

25   reasonable probability that, but for counsel's unprofessional errors, the result . . . would have

26   been different." Strickland, 466 U.S. at 694.  "It is not enough 'to show that the errors had some

27   conceivable effect on the outcome of the proceeding.'" Richter, 562 U.S. at 104 (quoting

28

Strickland, 466 U.S. at 693).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  Id. (quoting Strickland, 466 U.S. at 687).  Under this standard, we ask "whether it is 'reasonably likely' the result would have been different."  Richter, 562 U.S. at 111 (quoting Strickland, 466 U.S. at 696).

That is, only when "[t]he likelihood of a different result [is] substantial, not just conceivable," id., has the defendant met Strickland's demand that defense errors were "so serious as to deprive the defendant of a fair trial."  Id., at 104 (quoting Strickland, 466 U.S. at 687).  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Under the AEDPA, the Court does not apply Strickland de novo.  Rather, the Court must determine whether the state court's application of Strickland was unreasonable.  Richter, 562 U.S. at 99-100.  Establishing that a state court's application of Strickland was unreasonable under 28 U.S.C. § 2254(d) is very difficult.  Richter, 562 U.S. at 100.  Since the standards created by Strickland and § 2254(d) are both "highly deferential" when the two are applied in tandem, review is "doubly" so.  Richter, 562 U.S. at 105 (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)).  Further, because the Strickland rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial."  Id. at 101; Premo v. Moore, 562 U.S. 115, 127 (2011).

If the petitioner makes an insufficient showing as to either one of the two Strickland components, the reviewing court need not address the other component.  Strickland, 466 U.S. at 697.

### b.    Review of Claim 6

In this claim, Petitioner alleges ineffective assistance of counsel by failure to investigate and present evidence of mental state defenses, violating his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

1    Petitioner raised this claim in his state petition for habeas corpus. (SPet. claim C.) The

2    California Supreme Court summarily denied the claim in a decision unaccompanied by

3    explanation.   In re Sanchez, S049502 (DD.)   In such a case where the state court denied

4    Petitioner's state petition for habeas corpus without an explanation,  "the habeas petitioner's

5    burden still must be met by showing there was no reasonable basis for the state court to deny

6    relief," Richter, 562 U.S. at 98, and this Court "must determine what arguments or theories

7    supported or . . . *could have supported*, the state court's decision; and then it must ask whether it

8    is possible fair-minded jurists could disagree that those arguments or theories are inconsistent

9    with the holding in a prior decision of this Court."  Id.  (emphasis added).

10    Petitioner contends that a reasonable investigation would have revealed his organic brain

11    difficulties and psychiatric impairments relating to childhood abuse and trauma and deprivations

12    and his long history of substance abuse.   During the week prior to the homicides, Petitioner

13    alleges he drank alcohol and smoked PCP continually and in large amounts, triggering a post-

14    traumatic stress reaction, precluding his forming an intent to kill and premeditation and

15    deliberation during the Bocanegra homicides.   He claims his substance abuse led to long-term

16    brain dysfunction.  (SHCP Ex. 114, ¶¶ 67-70.)

17    The evidence proffered by Petitioner suggests chronic substance abuse beginning as early

18    as 1977. (SPet. Exhs. 105, pp. 64-65, 74-75; 110, p. 1; 119, p. 8; 123, p. 1; and 128,at pp. 1-2.)

19    Petitioner offers evidence that he engaged in substance abuse during the weeks prior to the

20    murders. (SPet. Ex. 105, pp. 85-87.)   However, Respondent correctly notes the absence of

21    competent evidence that Petitioner ingested and/or was under the influence of phencyclidine,

22    marijuana, or alcohol on the days the Bocanegra and Tatman murders occurred.   Based on the

23    record before it, the state court could reasonably have found that Petitioner was not under the

24    influence of phencyclidine (PCP), marijuana, or alcohol at the time of the Bocanegra and Tatman

25    murders.

26    The state court could have reasonably concluded that Petitioner' statements to jailhouse

27    informant Hernandez (CT 479-484, 487-489, 495, 500-505), detective Stratton (CT 77-78), and

28                                              32

1  reporter Trihey (RT 16-20; 175-181; SPet. Exhs. 700-701) demonstrated Petitioner's intentional

2  and deliberate aiding and abetting of Joey in the Bocanegra murders.  This being the case, a

3  tactical decision not to investigate and present such a defense could be reasonable where

4  evidence is lacking, or it could go toward aggravation.  See Strickland, 466 U.S. at 690-91.

5  Post-offenses jail records and medications Petitioner allegedly was given while

6  incarcerated (SHCP Exhs. 601, 602) do not show his emotional and mental state at the time of

7  the crimes.

8  Defense psychologist Donaldson, who evaluated Petitioner in May 1987, found that

9  although there were indications of organic difficulties in perceptual motor integration, Petitioner

10  was of average intelligence.  Specifically, Donaldson stated that:

11

12  There were no indications through the testing of deficits in reality testing, nor of a
thought disorder of any kind. There were no indications of significant anxiety or
depression. In spite of his socially and educationally deprived background . . . Mr.
13  Petitioner is a highly sociopathic individual.

14  (SPet. Ex. 106, pp. 1-2.)

15  Petitioner claims effective counsel would have been aware of the evidence showing

16  serious mental problems and would have investigated this evidence.  He points to a 1995

17  neuropsychological evaluation by psychologist Froming finding severe diffuse organic brain

18  damage and localized brain dysfunction.  (SHCP Ex. 114, ¶¶ 39-60.)  He points to post-offense

19  jail records which showed continuing mental problems including paranoia, depression, stress,

20  insomnia, inability to eat and a suicide attempt, and that he was given medication for these

21  conditions.   He also notes his 1995 evaluation by defense psychiatrist, Dr. Foster, finding

22  depression, mental impairment and post-traumatic stress disorders from childhood trauma and

23  deprivation of basic necessities, exacerbated by substance abuse, all possibly extending back to

24  the time of the instant homicides.  (SHCP Ex. 111, ¶¶ 16-17, 20-23, 79-95.)  He alleges defense

25  counsel missed this opportunity to show lack of premeditation and deliberation, and also

26  mistakenly believed voluntary intoxication would be no defense to felony murder.  He further

27  alleges that his impairments made him more likely to follow counsel's advice to waive a full

28

33

1   defense and also affected his ability to understand the consequences of doing so.

2       Respondent views these allegations as speculation.  Respondent contends that Petitioner's

3   statements to reporter Trihey did not necessarily imply that Petitioner believed his dead mother

4   was alive.  Respondent contends that Hernandez's observation that Petitioner was suicidal is

5   mere conjecture.  Respondent contends that the 1995 opinions of psychiatrist Foster and

6   psychologist Froming of a high probability of mental disorders and impairments at the time of

7   the crimes and subsequent trial are likewise speculation and surmise.

8       This Court agrees that Petitioner's proffer is not sufficient evidence of mental impairment

9   at the time of the murders and subsequent trial.  As discussed in claims 1-4, *ante*, the substantial

10  evidence shows Petitioner knowingly and intentionally assisted Joey in the Bocanegra murders

11  and confessed the same to reporter Trihey.  Significantly, Petitioner told detective Boggs of his

12  involvement in the Tatman murder (CT 288-320) and acknowledged that "he was going to prison

13  for the rest of his life anyway" for his role in the Bocanegra murders.  (CT 314.)

14      The Court does not find post-custody psychological and psychiatric reports sufficient

15  evidence that, at the time of the crimes and trial thereon, Petitioner suffered neurological or

16  psychological impairments. Significantly, there is no evidence defense psychiatrist Donaldson

17  recommended to Toton that a neuropsychological evaluation be performed.  Psychiatrist

18  Matychowiak, following his November 1987 court-ordered examination, found that Petitioner

19  was not suicidal or delusional or suffering memory gaps (SPet. Ex. 520, p. 5); that Petitioner

20  planned to tell the judge he was guilty (id. at 2); and that Petitioner understood the proceedings

21  and could cooperate with counsel.  (Id. at 6.) Petitioner told Matychowiak that he planned to tell

22  the jury he was guilty and "get it over with."  (SPet. Ex. 520, p. 2.)  Dr. Matychowiak found

23  Petitioner competent to stand trial.

24      Additionally, Petitioner cannot establish prejudice from defense counsel's alleged

25  ineffectiveness because a change in the outcome had mental defenses been further investigated

26  and presented is not reasonably likely given the substantial evidence against him and his

27  expressed desire to plead guilty.  That is, mental state defenses would not have been sufficient to

28

34

1  undermine confidence in the trial outcome.  See U.S. v. Lewis, 786 F.2d 1278, 1283 (5th Cir.

2  1986).  Defense psychologist Donaldson found Petitioner to be of average intelligence and

3  though there were indications in perceptual motor integration, no deficits in reality testing or

4  thought disorder was detected. (SPet. Ex. 106, p.2.)  Court appointed psychiatrist Matychowiak

5  came to essentially the same conclusions.  (SPet. Ex. 520, p.1; CT 646.)   Toton could reasonably

6  have believed Donaldson's negative findings were not relevant at the guilt and special

7  circumstance phase.  (SPet. Ex. 137, p. 2.)

8          Petitioner never alleged during trial proceedings that he was mentally impaired or that he

9  did not knowingly participate in the homicides.  Rather he admitted his knowing participation to

10  reporter Trihey (RT 181; see SPet. Exhs. 700-701), detective Stratton (CT 77-78) and informant

11  Hernandez (CT 479-484, 487-489).  Such a defense was contrary to Petitioner's stated desire to

12  plead guilty to the Bocanegra murders (SPet. Ex. 520, pp. 2-4) and "dying for his crimes but

13  dying with a clear conscience" (SPet. Ex. 700).  In fact, Petitioner proceeded to waive jury trial

14  on the guilt and special circumstances phase and submit on the preliminary hearing transcript and

15  testimony of additional prosecution witnesses.   (See Sanchez, 12 Cal.4th at 23-30.)   The

16  evidence does not suggest a reasonable probability that Petitioner would have agreed to go

17  forward on a mental defense, or that if he had, it would have been successful given his

18  incriminating statements.

19          For the reasons stated, a fair-minded jurist could have found that Petitioner failed to

20  establish that defense counsel's performance fell below an objective standard of reasonableness

21  and that, but for counsel's unprofessional errors, the result of the proceeding would have been

22  different.  Strickland, 466 U.S., at 687-694.

23          It does not appear that the state court rejection of the claim was contrary to, or an

24  unreasonable application of, clearly established federal law, as determined by the Supreme

25  Court, or that the state court's ruling was based on an unreasonable determination of the facts in

26  light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

27          Claim 6 is denied.

28

c.      **Review of Claim 7**

Petitioner alleges ineffective assistance of counsel by failure to investigate and impeach informant Hernandez, the principal witness against him, violating his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

The California Supreme Court summarily denied this claim (SPet. Claim D) raised in Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD.)  As noted, in such a case "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. (emphasis added).

Petitioner claims that, though Hernandez's history of drug abuse and heroin addiction was available to defense counsel, counsel deficiently failed to investigate these matters or interview Hernandez. (SHCP Exhs. 137, ¶ 12; 113, ¶ 11.)  This even though Hernandez's allegedly inconsistent testimony may have been related to drug use and the plea deal he received in exchange for his testimony.  Petitioner claims additional evidence discovered might have motivated Toton to put on a full defense.  (SHCP Ex. 137, ¶ 18.)

This Court is unconvinced.  For the reasons and upon consideration of the evidence discussed in claims 1 through 4, *ante*, the state court could reasonably have determined there was no basis upon which Petitioner could have effectively impeached Hernandez. Petitioner has not shown that Hernandez gave materially contradictory, inconsistent or false testimony, or that Hernandez was motivated by an undisclosed plea bargain.  No facts or discrepancies between the testimony and the physical evidence establish or compel the conclusion that Hernandez, by virtue of his alleged substance addiction, his plea deal, or otherwise, was motivated to and did testify falsely or inaccurately.  (SPet. Ex. 900, pp. 4, 11; SResp. Ex. B.)

Defense counsel Toton could have made a reasoned tactical decision not to interview

1   Hernandez.  Having cross-examined Hernandez at the preliminary hearing, Toton determined on

2   that basis not to interview him.  (SPet. Ex. 137, pp. 3-4.)  Moreover, Toton did ask Hernandez

3   about any undisclosed plea deal during cross-examination in the guilt and special circumstances

4   phase.  Hernandez's testimony was consistent with Petitioner's statements and the physical

5   evidence, that he had not been offered any disposition of then pending criminal matters prior to

6   agreeing to testify at the Petitioner prosecution.  (CT 576-577.)  Toton later cross-examined

7   Hernandez during the penalty phase.  Hernandez admitted a deal on a then pending charge in

8   exchange for his testimony in Petitioner's proceeding.  (RT 2850-2851.)  The Court does not find

9   that Hernandez's testimony was false or misleading in this regard.

10       Defense counsel Frank was not responsible for the guilt and special circumstance phase.

11  It was not unreasonable that Frank did not interview Hernandez relative to his statements therein.

12  (SPet. Ex. 113, p. 4.)

13       Additionally, given the speculative nature of impeachment, Petitioner's desire to plead

14  guilty, and the incriminating evidence, all as discussed in claims 1-4, *ante*, Petitioner was not

15  prejudiced from any allegedly deficient performance.  There was not a reasonable probability of

16  a different outcome from further attempted impeachment of Hernandez.

17       Also, such a defense was contrary to Petitioner's stated desire to plead guilty to the

18  Bocanegra murders (SPet. Ex. 520, p. 2) and "dying for his crimes but dying with a clear

19  conscience" (SPet. Ex. 700). Petitioner waived jury trial and submitted the guilt and special

20  circumstances phase on the preliminary hearing transcript and on the testimony of additional

21  prosecution witnesses.  See Sanchez, 12 Cal.4th at 23-30.  The evidence does not suggest a

22  reasonable probability impeachment would have been successful given his incriminating

23  statements to detective Stratton and reporter Trihey and the crime scene evidence corroborated

24  by Hernandez's testimony.  (See claims 1-4, *ante*.)

25       For the reasons stated, it is clear that a fair-minded jurist could have found that Petitioner

26  failed to establish that defense counsel's performance fell below an objective standard of

27  reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding

28

1    would have been different.  Strickland, 466 U.S., at 687-694.

2         It does not appear that the state court rejection of the claim was contrary to, or an

3    unreasonable application of, clearly established federal law, as determined by the Supreme

4    Court, or that the state court's ruling was based on an unreasonable determination of the facts in

5    light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

6         Claim 7 is denied.

7         **d.    Review of Claim 8**

8         Petitioner claims ineffective assistance of counsel by failure to investigate and present

9    testimony of jailhouse informant Seeley, violating his Sixth, Eighth and Fourteenth Amendment

10   rights.

11        The California Supreme Court summarily denied this claim (SPet. Claim E) raised in

12   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD.)  As noted, in such a

13   case "the habeas petitioner's burden still must be met by showing there was no reasonable basis

14   for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

15   arguments or theories supported or . . . *could have supported*, the state court's decision; and then

16   it must ask whether it is possible fair-minded jurists could disagree that those arguments or

17   theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

18   added).

19        Petitioner claims that Seeley had conversations both with him and Reyes and would have

20   testified that: Reyes was in the Bocanegra home at the time of the their murders; it was Reyes,

21   not Petitioner, who struck Mr. Bocanegra; that the assault on Mrs. Bocanegra by Petitioner and

22   Reyes was unconnected to Joey's subsequent killing of her; that Petitioner and Reyes did not

23   intend to rob the Bocanegras; that Petitioner and Reyes had no plan to kill the Bocanegras; and

24   that their deaths resulted from the sudden quarrel between Joey and Mr. Bocanegra. (SHCP Ex.

25   419.)  Toton, Petitioner claims, was aware of Seeley's statement, (SCHP Ex. 420), but did not

26   interview him or investigate. (SHCP Ex. 137, ¶ 12.) This even though counsel for Reyes in his

27   separate proceedings did attempt to investigate and interview Seeley (SHCP Ex. 136, ¶¶ 7, 8),

28

1   consistent with the local professional practice of interviewing informants.  (SHCP Ex. 127 ¶ 6.)

2        This Court finds that the record could reasonably support a tactical decision by Toton not

3   to investigate Seeley's possibly exculpating testimony.  Toton, who had experience with Seeley

4   on at least one other case, did not believe Seeley had actually spoken with Petitioner (SPet. Ex.

5   137, ¶ 4), did not believe Seeley was credible, and doubted the prosecution would call Seeley.

6   (SPet. Ex. 137, p. 4.)  Moreover, Seeley's version of events could have been viewed as contrary

7   to the physical evidence at the Bocanegra crime scene.  (SPet. Ex. 419, pp. 5-6, 17; CT 355-382.)

8   See e.g., Denham v. Deeds, 954 F.2d 1501, 1505-06 (9th Cir. 1992) (defense counsel not

9   ineffective where decision not to call witness based on inconsistencies in witness's testimony).

10        Seeley's testimony was in some ways more inculpating of Petitioner than were

11   Hernandez's statements.  Under Seeley's version of events, Petitioner actively participated in

12   attempts to subdue Mrs. Bocanegra.  Seeley apparently would have testified that Petitioner struck

13   several blows to Mrs. Bocanegra's head with a piece of rebar whereupon Joey stabbed her to

14   death.  (SPet. Ex. 419, pp. 6-8, 18-19.)  Furthermore, testimony by Seeley likely would have

15   been subject to rebuttal by significant contrary evidence from Hernandez, Stratton, Trihey, as

16   well as by the bloodstain evidence and Petitioner's professed desire to plead guilty.  All this

17   likely obviating any prejudice to Petitioner for not investigating and presenting Seeley.

18        Evidence of Petitioner's shoeprint in the kitchen undermines Seeley's July 27, 1987

19   statements to district attorney investigator Pendleton that Petitioner watched the assault on Mr.

20   Bocanegra from the hallway.  (SPet. Ex. 419.)  Seeley's version also could be viewed as

21   inconsistent with Petitioner's above noted statements to Hernandez and detective Stratton and to

22   reporter Trihey, where Petitioner omits any mention of Reyes's involvement in the assault by

23   Joey on Mr. Bocanegra.

24        In addition to these considerations of credibility and corroboration, the record reflects

25   that Seeley refused to speak with counsel for Reyes, (SPet. Ex. 136, pp.1-3), who characterized

26   Seeley as "a professional jailhouse snitch." (SPet. Ex. 139, p. 2.)  It is uncertain that he would

27   have agreed to speak with Toton. Even if, as Petitioner alleges, Toton had an unusual practice of

28

1   not talking to jailhouse informants except on the witness stand, Toton's alleged failure in this

2   case to investigate and present evidence from Seeley could nonetheless have been a reasonable

3   trial tactic.  Strickland permits counsel to "make a reasonable decision that makes particular

4   investigations unnecessary." Richter, 562 U.S. at 106 (citing Strickland, 466 U.S. at 691).

5       Accordingly, it was at least arguable that a reasonable attorney could decide to forego

6   investigation into Seeley's testimony in similar circumstances.  Toton was allowed to formulate a

7   strategy, reasonable at the time, and to balance limited resources consistent with effective trial

8   tactics and strategies.  See Richter, 562 U.S. at 107.  Toton was not required to pursue an

9   investigation that would have been fruitless, or worse, harmful to the defense.  Id. at 108.

10      As to defense counsel Frank, he could reasonably have decided not to interview Seeley to

11  the extent any evidence to be provided by Seeley related only to the guilt and special

12  circumstances phase, handled by Toton.  (See SPet. Ex. 113, p. 4.)

13      This claim, to the extent based on insufficiency of the evidence and actual innocence, is

14  unpersuasive for reasons discussed in claims 1 through 4, *ante*.  For the reasons discussed

15  therein, Petitioner has not established that Hernandez's testimony was materially unreliable or

16  inconsistent with the testimony of Stratton and Trihey and the physical evidence found at the

17  Bocanegra crime scene, or that  Hernandez testimony was given in exchange for an undisclosed

18  favorable (to Hernandez)  plea deal.

19       Nor has Petitioner made an evidentiary showing of prejudice.  For the reasons discussed

20  above, the state court could have determined there was no reasonable probability of a different

21  outcome from investigating Seeley and presenting him as a witness.  Fundamentally, such a

22  defense was contrary to Petitioner's stated desire to plead guilty to the Bocanegra murders,

23  (SPet. Ex. 520, p. 2), and "dying for his crimes but dying with a clear conscience."  (SPet. Ex.

24  700.)   Based on that desire, Petitioner waived jury trial and submitted guilt and special

25  circumstances phase on the preliminary hearing transcript and the testimony of additional

26  prosecution witnesses.  See Sanchez, 12 Cal.4th at 23-30; CT 891-892; RT 108a-115a.)  The

27  evidence does not suggest a reasonable probability that impeachment would have been

28

1   successful given Petitioner's incriminating statements to detective Stratton and reporter Trihey

2   and the crime scene evidence corroborated by Hernandez's testimony.  (See claims 1-4, *ante*.)

3        The Court concludes that a fair-minded jurist could have found that Petitioner failed to

4   establish that defense counsel's performance fell below an objective standard of reasonableness

5   and that, but for counsel's unprofessional errors, the result of the proceeding would have been

6   different.  Strickland, 466 U.S., at 687-694.

7        It does not appear that the state court rejection of the claim was contrary to, or an

8   unreasonable application of, clearly established federal law, as determined by the Supreme

9   Court, or that the state court's ruling was based on an unreasonable determination of the facts in

10  light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

11       Claim 8 is denied.

12       **e.      Review of Claim 9**

13       In this claim, Petitioner alleges ineffective assistance of counsel by failure to investigate

14  and present evidence about Joey, violating his Sixth, Eighth and Fourteenth Amendment rights.

15       The California Supreme Court summarily denied this claim (SPet. Claim F) raised in

16  Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD.)  As noted, in such a

17  case "the habeas petitioner's burden still must be met by showing there was no reasonable basis

18  for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

19  arguments or theories supported or . . . *could have supported*, the state court's decision; and then

20  it must ask whether it is possible fair-minded jurists could disagree that those arguments or

21  theories are inconsistent with the holding in a prior decision of this Court."  Id.  (emphasis

22  added).

23       Petitioner, citing to the declaration of defense investigator Peninger, faults defense

24  counsel for not investigating and presenting evidence of Joey's violent temper, threats and

25  assaults against his parents, and smoking PCP the night before the Bocanegra murders. (SHCP

26  127, ¶ 5.)  Petitioner claims such evidence would have shown that a sudden quarrel and a fear of

27  Joey precipitated the killings rather than premeditation, deliberation and an intent to commit

28

robbery.  He bases this claim upon facts allege in claims 1 through 4.

The Court is not persuaded.   In June, 1988, prior to trial, defense investigator Peninger interviewed Joey.  (SHCP Ex. 127, ¶ 5.)  Though Toton conceded he could have investigated Joey further, and would have done so if a full defense had been mounted, (SHCP Ex. 137, ¶¶ 18, 21, 22), Petitioner waived a full defense.

Proffer of evidence that there was no robbery motive would not have changed the outcome.  The trial court's found Petitioner was not guilty of robbery, and found not true the robbery-murder special circumstance. (CT 906; RT 236-237.)  Therefore no prejudice arose from any failure to investigate and present evidence of Joey's temper and prior assaultive behavior relating to robbery-murder theory.

As discussed in claims 1-8, *ante*, there was sufficient evidence to convict Petitioner of aiding and abetting first degree murder based upon a finding of premeditation and deliberation. The state court could reasonably have concluded that, in the face of such substantial evidence of guilt, it was not reasonably likely that a showing of Joey's temper and prior assaultive conduct would have raised a reasonable doubt that Petitioner aided and abetted the premeditated and deliberate murders of Mr. Bocanegra and Mrs. Bocanegra.

Petitioner points out that counsel for Reyes, in Reyes's separate proceeding, did investigate Joey and subpoenaed trial witnesses based thereon.  However, this alone does not suggest that, on the record in this proceeding, Toton's decision not to do so was an unreasonable trial tactic.  Especially so given the above noted substantial evidence of Petitioner's guilt and Reyes's decision to plead guilty to three counts of first degree murder.

Petitioner has not made an evidentiary showing of prejudice, that there is a reasonable probability of a different outcome from investigating and presenting evidence about Joey.  The state court could reasonably have found that, considering the record before it, evidence about Joey would not have changed the result.  Petitioner gave incriminating statements to detective Stratton and reporter Trihey, corroborated by the crime scene evidence and Hernandez's testimony.  (See claims 1-4, *ante*.)  Here again, such a defense was contrary to Petitioner's stated

1  desire to plead guilty to the Bocanegra murders, (SPet. Ex. 520, p. 2), and "dying for his crimes

2  but dying with a clear conscience."  (SPet. Ex. 700.)  Petitioner waived jury trial and submitted

3  guilt and special circumstances phase on the preliminary hearing transcript and the testimony of

4  additional prosecution witnesses.  See Sanchez, 12 Cal.4th at 23-30.

5       Accordingly, a fair-minded jurist could have found that Petitioner failed to establish that

6  defense counsel's performance fell below an objective standard of reasonableness and that, but

7  for counsel's unprofessional errors, the result of the proceeding would have been different.

8  Strickland, 466 U.S., at 687-694.

9       It does not appear that the state court rejection of the claim was contrary to, or an

10 unreasonable application of, clearly established federal law, as determined by the Supreme

11 Court, or that the state court's ruling was based on an unreasonable determination of the facts in

12 light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

13      Claim 9 is denied.

14      **f.**    **Review of Claim 10**

15      Petitioner next claims ineffective assistance of counsel by failure to investigate and

16 present physical evidence of Bocanegra murders, violating his Fifth, Sixth, Eighth and

17 Fourteenth Amendment rights.

18      The California Supreme Court summarily denied this claim (SPet. Claim G) raised in

19 Petitioner's state petition for habeas corpus. In re Sanchez, S049502 (DD.)  As noted, in such a

20 case "the habeas petitioner's burden still must be met by showing there was no reasonable basis

21 for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

22 arguments or theories supported or . . . *could have supported*, the state court's decision; and then

23 it must ask whether it is possible fair-minded jurists could disagree that those arguments or

24 theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

25 added).

26      Petitioner alleges that supplemental evidence from criminologist Laskowski and coroner

27 Holloway would have shown three people, Reyes, Petitioner and Joey, were in the Bocanegra

28

1  house at the time of the murders and that the victims' scalp wounds could have been inflicted by

2  different assailants using different implements.   (SHCP Exhs. 417, pp.1-2; 120, ¶¶ 6-7.)

3  Petitioner reasons this supplemental evidence would have rebutted the prosecution theory that

4  only Petitioner and Joey were present in the Bocanegra home at the time of the murders, and

5  would have caused defense counsel to take the matter to full trial on guilt, (SHCP Ex. 137, pp. 6-

6  7) and thereby increased possibility of a negotiated plea more favorable than the conviction and

7  sentence handed down.

8       The Court finds this claim unavailing. The evidence in the state record is consistent with

9  Reyes, at some point, entering the Bocanegra home.  Evidence of Reyes's bloody hand print on

10  the front doorknob was admitted at Petitioner's preliminary hearing.  (CT 202-203.)

11       Petitioner is correct that criminologist Laskowski testified at preliminary hearing to only

12  two shoe tread patterns found at the Bocanegra crime scene, and that Laskowski (during his

13  subsequent preparation for the separate Reyes trial) identified a third shoe tread pattern in the

14  kitchen of the Bocanegra residence.  However, Reyes admitted in this subsequent proceeding

15  that he served as lookout during the murders and entered the residence only afterwards to assist

16  Petitioner and Joey.  (SResp. Ex. A., p. 3:1-11.)

17       Petitioner is also correct in noting that, while Dr. Holloway testified at the preliminary

18  hearing that the same type of implement inflicted consistent scalp wounds on both Mr.

19  Bocanegra and Mrs. Bocanegra, (CT 118-119), Holloway at the penalty phase stated that Mr.

20  Bocanegra's scalp wounds were only "partially", rather than "entirely" consistent with Mrs.

21  Bocanegra's scalp wounds; and that it appeared different objects were used to inflict these scalp

22  wounds.  (RT 2712-13, 2720-21, 2725.)  However, Holloway qualified his preliminary hearing

23  testimony by noting that the scalp wounds on Mr. Bocanegra and Mrs. Bocanegra were not

24  necessarily inflicted by the same instrument.  (CT 131-134.)

25       Holloway's testimony, as qualified, did not then preclude the possibility that more than

26  one weapon and more than one perpetrator inflicted the wounds.  Defense counsel Toton argued

27  as much, that different individuals, using different weapons, could have inflicted the scalp

28

1    wounds on Mr. Bocanegra and Mrs. Bocanegra. (RT 189-191.)

2       The Court finds that, for the reasons discussed in claims 1-9, the state court could

3 reasonably have found that there was sufficient evidence to convict Petitioner of aiding and

4 abetting first degree murder based upon a finding of premeditation and deliberation.  In the face

5 of such substantial evidence, a further showing regarding physical evidence, that Reyes left a

6 bloody shoe print, and that two different weapons may have inflicted the scalp wounds, would

7 not have raised a reasonable doubt that Petitioner aided and abetted the premeditated and

8 deliberate murders of Mr. Bocanegra and Mrs. Bocanegra.  Additionally, evidence of Petitioner's

9 shoeprint in the kitchen undermines Seeley's testimony that Petitioner watched the assault on

10 Mr. Bocanegra from the hallway.  (SHCP, Ex. 419, pp. 6, 7, 22-23.)

11       For the reasons stated, Petitioner has not made an evidentiary showing of prejudice, i.e.,

12 that there is a reasonable probability of a different outcome from investigating physical evidence

13 of the Bocanegra murder scene.  As noted, such a defense was contrary to Petitioner's stated

14 desire to plead guilty to the Bocanegra murders (SPet. Ex. 520, p.2) and "dying for his crimes

15 but dying with a clear conscience." (SPet. Ex. 700.)  Petitioner waived jury trial and submitted

16 guilt and special circumstances phase on the preliminary hearing transcript and the testimony of

17 additional prosecution witnesses.  See Sanchez, 12 Cal.4th at 23-30.

18       Accordingly, the Court is not convinced of a reasonable probability that supplemental

19 crime scene evidence would have prompted defense counsel to put on a further defense or would

20 have resulted in a more favorable disposition for Petitioner given his incriminating statements to

21 detective Stratton and reporter Trihey and the crime scene evidence corroborated by Hernandez's

22 testimony.  (See discussion of claims 1-9, *ante*.)

23       For the reasons stated, a fair-minded jurist could have found that Petitioner failed to

24 establish that defense counsel's performance fell below an objective standard of reasonableness

25 and that, but for counsel's unprofessional errors, the result of the proceeding would have been

26 different.  Strickland, 466 U.S., at 687-694.

27       It does not appear that the state court rejection of the claim was contrary to, or an

28

1    unreasonable application of, clearly established federal law, as determined by the Supreme

2    Court, or that the state court's ruling was based on an unreasonable determination of the facts in

3    light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

4         Claim 10 is denied.

5         **g.      Review of Claim 11**

6         Petitioner next claims ineffective assistance of counsel by failure to pursue plea

7    negotiations, violating his Sixth, Eighth and Fourteenth Amendment rights.

8         The California Supreme Court summarily denied this claim (SPet. Claim H) raised in

9    Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  As noted, in such a

10   case "the habeas petitioner's burden still must be met by showing there was no reasonable basis

11   for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

12   arguments or theories supported or . . . *could have supported*, the state court's decision; and then

13   it must ask whether it is possible fair-minded jurists could disagree that those arguments or

14   theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

15   added).

16        Petitioner alleges that defense counsel was deficient in failing to pursue plea negotiations

17   given that the evidence supported the prosecution's theory that Joey was the actual killer of his

18   parents.  (RT 122, 155-156.)  Petitioner points out that Reyes, whom the prosecution viewed to

19   be of equal culpability, consummated a plea deal in his separate proceeding and avoided the

20   death penalty. (Id.)

21        This claim fails.  The state court could reasonably have found defense counsel Toton was

22   not deficient in failing to pursue continuing plea negotiations.  The record reflects that Toton

23   attempted to obtain a plea deal for Petitioner on May 10, 1988.  But the prosecutor rejected the

24   plea deal when Petitioner refused to provide information of Joey's involvement in the Bocanegra

25   murders, even though Petitioner had proposed to do just that in his plea bid.  (SResp. Ex. B.)

26        Toton also made a pre-penalty phase overture for Petitioner to provide information

27   regarding Joey's involvement in the Bocanegra murders in return for life without parole.  Here

28

1   again, Petitioner ultimately refused to provide such information, ending any possible deal. Id.

2       Nothing reasonably suggests that persistence of counsel alone could have resulted in a

3   plea deal without Petitioner's cooperation.

4       Prosecutor Ryals, who prosecuted both Petitioner and, in a separate proceeding, Reyes,

5   based her "decisions regarding plea bargain agreements . . . on [her] evaluations of the evidence,

6   the facts, and the circumstances of each case" and that "[t]he persistence and/or insistence of

7   defense counsel in seeking a plea bargain agreement on behalf of their client [was] not a factor . .

8   . ." (Id.)  The Court notes that "[s]trict adherence to the Strickland standard" is "all the more

9   essential when reviewing the choices an attorney made at the plea bargain stage." Premo, 562

10  U.S. at 124.  "Plea bargains are the result of complex negotiations suffused with uncertainty, and

11  defense attorneys must make careful strategic choices in balancing opportunities and risks." Id.

12      Additionally, for the reasons discussed in claims 1 through 4, *ante*, the evidence against

13  Petitioner was substantial.  In the face of such evidence and Petitioner's failure to support his

14  negotiated plea offers, it is not reasonably probable that continuing attempts by defense counsel

15  toward a negotiated plea would have been successful.  See Burger v. Kemp, 483 U.S. 776, 785-

16  86 (1987) (no ineffective assistance claim where prosecutor refuses to engage in plea

17  bargaining).

18      Petitioner has not made an evidentiary showing of prejudice given the improbability of a

19  plea deal without his cooperation.  Petitioner expressly stated his desire to plead guilty to the

20  Bocanegra murders (SPet. Ex. 520, p. 2) and "dying for his crimes but dying with a clear

21  conscience."  (SPet. Ex. 700; see Jones, 114 F.3d at 1012 (denying factual development where

22  improbable petitioner would have accepted plea offer).  As noted, Petitioner waived jury trial and

23  submitted the guilt and special circumstances phase on the preliminary hearing transcript and the

24  testimony of additional prosecution witnesses.  See Sanchez, 12 Cal.4th at 23-30.  The evidence

25  does not suggest a reasonable probability that further plea negotiation would have resulted in a

26  more favorable disposition for Petitioner given his incriminating statements to detective Stratton

27  and reporter Trihey and the crime scene evidence corroborated by Hernandez's testimony.

28

1    For the reasons stated, a fair-minded jurist could have found that Petitioner failed to

2  establish that defense counsel's performance fell below an objective standard of reasonableness

3  and that, but for counsel's unprofessional errors, the result of the proceeding would have been

4  different.  Strickland, 466 U.S., at 687-694.

5    It does not appear that the state court rejection of the claim was contrary to, or an

6  unreasonable application of, clearly established federal law, as determined by the Supreme

7  Court, or that the state court's ruling was based on an unreasonable determination of the facts in

8  light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

9    Claim 11 is denied.

10    **h.    Review of Claim 12**

11    Petitioner claims ineffective assistance of counsel by counsel's failure to move to exclude

12  jailhouse statements by Petitioner to the police implicating him in the Bocanegra homicides,

13  violating his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

14    The California Supreme Court summarily denied this claim (SPet. Claim I) raised in

15  Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  As noted, in such a

16  case "the habeas petitioner's burden still must be met by showing there was no reasonable basis

17  for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

18  arguments or theories supported or . . . *could have supported*, the state court's decision; and then

19  it must ask whether it is possible fair-minded jurists could disagree that those arguments or

20  theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

21  added).

22    Petitioner supports this claim with facts alleged in claim 6, *ante*.  He alleges that he

23  suffered organic brain damage, psychiatric disorders (post-traumatic stress disorder, depression,

24  and paranoia), and that he expected favorable treatment when, at the request of his then attorney,

25  Mr. Huffman, Petitioner waived Miranda rights and gave incriminating statements to detective

26  Stratton, (CT 75-78)   (Bocanegra murders), and detective Boggs   (CT 308-319) (Tatman

27  murder).  Petitioner claims that his Miranda waiver was not intelligent and voluntary.

28

1      In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), the Supreme Court held that "the

2  prosecution may not use statements, whether exculpatory or inculpatory, stemming from

3  custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

4  effective to secure the privilege against self-incrimination."   As to the procedural safeguards to

5  be employed, "[p]rior to any questioning, the person must be warned that he has a right to remain

6  silent, that any statement he does make may be used as evidence against him, and that he has a

7  right to the presence of an attorney, either retained or appointed." <u>Id.</u>   Nevertheless, "'[t]he

8  defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is

9  made voluntarily, knowingly and intelligently.'" <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)

10  (quoting <u>Miranda</u>, 384 U.S. at 444, 475).

11      This claim fails for the same reasons discussed in claim 6.   The state court could

12  reasonably have found that the evidence did not show that prior to, during, or after the murders

13  Petitioner suffered any material neurological and/or psychiatric impairment.   The report of court-

14  appointed psychiatrist Matychowiak states that on November 13, 1987, [Petitioner] was "able to

15  discuss himself, his decisions and his reasoning for his decisions" and was "presently able to

16  understand the nature and purpose of the proceedings taken against him" and "to cooperate in a

17  rational manner with counsel in presenting a defense." (SPet. Ex. 520, pp.5-6.)

18      Under <u>Miranda</u>, if a suspect indicates "at any time prior to or *during* questioning, that he

19  wishes to remain silent, the interrogation must cease." <u>Miranda</u>, 384 U.S. at 473-74 (emphasis

20  added).   Petitioner does not point to evidence supporting coercive tactics by Stratton and Boggs

21  or showing Petitioner was promised any concession in his then pending charge of burglarizing

22  Joey's residence.   See <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986) (confession not

23  involuntary absent coercive police activity).   Petitioner apparently did not attempt to make any

24  evidentiary showing of police coercion.   The state court could have reasonably concluded

25  Petitioner's <u>Miranda</u> waiver was not involuntary.

26      Additionally, it was Petitioner who initiated contact with the police, offering testimony

27  on the Bocanegra murders in exchange for "some type of consideration" in the burglary charge

28

1  against him.  (SPet. Ex. 412; CT 76.)

2      The Court finds that, in the face of such lack of evidence, it is not reasonably probable

3  that a motion to exclude jailhouse statements based upon invalid waiver would have been

4  successful.  See Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (counsel's failure to make a

5  futile motion is not ineffective assistance).  Even assuming impaired mental status, such alone is

6  not sufficient reason to suppress a confession.  See Connelly, 479 U.S. at 167 (coercive police

7  conduct  necessary  to  find  confession  involuntary  under  Due  Process  Clause).

8      Petitioner has not made an evidentiary showing of prejudice, that there is a reasonable

9  probability of a different outcome had defense counsel moved to exclude jailhouse statements

10 based on invalid waiver.  As discussed, such a defense was contrary to Petitioner's stated desire

11 to plead guilty to the Bocanegra murders (SPet. Ex. 520, p.2) and "dying for his crimes but dying

12 with a clear conscience."  (SPet. Ex. 700.)  Petitioner waived jury trial and submitted the guilt

13 and special circumstances phase on the preliminary hearing transcript and the testimony of

14 additional prosecution witnesses.  See Sanchez, 12 Cal.4th at 23-30.  The evidence does not

15 suggest a reasonable probability that a motion to exclude jailhouse statements would have

16 resulted in a more favorable disposition for Petitioner given his incriminating statements to

17 reporter Trihey and the crime scene evidence corroborated by Hernandez's testimony.  (See

18 claims 1-4, *ante*.)

19     For the reasons stated, a fair-minded jurist could have found that Petitioner failed to

20 establish that defense counsel's performance fell below an objective standard of reasonableness

21 and that, but for counsel's unprofessional errors, the result of the proceeding would have been

22 different.  Strickland, 466 U.S., at 687-694.

23     It does not appear that the state court rejection of the claim was contrary to, or an

24 unreasonable application of, clearly established federal law, as determined by the Supreme

25 Court, or that the state court's ruling was based on an unreasonable determination of the facts in

26 light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

27     Claim 12 is denied.

28

1  **i.      Review of Claim 13**

2       In this next claim, Petitioner alleges ineffective assistance of counsel by failure to seek

3  sufficient continuance to adequately prepare for trial, violating his Sixth, Eighth and Fourteenth

4  Amendment rights.

5       The California Supreme Court summarily denied this claim (SPet. Claim J) raised in

6  Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD.)  As noted, in such a

7  case "the habeas petitioner's burden still must be met by showing there was no reasonable basis

8  for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

9  arguments or theories supported or . . . *could have supported*, the state court's decision; and then

10 it must ask whether it is possible fair-minded jurists could disagree that those arguments or

11 theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

12 added).

13       Petitioner supports this claim with facts alleged in claims 2, 4, and 6 through 10.  He

14 alleges that, as of May 16, 1988, when a three-week pre-trial continuance was requested and

15 granted through June 27, 1988, defense counsel had done no guilt investigation, except for

16 consulting a serologist and obtaining a sanity evaluation, (SHCP, Ex. 127, ¶ 4), and had not done

17 any investigation for the penalty phase.  (SHCP, Ex. 127, ¶¶ 4, 11.)  He claims competent

18 counsel would have begun trial preparations sooner.  (Id., ¶ 12.)

19       Petitioner's trial began on July 7, 1988.  He alleges that had defense counsel requested,

20 consistent with local practice, required a continuance longer than the three weeks, there is a

21 reasonable probability that a plea bargain could have been negotiated, or a full trial on guilt and

22 special circumstances would have been sought.

23       For the reasons discussed in claims 1-12, the evidence does not support a reasonable

24 possibility that Petitioner would have received a more favorable disposition even with a longer

25 continuance.  Petitioner relies on defense investigator Peninger's declaration regarding the extent

26 to which she was aware of the defense investigation and her view that further investigation

27 should have been done.  (SPet. Ex. 127, pp. 1-2.)  Even if evidence, the Peninger declaration

28

51

1  does not demonstrate the actual extent and tactical appropriateness of defense counsel's trial

2  preparations.

3      The record suggests that defense counsel timely began trial preparations, retaining

4  defense expert(s) as early as November 1987. (RT [5/16/88] 3-4.) Petitioner concedes defense

5  counsel retained serology and psychological experts prior to the request for continuance. The

6  continuance request was partially opposed by the prosecution, (RT [5/16/88] 5-6; CT 713-714),

7  suggesting a further continuance was unlikely.

8      There state court could reasonably have determined that Petitioner did not want or need a

9  continuance. Petitioner initially refused to waive time for beginning trial, stating his intention to

10 enter a guilty plea. (RT [5/16//88] 7.) Petitioner agreed to waive time only after discussions with

11 counsel. (RT [5/16/88] 7-8.) Petitioner continued to express his desire to plead guilty to the

12 Bocanegra murders. (SPet. Exhs. 520, p.2; 700.)

13     On July 11, 1988, Toton requested submission of guilt and special circumstance phase

14 on the preliminary hearing transcript. Defense counsel Frank had no expressed need for a further

15 continuance to prepare his penalty phase case. Frank stated his preparations would be complete

16 by July 25, 1988. (RT [5/16/88] 6.) The penalty phase did not start until September 21, 1988,

17 almost two month later. (CT 949; RT 2583.) It does not reasonably appear the defense needed

18 and would have been granted further pre-trial continuance. "A fair assessment of attorney

19 performance requires that every effort be made to eliminate the distorting effects of hindsight . . .

20 and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

21     For the reasons stated, a fair-minded jurist could have reasonably have determined that,

22 based on the evidence, a longer continuance would not have resulted in a more favorable

23 disposition for Petitioner. His incriminating statements to detective Stratton and reporter Trihey

24 and the crime scene evidence that was corroborated by Hernandez's testimony reasonably

25 suggest otherwise. (See claims 1-12, *ante*.)

26     Petitioner has failed to establish that defense counsel's performance fell below an

27 objective standard of reasonableness and that, but for counsel's unprofessional errors, the result

28

1    of the proceeding would have been different.  Strickland, 466 U.S., at 687-694.

2         It does not appear that the state court rejection of the claim was contrary to, or an

3    unreasonable application of, clearly established federal law, as determined by the Supreme

4    Court, or that the state court's ruling was based on an unreasonable determination of the facts in

5    light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

6         Claim 13 is denied.

7         **j.     Review of Claim 14**

8         Petitioner next claims ineffective assistance of counsel by the decision to waive jury trial,

9    confrontation and presentation of a defense, violating his Fifth, Sixth, Eighth and Fourteenth

10   Amendment rights.

11        The California Supreme Court summarily denied this claim (SPet. Claim K) raised in

12   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD.)

13        The state supreme court, on direct appeal, addressed the merits of the validity of

14   submission on the Preliminary Hearing Transcript as follow:

15         [Petitioner's] chief guilt phase trial counsel, Toton, informed the court that the
           submission proposal was a compromise made by defendant at Toton's request.
16         Defendant originally had wanted to plead guilty to the capital charges, but Toton
           would not consent to such a plea, believing that a guilty plea would amount to
17         ineffective assistance of counsel . . . .  [Citation]

18

19   Sanchez, 12 Cal.4th at 24.

20        Defendant repeatedly acknowledged that he was waiving his constitutional rights and that

21   his decision was entered "freely and voluntarily."  Id., at 25.  Once the waivers were taken, the

22   following exchange occurred between the trial court and Petitioner:

23
           "The Court: I take it that . . . Mr. Frank and Mr. Toton have talked to you at some
24         length about the waivers?
           "The Defendant: Yes, sir.
25         "The Court: Do you feel you understood them?
           "The Defendant: Yes, sir, I believe I do.
26         "The Court: And you have had some time to think about it, at least since about
           10:30 this morning, and they talked to you later, I take it?
27         "The Defendant: Yes, sir.
           "The Court: And you have thought about it?
28

                                          53

"The Defendant: Yes, sir.

"The Court: So far as you are losing your right to confront witnesses, those witnesses whose testimony will be presented to the court through the preliminary examination, you won't get a chance to cross-examine them in this court. You understand that?

"Defendant: Yes sir.

"The Court: And you are giving that right up then?

"The Defendant: Yes, sir.

"The Court: Now, so far as the witnesses called . . . to augment the People's case and/or in your behalf, the live witnesses called in this case, you will have the right to confrontation and you understand that?

"The Defendant: Yes, sir.

"The Court: I have to tell you that some of the cases in the state of California say that when you present a case to the judge to determine the guilt or innocence on the basis of the preliminary hearing transcript, that's sometimes called a slow guilty plea.

"The Defendant: Yes, sir.

"The Court: I don't know whether you have heard that language before, but it's used in the cases.

"The Defendant: Yes, sir.

"The Court: And I want you to be aware of that. I am not telling you how I am going to decide this case, but there is an aura of that in the cases and you should be aware of that fact.

"The Defendant: Yes, sir.

"The Court: And do you understand that?

"The Defendant: Yes, sir.

"The Court: And you are willing to give up your right to a trial by jury both as to the guilt of the two homicides alleged and of the other enhancements and the special circumstances; is that right?

"The Defendant: Yes.

"The Court: And you know you have the right, and we are ready to give you a jury on all those issues.

"The Defendant: Yes, your Honor, I understand all that.

"The Court: And you nonetheless give it up?

"The Defendant: Yes, sir."

Id., at 25-26.

The trial court later confirmed the waivers:


"The Court: Are you satisfied with your decision?

"The Defendant: Yes, sir, I am very confident.

"The Court: Because you know we have got a record of everything here. It's going to be kind of hard to tell somebody else, gee, I didn't think about it. The judge coerced me. The [d]istrict [a]ttorney growled at me. My lawyers kicked me around. You know, it's going to be kind of hard to say that after you have been very candid with us here. Are you satisfied with that?

"The Defendant: Yes, sir, I am very satisfied.

"The Court: You seem satisfied. I believe you are satisfied. I will make that kind of a finding."

54

Id., at 27.

Petitioner confirmed his intent to waive his jury trial and confrontation rights the following morning, but no mention was made by the court or counsel of defendant's right against self-incrimination.   Even so, the California Supreme Court went on to find Petitioner's submission on the preliminary hearing transcripts was not a "slow (guilty) plea" that would have required an on the record waiver of the right against self-incrimination, as follows:

> Defense counsel Toton conducted substantial cross-examination of the prosecution witnesses during the preliminary hearing. Toton also called prosecution witnesses Hernandez and Detective Stratton to testify for the defense, and questioned Hernandez about whether he had agreed to testify against defendant with the intent of making a deal in his own case.
>
> In addition, following the close of the prosecution's guilt phase presentation, Toton renewed his motions to strike portions of the trial testimony of Maria Rodriguez, Detective Boggs, and William Freeman (the patrolman who seized two screwdrivers from defendant that had been stolen from the Bocanegra residence), and then moved for a judgment of acquittal of all the charges.
>
> In arguing the motion for acquittal, Toton asserted there was insufficient evidence of defendant's guilt of the robbery and murder charges, and that the People failed to charge properly the special circumstance allegations. In addition, Toton asserted that no physical evidence linked defendant to the Bocanegra murders. He argued that the prosecution presented no evidence of premeditation in those murders, and that defendant's hypothetical questions to Detective Stratton should not be used as evidence of murder. Toton also pointed out that defendant's incriminating statements to newsman Trihey implied knowledge of the crime, but not intent to kill, that there was no evidence that defendant robbed the Bocanegras or that defendant had the specific intent to kill either the Bocanegras or Tatman.
>
> Toton's closing argument following the guilt phase was equally extensive. He asserted there was insufficient evidence, as a matter of law, to prove beyond a reasonable doubt that defendant committed the charged robberies and the Bocanegra murders because the testimony of Hernandez and Trihey was not credible. At best, he argued, the evidence in the Bocanegra murders supported a verdict of voluntary manslaughter. He also asserted that the prosecution had failed to prove the specific intent to kill necessary to support the special circumstance allegations.
>
> It therefore appears that defense counsel's cross-examination was substantial, and that he argued constantly that the facts as presented at the preliminary hearing should be viewed as not supporting first degree murder convictions. These facts support the People's assertion that defendant's submission on the preliminary hearing transcripts for the guilt and special circumstance phases of the trial was not tantamount to a guilty plea. [Citation]
>
> For submissions not tantamount to a guilty plea, a trial court's failure to advise the defendant of his right against self-incrimination is implicated only to the extent

1
2
3

> defendant surrendered the right. [Citation] Through the submission stipulated to here, defendant never surrendered his self-incrimination privilege because he chose not to testify during the guilt phase proceedings. Because defendant never surrendered his right against self-incrimination, there was no requirement of a personal, on-the-record waiver. [Citation]

Id., at 29-30.

4

5   The state supreme court also concluded there was no requirement that Petitioner be

6   advised of ramifications of submission and waiver and the probability of conviction in light of

7   defendant's reservation of his right to present additional evidence and to contest his alleged guilt

8   in argument to the court.   That is, a defendant must be advised of the probability that his

9   submission will result in a conviction of the offenses only "[i]f a defendant does not reserve the

10  right to present additional evidence and does not advise the court that he will contest his guilt in

11  argument to the court . . . ." Bunnell, 13 Cal.3d 592, 605 (1975).

12  Petitioner contends that reasonably competent counsel defending a capital case would not

13  have submitted without a full trial.  He supports this claim with facts alleged in claims 2, 4 and 6

14  through 10.  He reiterates his above claims that Toton and Frank did not conduct sufficient trial

15  investigation and preparation.  He claims Toton's agreement to allow additional evidence upon

16  submission negated Toton's theory that submission on the preliminary hearing would limit

17  damaging evidence.  (See SHCP Ex. 137, ¶¶ 14-16.)  He claims that Frank had reservations

18  about waiving full defense, but did not express them to the trial court. (SHCP Ex. 113, ¶ ¶ 13-

19  19.)   However, this Court finds that, for the reasons and based on the evidence discussed in

20  claims  1-13, ante, the state court could reasonably have found that defense counsel were not

21  deficient in preparing for trial and that the trial waiver was not necessarily inform on this basis..

22  Petitioner alleges mental impairments prevented him from knowingly, voluntarily, and

23  intelligently entering the waiver with complete knowledge of the relevant circumstances and

24  likely consequences.  See Brady v. United States, 397 U.S. 742, 747–48 and n.4 (1970).

25  However, the mental defense claim is unavailing for reasons discussed in claim 6.  Petitioner

26  agreed to submit the case following "several long discussions" with Toton, (SPet. Ex. 137, p.5)

27  and in compromise of Petitioner's expressed desire to plead guilty (RT [5/16/88] 7), and Toton's

28

1   refusal to consent to a guilty plea.  The trial judge discussed the submission with Petitioner in

2   some detail, including how it might impact his case (CT 889, 891-892; RT – 65a-71a, 85a-89a,

3   98a-115a.) and the waiver of any conflict of interest Toton might have had relating to his

4   debarment proceedings.   (RT [7/27/88] 6.)  Petitioner waived his trial rights on the record. (RT

5   107a-111a.)  The prosecution also examined him regarding the waivers. (RT 108a-114a.)  It was

6   not unreasonable for the state court to conclude that Petitioner understood and freely entered the

7   waivers.

8        Petitioner also fails to make an evidentiary showing of prejudice.  He had expressed his

9   intention to enter a guilty plea (RT [5/16/88] 7) and waive jury trial.  (RT [7/27/88] 6.)  Defense

10  counsel Frank's preparation of penalty phase defense was nearly complete at time of the trial

11  waiver and was not adversely affected.  (SPet. Ex. 113, pp. 5-7.)  Defense counsel could have

12  reasonably believed that, as a matter of trial strategy, submission on the preliminary hearing

13  transcripts would limit damaging evidence, (SPet. Exhs. 137, pp. 4-5; 113, pp.4-5), keeping

14  "some of the blood and gore of the homicides away from the penalty jury." (SPet. Ex. 113, ¶ 16.)

15  Especially so given Toton's concern that Reyes might testify against Petitioner, and Toton's

16  belief the aider and abettor theory might be more favorably decided by the court rather than a

17  jury.  (SPet. Ex. 137, p. 5.)

18       In sum, the evidentiary record does not support a reasonable possibility that Petitioner

19  would have received a more favorable disposition had the matter gone to jury trial at the guilt

20  and special circumstance phase.   Had Petitioner testified before a jury as to lack of knowledge

21  and intent in aiding and abetting the murders, he likely would have been impeached for reasons

22  discussed in claims 1-13.

23       For the reasons stated, Petitioner has not established that defense counsel's performance

24  fell below an objective standard of reasonableness and that, but for counsel's unprofessional

25  errors, the result of the proceeding would have been different.  Strickland, 466 U.S., at 687-694.

26       It does not appear that the state court rejection of the claim was contrary to, or an

27  unreasonable application of, clearly established federal law, as determined by the Supreme

28

1   Court, or that the state court's ruling was based on an unreasonable determination of the facts in

2   light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

3          Claim 14 is denied.

4          **k.      Review of Claim 15**

5          Petitioner next claims ineffective assistance of counsel by failing to cross-examine

6   newspaper report Trihey, violating Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment

7   rights.

8          The California Supreme Court summarily denied this claim (SPet. Claim L) as it was

9   raised in Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD.)  That court

10  also rejected on appeal Petitioner's contention that Toton's failure to cross-examine Trihey

11  before closing argument denied him the effective assistance of counsel, finding that:

12

13          Toton convinced the court during his closing argument that Trihey's testimony
            should not be given substantial weight; his decision not to cross-examine Trihey
14          as to the contents of the published material was sound strategy, given the nature
            of defendant's alleged contradictory statements.  Defendant does not establish that
15          cross-examination would have revealed any new information, or that any
            additional information about the interviews would have influenced the court's
16          judgment.  Hence, we cannot find counsel's failure to cross-examination Trihey to
            be deficient.  In any event, given the fact that the court dismissed the robbery
17          charges against defendant, and found not true the robbery-murder special-
            circumstance allegation, we discern no prejudice to defendant based on counsel's
18          performance.  [Citation]

19  Sanchez, 12 Cal.4th 59.

20          Petitioner supports this claim with facts alleged in claims 2 and 4.  He alleges that had

21  Toton cross-examined Trihey on the published newspaper articles he could have called into

22  question the version of events offered by Trihey and Hernandez, and supported Petitioner's

23  mental defenses.  (Pet. ¶ 306-314.)

24          Strickland provides that "strategic choices made after thorough investigation of law and

25  facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690-91.

26  "[S]trategic choices made after less than complete investigation are reasonable precisely to the

27  extent that reasonable professional judgments support the limitations on investigation."  Id.

28

1    Petitioner argues cross-examination regarding the contents of the newspaper articles,

2    cross-examination Toton refused under conditions imposed by the Court (limiting such to the

3    printed articles – see RT 57-59) would have been beneficial, but he does not demonstrate how or

4    why this is so given his contradictory statements of the crimes and his involvement.

5    Trihey testified at the guilt and special circumstance phase that during the course of five

6    interviews, Petitioner stated he was "a triple murderer" and that the victims were killed for their

7    "Social Security checks." (RT 17-18). These statements were included in the published articles.

8    (Id.) Based on the record before it, the state court could reasonably have found that any claimed

9    advantage that would have resulted from cross-examination of Trihey was speculative. It

10   follows that the decision of defense counsel not to cross-examine Trihey could be seen as neither

11   unreasonable nor prejudicial.

12   The trial judge limited any cross-examination to the confession and information

13   published by Trihey in the newspaper. Unable to impeach Trihey, defense counsel could

14   reasonably have concluded that cross-examination might highlight inconsistencies in Petitioner's

15   versions of how the murders occurred, bolstering both the direct examination and the damaging

16   testimony of Hernandez. Moreover, defense counsel Toton, during closing argument, argued

17   effectively to limit the impact of Trihey's testimony regarding robbery, (RT 175-183), and the

18   robbery-murder special circumstance. Petitioner cannot show prejudice where he fails to state

19   with specificity the nature of the proposed testimony. Alcala v. Woodford, 334 F.3d 862, 872-73

20   (9th Cir. 2003); see also Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (mere speculation

21   of possible helpful information from potential witnesses is not sufficient to show ineffective

22   assistance of counsel).

23   Additionally, for the reasons discussed in claims 1 through 4 and 6, the evidence does not

24   support a reasonable possibility that Petitioner would have received a more favorable disposition

25   on sufficiency of the evidence, actual innocence and mental states defenses by cross-examining

26   Trihey. Instead, defense counsel could have reasonably believed that cross-examining Trihey as

27   to mental state defenses, unsupported in the record, might serve only to reinforce the published

28

1  confession.

2        Petitioner was not prejudiced by failing to Toton's failure to cross-examine Trihey. The

3  trial court's guilt phase verdicts, rejecting robbery and robbery special circumstance counts in the

4  Bocanegra homicides, reflect its acceptance of Toton's argument that Trihey's testimony should

5  not be given substantial weight.  (RT 235-236.)  Trihey's testimony likely would not have

6  changed the outcome.

7        Accordingly, the Court finds the state court rejection of the claim was neither contrary to,

8  or an unreasonable application of, clearly established federal law, as determined by the Supreme

9  Court, nor based on an unreasonable determination of the facts in light of the evidence presented

10 in the state court proceeding, viewed most favoring the prosecution.   See 28 U.S.C. § 2254(d).

11       Claim 15 is denied.

12       **l.      Review of Claim 16**

13       In his next claim, Petitioner alleges ineffective assistance of counsel by failure to argue

14 for second degree Murder in Bocanegra homicides, violating his Fifth, Sixth, Eighth and

15 Fourteenth Amendment rights.

16       The California Supreme Court summarily denied this claim (SPet. Claim M) raised in

17 Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  As noted, in such a

18 case "the habeas petitioner's burden still must be met by showing there was no reasonable basis

19 for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

20 arguments or theories supported or . . . *could have supported*, the state court's decision; and then

21 it must ask whether it is possible fair-minded jurists could disagree that those arguments or

22 theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

23 added).

24       Petitioner claims that Toton should have argued for lesser included second degree murder

25 because evidence he premeditated the murders was insufficient.  (RT 168-196.)  He supports this

26 claim with facts alleged in claims 2 and 4, *ante*.  However, Petitioner has not established actual

27 innocence, or that the evidence was insufficient to support the premeditated and deliberate

28

1   murder of the Bocanegras. (See claims 1 through 4, *ante*.) Second degree murder was in any

2   event a lesser included option, necessarily rejected by the trial court in its finding of first degree

3   murder. (RT 235-236.)

4          The Court finds it was not unreasonable for Toton to argue voluntary manslaughter (RT

5   168-196), foregoing argument of second degree murder, given his theory that a sudden heated

6   argument between Mr. Bocanegra and Joey led to the killings. (CT 77-78, 479, 487, 500, 590;

7   RT 97, 132-33, 188-193, 195-96.)   Given the support in the evidentiary record for the

8   manslaughter argument, the state court could reasonably have determined Toton's failure to

9   argue for second degree murder was not ineffective assistance.

10          The state court could reasonably have determined that Petitioner was not prejudiced by

11   Toton's failure to argue for second degree murder.  Though Petitioner contends in this claim that

12   he was willing to accept any non-capital conviction, this position is not consistent with his stated

13   desire to plead guilty to the Bocanegra murders.  (SPet. Ex. 520, p. 2; 700.)  Petitioner waived

14   jury trial and submitted guilt and special circumstances phase on the preliminary hearing

15   transcript and the testimony of additional prosecution witnesses.  See <u>Sanchez</u>, 12 Cal.4th at 23-

16   30.  The evidence does not suggest a reasonable probability that argument for second degree

17   murder would have resulted in a more favorable disposition for Petitioner given the substantial

18   evidence against him, his incriminating statements to detective Stratton and reporter Trihey and

19   the crime scene evidence corroborated by Hernandez's testimony.  (See claims 1-10.)

20          The Court notes that Toton's motion for acquittal based upon sufficiency of the evidence

21   was denied by the trial court.  (RT 140-141.)   Toton's argument in closing, revisiting

22   insufficiency of the evidence, was also unsuccessful.

23          Accordingly, a fair-minded jurist could have found that Petitioner failed to establish that

24   defense counsel's performance fell below an objective standard of reasonableness and that, but

25   for counsel's unprofessional errors, the result of the proceeding would have been different.

26   <u>Strickland</u>, 466 U.S., at 687-694.

27          It does not appear that the state court rejection of the claim was contrary to, or an

28

1  unreasonable application of, clearly established federal law, as determined by the Supreme

2  Court, or that the state court's ruling was based on an unreasonable determination of the facts in

3  light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

4       Claim 16 is denied.

5       **m.    Review of Claim 17**

6       Petitioner next claims ineffective assistance of counsel by failure to object to improper

7  prosecution closing at the guilt and special circumstances phase, violating his Fifth, Sixth, Eighth

8  and Fourteenth Amendment rights.

9       The California Supreme Court summarily denied this claim (SPet. Claim N) raised in

10 Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD.)  As noted, in such a

11 case "the habeas petitioner's burden still must be met by showing there was no reasonable basis

12 for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

13 arguments or theories supported or . . . *could have supported*, the state court's decision; and then

14 it must ask whether it is possible fair-minded jurists could disagree that those arguments or

15 theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

16 added).

17      Petitioner alleges that the prosecutor's argument, that there were only two people, other

18 than the Bocanegras, present at the time of the killings, was false and misleading.  Petitioner

19 states that the prosecution presented evidence of Reyes's bloody palm print on the door knob

20 inside the Bocanegra home.  (CT 202-203.)  Yet Toton failed to object because he wrongly

21 assessed the evidence.  (SHCP Ex. 137, ¶ 30.)  Defense counsel Frank did not object because he

22 was responsible only for the penalty phase. (SHCP Ex. 113, ¶ 27.)

23      This Court is not convinced.  Physical evidence that Reyes was in the Bocanegra home is

24 not inconsistent with the evidence that Reyes served as a lookout and entered the Bocanegra

25 home after the homicides to assist Joey and Petitioner.  (SResp. Ex. A, pp.3-4; see claim 10.)

26 The prosecution's argument then was not inconsistent with the evidence.   Toton could

27 reasonably have concluded that the prosecution's "two person" argument was not objectionable

28

as false or misleading based on the record.  (SPet. Ex. 137, pp. 9-10.)

Moreover, Petitioner did not challenge the evidence that he struck Mr. Bocanegra with a bar (CT 481-82; RT 169, 184-85, 188, 196, 207), and that he grabbed Mrs. Bocanegra and told Joey to "shut her up".  (CT 482-483, 504; RT 190-91.)  Counsel is not ineffective for failing to make an objection that would be overruled.  See United States v. Steele, 785 F.2d 743, 750 (9th Cir. 1986). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, at 691.

Petitioner does not demonstrate by evidence in the record that Toton failed to reasonably investigate these matters. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."   Strickland, 466 U.S at 690-91. Even if he had, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id.  Toton could reasonably have concluded further investigation would have been futile given the weight of the evidence against Petitioner.

Toton could have considered the prosecution argument, that there was no evidence anyone other than Joey and Petitioner committed the Bocanegra homicides, to be consistent with the evidence and not unreasonable.  Moreover, Toton did argue an inference from the evidence, that Mrs. Bocanegra's scalp wounds were inflicted by someone other than Petitioner, (RT 191), and that there was insufficient evidence to show Petitioner inflicted the wounds.

There is no sufficient showing that Petitioner was prejudiced by Toton's alleged failure to object to the prosecutor's guilt and special circumstance closing argument that there were only two perpetrators in the Bocanegra homicides. The evidentiary record contains substantial evidence against Petitioner, his incriminating statements to detective Stratton and reporter Trihey and the crime scene evidence corroborated by Hernandez's testimony.  (See claims 1-10.)

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that defense counsel's performance fell below an objective standard of reasonableness

1 | and that, but for counsel's unprofessional errors, the result of the proceeding would have been

2 | different.  Strickland, 466 U.S., at 687-694.

3 |     It does not appear that the state court rejection of the claim was contrary to, or an

4 | unreasonable application of, clearly established federal law, as determined by the Supreme

5 | Court, or that the state court's ruling was based on an unreasonable determination of the facts in

6 | light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

7 |     Claim 17 is denied.

8 |     **n.    Review of Claim 18**

9 |     Petitioner next claims ineffective assistance of counsel by cumulative ineffectiveness

10 | during the guilt phase violating his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

11 |     The California Supreme Court summarily denied this claim (SPet. Claim O) raised in

12 | Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  As noted, in such a

13 | case "the habeas petitioner's burden still must be met by showing there was no reasonable basis

14 | for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

15 | arguments or theories supported or . . . *could have supported*, the state court's decision; and then

16 | it must ask whether it is possible fair-minded jurists could disagree that those arguments or

17 | theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

18 | added).

19 |     Petitioner claims that Toton's failure to seek a continuance to conduct guilt phase

20 | investigation, and failure to present complete defenses based on physical evidence, mental state,

21 | and testimony from Joey, Seeley, and Hernandez had the cumulative effect of denying Petitioner

22 | a full trial at the guilt and special circumstance phase and possibility of a plea bargain.  Petitioner

23 | bases this claim on facts alleged in claims 2, 4, and 6 through 17, *ante*.

24 |     "The Supreme Court has clearly established that the combined effect of multiple trial

25 | errors may give rise to a due process violation if it renders a trial fundamentally unfair, even

26 | where each error considered individually would not require reversal."  Parle v. Runnels, 505 F.3d

27 | 922, 928 (9th Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

28 |

1    The cumulative effect of trial court errors can be a basis for habeas relief in certain

2    circumstances:

3

4    Although individual errors looked at separately may not rise to the level of
     reversible error, their cumulative effect may nevertheless be so prejudicial as to

5    require reversal.  United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir.
     1993).  However, the fact that errors have been committed during a trial does not

6    mean that reversal is required.  [W]hile a defendant is entitled to a fair trial, [she]
     is not entitled to a perfect trial, for there are no perfect trials.  United States v.

7    Payne, 944 F.2d 1458, 1477 (9th Cir. 1991).

     U.S. v. de Cruz, 82, F.3d 856, 868 (9th Cir. 1996).
8

9    Here, there is not a need to employ cumulative error analysis because review has detected

10   no error, for the reasons discussed in claims 2, 4 and 6-17.  Petitioner has not established that the

11   evidence before the trial court showed defense counsel Toton was ineffective.  These claims are

12   insubstantial whether considered singely or cumulatively.  See United States v. Karterman, 60

13   F.3d 576, 580 (9th Cir.1995) ("Because each error is, at best, marginal, we cannot conclude that

14   their cumulative effect was 'so prejudicial' to [defendant] that reversal is warranted."); see also

15   Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1995); Detrich v. Ryan, 740 F.3d 1237, 1273 (9th

16   Cir. 2013).  Cumulative error analysis applies where there are two or more actual errors.  It does

17   not apply . . . to the cumulative effect of non-errors."  Moore v. Gibson, 195 F.3d 1152, 1175

18   (10th Cir. 1999) (quoting Castro v. Ward, 138 F.3d 810, 832 (10th Cir. 1998)).

19   Accordingly, Petitioner has not established that defense counsel's cumulative

20   performance fell below an objective standard of reasonableness and that, but for counsel's

21   unprofessional errors, the result of the proceeding would have been different.  Strickland, 466

22   U.S., at 687-694. Petitioner's reliance on Cargle v. Mullin, 317 F.3d 1196, 1210 (10th Cir.

23   2003), a case readily distinguished on the facts of ineffective assistance, is misplaced.

24   Respondent contends this claim is not cognizable because it creates and retroactively

25   applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

26   Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

27   under Teague, but rather on grounds the claim lacks merit for the reasons stated.

28

1    Claim 18 is denied.

2          5.       Denial Of Effective Assistance Of Counsel – Claims 19-27

3          In claims 19 through 27, Petitioner alleges that during the guilt and special circumstance

4    phase he was denied effective assistance of defense counsel.

5          **a.       Clearly Established Law**

6          A breakdown in the attorney-client relationship can result in a denial of the right to

7    effective assistance of counsel.  Frazer v. United States, 18 F.3d 778, 782-83, 785 (9th Cir.

8    1994); see also Brown v. Craven, 424 F.2d. 1166, 1169-70 (9th Cir. 1970) (trial court's failure to

9    conduct inquiry into irreconcilable conflict arising from the client's refusal to communicate or

10   cooperate with counsel resulted in denial of effective assistance of counsel).

11         The Sixth Amendment requires an appropriate, on the record, inquiry into the grounds for

12   such a motion, and that the matter be resolved on the merits before the case goes forward.  Schell

13   v. Witek, 218 F.3d 1017, 1025, citing Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir. 1991)).

14   The overarching constitutional question is whether the attorney-client conflict has become so

15   great that "it resulted in a total lack of communication or other significant impediment that

16   resulted in turn in an attorney-client relationship that fell short of that required by the Sixth

17   Amendment." Id., at 1026.

18         **b.       Review of Claim 19**

19         Petitioner claims trial court error by denial, without adequate investigation, of defense

20   counsel's motions to withdraw depriving him of effective assistance of counsel, violating his

21   Sixth, Eighth and Fourteenth Amendment rights.

22         The state supreme court considered this claim on appeal and found that the trial court did

23   not abuse its discretion in denying defense counsel's two motions to withdraw, as follows:

24

25         [I]mplicit in the court's denial of the motions is the finding that defendant's
           discussion of his case with the media was not an indication of his distrust or
26         dissatisfaction with counsel.  Rather, the conduct was merely indicative of his
           unwavering desire to admit culpability and to atone for his crimes.  Indeed,
27         allowing counsel to withdraw would not have alleviated any prejudice to
           defendant caused by his contact with the press, nor does the record indicate that
28         denying the motion to withdraw influenced defendant's desire to submit the guilt

                                              66

issue on the basis of the preliminary hearing transcripts.  Even though counsel were dissatisfied with defendant's failure to heed their advice and not discuss the case with the media, the record shows defendant's right to counsel was not jeopardized by counsel's continuing representation.  Thus, because defendant does not show that any disagreement with counsel resulted in a complete breakdown in the attorney-client relationship that jeopardized his right to a fair trial, we conclude the trial court did not abuse its discretion in denying counsels' motions to withdraw.  [Citation]  In reviewing denial of motion to substitute attorneys, the court "focuses on the ruling itself and the record on which it is made.  It does not look to subsequent matters . . . ."]

Sanchez, 12 Cal.4th at 37.

Petitioner alleges that his out-of-court actions revealed a complete breakdown in his relationship with counsel and that his lack of trust and confidence was not unfounded as counsel ignored his serious mental disturbances which should have been obvious.  Petitioner     notified defense counsel of his intent to speak to the media on February 2, 1988.  Later that day counsel met with Petitioner and advised against contacting the media.  After the meeting, counsel discovered Petitioner had given an interview to Michael Trihey, reporter for the Bakersfield Californian newspaper, earlier that day.  That interview led to a front-page story published on February 12, 1988.

On February 16, 1988, defense counsel filed a motion to withdraw, asserting Petitioner had indicated he did not trust counsel and actively mislead them by failing to inform them he had already given an interview to Trihey, Petitioner's refusal to cooperate rendered his representation virtually impossible, and their attorney-client relationship was so tainted counsel's efforts would be of no assistance.  However, the Court denied the motion because it found no breakdown in the attorney-client relationship and that any prejudice created by Petitioner's contacting the press against counsel's advice would not be ameliorated by counsel's withdrawal.  On March 7, 1988 the trial court, before denying the initial motion to withdraw, questioned Petitioner about whether he trusted defense counsel.  Petitioner responded that "[he was] willing to stay with them."  (CT 690, 707-708; RT [3/7/88] 4-5.)

On April 25, 1988, another article by Trihey was published in the Bakersfield Californian that asserted that Petitioner said he was a triple killer who deserved to die and described Petitioner's legal predicament of not being able to plead guilty and accept the death penalty

1    without his counsel's consent.

2       On May 2, 1988, counsel again moved to withdraw, asserting continued representation

3 would require unethical conduct by counsel.  The trial judge met with defense counsel and

4 Petitioner regarding counsel's renewed motions to withdraw.  The court denied Toton's motion

5 on the merits on that day.  (CT 707; RT [5/6/88] 3.)  Four days later the Court denied Frank's

6 motion due to "nearness of the trial date."  (CT 708; RT [5/10/88] 5.)  The trial court had

7 previously noted that substitution of counsel would not alleviate any prejudice to the case already

8 resulting from Petitioner's discussions with report Trihey.  (RT [3/7/88] 5.)  On June 22, 1988,

9 the Court of Appeal of the State of California, Fifth Appellate District, denied Petitioner's

10 petition for writ of mandate and/or prohibition, seeking an order directing the trial court to grant

11 counsel's motions to withdraw.  (CT 768.)

12       Here, the state court could reasonably have found that any disagreement with counsel was

13 not so great that it resulted in a complete breakdown in the attorney-client relationship

14 jeopardizing his right to effective representation and a fair trial. (CT 690; RT [3/7/88] 4-5.)  The

15 contention of defense counsel in their initial (February 1988) motion that the newspaper article

16 reflected a lack of trust and cooperation (RT March 7, 1988 at pp. 3-4; CT 685-686) was

17 countered by Petitioner during his colloquy with the trial court. Petitioner stated to the trial judge

18 that, "[t]here is a little bit of mistrust there, but you know, I'm willing to stay with them, if they

19 want out, you know, I won't stop them." (RT March 7, 1988 at pp. 4-5; CT 685-686.)

20       Petitioner's assertion that the trial court erred by treating the newspaper interview as the

21 sole issue, failing to investigate and address the more pervasive problem of mistrust, is

22 unavailing.  Toton's February 1988 withdrawal motion, which raised a lack of trust and

23 confidence as a result of the newspaper article, was denied by the trial court on the merits (CT

24 707; RT May 6, 10, and June 24, 1988 at p. 3) following the trial court's above noted discussion

25 of these very issues with Petitioner.  (RT March 7, 1988 at pp. 4-5; CT 685-686.)

26       Petitioner also contends that the second motion to withdraw, brought by Frank in May

27 1988 and joined in by Toton, was improperly denied. He points out that this motion was

28

1   unopposed and that the trial court delayed reaching the motion and ultimately did not reach the

2   merits.  Frank's May 1988 withdrawal motion, brought on ethical grounds relating to possibly

3   perjurous testimony, (CT 694-696; URT[6] (Frank) [5/6/88] 2-8), joined in by Toton, was denied

4   by the trial court following ex parte in camera hearing because it was too close to trial.  (CT 708-

5   710; RT May 6, 10, and June 24, 1988, at p. 5.)  However, the request was devoid of facts

6   showing the nature and basis for relief requested. (RT May 10, 1988, pp. 4-5, 7-8.)  Any ethical

7   dilemma involving perjurous testimony would not likely have been resolved by appointing

8   replacement counsel, and the trial court recognized as much.  (URT (Frank) [5/6//88] 4-6.)

9   Petitioner does not allege or support an ethical violation.  Even if he had, a lawyer's violation of

10  ethical norms does not make the lawyer per se ineffective.  Burt v. Titlow, 134 S. Ct. 10, 18

11  (2013).

12      Moreover, as with the earlier motion to withdraw, Petitioner was ambivalent, neither

13  seeking nor objecting to withdrawal.  (URT (Frank) [5/6/88] 9; RT [5/6/88] 2.)  Petitioner's

14  contention his defense waiver was a product of ineffective assistance (Pet. ¶¶ 377-380) is refuted

15  by his expressed desire to plead guilty.  (RT [7/27/88] 6-7; URT (Toton) [5/6/88] 2.)

16      Petitioner's suggestion that he lacked confidence in counsel because they ignored his

17  mental disturbance was not communicated by him to the court and counsel and is not supported

18  by any proffer in the evidentiary record.  Petitioner neither sought nor objected to withdrawal of

19  defense counsel Toton and Frank, (RT [5/6/88]2), and had expressed his desire to enter a guilty

20  plea.  (RT [5/16/88] 7.)  In accordance therewith, trial was waived on the guilt and special

21  circumstances phase.  (RT [7/27/88] 6-7.)  The state court could reasonably have determined that

22  withdrawal would not have ameliorated any prejudice from Petitioner's contacting the press, or

23  affected Petitioner's submission on the preliminary hearing.  Sanchez, 12 Cal.4th at 36-37.  On

24  this basis Petitioner's right to counsel was not placed by jeopardy by the continued

25  representation of defense counsel.

26      Respondent contends this claim is not cognizable because it creates and retroactively

27

28  ────────────────
    [6] The term "URT" is a reference to Unsealed Reporter's Transcripts of ex parte in camera proceedings.

applies a "new rule" of constitutional law within <u>Teague v. Lane</u>, 489 U.S. 288.  However, the Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure under <u>Teague</u>, but rather on grounds the claim lacks merit for the reasons stated.

For the reasons stated, the state court rejection of the claim was neither contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim 19 is denied.

**c.     Review of Claim 20**

In claim 20, Petitioner alleges ineffective assistance of counsel by complete breakdown in the attorney/client relationship violating his Sixth, Eighth and Fourteenth Amendment rights.

The California Supreme Court summarily denied this claim (SPet. Claim Q) raised in Petitioner's state petition for habeas corpus.  <u>In re Sanchez</u>, S049502 (DD).  The state supreme court, in its decision on direct appeal, considered Toton's disciplinary proceedings and noted the following trial court discussion:

> "The Court: One of the things that concerns me about this incident is the fact of the date of August 25th and the fact that a jury trial was waived in this case, and now we're at that stage of the case where a [Penal Code section] 1118.1 is under submission.  And I suppose somebody reviewing this case could say one of the reasons maybe that Mr. Toton suggested that the jury trial be waived was the fact that the trial could be completed prior to the time that the Californian suggests that there's going to be some kind of a ruling in his case.  As-and clearly if we had had a jury, we would still have been going at that time, and I really seriously doubt whether we would have been in a position even to have begun to take evidence as of the 25th day of August.  That situation worried me a little bit.

> "And I wonder if you have discussed this with your client.

> "Mr. Frank: Yes, your Honor.  I advised [defendant] that the article certainly did imply that Mr. Toton's motivation for pursuing the presentation of the case in the manner in which he has, at least indicated, that perhaps he did that because of his own personal problems, plans or agenda.

> "I advised [defendant] that he had the right to be represented by an attorney who was completely and absolutely free from any sort of conflict, that [defendant] had the right to have an attorney whose decision-making process was unfettered by any of his own personal plans or problems, and that he had the right to have an attorney whose representation and whose decision-making process was based not on any of the attorney's considerations but on the best interests of [defendant], the

70

1  client in this case."

2  <u>Sanchez</u>, 12 Cal.4th at 38.

3          Petitioner revisits allegations in claim 19 regarding Toton's disciplinary issues, and

4  proffers an unsigned declaration of defense expert Isabel Wright that defense counsel disbelieved

5  and disregarded Petitioner. (SHCP Ex. 131, Att. B, ¶ 6-9.)   However, even if competent

6  evidence, Wright's testimony is controverted by that of defense counsel Toton (SHCP Ex. 137,

7  p. 8) and Frank (SHCP Ex. 113,  ¶ 6), that apart from the media interview issue, the attorney-

8  client relationship was   a cooperative one.   Moreover, the record shows that the trial court

9  questioned Petitioner to verify that he had spoken to Frank about the disciplinary proceedings,

10  that he had read the <u>Bakersfield Californian</u> article, and that he was unaware of any disciplinary

11  action against Toton prior to the date of the article.   The court asked Petitioner if he believed the

12  article implied that "one reason Mr. Toton was pushing this case forward was because of his own

13  personal time considerations."   Petitioner  replied: "Not really sir, because we had discussed-you

14  know, this was part- I wanted to go this way in the beginning anyway.   So there was really-I

15  never really felt that he was doing it for his own incidences [sic]." <u>Sanchez</u>, 12 Cal.4th at 39.

16          The trial court discussed with Petitioner his earlier position that it was his idea alone to

17  "waive the jury under any circumstances."   Petitioner told the trial court that he wanted to waive

18  jury trial on the guilty and special circumstances phase and that the idea started with him and not

19  defense counsel.  (RT [7/27/88] 6-7.)

20          The trial court discussed with Petitioner whether he wanted to make a motion for mistrial

21  "and for certain other motions in view of the publicity that this has gotten?"   The following

22  colloquy took place:

23

24          "The Court: What I'm concerned [about] is that something will happen down the
         line and then you will say, gee, I didn't know what I was doing; I should have
25          asked for a mistrial at that point in time.  That would probably be too late, because
         I'm probably getting an indication that you want to waive any problems that Mr.
26          Toton's difficulties might have in this case. Is that right?
         "The Defendant: Yes.
27          "The Court: I didn't make that very clear.
         "The Defendant: Yeah.
28          "The Court: What I'm saying is, I don't want you to go down the line and then all

71

1

of a sudden say, gee, I've changed my mind.
"The Defendant: Yeah.

2

"The Court: Probably you can't do that. You understand that?
"The Defendant: Yes, I understand that.

3

"The Court: Are you satisfied with the state of the record at this point?
"The Defendant: Yes sir. I'm very satisfied.

4

"The Court: Nobody threatened you to get you to say this?
"The Defendant: No, sir ....

5

"The Court: Are you satisfied, sir, that Mr. Toton's dilemma with the State Bar
had nothing to do with the waiver of the jury trial?

6

"Mr. Frank: I am, yes.
"The Court: And are you, Mr. Sanchez?

7

"The Defendant: I am too."

8

Sanchez, 12 Cal.4th at 39-40.

9

Based on the foregoing, and for the reasons discussed in claim 19, the state court could

10

reasonably have determined Petitioner did not established ineffective assistance of counsel

11

through complete breakdown of the attorney/client relationship.  As noted by the state supreme

12

court, "[i]n order to establish a violation of the right to effective assistance of counsel, a

13

defendant must show that counsel's performance was inadequate when measured against the

14

standard of a reasonably competent attorney, and that counsel's performance prejudiced

15

defendant's case in such a manner that his representation "so undermined the proper functioning

16

of the adversarial process that the trial cannot be relied on as having produced a just result."

17

Strickland, 466 U.S. at 686.  The record above does not support such a finding.

18

Moreover, "a court need not determine whether counsel's performance was deficient

19

before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."

20

Strickland, 466 U.S. at p. 697.  Prejudice is shown when there is a "reasonable probability that,

21

but for counsel's unprofessional errors, the result of the proceeding would have been different.  A

22

reasonable probability is a probability sufficient to undermine confidence in the outcome."  In re

23

Sixto (1989) 48 Cal.3d 1247, 1257; Strickland, 466 U.S. at p. 694.  If defendant fails to show

24

that he was prejudiced by counsel's performance, the ineffective assistance claim may be rejected

25

without determining whether counsel's performance was inadequate.  Strickland, 466 U.S. at p.

26

697.)"

27

Petitioner has not established prejudice.  Toton was licensed to practice law until his

28

72

1    disbarment on March 31, 1989, after Petitioner's trial was completed.  In rejecting this claim on

2    appeal, the state supreme court pointed out that:

3

4         [Petitioner] does not assert that Toton's pending discipline prejudiced his case.
          The record would not support such an argument. Toton vigorously cross-
5         examined prosecution witnesses at the preliminary hearing and during the guilt
          phase, made several defense motions, including one for appointed assistant
6         counsel, which was granted, and motions for pretrial discovery, severance and
          additional motions that indicated he was vigorously representing his client. In
7         addition, Toton made a comprehensive closing argument at the guilt phase. Thus,
          there is no indication on the record that counsel's representation was anything less
8         than competent, and defendant fails to persuade us that counsel's representation
          was ineffective solely on the basis of the disciplinary action pending against him .
9         . . Toton was a member of the State Bar at all times during his representation of
          defendant. " 'Erring morally or by a breach of professional ethics does not
10        necessarily indicate a lack of knowledge of the law.'"  [Citation] We simply are
          not persuaded that Toton's unrelated disciplinary problems in any way influenced
11        his representation of defendant or otherwise rendered him unfit as a matter of law.
          [Citation]

12   Sanchez, 12 Cal.4th at 43-45.

13        Petitioner's contention that defense counsel found him uncooperative is refuted by Mr.

14   Frank's declaration where he said that, except for the media interviews, Petitioner was

15   cooperative with defense counsel.  (SPet.  Ex. 113, p. 3.)  As to the alleged ethical dilemma, as

16   noted a lawyer's violation of ethical norms does not make the lawyer per se ineffective.  Burt,

17   134 S. Ct. at 18.

18        Respondent contends this claim is not cognizable because it creates and retroactively

19   applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

20   Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

21   under Teague, but rather on grounds the claim lacks merit for the reasons stated.

22        The Court finds that, the reasons discussed, the state court rejection of the claim was

23   neither contrary to, or an unreasonable application of, clearly established federal law, as

24   determined by the Supreme Court, nor an unreasonable determination of the facts in light of the

25   evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

26        Claim 20 is denied.

27        d.     Analysis - Claims 21-24

28
                                          73

Petitioner claims denial of effective assistance of counsel through the appointment of Toton as lead counsel and the failure to replace him notwithstanding his conflicts of interest and Petitioner's insufficient waiver thereof, violating his Sixth, Eighth, and Fourteenth Amendment rights.

The California Supreme Court summarily denied claims 21, 23 and 24 (SPet. Claims P, R and S respectively) raised in Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  As noted, in such a case "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. (emphasis added).

The state supreme court, in reviewing these issues on direct appeal, noted that:

Defendant's claim that Toton's disciplinary proceedings rendered him incompetent is no more persuasive if considered under the rubric of conflict of interest. A criminal defendant's right to effective assistance of counsel, guaranteed by both the state and federal Constitutions, includes the right to representation free from conflicts of interest. [Citation] To establish a violation of the right to unconflicted counsel under the federal Constitution, 'a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' [Citation] To establish a violation of the same right under our state Constitution, a defendant need only show that the record supports an 'informed speculation' that counsel's representation of the defendant was adversely affected by the claimed conflict of interest. [Citation]

[W]e also observed that "[c]onflicts of interest may arise in various factual settings. Broadly, they 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests.'" [Citation]

Defendant contends that the alleged conflict of interest between himself and Toton was caused by Toton's "own interest" in expediting the trial prior to his disbarment, to the defendant's prejudice. Defendant asserts that the fact of the pending disciplinary action gave Toton a strong incentive to finish defendant's case as quickly as possible, implying that Toton's desire to end the case led to a constitutionally deficient performance.

Based on the appellate record, we are not persuaded by defendant's arguments. As we have observed, the record shows that Toton was not disbarred until eight months after the court and defendant learned of the proceedings against him, and

74

one month after completion of the penalty phase of defendant's trial. There is no indication that the disciplinary proceedings influenced the pace of Toton's representation, and, indeed, there is substantial evidence on record that would support the opposite conclusion.

First and foremost, it was Toton who advised defendant not to plead guilty and instead to submit the guilt and special circumstance issues on the basis of the preliminary hearing transcripts. This alternative to a guilty plea allowed counsel to contest the People's case, present various defense motions to the court, and generally make a stronger case for defendant than would have been available following a guilty plea. Thus, counsel Toton actually prolonged the trial notwithstanding defendant's desire to proceed directly to the penalty phase.

Moreover, even if we were to perceive either an actual conflict of interest, as required by federal law, or to conclude the record supports an "informed speculation" of a conflict as required under our state Constitution, defendant intentionally and knowingly waived any conflict on the record. [Citation]

In addition, defense counsel Frank informed the court he was satisfied that Toton's pending discipline "had nothing to do with the waiver of the jury trial." At a later in camera hearing attended by defense counsel Frank, defendant admitted that, in partially submitting his case, it was his desire to waive jury trial "under any circumstances," that he had had a "lengthy discussion" regarding his rights with defense counsel Frank, and that he wanted to maintain the status quo.

The fact that defendant did not discuss Toton's pending discipline with him does not assist defendant's conflict claim. Here, defendant asserts that his "discussion with Frank could not substitute for a discussion with Toton. By his own admission, Frank knew nothing about his co-counsel's impending [discipline] until the news appeared on the front page of the Bakersfield newspaper . . . . Toton hid this important fact from his own assistant counsel until the news became public. Nothing in the record indicates that Frank knew any more about the [discipline] than did the readers of the Bakersfield Californian. Frank simply was not able to speak for Toton in discussing the impact of the [disciplinary proceedings] on the future conduct of the defense [nor was] Frank in [a] position to discuss with [defendant] how the [disciplinary] proceedings already might have affected Toton's guilt phase strategy." Defendant fails to show, however, how Toton's assurances or perspective would have assisted him in determining whether he wanted to waive the conflict, or how Toton would have provided him with a better explanation than that given by the court about the potential drawbacks of Toton's continued representation.

Defendant next asserts that the trial court failed in its duty to ensure that he knowingly and intelligently waived any conflict with counsel. "When a trial court knows or should know that defense counsel has a possible conflict of interest with his client, it must inquire into the matter [citations] and act in response to what its inquiry discovers [Citation]." If the court determines that a waiver of a conflict is necessary, it must satisfy itself that " '(1) the defendant has discussed the potential drawbacks of [potentially conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of [such] representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right.'" [Citation] A trial court's failure to inquire into the conflict or to adequately respond to its inquiry amounts to reversible error if the defendant can show "that an actual conflict of interest existed and that

75

that conflict adversely affected counsel's performance." [Citation]

Defendant asserts that the trial court "never asked [defendant] in clear, unambiguous language whether he was willing to waive his right to unimpaired counsel." He also complains of the court's failure to "determine whether [Toton's] alleged misuse of client funds might indicate that Toton had financial difficulties which might affect his work or handling of funds in [defendant's] case, [nor did the court] ask Toton about the timetable of state bar proceedings [or ask] how the bar proceeding might affect, or might have affected, Toton's conduct of [defendant's] case."

In deciding whether a defendant understands the nature of a possible conflict of interest with counsel, the trial court need not explore each foreseeable conflict and consequence. [Citation] Nor does a defendant's waiver of conflict-free counsel extend merely to matters discussed on the record. [Citation] As we observed in [Citation] "[r]ules that are that strict seem neither necessary nor workable." [Citation] (waiver found adequate even though all conceivable ramifications of conflict not explained). Thus, looking at the whole record, we must determine whether defendant was aware of the potential drawbacks and possible consequences of retaining Toton, and whether he understood his right to conflict-free counsel and knowingly waived that right.

It is clear that the record belies defendant's argument. The court's response to the asserted conflict of interest was appropriate under the circumstances; it was immediate and informed petitioner of his rights under the facts. As the record indicates, the court discussed the conflict with the parties, was careful to ensure defendant was aware that a conflict existed, and confirmed that his waiver of the conflict was voluntary and knowing. [Citation] Defendant even declined the court's invitation to make a motion for mistrial, emphasizing that he was satisfied with the state of the record. Thus, in light of all the circumstances, we conclude the court gave defendant an opportunity to declare a mistrial, to relieve counsel, and to voice his objections on the record. In our view, the trial court conducted an adequate inquiry into the conflict, and we are satisfied that defendant's waiver was knowing and voluntary. [Citation]

Sanchez, 12 Cal.4th at 45-48.

The Sixth Amendment provides that a criminal defendant shall have the right to "the Assistance of Counsel for his defense." As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

An exception exists for cases in which counsel actively represents conflicting interests. Mickens v. Taylor, 535 U.S. 162, 166 (2002); Cuyler v. Sullivan, 446 U.S. 335, 345-50 (1980). In such a case, prejudice is presumed. Id. However, Petitioner must establish that "an actual

76

1    conflict of interest actually affected the adequacy of [defense counsel's] representation."

2    Sullivan, 446 U.S. at 348-49.  Thus, "until a defendant shows that his counsel *actively*

3    *represented* conflicting interests, he has not established the constitutional predicate for his claim

4    of ineffective assistance." Id. at 350 (emphasis in original).

5          Petitioner supports these claims in part with facts alleged in claims 5 and 6.  He contends

6    that Toton, who had state bar disciplinary proceedings pending against him at the time he was

7    appointed to Petitioner's case.  He contends Toton obtained his bar license by fraud.  He

8    contends that Toton had conflicts of interest relating to disbarment proceedings which should

9    have resulted in replacement lead counsel and a jury trial at the guilt and special circumstance

10   phase. However, there is no competent evidence Toton obtained his law license by fraud (SHCP

11   Ex. 133, Att. A), or that he engaged in the practice of law prior to his admission to the bar.

12   (SHCP Exhs. 514; 516-18.)  Toton was not disbarred until March 31, 1989, five months after the

13   penalty phase verdict.  (SHCP Ex. 519.)

14         Petitioner faults the trial court for failure to conduct an adequate inquiry into Toton's

15   possible conflict of interest, noting Toton was never questioned.  (Sealed RT July 26, 1988, at

16   pp. 80-84.)  However, the trial judge did look into the pending disciplinary proceedings against

17   Toton and discussed such with the parties and Petitioner.  See Sanchez, 12 Cal.4th at 47.  The

18   Court provided Petitioner the opportunity to "declare a mistrial, to relieve counsel, and to voice

19   his objections to the record."  Id.  In response Petitioner voluntarily, knowingly and intentionally

20   waived any conflict of interest on the record following a discussion with co-counsel Frank and

21   the trial court as to his rights to conflict free representation and potential drawbacks and

22   consequences of staying with Toton (RT [7/27/88] 3, 4-10), as reflected by his statement he

23   wanted to maintain the status quo.  (RT [7/27/88] 8.)  He refused the court's invitation for

24   mistrial, to relieve counsel, and to object to the record.  Sanchez, 12 Cal.4th at 47.

25         The evidentiary record does not reflect that Toton's litigation of the case was influenced

26   by an actual conflict arising from the disciplinary proceedings.  See Burger, 483 U.S. at 783.

27   Petitioner's argument that, had the trial court pressed the inquiry, Toton would have withdrawn

28

                                                  77

1    or been replaced and a full defense then mounted, is based upon speculation.  The trial court

2    could reasonably have found that there was no actual unwaived conflict of interest.  The state

3    court could have concluded that Petitioner understood what he was waiving, was "very satisfied"

4    with the record and acting voluntarily, (RT [7/27/88] 8), and that Toton's situation had "nothing

5    to do with his waiver of the jury trial."  (RT [7/27/88] 9-10.)

6          Petitioner's contention that he should have been allowed to discuss Toton's alleged

7    conflict with Toton himself or outside counsel is unaccompanied by any evidentiary proffer how

8    that would have resulted in a more favorable outcome.  The state supreme court  found that "the

9    fact disciplinary proceedings were pending against counsel Toton did not automatically render

10   Toton's performance inadequate or prejudice [Petitioner's] right to effective counsel."  Sanchez,

11   12 Cal.4th at 44.  The court further found that Toton engaged in vigorous witness examination

12   and cross-examination (CT 518-625; RT 2664-2670), pre-trial discovery (CT 649-663, 769),

13   preemptory challenges (CT 836-840) evidentiary motions (CT 841-45, 846-53, 854-58, RT 80,

14   97-113), and closing argument.  (RT 169-96.)  All this supported the conclusion that Toton's

15   representation was adequate.  The state supreme court also found "no indication that the

16   disciplinary proceedings influenced the pace of Toton's representation."  Sanchez 12 Cal.4th at

17   45:2).  Nothing in the state record suggests otherwise.

18         For the reasons discussed in claims 19 and 20, *ante*, Petitioner has not established denial

19   of effective assistance of counsel through denial of defense counsel motions to withdraw,

20   breakdown of the attorney-client relationship by virtue of Toton's debarment proceedings, or

21   waiver of jury trial at the guilt and special circumstance phase.  The assertion in claims 21-24,

22   that the trial court did not sufficiently investigate defense counsel's alleged conflict of interest

23   similarly fails for the same reasons.

24         Petitioner expressed his desire to plead guilty, to stay with Toton following discussion

25   with the court and defense counsel.  Toton, assisted by co-counsel Frank, vigorously cross-

26   examined witnesses and made a variety of pretrial and trial motions and made a detailed guilt

27   phase closing argument, thereby distinguishing this matter from Petitioner's cited People v.

28

1    Williams, 93 Ill.2d 309 (1982) and People v. Rainge, 112 Ill.App.3d 396 (1983).  Petitioner was

2    aware of the possible problems with Toton's continued representation and his right to conflict

3    free representation, having discussed these matters with co-counsel Frank for approximately an

4    hour, and Petitioner thereafter expressly waived any such conflict.   (RT [7/27/88] 4-10.)

5    Petitioner argues that defense counsel Frank lacked sufficient information about Toton's

6    disciplinary proceedings to discuss the matter with Petitioner, (SHCP Ex. 137, ¶ 16), but makes

7    no proffer of how and why this was so and cause him prejudice.  Frank believed that Toton's

8    disciplinary issues did not affect the proceedings.  (Sealed RT July 27, 1988, at p. 9-10.)

9           Petitioner's re-argument that neuropsychological deficits (organic impairments) and

10   neurological and psychiatric disorders (psychiatric impairments) prevented him from

11   competently waiving the conflict fails substantively for the reasons stated in claims 1-4 and 6.

12   As discussed in those claims, Dr. Foster's 1995 opinion of Petitioner's mental state, that there is

13   a high probability Petitioner suffered neuropsychological and psychiatric disorders and

14   impairments during the pretrial and trial period, does not demonstrate the trial court decision to

15   allow Toton to continue as lead counsel was unreasonable.

16          At bottom, Petitioner has not demonstrated Toton had an actual conflict of interest.  See

17   Garcia v. Bunnell 33 F.3d 1193, 1198 (9th Cir. 1994) (no actual conflict where record discloses

18   no active representation of competing interest); see also Burger, 483 U.S.at 783; Mickens, 535

19   U.S. at 171 ("[A]n actual conflict of interest [means] precisely a conflict that affected counsel's

20   performance—as opposed to a mere theoretical division of loyalties.").  To meet this standard, he

21   must show "that the attorney's behavior seems to have been influenced by the conflict," which,

22   though not a showing of actual prejudice, "remains a substantial hurdle."  Lockhart v. Terhune,

23   250 F.3d 1223, 1231 (9th Cir. 2001).  Even if he had demonstrated actual conflict, Petitioner has

24   not demonstrated that his waiver the conflict was invalid.  Garcia, 33 F3d at 1195 (9th Cir.

25   1994);

26          Respondent contends claims 21, 22 and 24 are not cognizable because each creates and

27   retroactively applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.

28
                                        79

1  However, the Court finds the claims fail not because Petitioner seeks to apply a new rule of

2  criminal procedure under <u>Teague</u>, but rather on grounds the claims lack merit for the reasons

3  stated.

4       A fair-minded jurist could have found that rejection of these claims was neither contrary

5  to, or an unreasonable application of, clearly established federal law, as determined by the

6  Supreme Court, nor an unreasonable determination of the facts in light of the evidence presented

7  in the state court proceeding.  See 28 U.S.C. § 2254(d).

8       Claims 21-24 are denied.

9       **e.**    **Review of Claims 25-26**

10       Petitioner next claims that he was not competent to waive trial by jury and confrontation

11  and cross-examination of witnesses and presentation of a defense, and that he was not competent

12  to stand trial, violating his Sixth, Eighth, and Fourteenth Amendment rights.  He supports these

13  claims with facts alleged in denied claims 6 through 10 and 14.

14       The California Supreme Court summarily denied claims 25 and 26 (SPet. Claims W and

15  T respectively) raised in Petitioner's state petition for habeas corpus.  <u>In re Sanchez</u>, S049502

16  (DD).  As noted, in such a case "the habeas petitioner's burden still must be met by showing

17  there was no reasonable basis for the state court to deny relief," <u>Richter</u>, 562 U.S. at 98, and this

18  Court "must determine what arguments or theories supported or . . . *could have supported*, the

19  state court's decision; and then it must ask whether it is possible fair-minded jurists could

20  disagree that those arguments or theories are inconsistent with the holding in a prior decision of

21  this Court."  <u>Id.</u> (emphasis added).

22       *i.*    *Trial Waivers*

23       The state supreme court found Petitioner knowingly, voluntarily and intelligently waived

24  rights when it considered the matter on direct appeal. This Court agrees, for the reasons

25  discussed in claims 6, 14 and 21-24.  The trial court allowed Toton to inform Petitioner of his

26  constitutional rights, which Petitioner acknowledged he was waiving "freely and voluntarily."

27  <u>Sanchez</u>, 12 Cal.4th at 24-25.   Petitioner's suggestion he did not receive a sufficient narrative

28

1  explanation of rights waived is refuted by the evidentiary record.   Toton informed the trial court

2  he had discussed the guilt and special circumstance submission and waiver with Petitioner, who

3  agreed to the procedure.  (RT-10a.)  Petitioner expressly declined the offer of more time to

4  consider the waiver decision, stating that he was "very confident" of his decision.  See Sanchez,

5  12 Cal.4th at 26; CT 889-892; RT-10a, 98a-100a.).  Petitioner then entered jury trial, compulsory

6  process, confrontation and cross-examination and presentation of evidence waivers on the

7  record. (CT 891; RT- 108a-114a.) Petitioner confirmed the waivers the next day, July 14, 1988.

8  (CT 892; RT-115a.)  Petitioner's argument that medication he received during his incarceration

9  impacted the waivers (SHCP Exhs. 111, ¶ 64; 601) is not sufficiently supported in the

10 evidentiary record.

   ii.    _Slow Guilty Plea_

12     The State Supreme Court also considered on direct appeal Petitioner's argument that the

13 submission for court trial was a "slow plea" unaccompanied by waivers sufficient under Boykin-

14 Tahl. That court found no "slow plea" because defense counsel called and cross-examined

15 witnesses, retained the right to present additional evidence, attempted to impeach Hernandez,

16 moved to strike testimony, moved for judgment of acquittal on insufficiency of the evidence,

17 argued against first degree murder, and made an extensive closing argument. Sanchez, 12 Cal.4th

18 at 28-30.  That court also ruled there was no surrender of the rights against self-incrimination

19 (because Petitioner chose not to testify at the guilt phase) and no prejudicial error from any

20 failure to advise Petitioner of the consequences of conviction, noting that:

> Defendant had been thoroughly advised by counsel of the consequences of pleading guilty and of the consequences of waiving his constitutional rights. He was well aware that he faced a possible death sentence, and, according to reporter Trihey, even asked for his own death. It is clear from the record that defendant would have waived his right to a jury trial and insisted on the submission of the guilt phase on the preliminary hearing transcripts even if he was specifically told by the court that he faced a possible death sentence.

Sanchez, 12 Cal.4th at 30-31.

At trial, Petitioner was questioned about the charges pending and consequences of conviction:

> "Mr. Toton: And you also understand the nature of the charges against you in this proceeding; is that correct?
> "The Defendant: Yes, sir.
> Mr. Toton: All right, and that there are three counts of homicide alleged with special circumstances.
> The Defendant: Yes.
> Mr. Toton: Thank you, your Honor.
> The Court: And I take it, sir, that you have done all this freely and voluntarily?
> The Defendant: Yes, sir.
> The Court: No one has threatened you?
> The Defendant: No, sir.
> The Court: And you have done this after consultation with both of your lawyers?
> The Defendant: Yes, sir.
> The Court: Thank you.

(CT 889; RT- 65a-68a.)

Petitioner was given time to consider the waiver which did not become final until the following day, when he confirmed the waiver and that it was made freely and voluntarily.  (CT 891-892; RT-115a.)

The Court finds the "slow plea" claim is not adequately supported by the state record. Petitioner consulted with defense counsel prior to the waivers and submission to court trial; repeatedly stated his desire to plead guilty; and acquiesced to counsel's urging to allow cross-examination and argument in his defense. The California Supreme Court's determination of facts was not unreasonable in light of the evidence above and Petitioner's desire to plead guilty. (RT – 87a.)   That court's rejection of Petitioner's claims neither contrary to, nor an unreasonable application of, United States Supreme Court precedent.

  *iii.*  <u>*Competency for trial*</u>

Petitioner maintains Dr. Matychowiak, who conducted his psychiatric evaluation  in November 1987, erred in finding  him competent to stand trial because: (1) the opinion was based on a single, inefficient interview, (2) the conclusion relies almost exclusively on Petitioner's statements and are not corroborated by independent evidence, (3) insufficient information was obtained about several important factors, including Petitioner's history of severe

82

1  childhood trauma and extreme neurological deficits, (4) the effect of signs of potential brain

2  damage, including history of head injury, paint sniffing and PCP use, as well findings of poor

3  "theoretical and general judgment" were not considered, (5) the effect of signs of depression,

4  suicidal intentions, and self-mutilation were not considered, (6) no questions were asked about

5  Petitioner's understanding of the nature of the proceedings or his ability to consult with or assist

6  counsel, and (7) the diagnosis of borderline personality disorder with a past history of substance

7  abuse did not follow logically from findings of head injury, severe drug abuse, depression,

8  suicidal tendencies and poor theoretical and general judgment.

9        A defendant is not competent to stand trial if he lacks "sufficient present ability to consult

10 with his lawyer with a reasonable degree of rational understanding–and a rational as well as

11 factual understanding of the proceedings against him."  Dusky v. United Sates, 362 U.S. 402

12 (1960). A state may legislate the presumption that defendants are competent to stand trial and

13 require defendants to bear the burden of proving that they are not.  Medina v. California, 505

14 U.S. 437, 449 (1992).

15       Petitioner has not made a sufficient showing that he was erroneously deemed mentally

16 competent.  Petitioner's contention his neuropsychological deficits (organic impairments) and

17 neurological and psychiatric disorders (psychiatric impairments) prevented him from

18 competently standing trial and making the above waivers fails substantively for the reasons

19 stated in claim 6.  Petitioner did not suffer hallucinations or delusions memory lapse at this time.

20 (SPet. Ex. 520, p. 5.)  He wanted to enter a guilty plea, though his attorneys had not allowed him

21 to do so.  (Id. at p. 2-4.)  Dr. Matychowiak found that Petitioner

22

23       [Q]uite clearly understand(s) his situation and has the comprehension of the court
        processes.  He is able to discuss himself, his decisions and his reasoning for his
24      decisions . . . At the present time he shows evidence of a basic personality
        disorder.  However, this does not make him unable to understand court procedures
25      or his need for his own defense.  It does not appear to significantly interfere with
        his capacity to cooperate with his attorney."

26 Id., at 5-6.  Dr. Matychowiak found Petitioner "presently able to understand the nature and

27 purpose of proceedings taken against him" and "to cooperate in a rational manner with counsel

28

1   in presenting a defense." (SPet. Ex. 520, p.6.)

2       As discussed above, defense psychologist Donaldson, who examined Petitioner prior to

3   the preliminary hearing, found Petitioner to be of average intelligence with no deficits in reality

4   testing or thought disorder. (SPet. Ex. 106, p. 2.) Defense counsel were entitled to rely on the

5   expert's opinions, and were not obligated, without a request for information from the expert, to

6   investigate further in these regards. Hendricks v. Calderon, 70 F.3d 1032, 1038 (9th Cir. 1995);

7   cf., Silva v. Woodford, 279 F.3d 825, 842-43 (9th Cir. 2002) (trial counsel deficient if inadequate

8   investigation into background and mental health: at guilt if expert requests information; and at

9   penalty if the information is mitigating).

10      Petitioner points to declarations included with the state habeas petition by psychologists

11  Doane and Froming (SHCP Exhs. 105 and 114 respectively) and psychiatrist Foster (SHCP Ex.

12  111). These experts opine that Petitioner had a history of heavy paint sniffing and PCP abuse

13  (SHCP, Ex. 111, ¶ 90), and suffered significant organic brain damage and neuropsychological

14  deficits and post-traumatic stress disorder at the time of his trial waivers. (SHCP Exhs. 105, ¶¶

15  153-165; 111, ¶¶ 60-69). Petitioner contends that, as of December 1987, he was considered a

16  "mentally unstable inmate' based on his bizarre behavior, overwhelming guilt and depression,

17  instability, possible hallucinations and a suicide attempt. (SCHP Ex. 601.)

18      However, to the extent that these declarations can be considered evidence, they were not

19  presented to the California Supreme Court in his appeal. As to claims adjudicated in the appeal,

20  the Court cannot consider these declarations here. Pinholster, 131 S. Ct. at 1398. Even if they

21  could be considered, they are not sufficient evidence in support of the claims for the reasons

22  stated. Petitioner was mentally competent for reasons discussed in claims 6, and knowingly and

23  voluntarily made the waivers for reasons discussed in claims 14 and 21through 24.

24      Due process requires a state to provide access to competent psychiatric assistance when a

25  defendant demonstrates that his sanity at the time of the offense will be a significant factor at

26  trial. Ake v. Oklahoma, 470 U.S. 68, 83 (1985). However, an indigent defendant does not have

27  a constitutional right to hire the psychiatrist of his choice. Id. Petitioner's claim that the court-

28

84

1   hired psychiatrist, Dr. Matychowiak, was incompetent is foreclosed by Harris v. Vasquez, 949

2   F.2d 1497, 1517 (9th Cir. 1990), which refused to expand Ake to encompass a "battle of

3   experts." Id., at 1517-18 (citing Silagy v. Peters, 905 F.2d 986, 1013 (7th Cir. 1990)).

4   "Allowing such battles of psychiatric opinions during successive collateral challenges to a death

5   sentence would place federal courts in a psycho-legal quagmire resulting in the total abuse of the

6   habeas process." Id. at 1518.

7           Dr. Matychowiak was aware of Petitioner's history of substance abuse (SPet. Ex. 520, pp.

8   3-4), and found Petitioner competent to stand trial. (SPet. Ex. 520, pp. 2-6.)  Dr. Matychowiak

9   found that Petitioner understood his situation and the court process, had the capacity to cooperate

10  with his attorney and wanted to plead guilty and "get it over with." (SPet. Ex. 520, pp. 2-6.)

11  Moreover, Petitioner's coherent interaction with the trial court and counsel, and defense

12  counsel's failure to raise any competency concern, are some evidence Petitioner was then

13  competent. See United States v. Lewis, 991 F.2d 524, 528 (9th Cir. 1993). Petitioner's alleged

14  facts are not sufficient to create real and substantial doubt as to his competency. See Boag v.

15  Raines, 769 F.2d 1341, 1343, (9th Cir. 1985).

16          For the reasons stated, a fair-minded jurist could have found that the state court rejection

17  of these claims was neither contrary to, or an unreasonable application of, clearly established

18  federal law, as determined by the Supreme Court, nor an unreasonable determination of the facts

19  in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

20          Claims 25-26 are denied.

21      **f.      Review of Claim 27[7]**

22          In his next claim, Petitioner alleges the trial court misapplied the California Shield Law

23  to reporter Trihey's testimony, violating Petitioner's rights to confrontation, due process, a fair

24  trial and compulsory process under the Sixth, Eighth, and Fourteenth Amendments.

25          The California Supreme Court rejected this claim on direct appeal. Sanchez, 12 Cal.4th at

26  52-58.

27

28  ─────────────
    [7] The legal basis of the Eighth Amendment was stricken as unexhausted. ECF No. 60 at 9:4.

1    The California Shield Law[8] states in pertinent part that:

2    A publisher, editor, reporter, or other person connected with or employed upon a
     newspaper, magazine, or other periodical publication, or by a press association or
3    wire service, or any person who has been so connected or employed, shall not be
     adjudged in contempt by a judicial, legislative, or administrative body, or any
4    other body having the power to issue subpoenas, for refusing to disclose the
     source of any information procured while so connected or employed for
5    publication in a newspaper, magazine or other periodical publication, or for
     refusing to disclose any unpublished information obtained or prepared in
6    gathering, receiving or processing of information for communication to the
     public. "As used in this subdivision, 'unpublished information' includes
7    information not disseminated to the public by the person from whom disclosure is
     sought, whether or not related information has been disseminated and includes,
8    but is not limited to, all notes, outtakes, photographs, tapes or other data of
     whatever sort not itself disseminated to the public through a medium of
9    communication, whether or not published information based upon or related to
     such material has been disseminated."
10
     The state supreme court considered this claim and noted the burden on Petitioner:
11
12   Faced with a claim of privilege, the burden is on the party seeking to avoid the
     privilege competently to demonstrate not only that the evidence sought is relevant
13   and necessary to his case, but that it is not available from a source less intrusive
     upon the privilege. Moreover, as with any attempt to discover evidence subject to
14   a claim of privilege, a defendant must show a reasonable possibility that the
     evidence sought might result in his exoneration." [Citation]

15   Sanchez, 12 Cal.4th at 52.

16       Trihey testified during the guilt phase subject to invocation of the newsperson's shield

17   law.  He testified that during interviews that Petitioner had told him he was "triple murderer" and

18   that "all three were killed for their Social Security checks." (RT 18.) These statements were

19   published in the Bakersfield Californian on April 25, 1988.  (RT 17-18.)

20       Toton objected to use of the newsperson's shield law to protect unpublished information

21   in Trihey's possession.   The trial court ruled for such protection, limiting Toton's cross-

22   examination to only published information and finding that impeachment of Trihey was not at

23   issue. (RT 57-59.)  Toton then decline further cross-examination of Trihey. (RT 65.)

24       Petitioner alleges that the trial court's misapplication of California Shield Law to reporter

25   Trihey's testimony caused defense counsel Toton to decline any cross-examination of Trihey,

26   denying Petitioner an effective defense.

27
     _____
28   [8] California Constitution, article I, section 2, subdivision (b); Cal. Evid. Code §1070 contains substantially similar
     language. See Delaney v. Superior Court, 50 Cal.3d 785, 796 (1990).

The state court found Petitioner failed to carry his burden:

In attempting to meet his burden, defendant attacks his own credibility by claiming he made inconsistent statements during the course of the interviews that would have exposed his confused state of mind at the time the interviews took place. He asserts his alleged unpublished statements also could have been used to impeach Trihey's testimony that defendant had told him he was a "triple murderer" and that "all three were killed for their social security checks." But defendant never shows how the information he sought would materially assist his defense, or how it differed in content from the testimony and published information available for cross-examination, including defendant's statements that he was scared, that he had taken phencyclidine (PCP), and that he had not murdered anyone. Defendant simply asserts that he "needed discovery of, and cross-examination about, the unpublished records of the interviews to impeach Trihey's testimony. Unlike other statements attributed to [defendant] in the April 25th article, Trihey's 'triple murderer' assertion was not a direct quotation. Rather, it was a conclusion drawn by Trihey. Trihey's unpublished material might have shown that his 'triple murder' testimony was his own interpretation of [defendant's] account, not an actual admission. Moreover, discovery and cross-examination might have proven that Trihey's conclusion was not supported by the interviews. The tapes might have shown that [defendant] never said he was a 'triple murderer' or a 'triple killer'; that he did not hit either Juan or Juanita; that he did nothing to aid or abet Joey; that he did not intend that either Juan or Juanita be killed; that he tried to stop Joey from killing his parents; or that he feels guilty because he failed to prevent the homicides. Any of these possibilities would have bolstered [defendant's] insufficiency of the evidence argument."

The alleged evidence defendant claims would have materially assisted his defense consists of nothing more than self-serving statements that a court could reasonably conclude were either too speculative to assist defendant or would harm, rather than materially assist, the defense. Indeed, this case is similar to [Citation], in which the court rejected the defendant's attempt to attack his own credibility by subpoenaing a reporter's unpublished interview notes. Based on this record, and under the more recent [citation] threshold test, we find that defendant has failed to make the threshold showing that publication of alleged unpublished interview information possessed by Trihey would have materially assisted the defense and defeated Trihey's claim of immunity under the shield law.

In addition, for the same reasons noted above, we reject defendant's claim that he was denied his right to confront and cross-examine Trihey and to discover and present evidence under the Sixth and Fourteenth Amendments. The record shows the court rejected Trihey's statements as proof that defendant killed the victims for their Social Security checks. Moreover, the court found untrue the special circumstance allegations that the murders of Juan and Juanita Bocanegra were committed during a robbery and found defendant not guilty of the robbery in connection with that crime. Thus, it appears the court afforded little weight to Trihey's testimony, and defendant was not denied his federal constitutional right to a fair trial simply because the court allowed the testimony to be introduced.

Sanchez, 12 Cal.4th at 56-58.

The state supreme court also rejected Petitioner's assertion that counsel's failure to cross-

1   examine Trihey before closing argument denied him the effective assistance of counsel under

2   article I, section 15 of the California Constitution, and the Sixth and Fourteenth Amendments to

3   the federal Constitution, noting that:

5   > In order to succeed in his claim, "defendant must show (1) deficient performance
    > under an objective standard of professional reasonableness and (2) prejudice
6   > under a test of reasonable probability of an adverse effect on the outcome."
    > [Citation] Defendant does not satisfy either prong of the foregoing test.

7   > As discussed, Toton convinced the court during his closing argument that Trihey's
    > testimony should not be given substantial weight; his decision not to cross-
8   > examine Trihey as to the contents of the published material was sound strategy,
    > given the nature of defendant's alleged contradictory statements. Defendant does
9   > not establish that cross-examination would have revealed any new information, or
    > that any additional information about the interviews would have influenced the
10  > court's judgment. Hence, we cannot find counsel's failure to cross-examination
    > Trihey to be deficient. In any event, given the fact that the court dismissed the
11  > robbery charges against defendant, and found not true the robbery-murder special-
    > circumstance allegation, we discern no prejudice to defendant based on counsel's
12  > performance. [Citation]

13  Sanchez, 12 Cal.4th at 58-59.

14          The state court was not unreasonable in rejecting the claim. Petitioner does not make an

15  evidentiary showing identifying how and why unpublished interview information sought from

16  Trihey differed from that in the record and would likely change the result in his proceeding. The

17  state court, having found that impeachment of Trihey was not in issue, Sanchez, 12 Cal.4th 52,

18  and giving only minimal weight to Trihey's testimony of a robbery motive, could reasonably

19  have rejected Petitioner's speculation and desire to impeach himself by arguing that the

20  interviews did not support the articles.

21          "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision

22  that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "In any

23  ineffectiveness case, a particular decision not to investigate must be directly assessed for

24  reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

25  judgments." Id. at 691.

26          Petitioners claim fails under this standard. The trial judge was able to evaluate Trihey's

27  credibility and motivations in testifying, expressly found that impeachment of Trihey was not in

28

                                                  88

issue.  (RT 59.)  Toton was afforded the opportunity to cross-examine Trihey, both about Petitioner's statements and any inconsistency therein (RT 51, 54-57), as well published statements by Hernandez and by Seeley which alleged were attributed to Petitioner. (RT 51-53.)

The record does not support claimed denial of confrontation and fair trial.  Any confrontation clause error was harmless, for reasons discussed in claims 1-4 there was substantial evidence of guilt even without Trihey's testimony.

The trial court verdict accorded only slight evidentiary value to Trihey's testimony. Defense counsel Toton successfully argued to minimize the significance of Trihey's testimony regarding robbery motive.  (RT 175-183, 235-236.) Any claim of due process and compulsory process error fails because it is not reasonable to believe any evidence suppressed might have affected the outcome of trial for reasons discussed in claims 1-26.

Accordingly, the Court finds that the California Supreme Court's determination of facts was not unreasonable in light of the evidence, and its rejection of this claim was neither contrary to, nor an unreasonable application of, United States Supreme Court precedent.

Claim 27 is denied.

6. <u>Prosecutorial Misconduct in Guilt and Special Circumstances Phase - Claims 28-33</u>

In claims 28 through 33, Petitioner alleges instances of prosecutorial misconduct during the guilt and special circumstance phase

**a.    Clearly Established Law**

*i.    <u>Brady</u>*

The Supreme Court held that if the state fails to disclose exculpatory evidence in violation of <u>Brady v. Maryland, 373 U.S 83 (1963)</u>, the conviction cannot stand if there is a reasonable probability that the evidence, considered cumulatively, would have produced a different result at trial.  <u>Kyles v. Whitley</u>, 514 U.S. 419, 441 (1995).  There are three components of a <u>Brady</u> violation: (1) the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the

1   State either willfully or inadvertently; and (3) prejudice must have ensued.  Banks v. Dretke, 540

2   U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281–82 (1999).  "Such evidence is

3   material if there is a reasonable probability that, had the evidence been disclosed to the defense,

4   the result of the proceeding would have been different."  Strickler, 527 U.S. at 280, quoting

5   United States v. Bagley, 473 U.S. 667, 682 (1985)).  "[T]here is never a real Brady violation

6   unless the nondisclosure was so serious that there is a reasonable probability that the suppressed

7   evidence would have produced a different verdict."  Strickler, 527 U.S. at 281.

8          The Supreme Court has held that a federal court can grant habeas relief on a

9   constitutional trial error claim only if the error had a "substantial or injurious effect" on the

10  verdict.  Brecht, 507 U.S. at 637.  A new trial is warranted only if prosecutorial misconduct

11  resulted in a fundamental denial of due process.  Darden v. Wainwright, 477 U.S. 168, 181

12  (1986).  Where the issue is evenly balanced and the judge has doubts about whether the error had

13  a "substantial and injurious effect" on the jury's verdict, then the judge must treat the error as if

14  it were not harmless.  O'Neal v. McAninch, 513 U.S. 432, 435 (1995).  In California v. Roy, 519

15  U.S. 2 (1996), the Supreme Court ruled that the Ninth Circuit's application of a modified O'Neal

16  harmless error standard ("the omission is harmless only if review of the facts found by the jury

17  establishes that the jury necessarily found the omitted element") was too strict and remanded the

18  case for further consideration in light of Brecht and O'Neal.

19         The Court in Kyles also held that once a habeas petitioner establishes the "reasonable

20  probability" of a different result, the error cannot subsequently be found harmless under Brecht.

21  Kyles, 514 U.S. at 436.

22         *ii.*   *Due Process*

23         A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

24  the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly,

25  416 U.S. at 643.  To constitute a due process violation, the prosecutorial misconduct must be "of

26  sufficient significance to result in the denial of the defendant's right to a fair trial."  Greer v.

27  Miller, 483 U.S. 756, 765 (1987) (quoting Bagley, 473 U.S. at 667).  "'Before a federal court

28
                                                90

1   may overturn a conviction resulting from a state trial . . . it must be established not merely that

2   the [State's action] is undesirable, erroneous, or even 'universally condemned,' but that it

3   violated some right which was guaranteed to the defendant by the Fourteenth Amendment."

4   Smith v. Phillips, 455 U.S. 209, 221 (1982) (quoting Cupp v. Naughten, 414 U.S. 141, 146

5   (1973)).

6        Any claim of prosecutorial misconduct must be reviewed within the context of the entire

7   trial.  Greer, 485 U.S. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir.

8   1994).  The court must keep in mind that "[t]he touchstone of due process analysis in cases of

9   alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"

10  and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but

11  avoidance of an unfair trial to the accused."  Phillips, 455 U.S. at 219.  "Improper argument does

12  not, per se, violate a defendant's constitutional rights."  Thompson v. Borg, 74 F.3d 1571, 1576

13  (9th Cir. 1996) (quoting Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993)).  Furthermore,

14  the Supreme Court has stated:

15

16        [A]rguments of counsel generally carry less weight with a jury than do
          instructions from the court. The former are usually billed in advance to the jury as
          matters of argument, not evidence  . . . and are likely viewed as the statements of

17        advocates; the latter, we have often recognized, are viewed as definitive and
          binding statements of the law. Arguments of counsel which misstate the law are

18        subject to objection and to correction by the court. This is not to say that
          prosecutorial misrepresentations may never have a decisive effect on the jury, but

19        only that they are not to be judged as having the same force as an instruction from
          the court. And the arguments of counsel, like the instructions of the court, must be

20        judged in the context in which they are made.

21   Boyde v. California, 494 U.S. 370, 384-85 (1990).

22        If prosecutorial misconduct is established, and it was constitutional error, the error must

23  be evaluated pursuant to the harmless error test set forth in Brecht.  See Thompson, 74 F.3d at

24  1577 ("Only if the argument were constitutional error would we have to decide whether the

25  constitutional error was harmless.").

26        **b.**    **Review of Claim 28**

27        In this claim, Petitioner alleges that information tending to undermine the credibility of

28

1  jailhouse informant Hernandez, that Hernandez was a heroin addict who gave testimony
2  motivated by Detective Stratton's offer of a deal over pending heroin and probation violation
3  charges and to avoid being suspected in the Bocanegra murders, was withheld by the
4  prosecution.

5      The California Supreme Court summarily denied claim 28 (SPet. Claims U) raised in
6  Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD). As noted, in such a
7  case "the habeas petitioner's burden still must be met by showing there was no reasonable basis
8  for the state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what
9  arguments or theories supported or . . . *could have supported*, the state court's decision; and then
10 it must ask whether it is possible fair-minded jurists could disagree that those arguments or
11 theories are inconsistent with the holding in a prior decision of this Court." Id. (emphasis
12 added).

13     Here the state court could reasonably have found that Petitioner was not prejudiced by
14 alleged prosecution failure to disclose information about jailhouse informant Hernandez.  The
15 record in this matter shows that the defense had the benefit of Hernandez's arrest report and
16 presumptively was aware of his criminal record including any matters relating to substance
17 abuse.  (SPet. Ex. 409, pp. 1-2.)  The defense was aware of Hernandez plea deal and cross-
18 examined Hernandez regarding it. (CT 576-577; RT 2850-51.)  Facts surrounding Hernandez
19 alleged heroin addiction were equally available to defense counsel through discovery.  (CT 654-
20 676.)  See U.S. v. Pelullo, 399 F.3d 197, 202 (3d. Cir. 2005) (Brady challenge fails where
21 information equally available).  For the same reason, any alleged omission of Hernandez's
22 probation status regarding charges plea bargained is unavailing.

23     Petitioner has not made any sufficient showing in the evidentiary record that Hernandez
24 testified falsely by omitting charges covered by plea bargain.  These "omitted" charges were
25 resolved outside the plea bargain under which Hernandez testified.  (SPet. Ex. 508, p. 6.)
26 Contrary to Petitioner's assertion, the record reflects that it was Hernandez who initiated contact
27 with the authorities.  (RT 2857; CT 576-77; SResp. Ex. C, pp. 1-2.)  Petitioner's allegation that

28

1   Hernandez's testimony was coerced by detective Stratton, and false, fails substantively for

2   reasons discussed in claims 1-4, *ante*.  As discussed in those claims, Hernandez testimony was

3   not inconsistent with the physical evidence.  (CT 355, 378-80.)   See United States v. Cooper,

4   173 F.3d 1192, 1202 (9th Cir. 1999) (stating that to show Brady error, the petitioner must show

5   that the evidence (1) was exculpatory, (2) should have been but was not produced, and (3) was

6   material to guilt or innocence).  Hernandez's unsigned declaration (SPet. Ex. 101, Att. A) is not

7   evidence otherwise.  28 U.S.C. § 1746.

8       Given the foregoing and the extended cross-examination of Hernandez by Toton and the

9   consistent physical evidence, the state court could reasonably have found it unlikely that

10  allegedly undisclosed evidence would have affected assessment of witness' credibility and, given

11  Petitioner desire to plead guilty, the result of the proceedings.

12      Respondent contends claim 28 is not cognizable because it creates and retroactively

13  applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

14  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

15  under Teague, but rather on grounds the claim lacks merit for the reasons stated.

16      For the reasons stated, a fair-minded jurist could have found that the state court rejection

17  of the claim was neither contrary to, or an unreasonable application of, clearly established federal

18  law, as determined by the Supreme Court, nor an unreasonable determination of the facts in light

19  of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

20      Claim 28 is denied.

21      **c.    Review of Claim 29**

22      In this next claim, Petitioner alleges that Hernandez's notes of conversation with

23  Petitioner, which might have provided a basis to impeach Hernandez, were not safeguarded by

24  police and the prosecution and were lost.

25      The California Supreme Court summarily denied claim 29 (SPet. Claims V) raised in

26  Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  In such a case, "the

27  habeas petitioner's burden still must be met by showing there was no reasonable basis for the

28

1    state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

2    arguments or theories supported or . . . *could have supported*, the state court's decision; and then

3    it must ask whether it is possible fair-minded jurists could disagree that those arguments or

4    theories are inconsistent with the holding in a prior decision of this Court." Id. (emphasis

5    added).

6         According to the court in Arizona v. Youngblood, 488 U.S. 51, 57 (1988) the failure of a

7    state to preserve evidence "of which no more can be said than it could have been subjected to

8    tests, the results of which might have exonerated the defendant," is not a denial of due process of

9    the law "unless a criminal defendant can show bad faith on the part of the police."

10        The Ninth Circuit used the Youngblood standard for a claim of bad faith destruction of

11   evidence in U.S. v. Hernandez, 109 F.3d 1450, 1455 (9th Cir. 1997), stating "[t]he mere failure

12   to preserve evidence which could have been subjected to tests which might have exonerated the

13   defendant does not constitute a due process violation", citing Mitchell v. Goldsmith, 878 F.2d

14   319, 322 (9th Cir. 1989).

15        Where the government fails to preserve evidence that is only potentially exculpatory, the

16   right to due process is violated only if [the evidence] possesses "an exculpatory value that was

17   apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be

18   unable to obtain comparable evidence by other reasonably available means." California v.

19   Trombetta, 467 U.S. 479, 489 (1984).

20        The state court could reasonably have found there was no bad faith failure to preserve

21   potentially useful evidence. The record does not readily suggest Hernandez made the notes for

22   the prosecution or as their agent, (CT 74, 477-499, 503, 575-577; SResp. Ex. C, pp. 1, 3), or

23   prosecutorial bad faith in failing to take custody of and preserve potentially material evidence.

24   Youngblood, 488 U.S. at 58.  Additionally, Petitioner has not demonstrated that the materiality

25   and exculpatory value of such notes was anything more than speculative. (CT 484-487, 503;

26   SResp. Ex. C, p. 3.)

27        Respondent contends claim 29 is not cognizable because it creates and retroactively

28

94

1    applies a "new rule" of constitutional law within <u>Teague v. Lane</u>, 489 U.S. 288.  However, the

2    Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

3    under <u>Teague</u>, but rather on grounds the claim lacks merit for the reasons stated.

4        For the reasons stated, a fair-minded jurist could have found that the state court rejection

5    of the claim was neither contrary to, or an unreasonable application of, clearly established federal

6    law, as determined by the Supreme Court, nor an unreasonable determination of the facts in light

7    of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

8        Claim 29 is denied

9        **d.    Review of Claim 30**

10       Petitioner next claims that criminalist Laskowski, who testified to two different sets of

11   footprints during Petitioner's proceeding, subsequently identified a third set during Reyes's

12   separate trial for his role in the Bocanegra murders, undermining the prosecution's argument at

13   Petitioner's trial that Petitioner and Joey were the only two who struck blows to the victims.

14       The State Supreme Court reviewed this claim in Petitioner state petition for habeas

15   corpus (SPet. Claim X) and summarily denied it.  <u>In re Sanchez</u>, S049502 (DD).  In such a case,

16   "the habeas petitioner's burden still must be met by showing there was no reasonable basis for

17   the state court to deny relief," <u>Richter</u>, 562 U.S. at 98, and this Court "must determine what

18   arguments or theories supported or . . . *could have supported*, the state court's decision; and then

19   it must ask whether it is possible fair-minded jurists could disagree that those arguments or

20   theories are inconsistent with the holding in a prior decision of this Court."  <u>Id.</u> (emphasis

21   added).

22       The knowing use of false or perjured testimony against a defendant to obtain a conviction

23   is unconstitutional.  <u>Napue v. Illinois</u>, 360 U.S. 264 (1959).  In <u>Napue</u>, the Supreme Court held

24   that the knowing use of false testimony to obtain a conviction violates due process regardless of

25   whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when

26   it appeared.  <u>Id.</u> at 269.  The Court explained that the principle that a State may not knowingly

27   use false testimony to obtain a conviction - even false testimony that goes only to the credibility

28

1  of the witness - is "implicit in any concept of ordered liberty." Id.

2       A conviction obtained by the knowing use of perjured testimony "must be set aside if

3  there is any reasonable likelihood that the false testimony could have affected the judgment of

4  the jury."  Bagley, 473 U.S. at 678.  Nevertheless, simple inconsistencies in testimony are

5  insufficient to establish that a prosecutor knowingly permitted the admission of false testimony.

6  United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995).  "Discrepancies in . . .

7  testimony . . . could as easily flow from errors in recollection as from lies."  Id.

8       To warrant habeas relief, Petitioner must establish that: 1) The testimony was actually

9  false; 2) The prosecution knew or should have known it to be false; and 3) There is a reasonable

10  likelihood that the false testimony could have affected the jury's verdict.  Tayborn v. Scott, 251

11  F.3d 1125, 1130 (7th Cir. 2001).

12       There is no sufficient showing Petitioner was prejudiced by presenting the testimony of

13  criminologist Laskowski regarding the shoe tread pattern photographs taken at the Bocanegra

14  crime scene.  The state court could reasonably have found that, during Petitioner's trial,

15  Laskowski and prosecutor Ryals were unaware of a third set of different footprints in the

16  Bocanegra home.  (CT 376; SResp. Ex. B.)  Moreover, there is not a reasonable possibility that

17  testimony of a third set of footprints would have affected the outcome of Petitioner's trial.  See

18  U.S. v. Agurs, 427 U.S. 97, 103 (1976).  Reyes admitted he served as lookout and entered the

19  home after the murders to assist Joey and Petitioner.  (SResp. Ex. A, pp.3-4; see claim 10, *ante.*)

20  His bloody palm print was in evidence.  (CT 202-203.)

21       Any attempt by defense counsel to argue that Reyes rather than Petitioner struck blows to

22  the victims is rebutted by the record (CT 77-78, 479-84, 487-89, 495, 500-05; RT 181; SPet.

23  Exhs. 700-701) and Petitioner's express desire to plead guilty.  (SPet. Ex. 520, p. 2; see CT 891-

24  92; RT [5/16/88] 7; RT-108a-155a.)  Petitioner's statements that he assisted Joey in murdering

25  Mr. Bocanegra and Mrs. Bocanegra combined with Petitioner's desire to plead guilty suggests no

26  reasonable likelihood of a different result had evidence of a third footprint been presented.  The

27  state record in this matter does not demonstrate that Reyes guilty plea was prompted by

28

1    discovery of the third shoe print.  (SPet. Ex. 139, p. 2.)

2        Petitioner fails to demonstrate that no reasonable jurist could have found that he failed to

3    make a prima facie case that the prosecution knowingly used false or perjured evidence with

4    respect to Laskowski's testimony.

5        Respondent contends claim 30 is not cognizable because it creates and retroactively

6    applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

7    Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

8    under Teague, but rather on grounds the claim lacks merit for the reasons stated.

9        For the reasons stated, a fair-minded jurist could have found that the state court rejection

10   of these claims was neither contrary to, or an unreasonable application of, clearly established

11   federal law, as determined by the Supreme Court, nor an unreasonable determination of the facts

12   in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

13       Claim 30 is denied.

14       **e.    Review of Claim 31**

15       Petitioner alleges in this claim that pathologist Holloway's testimony was untruthful

16   because Dr. Holloway stated at the preliminary hearing that victims' scalp wounds were

17   "entirely" consistent with one weapon wielded by one person, but later stated at the penalty

18   phase he found only "partial" consistency in these matters.

19       The State Supreme Court reviewed this claim in Petitioner state petition for habeas

20   corpus and alternatively denied it on the merits and as procedurally barred.  In re Sanchez,

21   S049502 (DD).  In such a case, "the habeas petitioner's burden still must be met by showing

22   there was no reasonable basis for the state court to deny relief," Richter, 562 U.S. at 98, and this

23   Court "must determine what arguments or theories supported or . . . *could have supported*, the

24   state court's decision; and then it must ask whether it is possible fair-minded jurists could

25   disagree that those arguments or theories are inconsistent with the holding in a prior decision of

26   this Court."  Id. (emphasis added).

27       Petitioner cites to facts alleged in claim 10, *ante*.  He argues that had Holloway testified

28

97

1    truthfully at the preliminary hearing, a three assailant theory might have discredited Hernandez's

2    testimony that only two assailants struck blows to the victims. However, the Court is not

3    convinced that Dr. Holloway's erroneous testimony precluded a theory that more than one

4    perpetrator and more than one weapon inflicted the scalp wounds on Mr. Bocanegra and Mrs.

5    Bocanegra; Toton argued as much.  (RT 187-191.)

6          Dr. Holloway testified at the preliminary hearing that Mr. Bocanegra's head wounds were

7    entirely consistent with being inflicted by one person (CT 118-119, 134), similar to Mrs.

8    Bocanegra's head wounds  (CT 118, 155-156, 159), and were consistent with being inflicted by

9    the same type of instrument (CT 118-119), though not necessarily the identical instrument.  (CT

10   131-134.)

11         Dr. Holloway later testified at the penalty phase that he had erred, that Mr. Bocanegra's

12   head wounds were not entirely consistent with Mrs. Bocanegra's (RT 2704-2706, 2720-2721,

13   2725), that is they were only partially consistent (RT 2721-2722, 2725), and that he could not

14   conclude from the autopsy evidence how many assailants were involved in the attack on Mr.

15   Bocanegra and Mrs. Bocanegra.  (SPet. Ex. 120, p.3.)

16         Even so, the state court could reasonably have found that Holloway and prosecutor Ryals

17   were not aware of the error at the preliminary hearing.  (SResp. Ex. B.)

18         There is no sufficient showing Petitioner was prejudiced by pathologist Holloway's

19   erroneous interpretation of scalp wounds of Mr. Bocanegra and Mrs. Bocanegra.  The state court

20   could reasonably have found that Holloway's erroneous testimony that Mr. Bocanegra's scalp

21   wounds were "entirely" consistent with Mrs. Bocanegra's did not affect the outcome of

22   Petitioner's trial.  See Agurs, 427 U.S. at 103.  Holloway's preliminary hearing opinion qualified

23   that the scalp wounds were not necessarily caused by the "the identical instrument" (CT 132) and

24   were consistent with being inflicted by one person (CT 134).  Holloway's testimony did not

25   reasonably preclude Toton from arguing use of more than one weapon by more than one

26   perpetrator.  (RT 189-191).  Moreover, had Dr. Holloway's modified testimony been presented

27   at the preliminary hearing the outcome would not likely have changed for reasons stated in

28

1    claims 1, 3, and 10.

2          Any attempt by defense counsel to argue Reyes rather than Petitioner struck blows to the

3    victims is rebutted by the record (CT 77-78, 479-84, 487-89, 495, 500-505; RT 181; SPet. Exhs.

4    700-701) and Petitioner's expressed desire to plead guilty.  (SPet. Ex. 520, p. 2; CT 891-92; RT

5    [5/16/88] 7; RT- 108a-155a.)   A mere inconsistency in testimony does not establish that a

6    prosecutor knowingly permitted the admission of false testimony.  Zuno-Arce, 44 F.3d at 1423.

7    Holloway's erroneous preliminary hearing testimony was corrected at the penalty phase.  (SPet.

8    Ex. 120, p. 3.)

9          Respondent contends claim 31 is not cognizable because it creates and retroactively

10   applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

11   Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

12   under Teague, but rather on grounds the claim lacks merit for the reasons stated.

13         For the reasons stated, a fair-minded jurist could have found that the state court rejection

14   of the claim was neither contrary to, or an unreasonable application of, clearly established federal

15   law, as determined by the Supreme Court, nor an unreasonable determination of the facts in light

16   of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

17         Claim 31 is denied.

18         **f.    Review of Claim 32**

19         Petitioner claims here that prosecutor Ryals' falsely argued the two assailant theory when

20   the evidence (i.e., the third set of footprints and a bloody palm print on the doorknob and

21   information from Seeley) supported Reyes's presence in the Bocanegra home.

22         This claim was reached and summarily denied in Petitioner's state petition for habeas

23   corpus (SPet. Claim Z).  In re Sanchez, S049502 (DD).  In such a case, "the habeas petitioner's

24   burden still must be met by showing there was no reasonable basis for the state court to deny

25   relief," Richter, 562 U.S. at 98, and this Court "must determine what arguments or theories

26   supported or . . . *could have supported*, the state court's decision; and then it must ask whether it

27   is possible fair-minded jurists could disagree that those arguments or theories are inconsistent

28

1    with the holding in a prior decision of this Court." <u>Id.</u> (emphasis added).

2        The California Supreme Court declined to reach the claim that Prosecutor Ryals

3    committed such prejudicial misconduct in her guilt phase closing argument because the asserted

4    evidence of misconduct, allegedly contrary statements by prosecutor Ryals to the court during

5    subsequent, separate pretrial hearings in the prosecution of Reyes, were not within the appellate

6    record or matters judicially noticed.  This Court cannot consider evidence outside the state

7    record.  <u>Pinholster</u>, 131 S. Ct. at 1398.  Even if it could, evidence proffered in the Reyes

8    proceeding was not necessarily inconsistent with the prosecution's two assailant theory in this

9    action.  <u>See</u> <u>People v. Robert Gabriel Reyes</u>, Kern County Superior Court case number 34638,

10   RT [10/3/91] 2-3, SResp. Ex. A.

11       The state court could reasonably have determined that Petitioner was not prejudiced by

12   the prosecution's two assailant argument for reasons discussed in claims 1-4 and 28-31.  The

13   prosecution could rely upon inference from trial court evidence that supported the two person

14   theory, i.e., that only Joey and Petitioner were in the Bocanegra home at the time of the murders.

15   Notably, Petitioner did not challenge the evidence demonstrating that he struck Mr. Bocanegra

16   (CT 481-82; RT 169, 184-185, 188, 196; RT 207) and that he grabbed Mrs. Bocanegra and told

17   Joey to "shut her up" (CT 482-83, 504; RT 190-191).  Evidence that, at some point, Reyes was

18   present in the house does not necessarily establish his participation in the murders.  (See CT 202-

19   203.)

20       Additionally, no theory inconsistent with the two assailant theory was advanced in

21   Reyes's separate criminal proceedings.  Reyes pled guilty in his criminal proceeding on the

22   theory he participated in the Bocanegra murders only by acting as a lookout during the murders

23   and then assisting Joey and Petitioner after the murders.  <u>See</u> <u>People v. Robert Gabriel Reyes</u>,

24   Kern County Superior Court Case No. 34638, RT [10/3/91] 2-3; SResp. Ex. A.  Even if there

25   were inconsistencies in testimony regarding the Reyes involvement in the Bocanegra murders,

26   inconsistencies alone are not sufficient to establish that the prosecutor knowingly permitted the

27   admission of false testimony.  <u>Zuno-Arce</u>, 44 F.3d at 1423.

28

1    The Court does not find that Petitioner's trial was fundamentally unfair.   The two

2  assailant theory was consistent with the evidence at the guilt and special circumstance phase and

3  inference therefrom and was not objected to by Toton.  (RT 147-149, 191, 211-12; claims 1, 3,

4  10.)  See Donnelly, 416 U.S. at 647-48 (1974) (improper jury argument by the state does not

5  present a claim of constitutional magnitude unless it is so prejudicial that the petitioner's trial

6  was fundamentally unfair . . . [t]o establish prejudice, the petitioner must demonstrate either

7  persistent and pronounced misconduct or that the evidence was so insubstantial that, in all

8  probability, but for the remarks, no conviction would have occurred); see also Darden, 477 U.S.

9  at 182 (claim of prosecutorial misconduct rejected where the prosecutor's comments "did not

10  manipulate or misstate the evidence, nor . . . implicate other specific rights of the accused, such

11  as the right to counsel or to remain silent.").  For the reasons stated in claims 1-4, the weight of

12  evidence against Petitioner was not insubstantial.

13    Respondent also contends claim 32 is not cognizable because it creates and retroactively

14  applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

15  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

16  under Teague, but rather on grounds the claim lacks merit for the reasons stated.

17    Accordingly, a fair-minded jurist could have found that the state court rejection of the

18  claim was neither contrary to, or an unreasonable application of, clearly established federal law,

19  as determined by the Supreme Court, nor an unreasonable determination of the facts in light of

20  the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

21    **g.    Review of Claim 33**

22    In this next claim, Petitioner alleges cumulative error from prosecutorial misconduct.

23    This claim was reached and summarily denied in Petitioner's state petition for habeas

24  corpus (SPet. Claim AA).  In re Sanchez, S049502 (DD).  In such a case, "the habeas petitioner's

25  burden still must be met by showing there was no reasonable basis for the state court to deny

26  relief," Richter, 562 U.S. at 98, and this Court "must determine what arguments or theories

27  supported or . . . *could have supported*, the state court's decision; and then it must ask whether it

28

1  is possible fair-minded jurists could disagree that those arguments or theories are inconsistent

2  with the holding in a prior decision of this Court."  Id. (emphasis added).

3      Petitioner cites to facts alleged in claims 28-32, *ante*, in support of this claim.  However,

4  the Court finds Petitioner has not made a sufficient showing of prejudiced by cumulative error

5  from prosecutorial misconduct.   The state court could reasonably have found that Petitioner

6  failed to established prosecutorial misconduct causing him prejudice for the reasons discussed

7  above in claims 28-32.   These claims are insubstantial when considered cumulatively.  See

8  Karterman, 60 F.3d at 580; see also Rupe, 93 F.3d at 1445.  Petitioner has not then established a

9  reasonable probability that the evidence of alleged prosecutorial error, considered cumulatively,

10  would have produced a different result at trial.

11      Respondent contends claim 33 is not cognizable because it creates and retroactively

12  applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

13  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

14  under Teague, but rather on grounds the claim lacks merit for the reasons stated.

15      Accordingly, for the reasons stated, a fair-minded jurist could have found that the state

16  court rejection of the claim was neither contrary to, or an unreasonable application of, clearly

17  established federal law, as determined by the Supreme Court, nor an unreasonable determination

18  of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. §

19  2254(d).

20      Claim 33 is denied.

21      7.    Cumulative Error in Guilt and Special Circumstance Phase – Claim 34

22      **a.    Clearly Established Law**

23  The applicable legal standard is set forth above, in the Court's analysis of claim 18.

24      **b.    Review of Claim 34**

25      In this next claim, Petitioner alleges that constitutional violations during the guilt and

26  special circumstance phase, claims 1 through 33, *ante*, when considered together and taken as a

27  whole, prejudicially caused an unfair guilt trial, in violation of the Fifth, Sixth, Eighth and

28

1   Fourteenth Amendments.

2         The California Supreme Court summarily denied claim 34 (SPet. Claim BB) raised in

3   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).

4         The state supreme court also considered this claim on appeal and rejected it noting:

5

6         Defendant contends his conviction should be reversed because of the cumulative
          effect of the alleged guilt phase errors.  He relies on the California Constitution,
7         article I, section 15, and the Sixth and Fourteenth Amendments to the United
          States Constitution.

8         Contrary to defendant's contention, however, he has not sustained any of his
          claims of error.  Accordingly, we find no cumulative deficiency in the guilt
9         phase proceedings to support reversal. [Citation]

10  Sanchez, 12 Cal.4th, at 60.

11        Where none of the alleged claims state a violation of constitutional law, there is no reason

12  to grant habeas relief based on cumulative error.  Rupe, 93 F.3d at 1445.  For the reasons stated

13  in claims 1-33 above, this Court finds claim 34 fails substantively for reasons discussed in claims

14  1-33.

15        Respondent also contends claim 34 is not cognizable because it creates and retroactively

16  applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

17  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

18  under Teague, but rather on grounds the claim lacks merit for the reasons stated.

19        Accordingly, the state court rejection of claim 34 was not contrary to, or an unreasonable

20  application of, clearly established federal law, as determined by the Supreme Court.  Nor was the

21  state court's ruling based on an unreasonable determination of the facts in light of the evidence

22  presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

23        Claim 34 is denied.

24        8.      State Appellate Review of Guilt and Special Circumstance Phase – Claim 35

25        a.      **Clearly Established Law**

26        A habeas petition must allege that the petitioner's detention violates the Constitution, a

27  federal statute, or a treaty.  28 U.S.C. § 2241(c)(3); Rose v. Hodges, 423 U.S. 19, 21 (1975).  No

28

constitutional provision or federal law entitles Petitioner to any state collateral review. <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 557 (1987).  As the Ninth Circuit and nearly all other circuit courts have found, "federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings."  <u>Ortiz v. Stewart</u>, 149 F.3d 923, 939 (9th Cir. 1998); <u>Franzen v. Brinkman</u>, 877 F.2d 26 (9th Cir. 1989) ("a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings"); <u>Williams v. State of Mo.</u>, 640 F.2d 140, 143 (8th Cir. 1981) (infirmities in the state's post-conviction remedy procedure cannot serve as a basis for setting aside a valid original conviction); <u>Hassine v. Zimmerman</u>, 160 F.3d 941, 954 (3d Cir. 1998) ("[T]he federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into a habeas calculation."); <u>Morris v. Cain</u>, 186 F.3d 581, 585 n.6 (5th Cir. 1999) (finding that "errors in state post-conviction proceedings will not, in and of themselves, entitle a petitioner to federal habeas relief"); <u>Bryant v. Maryland</u>, 848 F.2d 492, 493 (4th Cir. 1988) ("claims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal habeas corpus relief"); <u>Millard v. Lynaugh</u>, 810 F.2d 1403, 1410 (5th Cir. 1987); <u>Kirby v. Dutton</u>, 794 F.2d 245, 247-48 (6th Cir. 1986); <u>Spradley v. Dugger</u>, 825 F.2d 1566, 1568 (11th Cir. 1987).

The Supreme Court has stated that "when a State chooses to offer help to those seeking relief from convictions," due process does not "dictat[e] the exact form such assistance must assume."  <u>Finley</u>, 481 U.S. at 559.  Since the petitioner has already been found guilty at a fair trial, he has only a limited due process interest in post-conviction relief.  <u>Dist. Attorney's Office for Third Judicial Dist. v. Osborne</u>, 557 U.S. 52, 69 (2009).  "[T]he question is whether consideration of [defendant's] claim within the framework of the State's procedures for post-conviction relief "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation."  <u>Id.</u> (quoting <u>Medina v. California</u>, 505 U.S. 437, 446, 448

1    (1992).  "Federal courts may upset a State's post-conviction relief procedures only if they are

2    fundamentally inadequate to vindicate the substantive rights provided." Id.

3          Accordingly, a claim challenging the adequacy of state appellate review is not cognizable

4    on federal habeas.  Under well-established principles of law and comity, a federal court has no

5    jurisdiction over state courts to assess the adequacy or competence of their review since appellate

6    review is not constitutionally required.  Evitts v. Lucey, 469 U.S. 387, 393 (1985) (citing

7    McKane v. Durston, 153 U.S. 684 (1894)); see also Franzen v. Brinkman, 877 F.2d 26 (9th Cir.

8    1989) (federal habeas court may not review a petition alleging errors in the state post-conviction

9    review process).  The federal constitution only requires that an appellate forum be accessible and

10   available to all, regardless of economic status, once a state establishes a right to appeal.  Lucey,

11   469 U.S. at 393-94.

12         **b.    Review of Claim 35**

13         Petitioner alleges in this claim that the California Supreme Court affirmed his conviction

14   and sentence on the basis of material misstatements and omissions of issues and facts, and then

15   denied rehearing, violating his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

16         The state supreme court considered this claim in the petition for rehearing.  That court

17   issued a modification opinion upon denial of rehearing (see 12 Cal. 4th 825b), corrected errors

18   and withdrew the "Alleged Prosecutorial Misconduct" section of its opinion.

19         Petitioner alleges that the state supreme court erred by not re-assessing or re-analyzing

20   legal issues in light of the modification.

21         Appellate review of California's capital cases is authorized by California Penal Code

22   sections 190.4(e) and 1239(b).  At the time of Petitioner's trial, section 1239(b) provided,

23   "[w]hen upon any plea a judgment of death is rendered, an appeal is automatically taken by the

24   defendant without any action by him or his counsel."  Even where defendant's counsel takes no

25   action, California's high court has a duty to examine the complete trial record to "ascertain[]

26   whether defendant was given a fair trial." People v. Perry, 14 Cal. 2d 387, 392 (1939).

27         Section 190.4 provides an automatic application for modification of a verdict imposing

28

1    the death penalty, by which the trial judge reviews the evidence and reweighs the section 190.3

2    aggravating and mitigating circumstances before imposing sentence based on the jury's verdict.

3    Denial of modification of a verdict of death is reviewed on the automatic appeal pursuant to

4    section 1293(b).  Such review includes the "evidence relied on by the [trial] judge." Pulley, 465

5    U.S. at 53 (quoting People v. Frierson, 25 Cal. 3d 142, 179 (1979)) ("the statutory requirements

6    that the jury specify the special circumstances which permit imposition of the death penalty, and

7    that the trial judge specify the reasons for denying the modification of the death penalty, serve to

8    assure thoughtful and effective appellate review, focusing upon the circumstances present in

9    each particular case.").

10        Aside from the state statutory duty to examine the complete trial record for fairness and

11   the federal constitutional requirement that an appeal be available to indigent appellants, there are

12   no obligations placed on the California Supreme Court that could cause a violation of an

13   appellant's federal constitutional rights.  Sections 190.4(e) and 1239(b), and the cases construing

14   them, provide the mechanism for meaningful appellate review.

15        Petitioner alleges misstatements regarding the Bocanegra murders; misstatements and

16   omissions regarding disciplinary proceedings against Toton; misstatements and omissions

17   regarding reporter immunity under California Shield Law; misstatements regarding alleged

18   prosecutorial misconduct; and other misstatements and omissions.   Nonetheless, the state

19   supreme court's affirmance was based on its modified opinion. Reasonably implicit in the

20   modified opinion is that court's re-examination of the issues underlying its issuance of the

21   modified opinion.

22        Additionally, Petitioner has not made a showing on the evidentiary record that the

23   modified opinion contained any misstatements or omission.  In that no material misstatements or

24   omissions are identified in the modified opinion, and given that court's adjudication of all

25   Plaintiff's claims on the merits, this Court cannot find the state supreme court's determination of

26   facts to be unreasonable or unfair on the record before it.

27        Respondent contends claim 35 is not cognizable because it creates and retroactively

28

106

1  applies a "new rule" of constitutional law within <u>Teague v. Lane</u>, 489 U.S. 288. However, the

2  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

3  under <u>Teague</u>, but rather on grounds the claim lacks merit for the reasons stated.

4       Accordingly, the state court rejection of claim 35 was not contrary to, or an unreasonable

5  application of, clearly established federal law, as determined by the Supreme Court. Nor was the

6  state court's ruling based on an unreasonable determination of the facts in light of the evidence

7  presented in the state court proceeding. See 28 U.S.C. § 2254(d).

8       Claim 35 is denied.

9       9.    <u>Constitutionality of California Death Penalty – Claim 36</u>

10      **a.    Clearly Established Law**

11      Supreme Court cases have established that a state capital sentencing system must: "(1)

12  rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a

13  reasoned, individualized sentencing determination based on a death-eligible defendant's record,

14  personal characteristics, and the circumstances of his crime." <u>Kansas v. Marsh</u>, 548 U.S. 163,

15  173-74 (2006). If the "state system satisfies these requirements," then the "State enjoys a range

16  of discretion in imposing the death penalty, including the manner in which aggravating and

17  mitigating circumstances are to be weighed." <u>Id.</u> (citing <u>Franklin v. Lynaugh</u>, 487 U.S. 164, 179

18  (1988) and <u>Zant v. Stephens</u>, 462 U.S. 862, 875–876, n.13 (1983)).

19      A state may narrow the class of murderers eligible for the death penalty by defining

20  degrees of murder. <u>Sawyer v. Whitley</u>, 505 U.S. 333, 342 (1992). A state may further narrow

21  the class of murderers by finding "beyond a reasonable doubt at least one of a list of statutory

22  aggravating factors." <u>Id.</u>; <u>see</u> <u>also</u> <u>Gregg</u>, 428 U.S. at 196-97.

23      **b.    Review of Claim 36**

24      In this claim Petitioner alleges that California's death penalty scheme in effect in 1987

25  was unconstitutional because it was arbitrary and unpredictable, failing to genuinely narrow class

26  of murders eligible for the death penalty, violating his Eighth and Fourteenth Amendment rights.

27      The California Supreme Court summarily denied claim 34 (SPet. Claim YY) raised in

28

107

Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).

The state supreme court also considered this claim on appeal, as follows:

Defendant contends that the 1978 death penalty law is unconstitutional under the United States and California Constitutions because it fails to narrow the class of death-eligible murderers and thus renders "the overwhelming majority of intentional first degree murderers" death eligible. Defendant cites statistics of all first degree murder convictions in which a defendant was found death eligible, and concludes: "The vice of the California scheme is not that any one of the special circumstances taken alone is unconstitutional-each arguably identifies a subclass of all first degree murders more deserving of the death penalty than other members of the class. The vice is that, taken together, the special circumstances cover virtually all first degree murders (and a substantial majority of all murders), and, thus, they perform no narrowing function at all." Principally, defendant relies on Justice Blackman's dissent in Tuilaepa v. California, (1994) 512 U.S. ---, --- [129 L.Ed.2d 750, 767-774, 114 S. Ct. 2630], in which he stated: "By creating nearly 20 such special circumstances, California creates an extraordinarily large death pool." Id.

We have repeatedly considered and rejected this identical claim beginning with our decision in People v. Rodriguez (1986) 42 Cal.3d 730, 770-779. [Citation] Moreover, in Tuilaepa, supra, and in a number of previous cases, the high court has recognized that "the proper degree of definition" of death-eligibility factors "is not susceptible of mathematical precision"; the court has confirmed that our death penalty law avoids constitutional impediments because it is not unnecessarily vague, it suitably narrows the class of death-eligible persons, and provides for an individualized penalty determination. [Citation] Defendant's argument fails to convince us to revisit the issue. [Citation]

Sanchez, 12 Cal.4th at 60-61.  In addition, the state supreme court has further held that:

California's scheme for death eligibility satisfies the constitutional requirement that it "not apply to every defendant convicted of a murder[, but only] to a subclass of defendants convicted of murder. [Citation.]" Even after 1990 additions by virtue of Propositions 114 and 115, the special circumstances set forth in the statute are not over inclusive by their number or terms. [Citation] Nor have the statutory categories been construed in an unduly expansive manner. [Citation] Having been found guilty of an intentional murder in the course of a robbery, defendant falls within the "subclass" of murderers who are eligible for the death penalty. [Citation]

People v. Arias, 13 Cal.4th 92, 186-87 (1996) (citing Harris, 465 U.S. at 53) (upholding 1977 death penalty law).

Petitioner claims most of those who could be convicted of first degree murder are statutorily eligible for the death penalty, yet only a small portion of murderers who are statutorily

108

1    eligible for the death penalty are actually sentenced to death.

2         However, in California, a defendant may be sentenced to death for first-degree murder if

3    the trier of fact finds the defendant guilty and also finds true one or more of [then] 19 special

4    circumstances listed in Cal. Penal Code § 190.2.  As relevant here, one of the circumstances is:

5    "[t]he defendant, in this proceeding, has been convicted of more than one offense of murder in

6    the first or second degree."  Cal. Penal Code § 190.2(a)(3).  There is no question that this

7    sentencing scheme satisfies clearly established constitutional requirements.  First, the subclass of

8    defendants eligible for the death penalty is rationally narrowed to those who have committed

9    multiple murders.  Tuilaepa, 512 U.S. at 969-73.  The multiple murder special circumstance

10   sufficiently guides the sentencer and is not unconstitutionally vague.  See Godfrey v. Georgia,

11   446 U.S. 420, 428 (1980) (the sentencer's discretion must be guided by "clear and objective

12   standards.").

13        In California v. Ramos, 463 U.S. 992 (1983), the United States Supreme Court stated that

14   "[o]nce the jury finds that the defendant falls within the legislatively defined category of persons

15   eligible for the death penalty" the jury's consideration of a myriad of factors and exercise of

16   "unbridled discretion" in determining whether death is the appropriate punishment is not

17   arbitrary and capricious.  Id. at 1008-09.  At the selection stage, an individualized determination

18   includes consideration of the character and record of the defendant, the circumstances of the

19   crime, and an assessment of the defendant's culpability.   Tuilaepa, 512 U.S. at 972-73.

20   However, the jury "need not be instructed how to weigh any particular fact in the capital

21   sentencing decision."  Id. at 979.

22        This Court finds that state supreme court could reasonably have determined that

23   California's death penalty scheme in effect in 1987 did not fail to genuinely narrow the class of

24   murderers eligible for the death penalty.  California's scheme, which narrows the class of death

25   eligible offenders to less than the definition of first degree murder and permits consideration of

26   all mitigating evidence, has been approved by the United States Supreme Court, Tuilaepa, 512

27   U.S. at 972-79; Harris, 465 U.S. at 38, and this Court, see Ben-Sholom v. Woodford, Case No.

28

                                              109

1  CV-F-93-5531 (E.D. Cal. October 5, 2001).

2      The state court rejection of this claim was not contrary to, or an unreasonable application

3  of, clearly established federal law, as determined by the Supreme Court.  Nor was the state

4  court's ruling was based on an unreasonable determination of the facts in light of the evidence

5  presented in the state court proceeding, viewed most favoring the prosecution, Jackson, 443 U.S.

6  at 319.  See 28 U.S.C. § 2254(d).

7      Claim 36 is denied.

8          10.    Prosecutorial Misconduct In The Penalty Phase – Claims 37 through 42

9          a.    **Clearly Established Law**

10     The legal standard is set out in the preface to claims 28-32.

11         b.    **Review of Claim 37**

12     Petitioner next claims prosecutorial misconduct in using, failing to correct and arguing

13  false evidence by Bakersfield Police Detective Boggs.

14     The California Supreme Court summarily denied claim 37 (SPet. Claim CC) raised in

15  Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).

16     The California Supreme Court also considered and rejected this claim on appeal, finding

17  that the defense had waived the issue on appeal, Sanchez, 12 Cal.4th 65-66, and that the record

18  did not support the claim because it was "simply a disagreement as to the interpretation of the

19  evidence, and in no way indicates that Ryals encouraged or elicited false testimony from Boggs."

20  Sanchez, 12 Cal.4th at 71.

21     As discussed above, the knowing use of false or perjured testimony against a defendant to

22  obtain a conviction is unconstitutional.  Napue v. Illinois, 360 U.S. 264 (1959).  In Napue, the

23  Supreme Court held that the knowing use of false testimony to obtain a conviction violates due

24  process regardless of whether the prosecutor solicited the false testimony or merely allowed it to

25  go uncorrected when it appeared.  Id. at 269.  The high court explained that the principle that a

26  State may not knowingly use false testimony to obtain a conviction - even false testimony that

27  goes only to the credibility of the witness - is "implicit in any concept of ordered liberty."  Id.  A

28

1    conviction obtained by the knowing use of perjured testimony "must be set aside if there is any

2    reasonable likelihood that the false testimony could have affected the judgment of the jury."

3    Bagley, 473 U.S. at 678.  Nevertheless, simple inconsistencies in testimony are insufficient to

4    establish that a prosecutor knowingly permitted the admission of false testimony. Zuno-Arce, 44

5    F.3d at 1423.  "Discrepancies in . . . testimony . . . could as easily flow from errors in

6    recollection as from lies."  Id.  To warrant habeas relief, Petitioner must establish that: 1) the

7    testimony was actually false; 2) the prosecution knew or should have known it to be false; and 3)

8    there is a reasonable likelihood that the false testimony could have affected the jury's verdict.

9    Tayborn, 251 F.3d at 1130.

10        In this claim, Petitioner alleges that Boggs, testifying at the penalty phase, falsely

11   attributed to Petitioner a statement actually made by Reyes, that after the Tatman murder he

12   "kicked back, drank some whiskey, smoked some dope, ate some food, and mostly relaxed for

13   the rest of the evening."  (RT 2663-2664.)  Though Boggs correctly attributed the statement to

14   Reyes at the preliminary hearing (CT 308), Petitioner contends that prosecutor Ryals did not

15   correct the false testimony at the penalty phase, instead using it to highlight Petitioner's lack of

16   remorse. (RT  2619, 3036.)

17        The evidence before the state court did not reasonably suggest Boggs knowingly testified

18   falsely, or that Prosecutor Ryals was aware of the errant testimony.  (SResp. Ex. B.)  Boggs

19   states in his June 29, 1995 declaration that he mistakenly testified at the penalty phase that

20   Petitioner, rather than Robert Reyes, stated that:

21

22        They returned to their own room and just, again in his own words, kicked back,
         drank some whiskey, smoked some dope, ate some food, and just relaxed for the
         rest of the evening.

23

24   SPet. Ex. 100.  The state court could reasonably have determined that Prosecutor Ryals did not

25   know that Boggs's testimony was erroneous and did not knowingly rely on erroneous testimony.

26   (SResp. Ex. B.)  Petitioner has not pointed to evidence before the state court demonstrating either

27   Ryals or Boggs was aware of the error in Boggs's testimony.  Defense counsel Toton and Frank,

28

1   who both were present at the preliminary hearing, were themselves unaware of the erroneous

2   testimony.  (SPet. Exhs. 137, p. 12; 113, p. 10.)

3        Nor does there appear to be a reasonable likelihood the error affected imposition of the

4   death penalty, see Agurs, 427 U.S. at 103, or made trial so fundamentally unfair as to deny due

5   process.  Donnelly, 416 U.S. at 645.  The Court concurs in Respondent's argument that it is

6   unlikely the erroneous testimony undercut juror sympathy for Petitioner given Petitioner's

7   confession to Boggs of the circumstances of the Tatman murder, that Petitioner decided to "hit

8   the old man" and take his food and refrigerator, that he and Reyes entered Mr. Tatman's room,

9   that Reyes made stabbing motions at Tatman with a screwdriver, and that Petitioner stole Mr.

10  Tatman's possessions after witnessing his murder.  (RT 2658-2666;  SPet. Ex. 129, pp. 1-2.)

11       For these reasons, the state court rejection of the claim was not contrary to, or an

12  unreasonable application of, clearly established federal law, as determined by the Supreme

13  Court, or based on an unreasonable determination of the facts in light of the evidence presented

14  in the state court proceeding viewed most favoring the prosecution,  Jackson, 443 U.S. at 319.

15  See 28 U.S.C. § 2254(d).

16       Claim 37 is denied.

17       **c.    Review of Claim 38**

18       Petitioner next claims prosecutorial misconduct in using false evidence at penalty phase

19  by Criminalist Laskowski.  He alleges that Laskowski falsely testified at the penalty phase, as he

20  did in the guilt and special circumstance phase, that there were only two sets of footprints at the

21  Bocanegra home after the murders, only later discovering a third set of footprints.  Petitioner

22  further argues that, as at the guilt and special circumstance phase, prosecutor Ryals used a two-

23  person theory to linking Petitioner to the murders.

24       The California Supreme Court summarily denied claim 38 (SPet. Claim DD) raised in

25  Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  In such a case, "the

26  habeas petitioner's burden still must be met by showing there was no reasonable basis for the

27  state court to deny relief,"   Richter, 562 U.S. at 98, and this Court "must determine what

28

1    arguments or theories supported or . . . *could have supported*, the state court's decision; and then

2    it must ask whether it is possible fair-minded jurists could disagree that those arguments or

3    theories are inconsistent with the holding in a prior decision of this Court." Id. (emphasis

4    added).

5         Napue established that the knowing use of false or perjured testimony against a defendant

6    to obtain a conviction is unconstitutional.  A conviction obtained by the knowing use of perjured

7    testimony "must be set aside if there is any reasonable likelihood that the false testimony could

8    have affected the judgment of the jury." Bagley, 473 U.S. at 678.  Nevertheless, simple

9    inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted

10   the admission of false testimony. Zuno-Arce, 44 F.3d at 1423.  "Discrepancies in . . . testimony .

11   . . could as easily flow from errors in recollection as from lies." Id.  To warrant habeas relief,

12   Petitioner must establish that: 1) the testimony was actually false; 2) the prosecution knew or

13   should have known it to be false; and 3) there is a reasonable likelihood that the false testimony

14   could have affected the jury's verdict. Tayborn, 251 F.3d 1125 at 1130.

15        Petitioner cites to facts alleged in claims 30 and 32 in support of this claim.  However,

16   the state court could reasonably have found that the claim lacks merit.  At the preliminary

17   hearing (CT 376) and at the penalty phase of Petitioner's trial (RT 2813), Laskowski testified he

18   was able to determine from crime scene photographs that there were two types of shoes in the

19   kitchen.  The following year he re-examined the photographs and determined that there were

20   three types of shoe patterns in the kitchen and outside the Bocanegra home.  (SPet. Ex. 121, p. 2;

21   Ex. 417, pp. 1-2; SHCP Ex. 137, Ex. A.)

22        However, Petitioner does not make an evidentiary showing that either Laskowski or

23   Ryals knew of the error at the time of the penalty phase.     The Court finds that the Claim fails

24   substantively for reasons stated in Claims 30 and 32, *ante*.  The state court could reasonably

25   conclude that neither Laskowski nor Ryals knew the former's interpretation was erroneous.

26        Nor is there a reasonable likelihood the erroneous testimony affected the jury's

27   imposition of the death penalty, see Agurs, 427 U.S. at 103, or made trial so fundamentally

28

1 unfair as to deny due process.  Donnelly, 416 U.S. at 645.  The evidence against Petitioner was

2 substantial as discussed in claims 30 and 32.

3      A fair-minded jurist could conclude from the evidence and statements Petitioner made to

4 Hernandez and Trihey, that Petitioner assisted Joey in murdering Mr. Bocanegra and Mrs.

5 Bocanegra (RT 2843-45, 2851-54, 2856-59) and that he desired to enter a guilty plea.  (SPet. Ex.

6 520, p. 2; see CT 891-92; RT [5/16/88] 7; RT-108a-155a.)   Evidence suggesting the presence of

7 a third non-victim in the Bocanegra Home does not does demonstrate or suggest a third person

8 was present during the murders.  (See claim 30, 32, *ante*.)

9      The Court finds the state court rejection of the claim was not contrary to, or an

10 unreasonable application of, clearly established federal law, as determined by the Supreme

11 Court.  Nor was the state court's ruling was based on an unreasonable determination of the facts

12 in light of the evidence presented in the state court proceeding, viewed most favoring the

13 prosecution, Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

14      Claim 38 is denied.

15      **d.      Review of Claim 39**

16      Petitioner next alleges prosecutorial misconduct through use of false evidence at the

17 penalty phase by Pathologist Holloway.  He alleges that Holloway falsely testified at the penalty

18 phase that Mr. Bocanegra's head wounds were a "contributory cause" of death, contradicting his

19 guilt phase testimony and prosecutor Ryals argument based thereon that head wounds neither

20 caused nor contributed to Mr. Bocanegra's death.  Petitioner claims Ryals knew or should have

21 known this testimony was false.

22      The California Supreme Court summarily denied claim 39 (SPet. Claim EE) raised in

23 Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).

24      The State Supreme Court also considered this claim on appeal and found that:

25      [T]the prosecutor did not commit misconduct in failing to correct Dr. Holloway's
          characterization of the nonfatal scalp wounds to Juan Bocanegra as a
26      "contributory cause" rather than an "other condition" of death.  The
          characterization of the scalp wounds as contributing to Juan's death was
27      minimally significant to the jury's assessment of defendant's culpability in the
          murders. The facts showed that defendant struck disabling blows to the victim's
28

1    head while Joey was stabbing him. Moreover, any misperceptions of the cause of
     Juan's death were corrected by the prosecutor's opening statement that the wounds
2    inflicted by defendant with a metal bar, "were not the actual blows that killed the
     man. They were only a part of what killed the man. The actual blow to the man
3    was the stab wound inflicted by his son while defendant was beating him in the
     head with an iron pipe."

4

5    Sanchez, 12 Cal.4th at 71.

6           Under Napue the knowing use of false or perjured testimony against a defendant to obtain

7    a conviction is unconstitutional.   A conviction obtained by the knowing use of perjured

8    testimony "must be set aside if there is any reasonable likelihood that the false testimony could

9    have affected the judgment of the jury."   Bagley, 473 U.S. at 678.   Nevertheless, simple

10   inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted

11   the admission of false testimony.   Zuno-Arce, 44 F.3d at 1423.   "Discrepancies in . . . testimony

12   . . . could as easily flow from errors in recollection as from lies."   Id.   To warrant habeas relief,

13   Petitioner must establish that: 1) the testimony was actually false; 2) the prosecution knew or

14   should have known it to be false; and 3) there is a reasonable likelihood that the false testimony

15   could have affected the jury's verdict.  Scott, 251 F.3d at 1130.

16          Here, Dr. Holloway's testimony was consistent from preliminary hearing through penalty

17   phase that Mr. Bocanegra died from three fatal stab wounds to the torso.  (RT 2697, 2699-2700.)

18   Prosecutor Ryals argued as much in her opening statement.  (RT 2620.)   Holloway's preliminary

19   hearing characterization of scalp wounds as an "other condition" attendant to fatal stab wounds,

20   (CT 112-119, 158-59), and Holloway's penalty phase characterization of the same scalp wounds

21   as a "contributory cause" attendant to fatal stab wounds, (RT 2706), was not erroneous because

22   Holloway used the terms interchangeably to characterize non-fatal wounds.  (SPet. Ex. 120, pp.

23   1-4.)  The same applies to Mrs. Bocanegra, who also suffered scalp wounds but died from stab

24   wounds.  (CT 115-117, 153-154.)

25          For the reasons stated and  those  discussed in Claims 31 and 32, it is not reasonably

26   likely Holloway's characterization of Mr. Bocanegra's head wounds as either "other conditions"

27   or a "contributory cause" misled the jury in its assessment of Petitioner's culpability.  The state

28

1    court was not unreasonable in concluding that:

2

3        "The characterization of the scalp wounds as contributing to Juan's death was
         minimally significant to the jury's assessment of defendant's culpability in the
4        murders. The facts showed that defendant struck disabling blows to the victim's
         head while Joey was stabbing him. Moreover, any misperceptions of the cause of
5        Juan's death were corrected by the prosecutor's opening statement that the
         wounds inflicted by defendant with a metal bar, were not the actual blows that
6        killed the man. They were only a part of what killed the man. The actual blow to
         the man was the stab wound inflicted by his son while defendant was beating him
7        in the head with an iron pipe."

8    Sanchez, 12 Cal.4th at 71.

9        A fair-minded jurist could conclude from the evidence and statements Petitioner made to

10   Hernandez and Trihey, that Petitioner assisted Joey in murdering Mr. Bocanegra and Mrs.

11   Bocanegra (RT 2843-45, 2851-54, 2856-59) and that he desired to enter a guilty plea. (SPet. Ex.

12   520, p. 2; see CT 891-92; RT [5/16/88] 7; RT-108a-155a.)

13       Respondent contends claim 39 is not cognizable because it creates and retroactively

14   applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288. However, the

15   Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

16   under Teague, but rather on grounds the claim lacks merit for the reasons stated.

17       This Court does not find that the state court rejection of the claim was contrary to, or an

18   unreasonable application of, clearly established federal law, as determined by the Supreme

19   Court, or that the state court's ruling was based on an unreasonable determination of the facts in

20   light of the evidence presented in the state court proceeding, viewed most favoring the

21   prosecution, Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

22       Claim 39 is denied.

23       **e.      Review of Claim 40**

24       In his next claim, Petitioner alleges prosecutorial misconduct by failure to disclose

25   exculpatory evidence and using false evidence by Hernandez at the penalty phase.

26       The California Supreme Court summarily denied claim 40 (SPet. Claims FF) raised in

27   Petitioner's state petition for habeas corpus. In re Sanchez, S049502 (DD). In such a case, "the

28

                                                    116

1    habeas petitioner's burden still must be met by showing there was no reasonable basis for the

2    state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

3    arguments or theories supported or . . . *could have supported*, the state court's decision; and then

4    it must ask whether it is possible fair-minded jurists could disagree that those arguments or

5    theories are inconsistent with the holding in a prior decision of this Court." Id. (emphasis

6    added).

7           As noted, there are three components of a Brady violation: (1) the evidence at issue must

8    be favorable to the accused either because it is exculpatory or because it is impeaching; (2) the

9    evidence must have been suppressed by the State either willfully or inadvertently; and (3)

10   prejudice must have ensued.  Banks, 540 U.S. at 691; Strickler, 527 U.S. at 281–82.  "Such

11   evidence is material if there is a reasonable probability that, had the evidence been disclosed to

12   the defense, the result of the proceeding would have been different." Strickler, 527 U.S. at 280,

13   (quoting Bagley, 473 U.S. 667, 682 (1985)).  "[T]here is never a real Brady violation unless the

14   nondisclosure was so serious that there is a reasonable probability that the suppressed evidence

15   would have produced a different verdict." Strickler, 527 U.S. at 281.

16          Additionally, under Napue the knowing use of false or perjured testimony against a

17   defendant to obtain a conviction is unconstitutional.  A conviction obtained by the knowing use

18   of perjured testimony "must be set aside if there is any reasonable likelihood that the false

19   testimony could have affected the judgment of the jury." Bagley, 473 U.S. at 678.  Nevertheless,

20   simple inconsistencies in testimony are insufficient to establish that a prosecutor knowingly

21   permitted the admission of false testimony.  Zuno-Arce, 44 F.3d at 1423.  "Discrepancies in . . .

22   testimony . . . could as easily flow from errors in recollection as from lies."  Id.  To warrant

23   habeas relief, Petitioner must establish that: 1) the testimony was actually false; 2) the

24   prosecution knew or should have known it to be false; and 3) there is a reasonable likelihood that

25   the false testimony could have affected the jury's verdict.  Tayborn, 251 F.3d at 1130).

26          Petitioner cites to claims 2, 7 and 28 in support of this claim.  He alleges Hernandez

27   testified falsely regarding his deal with the prosecution - that the prosecution had only promised

28

117

1    to tell the sentencing judge of Hernandez's testimony, when the circumstantial evidence, (SHCP

2    Exhs. 510, 511), suggested that he had a promise of probation in exchange for his testimony; and

3    that Hernandez concealed that he was in custody on a heroin charge; and falsely stated he

4    contacted the police when detective Stratton initiated the contact.

5         Petitioner's claim is unpersuasive.  He has not made an evidentiary showing that there

6    was an undisclosed sentence concession or that Hernandez testified falsely.  (See claims 1-4 and

7    28, *ante*.)  The record that was before the state court does not reasonably support any undisclosed

8    sentence concession(s).  (See SResp. Ex. B.)  Hernandez's testimony that he contacted police,

9    through a request made to a jail deputy (CT 477; see RT 2840) is not materially false and could

10   not reasonably have affected the jury's imposition of the death sentence given the noted

11   substantial evidence against Petitioner.  Petitioner claims, but makes no evidentiary showing that

12   Hernandez was a heroin addict.

13        For the reasons stated, a fair-minded jurist could have found that the state court rejection

14   of claims by the modified opinion was neither contrary to, or an unreasonable application of,

15   clearly established federal law, as determined by the Supreme Court, nor an unreasonable

16   determination of the facts in light of the evidence presented in the state court proceeding.  See 28

17   U.S.C. § 2254(d).

18        Claim 40 is denied

19        **f.     Review of Claim 41**

20        Petitioner next claims prosecutorial misconduct in Losing/Destroying Exculpatory

21   Evidence at Penalty phase. He claims the police or prosecution lost or destroyed Hernandez's

22   contemporaneous notes of conversations with Petitioner; notes which could have been used to

23   impeach Hernandez.

24        The California Supreme Court summarily denied claim 41 (SPet. Claims GG) raised in

25   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  "[T]he habeas

26   petitioner's burden still must be met by showing there was no reasonable basis for the state court

27   to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what arguments or

28

118

1 theories supported or . . . *could have supported*, the state court's decision; and then it must ask

2 whether it is possible fair-minded jurists could disagree that those arguments or theories are

3 inconsistent with the holding in a prior decision of this Court." Id. (emphasis added).

4      Where the government fails to preserve evidence that is only potentially exculpatory, the

5 right to due process is violated only if [the evidence] possesses "an exculpatory value that was

6 apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be

7 unable to obtain comparable evidence by other reasonably available means." Trombetta, 467

8 U.S. at 489.

9      For the same reasons state in claim 29, *ante*, Plaintiff has not made a sufficient

10 evidentiary showing that Hernandez acted for the police, or that the police and prosecution were

11 required to preserve alleged notes of conversations Hernandez had with Petitioner, or that the

12 notes had material exculpatory value.

13      Respondent contends claim 41 is not cognizable because it creates and retroactively

14 applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

15 Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

16 under Teague, but rather on grounds the claim lacks merit for the reasons stated.

17      A fair-minded jurist could have found that Petitioner failed to establish that the state court

18 rejection of the claim was contrary to, or an unreasonable application of, clearly established

19 federal law, as determined by the Supreme Court.  Nor was the state court's ruling based on an

20 unreasonable determination of the facts in light of the evidence presented in the state court

21 proceeding, viewed most favoring the prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. §

22 2254(d).

23      Claim 41 is denied.

24      **g.      Review of Claim 42**

25      Petitioner next claims prosecutorial misconduct during penalty phase closing argument.

26      The California Supreme Court summarily denied claim 42 (SPet. Claims JJ) raised in

27 Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).

28

1     The California Supreme Court also considered this claim on appeal and found that the

2   defense had not objected on this ground or sought a curative admonition at trial and thus waived

3   the issue on appeal, Sanchez, 12 Cal.4th at 65-66.  Additionally, the state supreme court found as

4   follows:

5
6          [A]ny error that did occur was harmless.  As we explain in detail below, although
           the prosecutor may have, at times, pushed the limits of proper advocacy, any
           misconduct that did occur could not have contributed to the verdict and was thus
7          rendered harmless.

8          Defendant contends Ryals improperly told the jury that he was Tatman's actual
           killer, and that Tatman was killed with a screwdriver seized from him. Defendant
9          also asserts that Ryals improperly treated defendant's conviction under section
           187 (without special circumstances) as a capital crime. Her argument, claims
10         defendant, violated the doctrines of collateral estoppel and double jeopardy, and
           denied him his constitutional rights under both the state and federal Constitutions.
11
           Defendant's first claim, that the prosecutor improperly argued to the jury that he
12         was Tatman's actual killer, was based on the following comments made during the
           prosecutor's closing argument:
13
           "First, Mr. Tatman, an old, sick man, wheelchair bound, living from payday to
14         payday in the Bakersfield Inn, hardly a match for the defendant alone much less
           for the defendant and his friend, Robert Reyes.
15
           "Think of the old man lying in his bed, fearful because there were burglars in his
16         little room at the Bakersfield Inn. Think of how that fear turned to horror as he
           realized that they weren't just burglars but that they intended to take his life.
17         Imagine how he must have felt when they approached him.

18         "Of course, the defendant told the police that he had no actual part in the murder,
           that he watched his buddy do it. But then, when you think of that, think that the
19         defendant learned to lie to authorities at an early age, I believe Dr. Wright said the
           third grade. Remember that he denied to the police also anything or any facts
20         concerning the Bocanegra murders, but then remember what he told Rufus
           Hernandez.
21
           "He told Rufus Hernandez what happened, how the two of them killed Mr.
22         Tatman, not how Robert [Reyes] killed Mr. Tatman or how he killed Mr.  Tatman
           but how they killed Mr. Tatman. Think of that when you are considering what the
23         penalty in this case should be.

24         "The two men could have taken the food. They could have taken the refrigerator.
           They could have taken everything that was in that room and not touched that old
25         man who weighed less than one hundred pounds. They could have gone into that
           room, completely cleared it out, even stripped the bed clothes out from under him
26         and never harmed him, never hurt him at all. But they didn't do that. The
           defendant didn't do that. They chose, for some useless, senseless reason, to
27         commit an act of violence, the ultimate, ultimate act of violence, murder."

28

                                                     120

In her rebuttal, the prosecutor told the jury that it should not attempt to relitigate the guilt phase facts, but then asked the jury to deliberate over what she had told it: "You do not know what evidence was presented in the previous hearing. You are not to re-litigate that at this time. You hear[d] the circumstances of the Tatman murder. You know what the defendant told the police because you heard that. But you also know what the defendant told Rufus Hernandez because you heard that. It is up to you to weigh this and to deliberate on that and to determine who exactly struck the fatal blow."

Defendant asserts that the effect of the above argument was to ask "the jury to disregard completely the trial court's not true verdict on the robbery murder special circumstance under Count I which implicitly and necessarily rejected the charges that [defendant] was the actual killer in the Tatman homicide and that he harbored an intent to kill in committing the crime." Defendant claims Ryals's argument sought to elevate a noncapital murder to which defendant was an accomplice into a capital murder in violation of the guarantee against double jeopardy following acquittal under the Fifth Amendment to the United States Constitution and article I, section 15 of the California Constitution, and the related doctrine of collateral estoppel. [Citation]

In making his argument, defendant points to the court's guilt phase verdict, in which the court found defendant acted as an accomplice (and not the actual killer) in the Tatman murder:

"As to the first count [the Tatman murder], the Court finds defendant guilty of murder and fixes that murder as murder in the first degree based on the felony murder rule.

"The Court finds that it is not true that the murder of Woodrow Wilson Tatman was committed while the defendant was engaged in the commission or attempted commission of a felony, to wit: The crime of robbery, within the meaning of the special circumstance section. That does not mean, I hasten to add, that I do not think there was a robbery in progress; that simply means that I find that the defendant was an aider and abettor of the robbery but that the homicide occurred in the commission of that, and therefore it's a first degree felony murder."

The People observe that this verdict appears inconsistent. The confusion over the verdict is highlighted by the fact that early in the guilt phase arguments, the prosecutor appeared to concede (and the court appeared to agree) that defendant could be found guilty only of second degree felony murder in connection with the Tatman killing. Of course, any inconsistency in the verdict was harmless in light of our law recognizing that accomplice status is sufficient to elevate a defendant's complicity in the crime to the robbery-murder special circumstance as long as defendant acted with "intent to kill." [Citation]

What is clear from the verdict is the court's finding that defendant aided and abetted the robbery, and that the murder verdict was based on the felony-murder rule. It is less clear, however, whether the court found defendant was or was not the actual killer. If we assume the court found the special circumstance untrue because the prosecution had proved neither that defendant was the actual killer, nor that he had the intent to kill, prosecutorial argument attempting to re-litigate the guilt phase as to actual killer status was improper. [Citation] To the extent Ryals crossed the line of proper argument, however, any misconduct was not prejudicial to defendant because it is not reasonably possible a result more favorable to the defendant would have occurred. Defendant was convicted of the

121

multiple murders of Juan and Juanita Bocanegra (§ 190.2, subd. (a)(3)), and the jury was aware of defendant's prior violent criminal activity (§ 190.3, factors (b) & (c)). Thus, Ryals's references to defendant's role in the Tatman murder could not have affected the outcome of the penalty phase. [Citation]

Defendant next claims that the prosecutor deliberately misled the jury by her opening statement comment that Tatman was actually murdered by Reyes with a screwdriver that had been stolen from the Bocanegra residence and later found on defendant's person. [Citation] Defendant asserts the prosecutor's comment contradicted guilt phase evidence indicating that Tatman was mortally wounded by a "massive blunt force injury to the left chest," consistent with a heel stomp or blow by a similar object (with a dimension of two to three inches). According to the autopsy report, the screwdriver wounds were superficial stab wounds that did not actually contribute to Tatman's death. Accordingly, defendant contends, the prosecutor's misstatement of the evidence rendered the penalty phase fundamentally unfair. [Citation]

Any inaccurate reference to the screwdriver as the actual murder weapon (or comment that the weapon was found on defendant) could not properly be characterized as prejudicial or so egregious as to deny defendant a fair trial. [Citation] When, as here, the point focuses on the prosecutor's comments to the jury, the question is whether there is a reasonable possibility that the jury construed or applied any of the complained-of remarks in an objectionable manner. [Citation]

Here, the jury was told that only nonfatal stab wounds were inflicted upon Tatman. Forensic pathologist Holloway testified that the cause of Tatman's death was massive blunt force injury to his chest. Holloway also stated that some of the injuries sustained by Tatman were multiple superficial stab wounds to the chest "none of which would be construed as capable of a cause of death in themselves," and a superficial stab wound to the abdomen which "would not itself have been a fatal wound."

In addition, Bakersfield Police Detective Boggs testified that, on March 23, 1987, defendant told him that after he and Reyes had entered Tatman's hotel room, he saw Reyes standing over Tatman in a threatening manner with a screwdriver in his hand, that Reyes "freaked out" and stabbed Tatman with a screwdriver although defendant never saw the screwdriver enter Tatman's body, and that Reyes "possessed the screwdriver at all times."

Moreover, the jury was consistently admonished by the court that it was to consider only the evidence presented, and that the opening statements of the lawyers were not to be considered evidence. The court admonished the jury that: "The important thing to remember is that what lawyers say in a trial, what they say in their argument, what they say in their opening statements, those simply are not evidence. They are just telling you what they expect to prove. You have to decide this case, however, based on what you hear under oath from the witness stand or based on some documents or pictures that I admit for your consideration. What a lawyer says . . . is not evidence." [Citation] The court repeated its admonition following closing arguments.

Taken in context as an attempt to counter defense counsel's argument that defendant did not participate in the Tatman killing, it is not reasonably possible the prosecutor's alleged inaccurate remarks about the Tatman murder misled the jury. [Citation] Moreover, the court's instruction that the lawyers' opening and

closing statements were not to be considered evidence by the jury vitiated the misleading effect of any inaccurate remarks. The court's instructions are determinative in their statement of law, and we presume the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade. [Citation] We cannot conclude on this record that the prosecutor's isolated mischaracterization of the evidence in her opening statement misled the jury.

Defendant also asserts that by discussing the circumstances of the Tatman killing during the penalty phase, the prosecutor improperly misled the jury into believing it could sentence defendant to death for the murder of Tatman alone, when the penalty should have been considered only for the Bocanegra crimes, in which the multiple-murder special circumstance was found true.

Defendant's argument is misplaced. The circumstances of the Tatman crime were properly argued as an aggravating factor under section 190.3, factor (a) (circumstances of the crime and the existence of any special circumstances found to be true pursuant to section 190.1). [Citation] Moreover, defense counsel reminded the jury of defendant's aider and abettor status in the Tatman murder when he stated: "Ted Sanchez did not kill Mr. Tatman nor did he share in Robert Reyes's intent to kill Mr. Tatman. Ted's role in that tragic incident was limited to removing some of Mr. Tatman's property." Hence, we find no prosecutorial error occurred in Ryals's discussion of the circumstances of the Tatman murder at the penalty phase.

Defendant's other claims of prosecutorial misconduct to which there was no defense objection are not supported by the record. For example, defendant's contention that the prosecutor allowed Detective Boggs to testify falsely as to who told him-Reyes or defendant-that both men had "kicked back" and "relaxed" after the Tatman murder, is simply a disagreement as to the interpretation of the evidence, and in no way indicates that Ryals encouraged or elicited false testimony from Boggs. In addition, the prosecutor did not commit misconduct in failing to correct Dr. Holloway's characterization of the nonfatal scalp wounds to Juan Bocanegra as a "contributory cause" rather than an "other condition" of death. The characterization of the scalp wounds as contributing to Juan's death was minimally significant to the jury's assessment of defendant's culpability in the murders. The facts showed that defendant struck disabling blows to the victim's head while Joey was stabbing him. Moreover, any misperceptions of the cause of Juan's death were corrected by the prosecutor's opening statement that the wounds inflicted by defendant with a metal bar, "were not the actual blows that killed the man. They were only a part of what killed the man. The actual blow to the man was the stab wound inflicted by his son while defendant was beating him in the head with an iron pipe."

Finally, defendant's claim that the prosecutor committed misconduct by asserting that the Bocanegras would not have been killed without defendant's assistance is without merit. The evidence supported the view that defendant restrained both victims while Joey Bocanegra stabbed them. "The argument came well within the broad discretion of the parties to state their views as to what the evidence shows and what inferences may be drawn therefrom." [Citation]

Sanchez, 12 Cal.4th at 66-72.

1   Petitioner alleges that prosecutor Ryals improperly argued and misstated evidence, that

2   the Bocanegra and Tatman murders would not have occurred but for Petitioner's participation,

3   that the jury was sentencing Petitioner for the Tatman murder, and that Petitioner stabbed Mr.

4   Tatman to death,  (See SHCP Ex. 124, ¶ 16), with a screwdriver (RT 2619.)  Petitioner contends

5   that the correct facts are that  Petitioner was only vicariously liable in the murders, that Mr.

6   Tatman was killed by blunt force rather than stab wounds (CT 109; RT 2695), and Petitioner was

7   sentenced by the trial court to 25 years to life for the Tatman conviction.

8   The Court finds that the state court could reasonably have concluded this claim lacks

9   merit.  Petitioner contends the prosecution misled the jury into thinking it was sentencing

10  Petitioner for the Tatman murder (RT 3047-3048), i.e., as a triple murderer (RT 3080), when in

11  fact the trial court was responsible for sentencing Petitioner for the Tatman murder, which was a

12  non-capital murder.  (CT 1103; RT October 31, 1988 at p. 13.)  Even if the prosecution argued

13  that Petitioner played a principal role in the Tatman murder, the state court could reasonably

14  have determined no prejudice resulted. The Tatman conviction was presented to the jury as

15  evidence in aggravation.  The jury was appropriately admonished and instructed in this regard.

16  (RT 2615-2616; CT 979-1021; RT 3082-3097.)  The record included testimony of pathologist,

17  Dr. Holloway that Mr. Tatman died of blunt force injury to his chest.  (RT 2695.)  Nothing in the

18  evidentiary record suggests the trial court's admonishment and jury instructions were not

19  understood and followed.  Moreover, the penalty phase evidence in aggravation was substantial

20  as discussed in claims 1 through 4, *ante*.

21  The record suggests that, as to Mr. Tatman, it was Petitioner's decision to "hit the old

22  man" and take his food and refrigerator, that Petitioner and Reyes entered Mr. Tatman's room,

23  that Reyes made stabbing motions at Mr. Tatman with a screwdriver, and that Petitioner stole

24  Mr. Tatman's possessions after witnessing his murder.  (RT 2658-2666;  SPet. Ex. 129, pp. 1-2.)

25  Hernandez testified he told detective Stratton (RT 2848-2849; 2855-2856), that Petitioner told

26  him that "[Petitioner] and two other men entered an old man's room at the Bakersfield Inn, that

27  the old man was in a wheelchair, that they beat the old man, that he and the other men stabbed

28

124

1    the old man with a screwdriver, and that they took the old man's money." (RT 2842, 2846-2848.)

2    Detective Stratton testified to that effect. (RT 2858-2861.)

3         The jury was made well aware that Mr. Tatman's stabbing wounds were non-fatal

4    injuries and that Petitioner's conviction for Mr. Tatman's murder was based on his aiding and

5    abetting Reyes.  (Id.; RT 235, 2693-2695.)  Defense counsel made its argument to the jury that

6    Petitioner did not intend to kill Mr. Tatman.

7         Ryals' argument that Petitioner had a principal role in the Bocanegra homicides, and that

8    the Bocanegras would not have been killed without his assistance, did not in all reasonable

9    likelihood mislead the jury or affect the death sentence imposed.  The evidence weighed heavily

10   against Petitioner as an aider and abettor of the homicides.  Petitioner grabbed and held Mr.

11   Bocanegra while Joey got a knife.  (RT 2843, 2853-54.)  Petitioner beat Mr. Bocanegra while

12   Joey stabbed him. (RT 2696-2706, 2719-21, 2725, 2843-44, 2854, 2858.)    Petitioner rushed

13   Mrs. Bocanegra and told Joey to "shut her up." (RT 2844, 2858.)   Petitioner pushed Mrs.

14   Bocanegra into a back room and hit her on the head with a bar while Joey stabbed her.  (RT

15   2710-14, 2720-21, 2725, 2752, 2844.)  This occurred Mrs. Bocanegra's hands were bound and

16   she was likely gagged.  (RT 2708, 2723, 2749-51, 2754-55, 2774-2775.)

17        Petitioner's proffer of statements by jurors Bobbie Crowder (SHCP Ex. 124, ¶ 16) and

18   John Rodriguez (SHCP Ex. 109, App. A, ¶ 3) suggesting they believed Petitioner to be equally

19   culpable with Joey in the Bocanegra murders, even if such statements were competent evidence,

20   does not reasonably demonstrate prosecutorial misconduct sufficiently significant to deny a fair

21   trial or lack confidence in the verdict, given the above noted evidence in aggravation.

22        Given the unrebutted evidence presented at the penalty phase, the admonitions of the trial

23   judge that argument is not evidence, the potential aggravating and mitigating effects of

24   circumstances surrounding the Bocanegra murders, the state court could reasonably have found

25   that the prosecution arguments above were not so prejudicial as to make trial fundamentally

26   unfair.  The multiple murder special circumstance in the Bocanegra murders and the substantial

27   evidence in aggravation presented during the penalty phase show that the state court could

28

1    reasonably determine the outcome would not likely have been different absent the alleged

2    prosecutorial misconduct.  See Donnelly, 416 U.S. at 643 (improper jury argument by the state

3    does not present a claim of constitutional magnitude unless it is so prejudicial that the

4    petitioner's trial was fundamentally unfair . . . [t]o establish prejudice, the petitioner must

5    demonstrate either persistent and pronounced misconduct or that the evidence was so

6    insubstantial that, in all probability, but for the remarks, no conviction would have occurred); see

7    also Darden, 477 U.S. at 182 (claim of prosecutorial misconduct rejected where the prosecutor's

8    comments "did not manipulate or misstate the evidence, nor . . . implicate other specific rights of

9    the accused, such as the right to counsel or to remain silent."); Furman v. Wood, 190 F.3d 1002,

10   1006 (9th Cir. 1999) (rejecting habeas claim where, although some of prosecutor's arguments

11   were improper, jury was told comments were not evidence, and evidence against defendant was

12   substantial).

13        Generally, counsel are "given latitude in the presentation of their closing arguments, and

14   courts must allow the prosecution to strike hard blows based on the evidence presented and all

15   reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d 1246, 1253–1254 (9th Cir. 1996)

16   (quoting United States v. Baker, 10 F.3d 1374, 1415 (9th Cir. 1993)); see also United States v.

17   Molina, 934 F.2d 1440, 1445 (9th Cir. 1991) (prosecutor has wide latitude during closing

18   argument to make reasonable inferences based on the evidence).

19        Accordingly, the state court rejection of the claim was not contrary to, or an unreasonable

20   application of, clearly established federal law, and the state court's ruling was not based on an

21   unreasonable determination of the facts in light of the evidence presented in the state court

22   proceeding, viewed most favoring the prosecution, Jackson, 443 U.S. 307, 319 (1979). See 28

23   U.S.C. § 2254(d).

24        Claim 42 is denied on the merits.

25        11.    Ineffective Assistance Of Counsel In Penalty Phase  - Claims 43 through 61

26        a.     Clearly Established Law

27   The applicable legal standard is set forth above, in the preface to the Court's analysis of

28

1   claims 6-18.  The basic requirements of Strickland apply with equal force in the penalty phase.

2   Thus, Petitioner must show that counsel's actions fell below an objective standard of

3   reasonableness, and that the alleged errors resulted in prejudice.  Strickland, 466 U.S. at 687-88.

4          In the context of the penalty phase, just as in the guilt phase, the Supreme Court has

5   "declined to articulate specific guidelines for appropriate attorney conduct and instead [has]

6   emphasized that '[t]he proper measure of attorney performance remains simply reasonableness

7   under prevailing professional norms.'"  Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S.

8   at 688).  In the penalty phase, defense counsel has an "obligation to conduct a thorough

9   investigation of the defendant's background," Williams, 529 U.S. at 396, and defense counsel has

10  a duty to investigate, develop, and present mitigation evidence during penalty phase proceedings,

11  Wiggins, 539 U.S. at 521-23.  Counsel has a duty to make a "diligent investigation into his

12  client's troubling background and unique personal circumstances." Williams, 529 U.S. at 415

13  (O'Connor, J., concurring).

14         However, the Supreme Court has recognized that the duty to investigate does not require

15  defense counsel "to scour the globe on the off chance something will turn up; reasonably diligent

16  counsel may draw a line when they have good reason to think further investigation would be a

17  waste."  Rompilla v. Beard, 545 U.S. 374, 382-83 (2005) (citing Wiggins, 539 U.S. at 525

18  (further investigation excusable where counsel has evidence suggesting it would be fruitless));

19  Strickland, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and

20  psychological evidence would be of little help"); Burger, 483 U.S. at 794 (limited investigation

21  reasonable because all witnesses brought to counsel's attention provided predominantly harmful

22  information).  The Strickland court stated:

23

24         [S]trategic choices made after thorough investigation of law and facts relevant to
           plausible options are virtually unchallengeable; and strategic choices made after
25         less than complete investigation are reasonable precisely to the extent that
           reasonable professional judgments support the limitations on investigation. In
26         other words, counsel has a duty to make reasonable investigations or to make a
           reasonable decision that makes particular investigations unnecessary. In any
27         ineffectiveness case, a particular decision not to investigate must be directly
           assessed for reasonableness in all the circumstances, applying a heavy measure of
28         deference to counsel's judgments.

                                              127

1

2   <u>Strickland</u>, 466 U.S. at 690-691.

3   "In assessing counsel's investigation, the Court must conduct an objective review of their

4   performance, measured for reasonableness under prevailing professional norms," <u>Strickland</u>, 466

5   U.S. at 688, which includes a context-dependent consideration of the challenged conduct as seen

6   "from counsel's perspective at the time," <u>id.</u>, at 689 ("[e]very effort [must] be made to eliminate

7   the distorting effects of hindsight")." <u>Wiggins</u>, 539 U.S. at 523.  Further, the reasonableness of

8   counsel's actions may be determined or substantially influenced by the defendant's own

9   statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic

10   choices made by the defendant and on information supplied by the defendant.  In particular, what

11   investigation decisions are reasonable depends critically on such information.  <u>Strickland</u>, 466

12   U.S. at 691.

13   In order to demonstrate prejudice, Petitioner must show "a reasonable probability that,

14   but for counsel's unprofessional errors, the result of the proceeding would have been different."

15   <u>Id.</u> at 693-94.  To assess that probability, the reviewing court must consider the totality of the

16   available mitigation evidence and reweigh it against the evidence in aggravation.  <u>Porter v.</u>

17   <u>McCollum</u>, 558 U.S. 30, 41 (2009) (<u>citing</u> <u>Williams</u>, 529 U.S. at 397-398).  The court must

18   consider whether the likelihood of a different result if the evidence had gone in is "sufficient to

19   undermine confidence in the outcome" actually reached at sentencing.  <u>Rompilla</u>, 545 U.S. at

20   393 (<u>quoting</u> <u>Strickland</u>, 466 U.S. at 694).

21   **b.    Review of Claim 43**

22   In this claim, Petitioner alleges ineffective assistance of counsel by failure to seek

23   sufficient continuance to prepare for penalty phase and avoid adverse publicity from defense

24   counsel Toton's impending disbarment.

25   The California Supreme Court summarily denied claim 43 (SPet. Claim LL) raised in

26   Petitioner's state petition for habeas corpus.  <u>In re Sanchez</u>, S049502 (DD).  In this case, "the

27   habeas petitioner's burden still must be met by showing there was no reasonable basis for the

28

1    state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

2    arguments or theories supported or . . . *could have supported*, the state court's decision; and then

3    it must ask whether it is possible fair-minded jurists could disagree that those arguments or

4    theories are inconsistent with the holding in a prior decision of this Court." Id. (emphasis

5    added).

6         Petitioner states that defense counsel Frank was aware that proper penalty phase

7    preparation had not been completed when the penalty trial started.  Petitioner faults Frank for

8    failing to fully investigate neurological, psychiatric, drug use and social history defenses.

9    Petitioner points to retained social historian Dr. Wright, who found the penalty preparations

10   disorganized. (SHCP Ex. 131, Att. B, ¶ 6.)  This disorganization, according to Dr. Wright, was

11   exacerbated by the accelerated penalty phase time line following trial waiver at the guilt and

12   special circumstances phase, (SHCP Ex. 137, ¶ 16), and by defense counsel's delay in paying

13   defense service providers. (SHCP Ex. 137, Att. B, ¶ 16.)  Dr. Wright also suggested aspects of

14   the penalty defense were not completed by the time of the penalty trial (SHCP Ex. 137, App. B,

15   ¶¶ 11-14),  such that defense counsel should have requested a continuance.  (SHCP Ex. 137, ¶¶

16   10-21.)

17        However, the state court could reasonably find here, as it did in claim 13, *ante*, that

18   additional preparation time was unnecessary.  Defense counsel consulted with a serologist and

19   retained defense psychologist Donaldson in 1987. (RT [5/16/88] 3-4.)  Defense counsel Frank,

20   who was responsible for the penalty phase, had almost completed his preparation when, on July

21   14, 1988, Petitioner waived jury trial on guilt and special circumstances.  (CT 892; RT-115a;

22   SPet. Ex. 113, pp. 5-6.)  By Frank's own estimate, his preparations were to be complete by July

23   25, 1988.  (RT [5/16/88] 6.)  This was reasonably sufficient time given that the penalty phase did

24   not begin until September 21, 1988.  (CT 949.)  Defense counsel Frank was able to complete his

25   defense investigation prior to the penalty phase.  (RT [5/16/88] 3-6.)   During this time, Frank

26   retained Dr. Wright to prepare the social history  (SHCP Ex. 137, Att. B, ¶ 3), and hired defense

27   investigators Peninger and McGregor.  (SHCP Ex. 124, ¶¶ 1-2.)  Given the foregoing, the state

28

1  court could reasonably have found Dr. Wright allegations relating to inadequate trial preparation,

2  if considered evidence, to be unpersuasive.

3       Defense counsel, having already been granted a partially opposed three week continuance

4  on the eve of trial, could reasonably have concluded that a further continuance was unlikely.

5  (RT [5/16/88] 5-6; CT 713-714.)  Moreover, a further continuance was contrary to Petitioner's

6  stated desire to plead guilty to the Bocanegra murders.  (SPet. Ex. 520, p. 2; SPet. Ex. 700.)

7  Petitioner waived jury trial (RT [5/16/88] 7-8) and submitted guilt and special circumstances

8  phase on the preliminary hearing transcript and the testimony of additional prosecution

9  witnesses.  See Sanchez, 12 Cal.4th at 23-30.  Dr. Wright's suggestion a continuance would have

10  been granted could have been viewed as speculative.

11       Petitioner also alleges his defense was affected by publicity of the pending disbarment

12  proceedings against defense counsel Toton.  Petitioner asserts that defense Counsel Toton

13  received substantial adverse publicity in the Bakersfield Californian from his impending

14  debarment some two weeks before jury selection.  However, the record does not demonstrate that

15  jurors had knowledge of the debarment proceedings or that the jury was unfair or biased as to

16  Toton's disciplinary matter.  As discussed in claims 49 and 55, post, the California Supreme

17  Court reasonably have determined that there was "no showing the jury was unfair or biased."

18  Sanchez, 12 Cal. 4th at 62, n.6.  That court noted that, during voir dire, only two of the jurors

19  selected, Razo and Rodriguez, had heard of the case.  (RT 1814-1815; 2458-2460, 2471.)

20  Neither of those two jurors mentioned having hearing of Toton.  Both of those jurors indicated

21  they could put what they had heard out of mind while deliberating.  Id.  Petitioner proffers no

22  evidence these statements were untrue.

23       It is well-established that "juror impartiality . . . does not require ignorance."  Skilling v.

24  United States, 561 U.S. 358, 360 (2010)  81 (citing Irvin v. Dowd, 366 U.S. 717, 722 (1961))

25  (jurors are not required to be "totally ignorant of the facts and issues involved, scarcely any of

26  those best qualified to serve as jurors will not have formed some impression or opinion as to the

27  merits of the case.");  Reynolds v. U.S., 98 U.S. 145,  155–156  (1878) ("[E]very case of public

28

1   interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in
2   the vicinity, and scarcely any one can be found among those best fitted for jurors who has not
3   read or heard of it, and who has not some impression or some opinion in respect to its merits.").

4       When pretrial publicity is at issue, "primary reliance on the judgment of the trial court
5   makes [especially] good sense" because the judge "sits in the locale where the publicity is said to
6   have had its effect" and may base her evaluation on her "own perception of the depth and extent
7   of news stories that might influence a juror." Mu'Min v. Virginia, 500 U.S. 415, 427 (1991).

8       Here, for the reasons stated, the California Supreme Court could reasonably have
9   concluded that there was no reasonable likelihood that Petitioner did not receive a fair trial
10  despite limited pretrial publicity.  Sanchez, 12 Cal.4th at 61.  "A fair assessment of attorney
11  performance requires that every effort be made to eliminate the distorting effects of hindsight . . .
12  and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.
13  Bearing that in mind, and as discussed in the claims above, the penalty phase evidence against
14  Petitioner was substantial.  Nothing suggests a reasonable likelihood of a more favorable
15  outcome had there been a further continuance.

16      Accordingly, the state court could have reasonably determined that there was no
17  competent evidence of juror bias arising from Toton's state bar difficulties and related publicity.
18  Petitioner has not established that defense counsel's failure to seek a further continuance to
19  prepare for the penalty trial and to avoid adverse publicity fell below an objective standard of
20  reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding
21  would have been different.  Strickland, 466 U.S., at 687-694.

22      A fair-minded jurist could have found that the state court rejection of the claim was
23  neither contrary to, or an unreasonable application of, clearly established federal law, as
24  determined by the Supreme Court, nor an unreasonable determination of the facts in light of the
25  evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

26      Claim 43 is denied.

27      **c.**    **Review of Claim 44**

28

1     Petitioner next claims ineffective assistance of counsel by the individual and cumulative

2   failure to conduct additional investigation and present mitigating evidence in the Bocanegra

3   homicides.

4     The California Supreme Court summarily denied claim 44 (SPet. Claim MM) raised in

5   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD). In this case, "the

6   habeas petitioner's burden still must be met by showing there was no reasonable basis for the

7   state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

8   arguments or theories supported or . . . *could have supported*, the state court's decision; and then

9   it must ask whether it is possible fair-minded jurists could disagree that those arguments or

10   theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

11   added).

12     The Court finds that Petitioner has not made a sufficient showing that he was prejudiced

13   by defense counsel's failure to further investigate and present mitigating evidence of the

14   Bocanegra homicides, for the reasons discussed below.

15         i.     *Jailhouse Informant Hernandez*

16     The Court finds that, for reasons discussed in claims 2 and 7, the decision of defense

17   counsel not to further investigate and impeach jailhouse informant Hernandez regarding

18   substance abuse and heroin addiction (SCHP Exhs. 112, ¶ 10; 137, ¶ 37; 113, ¶ 34), and his

19   changing testimony to inculpate Petitioner as an equal participant in all three homicides (CT 488;

20   RT 2842-44), could reasonably reflect counsel's lack of knowledge of sufficient supporting facts.

21   (SHCP Exhs. 137, ¶ 37; 113, ¶ 34; 112, ¶ 4.)

22     Additionally, it appears unlikely such impeachment would have been effective.  See

23   claims 2, 7, *ante*; see also Burger, 483 U.S. at 795 (failure to pursue fruitless or harmful

24   investigation not unreasonable).  The evidentiary record did not demonstrate that Hernandez, by

25   virtue of his alleged substance addition, his plea deal, or otherwise, was motivated to and did

26   testify falsely or inaccurately.  (SPet. Ex. 900, pp. 4, 11; SResp. Ex. B.)  Defense counsel Toton

27   cross-examined Hernandez at the preliminary hearing and asked Hernandez about any

28

1   undisclosed plea deal during cross-examination in the guilt and special circumstances phase.

2   (CT 576-577.)    Hernandez's testimony was consistent with Petitioner's statements and the

3   physical evidence.  (CT 355, 378-380; 576-77.)  Hernandez was not offered any disposition of

4   pending criminal matters prior to agreeing to testify at the Petitioner's proceeding.  (Id.; See

5   SResp. Ex. B.)    Toton later cross-examined Hernandez during the penalty phase.  Hernandez

6   admitted a deal on a then pending charge in exchange for his testimony.  (RT 2850-2857.)   As

7   discussed in claim 7, *ante,* Hernandez's testimony was not false or misleading.

8          Accordingly, the state court could reasonably have found that defense counsel were not

9   deficient in the decision not to conduct additional investigation of Hernandez to impeach him.

10          *ii.*     *Jailhouse Informant Seeley*

11          The Court finds that for reasons discussed in claims 2 and 8, the decision of defense

12   counsel not to further investigate alleged statements of jailhouse informant Charles Seeley

13   regarding Reyes's involvement in the Bocanegra homicides, could have been a reasonable trial

14   tactic given the evidentiary record.   Toton had dealt with Seeley in a separate matter and based

15   thereon doubted Seeley's credibility and whether the prosecution would call him.  (SPet. Ex.

16   137, p. 4.)  Seeley's version of events seemed contrary to the physical evidence at the Bocanegra

17   crime scene.  (SPet. Ex. 419, pp. 5-6, 17; CT 355-382.)  See e.g., Denham, 954 F.2d at 1505-06

18   (9th Cir. 1992) (defense counsel not ineffective where decision not to call witness based on

19   inconsistencies in witness's testimony).

20          Also, Seeley's testimony could reasonably have been viewed as more inculpating of

21   Petitioner than was Hernandez's testimony.  (SPet. Ex. 419, pp. 6-8, 18-19.)  Seeley's testimony

22   would have been subject to rebuttal by the substantial contrary evidence from Hernandez,

23   Stratton, Trihey, as well as by the crime scene physical evidence.

24          Defendant counsel Frank, for his part, had a tactical reason for not interviewing Seeley to

25   the extent any evidence provided by Seeley related only to the guilt and special circumstances

26   phase that were handled by Toton.  (See SPet. Ex. 113, p. 4.)

27          Accordingly, the state court could reasonably have found that defense counsel was not

28

1   deficient in the decision not to conduct further investigation of Seeley and present him as a

2   defense witness.

3           iii.    _Joey Bocanegra_

4           The Court finds that, for reasons discussed in claims 2 and 9, the evidentiary record could

5   reasonably support as trial tactics, the failure of defense counsel to further investigate and

6   present evidence about Joey's role in the murders of his parents including Joey's history of

7   violence, violent temper, PCP use around the time of the murders, and the sudden fight with Mr.

8   Bocanegra that preceded the murder.  There was substantial evidence that Petitioner aided and

9   abetted the Bocanegra murders with premeditation and deliberation.  (See claims 1-8.)  So much

10  so that defense counsel chose not to object to the prosecution's two assailant theory.

11          Petitioner has not made an evidentiary showing of prejudice regarding evidence about

12  Joey.  In the face of such substantial evidence of guilt, the state court could reasonably have

13  determined that a showing of Joey's temper and prior assaultive conduct would not have raised a

14  reasonable doubt that Petitioner aided and abetted the premeditated and deliberate murders of

15  Mr. Bocanegra and Mrs. Bocanegra.  Moreover, such a defense was contrary to Petitioner's

16  stated desire to plead guilty to the Bocanegra murders (SPet. Ex. 520, p. 2) and "dying for his

17  crimes but dying with a clear conscience." (SPet. Ex. 700.)  Petitioner waived jury trial and

18  submitted guilt and special circumstances phase on the preliminary hearing transcript and the

19  testimony of additional prosecution witnesses.  See Sanchez, 12 Cal.4th at 23-30.

20          The state court could reasonably have found that the record did not suggest that evidence

21  about Joey would have changed the result, given Petitioner's incriminating statements to

22  detective Stratton and reporter Trihey and the crime scene evidence corroborated by Hernandez's

23  testimony, (see claims 1-4, _ante_), supporting Petitioner's intent to aid and abet the murders.

24          The state court could reasonably have found that defense counsel was not deficient in the

25  decision not to conduct additional investigation of Joey Bocanegra regarding his role in the

26  murders of his parents.

27          iv.     _Physical Evidence_

28

134

1    The Court finds that, for the reasons discussed in claims 1, 3, 10, 38 and 39, the failure of

2    defense counsel to further investigate crime scene evidence was not unreasonable.

3    Petitioner revisits his allegations relating to Laskowski's testimony in this proceeding

4    that crime scene photographs showed two types of shoe prints in the Bocanegra kitchen, and

5    Laskowski's subsequent re-examination of the photographs and identification of three types of

6    shoe patterns in the kitchen and outside the Bocanegra home. (Pet. Ex. 121, p. 2; Ex. 417, pp. 1-

7    2; SHCP 137, Ex. A.)  Petitioner argues further investigation could have shown that Reyes, not

8    Petitioner, caused the scalp wounds.  However, Reyes admitted in subsequent proceedings that

9    he served as lookout during the murders and entered the residence only afterwards to assist

10   Petitioner and Joey.  (SResp., Ex. A.)  Evidence of Petitioner's shoeprint in the kitchen also

11   undermines Seeley's testimony that Petitioner watched the assault on Mr. Bocanegra from the

12   hallway. (SHCP, Ex. 419, pp. 6, 7, 22-23.)  Evidence suggesting the presence of a third non-

13   victim in the Bocanegra Home does not does demonstrate or suggest a third person was present

14   during the murders.  (See claim 30, 32, *ante*.)  Significantly, defense counsel did not to object to

15   the two assailant theory (SHCP Ex. 137, ¶ 22) and the state record suggests this decision was not

16   unreasonable.

17   Petitioner also revisits testimony by Dr. Holloway that the scalp wounds were non-fatal.

18   (CT 119, 158-159.)  Petitioner argues that further investigation could have shown the blows to

19   the head were not of such force as would show an intent to kill. However, as discussed in claims

20   1 and 3, there was substantial evidence of Petitioner's aider and abetter liability.  The violent

21   nature and extended duration of the struggles with Mr. Bocanegra and Mrs. Bocanegra, with

22   Joey taking time to get a kitchen knife, and Petitioner attempting to subdue and restrain each of

23   the victims during Joey's assault on them, along with the multiple stab and blunt force wounds

24   inflicted during room to room struggle with the victims, reasonably suggest a plan to kill them.

25   (CT112-120; 149-156; 159; 167; 181; 192-194; 357-383; 479-483; 488.)   Each victim suffered

26   multiple stab wounds (id.) and was left unassisted to hemorrhage to death. (CT 114-119.)  There

27   was evidence Mrs. Bocanegra's wrists had been tied together and that she had been gagged. (CT

28

113, 149-150, 153.) She suffered 26 stab wounds, three fatal, and six scalp wounds during the struggle. (CT 115-116, 153-154.) Mr. Bocanegra was stabbed at least eight times and had nine scalp wounds. (Id.) Defense counsel could reasonably have determined to focus limited resources elsewhere.

Additionally, there is no reasonable likelihood that the foregoing testimony of Laskowski and Holloway affected the jury's imposition of the death penalty, see Agurs, 427 U.S. at 103, or made trial so fundamentally unfair as to deny due process. Donnelly, 416 U.S. at 645. The evidence against Petitioner was substantial. A fair-minded jurist could conclude from the evidence and statements Petitioner made to Hernandez and Detective Stratton, that Petitioner assisted Joey in murdering Mr. Bocanegra and Mrs. Bocanegra (RT 2843-45, 2851-2854, 2856-59) and that he desired to enter a guilty plea. (SPet. Ex. 520, p. 2; see CT 891-92; RT [5/16/88] 7; RT- 108a-155a.)

Defense counsel's failure to further investigate and rebut the prosecution's physical evidence supporting the two assailant theory was not unreasonable given the evidentiary record.

        v.      *Mental Defenses*

The Court finds that, for the reasons discussed in claims 2 and 6, the failure of defense counsel to further investigate and present mitigating evidence of Petitioner's organic brain damage and psychiatric impairments could reasonably be justified by a lack of supporting evidence. (SHCP Exhs. 113, ¶ 31; 139, ¶ 11; 136, ¶ 10.) The evidentiary record suggests that Petitioner was not under the influence of phencyclidine (PCP), marijuana, or alcohol at the time of the Bocanegra and Tatman murders. The evidence proffered by Petitioner suggests a history of substance abuse (SPet. Exhs. 105, pp. 64-65, 74-75; 110,  p. 1; 119, p. 8; 123, p.1; 128, pp. 1-2), continuing through the weeks prior to the murders. (SPet. Ex. 105, pp. 85-87.) However, Respondent correctly points to the absence of competent evidence that Petitioner ingested and/or was under the influence of phencyclidine, marijuana, or alcohol on the days the Bocanegra and Tatman murders occurred.

As discussed in claim 6, defense psychologist Donaldson did not recommended to

136

1    defense counsel that a neuropsychological evaluation be performed.  Court appointed psychiatrist

2    Matychowiak, following his November 1987 examination, found that Petitioner was not suicidal

3    or delusional or suffering memory gaps (SPet. Ex. 520, p.5); that Petitioner planned to tell the

4    judge he was guilty (Id. at 2); and that Petitioner understood the proceedings and could cooperate

5    with counsel.  (Id. at 6.)  Petitioner told Matychowiak that he planned to tell the jury he was

6    guilty and "get it over with."   (SPet. Ex. 520, p. 2.)   Dr. Matychowiak found Petitioner

7    competent to stand trial. (SPet. Ex. 520, p. 2-6.)

8         The state court could reasonably have found that defense counsel were not deficient in

9    the decision not to conduct additional investigation of mental state defenses.

10        Accordingly, all the foregoing allegations of failure to investigate and present mitigating

11   evidence are insubstantial when considered cumulatively for the reasons stated.  See Karterman,

12   60 F.3d at 580.

13        For the reasons stated, a fair-minded jurist could have found that the state court rejection

14   of this claim was neither contrary to, or an unreasonable application of, clearly established

15   federal law, as determined by the Supreme Court, nor an unreasonable determination of the facts

16   in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

17        Claim 44 is denied.

18        **d.    Review of Claim 45**

19        In his next claim, Petitioner alleges ineffective assistance by counsel's failure to object to

20   admission of prejudicial crime scene and autopsy photographs.

21        The California Supreme Court summarily denied claim 44 (SPet. Claim NN) raised in

22   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).

23        The state supreme court also considered and rejected this claim on appeal:

24

25        The trial court admitted into evidence 44 photographs, including 2 photographs of
          the autopsies of Juan and Juanita Bocanegra depicting the extensive nature of
          their scalp wounds. (Exhibits Nos. 13 & 14.) The autopsy photographs had been

26        excluded from the guilt phase following a successful motion in limine by
          defendant. The trial court overruled defendant's objection to the admission of the

27        autopsy photographs, however, for the penalty phase. We first review his
          contention that the trial court erred in admitting the autopsy photographs because

28

                                        137

they were cumulative, misleading and inflammatory, and their prejudicial effect substantially outweighed their probative value.

In overruling defendant's objection, the court stated: "These scalp wounds are absolutely very important that the jury see. And they are not the kind of autopsy pictures-they're bad, I'll say that, all autopsy pictures are bad, but they're not the blood and guts type of thing that you sometimes see in autopsy pictures. And I think the prejudicial effect is far, far, far, and I can't stress it enough, outweighed by the probative value of these scalp wounds."

Defendant contends the trial court committed prejudicial error in admitting Exhibits Nos. 13 and 14 in violation of his right to a fair trial and reliable penalty determination under the Eighth and Fourteenth Amendments of the federal Constitution. The thrust of his argument is that the photos were not relevant to the penalty determination, were cumulative to the testimony of Dr. Holloway (the forensic pathologist who performed the autopsies on the Bocanegras), and seriously misled the jury as to defendant's culpability in the Bocanegra murders. In sum, the sole purpose of allowing the photographs, defendant asserts, was to improperly shock and horrify the jury.

Defendant points to the prosecutor's explanation to the jury as to why she believed the autopsy photographs were important evidence and asserts her comment actually exploited the prejudicial effect of the evidence: "You will have the pictures available to you. Look at the scalp wounds. You make the decision. But whatever, [Mrs. Bocanegra] would not have been killed but for the help of Teddy Brian Sanchez, and he is just as guilty of the murder as Joey Bocanegra." Defendant claims that because the probative value of the photographs was clearly outweighed by their prejudicial effect, their admission violated his constitutional rights.

The decision whether to admit photographs is within the trial court's discretion and will not be disturbed unless their prejudicial effect substantially outweighs their probative value. [Citation] We have examined Exhibits Nos. 13 and 14 and have determined they are not so horrific or shocking that we can conclude the trial court abused its discretion in admitting them. [Citation] The jury was familiar with the facts of the crime, and the photographs had substantial probative value in demonstrating defendant's culpability as an aider and abettor, and as corroborative of Hernandez's testimony implicating defendant in the crimes. Moreover, the probative value of the photographs was not diminished simply because the scalp wounds alone were not fatal to the victims. The photographs corroborated the testimonial evidence and were relevant to a determination of the appropriateness of the death penalty. [Citation]

Defendant's claim that there was no dispute as to the circumstances of the murders is not supported by the facts. Defense counsel Frank argued at the penalty phase that defendant should be spared the death penalty if the jury had a "lingering doubt" about the extent of defendant's participation in the Bocanegra killings.

Nor is defendant assisted by People v. Love (1960) 53 Cal.2d 843, 856-857, in which we held that the trial court's admission of a photograph showing the victim's face as she was dying, and of a tape recording of her last words as she lay on a hospital table in extreme pain, was prejudicial because it "served primarily to inflame the passions of the jurors." [Citation] Here, by contrast, the autopsy photographs depicting the Bocanegras' scalp wounds were clearly probative of (i) the manner in which the victims were wounded, (ii) defendant's culpability as an

138

1    aider and abettor, (iii) the malice and aggravation of the crime, and (iv) the
     appropriate ultimate penalty. [Citation]

2

3    Because we find no error in admitting the autopsy photographs, we need not
     address defendant's claims that admission of other photographs during the penalty
     phase (Exhibits Nos. 9, 18, 19 & 25, depicting the wounds on the Bocanegras and
4    Tatman) did not render harmless the prejudicial effect of the autopsy photos. Nor
     do we address defendant's related argument that, assuming we conclude the
5    admission of these photographs "undercut the prejudice resulting from the
     admission" of the autopsy photographs, trial counsel was ineffective for failing to
6    object to their admission. Neither argument is persuasive in light of our
     conclusion that the court did not err in admitting the autopsy photographs at the
7    penalty phase.

8    Sanchez, 12 Cal.4th at 63-65.

9           A due process claim can be stated where graphic photos of victims make the trial

10   fundamentally unfair.  Jammal, 926 F.2d at 919.  However, photos that are relevant to the crime

11   charges and elements thereof are admissible.  See Villafuerte v. Lewis, 75 F.3d 1330, 1343

12   (1996).  Under California law, "photographs which disclose the manner in which the victim was

13   wounded are relevant on the issues of malice and aggravation of the crime and the penalty."

14   People v. Thompson, 50 Cal.3d 134, 182 (1990).

15          Petitioner, citing in support to claim 56, post, alleges the jury was allowed to view

16   inflammatory and prejudicial autopsy, crime scene and victim photographs (RT 2891-2892),

17   depicting graphic and gory injuries unrelated to actions attributed to Petitioner, which should

18   have been excluded under California Evidence Code section 352, and that caused the penalty

19   trial to be fundamentally unfair.  He claims there was no tactical reason not to object to these

20   photographs.

21          The state record shows that defense counsel Toton did move to exclude all photographs

22   during the guilt phase (RT-30a-33a).  At the penalty phase, two autopsy photos of Mr. Bocanegra

23   and Juanita's scalp wounds (People's Exhs. 13, 14) were admitted, over the defense's objection,

24   (RT 2876, 2880-2281, 2285, 2891-2892), and the victim photos were admitted without objection.

25   (RT 2891).

26          However, the state court could reasonably find that Petitioner was not prejudiced by

27   introduction of the photos or failure of defense counsel to object to them.  The Court agrees with

28

                                            139

1    the state court reasoning in finding the photographs relevant and probative of charges and

2    elements including intent to kill, aggravation and penalty.

3         Nor does the failure to object necessarily demonstrate ineffective assistance.  See Nefstad

4    v. Baldwin, 66 F.3d 335 at *3 (9th Cir. 1995) (holding no violation of due process where

5    prosecutor during closing argument shows photographs of victim before and after murder

6    because relevant to intent).

7         Even without the photographs, it is not reasonably probable the jury would have returned

8    a sentence less than death given the evidence in aggravation including the circumstances

9    surrounding the murders of the Bocanegras and Mr. Tatman, and Petitioner's 1982 assaults on

10   Ammarie and Pena.  (RT 2863-2874.)

11        Accordingly, the state court could reasonable have found that Petitioner failed to make an

12   evidentiary showing that  defense counsel's performance fell below an objective standard of

13   reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding

14   would have been different.  Strickland, 466 U.S., at 687-694.

15        It follows that the state court rejection of the claim was neither contrary to, or an

16   unreasonable application of, clearly established federal law, nor  based on an unreasonable

17   determination of the facts in light of the evidence presented in the state court proceeding.  See 28

18   U.S.C. § 2254(d).

19        Claim 45 is denied.

20        **e.    Review of Claim 46**

21        Petitioner next claims ineffective assistance by failure to contest prosecution evidence of

22   lack of remorse.

23        The California Supreme Court summarily denied claim 46 (SPet. Claim OO) raised in

24   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  In this case, "the

25   habeas petitioner's burden still must be met by showing there was no reasonable basis for the

26   state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

27   arguments or theories supported or . . . could have supported, the state court's decision; and then

28

1    it must ask whether it is possible fair-minded jurists could disagree that those arguments or

2    theories are inconsistent with the holding in a prior decision of this Court." Id. (emphasis

3    added).

4         Petitioner alleges that he was prejudiced by Boggs's false testimony attributing to

5    Petitioner the lack of remorse shown by Reyes following the Tatman murder, i.e., that Reyes and

6    Petitioner "kicked back, drank some whiskey, smoked some dope, ate some food, and just

7    relaxed for the rest of the evening." (RT 2663-64; SPet. Ex. 100.) An error that Ryals also made

8    in her opening argument. (RT 2619.) Petitioner faults his counsel for failure to cross-examine

9    Boggs, and failure to introduce evidence of Petitioner's remorse expressed to reporter Trihey and

10   his friends Robin and Debbie Lozano.

11        The Court is not persuaded by this claim. Petitioner's contention regarding to Boggs's

12   allegedly false testimony and defense counsel's failure to cross-examine Boggs on this issue fails

13   substantively for reasons discussed in claim 37, i.e., the state court could reasonably have

14   concluded that prosecutor Ryals did not know of and knowingly rely upon Boggs's erroneous

15   testimony, (SPet. Exhs. 137, p. 12; 113, p.10; SResp. Ex. B), and there is no reasonable

16   likelihood the error affected the result of trial or caused an unfair trial.

17        Petitioner also alleges prejudice from Ryals's opening argument in which she made

18   reference to Boggs's errant testimony. Under California law, the absence or presence of remorse

19   is a factor relevant to the jury's penalty determination. People v. Ghent, 43 Cal.3d 739, 771

20   (1987); see also Harris v. Pulley, 885 F.2d 1354, 1384 (9th Cir. 1988). The prosecutor's

21   comment is impermissible only where it is "manifestly intended to call attention to the

22   defendant's failure to testify or is of such a character that the jury would naturally and necessarily

23   take it to be a comment on the failure to testify." Beardslee v. Woodford, 358 F.3d 560, 586 (9th

24   Cir. 2003). Here the prosecution evidence of lack of remorse did not refer to Petitioner's failure

25   to testify, but rather to statements that were already in evidence.

26        Additionally, there is not a reasonable probability that statements of remorse to Trihey

27   and acquaintances, the Lozanos, even if taken as admissible evidence of remorse, could have

28

1    affected the jury's imposition of the death penalty.   Statements of remorse to Trihey were

2    themselves inculpating.  (SPet. Ex. 113, p. 12.)  Moreover, a lack of remorse is in any event

3    suggested by Petitioner's statements describing  Mr. Tatman's murder and robbery, his intention

4    to rob Mr. Tatman, how Reyes stabbed Mr. Tatman, and how Petitioner and Reyes then took Mr.

5    Tatman's things back to their room.   (RT 2658-2666.)   Tactical reasons for not presenting

6    remorse evidence are reasonably suggested by hearsay issues relating to Petitioner's proffer (Pet.

7    719) and the defense strategy to not admit guilt but rather focus on "residual or lingering doubt."

8    (SPet. Ex. 113, pp. 8-12.)

9          The state court could have reasonably believed that Petitioner's confession to Boggs of

10   the circumstances surrounding Tatman's murder and Petitioner's involvement in it would have

11   undercut any sympathy toward him by the jury.   (See RT 2658-2666.)   Moreover, defense

12   counsel could reasonably have decided that a lingering doubt defense and mitigating social

13   history might well have been weakened by evidence of remorse.  (See RT 3053-3055, 3063-

14   3064.)

15         The Court finds that Petitioner has not established that defense counsel's performance fell

16   below an objective standard of reasonableness and that, but for counsel's unprofessional errors,

17   the result of the proceeding would have been different.  Strickland, 466 U.S., at 687-694.

18         For the reasons stated, a fair-minded jurist could have found that Petitioner failed to

19   establish that the state court rejection of the claim was contrary to, or an unreasonable

20   application of, clearly established federal law,  or an  or an unreasonable determination of the

21   facts in light of the evidence presented in the state court proceeding, viewed most favoring the

22   prosecution.  Jackson, 443 U.S. at 319.  See 28 U.S.C. § 2254(d).

23         Claim 46 is denied.

24         **f.    Review of Claim 47**

25         Petitioner next claims ineffective assistance by counsel's failure to investigate and

26   present mitigation evidence regarding the 1982 Ammarie and Pena Crimes.

27         The California Supreme Court summarily denied claim 47 (SPet. Claim PP) raised in

28

1   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  In this case, "the

2   habeas petitioner's burden still must be met by showing there was no reasonable basis for the

3   state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

4   arguments or theories supported or . . . could have supported, the state court's decision; and then

5   it must ask whether it is possible fair-minded jurists could disagree that those arguments or

6   theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

7   added).

8       The trial record reveals Mr. Ammarie, the store keeper victim in one incident, testified at

9   the penalty phase that, on May 7, 1982, Petitioner assaulted him when Ammarie refused to "get

10  [Petitioner] some bacon."  Petitioner stabbed Ammarie in the left shoulder and neck, took money

11  and ran away, leaving Ammarie in the hospital for two weeks.  (RT 2862-2866; see Sanchez, 12

12  Cal.4th at 22.)  The victim in the other incident,  Mr. Pena, a friend of and Petitioner, testified at

13  the penalty phase that Petitioner, without any provocation, stabbed him three times with a

14  kitchen knife and demanded money, leaving Pena hospitalized for two days.  (RT 2868-74.)

15      Petitioner contends that, as to the Ammarie and Pena crimes, defense counsel failed to

16  investigate and present mitigating evidence of Petitioner's emotional and family turmoil,

17  possible PCP psychosis, organic brain damage, and belief he acted in self-defense in these

18  incidents.  Petitioner claims there was no tactical reason for these omissions.

19      The Court finds this claim unavailing.  Petitioner does not offer facts showing the nature

20  and extent of the investigation conducted by defense counsel Frank, or what information if any,

21  Petitioner provided to defense counsel Frank in preparation for the penalty phase, or what

22  Petitioner did, if anything, to cooperate in developing mitigating penalty phase evidence.  As the

23  Supreme Court stated in Strickland, the information supplied by the defendant is "critical" in

24  determining whether counsel's investigation decisions are reasonable.  466 U.S. at 691.  Counsel

25  is "strongly presumed" to make decisions in the exercise of professional judgment.  Id. at 690.

26      Petitioner faults defense counsel Frank for failure to consult with counsel who assisted

27  Petitioner in the 1982 criminal proceedings.   Yet Petitioner does not state what credible,

28

1    probative mitigating information this consultation would have yielded over and above the police

2    and court records relating to the 1982 convictions, which Petitioner concedes defense counsel

3    undertook to obtain.   (SHCP Exhs. 137, ¶ 35; 113, ¶ 30.)

4          Petitioner faults defense counsel's for a failure to investigate possible social and mental

5    defenses contemporaneous to the 1982 crimes, including probable effects of alleged heavy PCP

6    use.  Petitioner offers in support the 1995 opinion of a clinical psychologist, Jeri Doane, as to the

7    effect of losses and turmoil in his personal life (SPet. Ex. 105, pp. 75-78), as well as anecdotal

8    assertions of Petitioner and others regarding potential mental and other defenses to his 1982

9    criminal conduct.  (SPet. Exhs. 105, pp. 1-5, 79-82, 99- 100; 802; 506, pp.6-8; 128, p. 2.)

10        But even assuming this type of mitigating information could be competent evidence, it

11    does not suggest Petitioner informed defense counsel in this proceeding of the existence of this

12    mitigating information, or that defense counsel in this proceeding was otherwise aware of it or

13    should have been aware of it.  Moreover, defense counsel Frank could reasonably have believed

14    such information, if developed, would have little if any mitigating value.  Petitioner does not

15    dispute that he was convicted of the 1982 crimes.  *Post hac* assertion of defenses to convictions

16    suffered years prior could reasonably be found to have little if any mitigating value.  As to

17    mental defenses, the lack of supporting evidence (see claim 6), and the fact that Petitioner was

18    convicted for these 1982 offenses, could reasonably suggest further investigation was

19    unwarranted.  Based on the evidentiary record, defense counsel could reasonably presume viable

20    defenses in the 1982 proceedings were raised therein.

21        These defenses would not advance defense counsel Frank's tactic of lingering doubt.

22    "Rare are the situations in which the 'wide latitude counsel must have in making tactical

23    decisions' will be limited to any one technique or approach."  Richter, 131 S. Ct. at 789 (quoting

24    Strickland, 466 U.S. at 689); see also Williams, 529 U.S. at 415 (O'Connor, J., concurring)

25    (defense counsel conducted a reasonable investigation into Petitioner's troubling background and

26    unique personal circumstances developed a coherent and organized strategy, proffered evidence,

27    and presented a case for mitigation); Wiggins, 539 U.S. at 521 (citing Strickland, 466 U.S. at

28

688) ("the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.").

       Just as the Supreme Court found in <u>Van Hook</u>,

> This is not a case in which the defendant's attorney [] failed to act while potentially powerful mitigating evidence stared [him] in the face, <u>cf</u>. <u>Wiggins</u>, 539 U.S., at 525, 123 S. Ct. 2527, or would have been apparent from documents any reasonable attorney would have obtained, <u>cf</u>. <u>Rompilla v. Beard</u>, 545 U.S. 374, 389–393, 125 S. Ct. 2456, 162 L.Ed.2d 360 (2005). It is instead a case, like <u>Strickland</u> itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

<u>Bobby v. Van Hook</u>, 558 U.S. 4, 11-12 (2009) (<u>quoting</u> <u>Strickland</u>, 466 U.S. at 699).

       Additionally, even if defense counsel Frank's investigation and presentation relating to the 1982 crimes was deficient, there was no reasonable probability such mitigation evidence could have affected the jury's imposition of the death penalty given the noted substantial evidence against Petitioner. The state court could reasonably have concluded that defense counsel's investigation was adequate given the above noted facts underlying these prior criminal convictions, defense counsel Frank's theory of lingering doubt and the social and personal history mitigation evidence discussed in claims 6, 26, *ante*.

       For these reasons, Petitioner has failed to overcome the strong presumption that counsel made decisions in the exercise of professional judgment. <u>Strickland</u>, 466 U.S. at 690. Even if defense counsel had discovered this evidence and still chose to proceed with his strategy as opposed to the strategy Petitioner now advocates, a fair-minded jurist could conclude that his decision was reasonable. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." <u>Richter</u>, 562 U.S. at 107. "[T]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." <u>Yarborough</u>, 540 U.S. at 8.

       Petitioner fails to demonstrate that no reasonable jurist could have found that he failed to make a prima facie showing that defense counsel rendered ineffective assistance during the penalty phase of the trial relating to mitigating the 1982 criminal convictions.

1    For the reasons stated, a fair-minded jurist could have found that the state court rejection

2  of this claim was neither contrary to, or an unreasonable application of, clearly established

3  federal law, as determined by the Supreme Court, nor an unreasonable determination of the facts

4  in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

5    Claim 47 is denied.

6    **g.    Review of Claim 48**

7    Petitioner next claims ineffective assistance by counsel's failure to fully and completely

8  develop and present adequate and reliable evidence about Petitioner's character, background, and

9  behavior.

10    The California Supreme Court summarily denied claim 48 (SPet. Claim QQ) raised in

11  Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  In this case, "the

12  habeas petitioner's burden still must be met by showing there was no reasonable basis for the

13  state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

14  arguments or theories supported or . . . could have supported, the state court's decision; and then

15  it must ask whether it is possible fair-minded jurists could disagree that those arguments or

16  theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

17  added).

18    Petitioner, citing to facts alleged in claim 6, contends that background and character

19  testimony from four family members as well as social anthropologist Isabel Wright did not fully

20  present evidence of his unstable family life, sporadic education, disabling physical violence,

21  abuse, deprivation, and emotional suffering of his childhood and adolescence his caring for

22  siblings and heavy drug use.  He alleges that defense counsel Frank, consistent with  Wright's

23  requests, should have presented a full social history prepared by a social anthropologist, along

24  with evidence of organic brain damage and psychiatric disorders prepared by a psychologist or

25  psychiatrist, such as included with his state petition.  (SHCP Exhs. 105, 111, 114.)

26    During the sentence selection stage, the Supreme Court has imposed a requirement that

27  the jury make "an *individualized* determination on the basis of the character of the individual and

28

146

1    the circumstances of the crime." <u>Tuilaepa</u>, 512 U.S. at 972-73 (<u>citing</u> <u>Zant</u>, 462 U.S. at 879, and

2    <u>Woodson v. North Carolina</u>, 428 U.S. 280, 303-304 (1976)).  This "requirement is met when the

3    jury can consider relevant mitigating evidence of the character and record of the defendant and

4    the circumstances of the crime." <u>Id.</u> (<u>citing</u> <u>Blystone v. Pennsylvania</u>, 494 U.S. 299, 307 (1990))

5    ("requirement of individualized sentencing in capital cases is satisfied by allowing the jury to

6    consider all relevant mitigating evidence").  The court may not "impede [] the sentencing jury's

7    ability to carry out its task of considering all relevant facets of the character and record of the

8    individual offender" by excluding "relevant mitigating evidence." <u>Skipper v. South Carolina</u>,

9    476 U.S. 1, 8 (1986).  Nevertheless, the court retains "the traditional authority of a court to

10   exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the

11   circumstances of his offense." <u>Lockett v. Ohio</u>, 438 U.S. 586, 605 n.12 (1978).

12       The Court does not find that Petitioner was prejudiced by any failure of defense counsel

13   to develop and present complete, adequate, and reliable evidence of Petitioner's character,

14   background, and behavior at the time of the Bocanegra and Tatman homicides.

15       Defense counsel Frank, while arguing for life without the possibility of parole, (RT 2895-

16   2896, 2910, 2923, 2928, 3021), did present the following significant mitigating background and

17   character evidence from family members including Petitioner's wife and retained social

18   anthropologist Dr. Wright.  (RT 2897, 2912, 2928, 2930, 3007-3008, 3017.)  Petitioner's mother

19   became pregnant with him when she was fifteen.  (RT 2897-2898, 2943-2945.)  His mother

20   turned to alcohol and drugs (2899-2900, 2902-2903) and embarked upon a succession of

21   unstable and unsupportive marriages and relationships.  Petitioner experienced an impoverished,

22   nomadic, neglected and sometimes abusive upbringing with little positive parental or adult

23   supervision.  (RT 2902-2941, 2958-2964, 3003-3006.)  He lived in a car and then cheap motels.

24   (RT 2904, 2908, 2918-2919.)  His parents drank and argued, (RT 2905, 2909), and sometimes

25   physically abused Petitioner (RT 2907, 2985.)  His siblings were removed from the home for

26   adoption.  (RT 2913-2914, 2941, 2970, 2978-83.)  His lack of stability in school, changing

27   schools often and infrequently attending class, resulted in poor academic performance such that

28

1  he did not progress beyond the eighth grade. (RT 2963-2969, 2941-2942, 2980, 2991-2994.)  He

2  began sniffing paint as a teen.  (RT 2993, 2998.)  His attempts at job training and employment

3  (RT 2996-2997) were short-lived because of his lack of skills and education. (RT 3003-3004.)

4          Defense Counsel Frank presented evidence that Petitioner nonetheless showed concern

5  and  care  for  his  siblings,  sometimes  stealing  food  for  them.    (RT 2920.)    Petitioner's

6  grandmother, to whom he was close, died in 1982 (RT 3000).  Petitioner's mother died from

7  alcohol related complications at age thirty-eight while he was in prison for the 1982 Ammarie

8  and Pena stabbings.  (RT 2897, 2912, 2916, 3001.)  Petitioner's step-father also died from

9  complication of alcohol.  (RT 2919, 2961.)  Petitioner lived a transient existence after his release

10  from prison in 1986. (RT 3001-3002.)   Petitioner was unable to find work and resorted to drugs.

11  (Id.)  Petitioner married Robin Alvarado shortly before his 1988 homicide trial, (RT 2925, 2928),

12  and prior to that cared for her children.  (RT 2927, 3000, 3018-3019.) Social anthropologist, Dr.

13  Wright,  testified  that  the  major  influences  in  Petitioner's  life  were  his  migratory  lifestyle

14  secondary to poverty and inconsistent family relationships.  (RT 2939, 3003, 3006.)

15          The evidentiary record demonstrates defense counsel argued all the foregoing in urging

16  the jury to return a life sentence without the possibility of parole for the then twenty-five year old

17  Petitioner.   (RT 2895-2896, 2910, 2923, 2928, 3021.)   Moreover, prosecutor Ryals, in her

18  argument to the jury, acknowledged there were mitigating factors in Petitioner's background and

19  character that evoked sympathy for him.  (RT 3043-3047, 3079.)

20          The Court finds that, given the substantial inculpating evidence against Petitioner, it is

21  not reasonably probable that Petitioner would have received a more favorable sentence had

22  further evidence of his background, character and behavior been presented.   In particular,

23  presentation  of  additional  evidence  regarding  Petitioner's  substance  abuse  would  not  have

24  necessarily added weight to his case for mitigation.  See Cullen, 131 S. Ct. at 1410 (noting that

25  evidence of serious substance abuse is "by no means clearly mitigating"); id. at 1406–07 (noting

26  that Strickland "rejected the notion that the same investigation will be required in every case"

27  and requires the habeas court to strongly presume that counsel exercised reasonable judgment in

28

1    making all significant decisions).

2          The state court could reasonably find Petitioner's alleged neurological and psychiatric

3    conditions and related mental defenses were not sufficiently supported by the record and failed

4    for reasons discussed in claims 6 and 26, *ante*.

5          Petitioner has not established that defense counsel's performance fell below an objective

6    standard of reasonableness and that, but for counsel's unprofessional errors, the result of the

7    proceeding would have been different.  <u>Strickland</u>, 466 U.S., at 687-694.

8          For the reasons stated, a fair-minded jurist could have found that Petitioner failed to

9    establish that the state court rejection of the claim was contrary to, or an unreasonable

10   application of, clearly established federal law, or an unreasonable determination of the facts in

11   light of the evidence presented in the state court proceeding, viewed most favoring the

12   prosecution.  <u>Jackson</u>, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

13         Claim 48 is denied.

14         **h.      Review of Claim 49**

15         Petitioner alleges defense counsel was ineffective by failing to request that the trial court

16   voir dire prospective jurors about adverse publicity from <u>Bakersfield Californian</u> articles relating

17   to debarment proceedings against defense counsel Toton.

18         The California Supreme Court summarily denied claim 49 (SPet. Claim RR) raised in

19   Petitioner's state petition for habeas corpus. <u>In re Sanchez</u>, S049502 (DD).

20         The state supreme court considered and rejected this claim on direct appeal:

21

22         [I]t is evident from the record that defendant failed to preserve his claim of
           improper voir dire by objecting to the court's questioning during trial. [Citation]
23         On the merits, our review of the record shows the trial court's voir dire adequately
           insured an impartial jury, without unnecessarily exposing the jury to the very
24         information defendant found could prejudice his case . . . .

25         The trial court assisted counsel and to ensure a fair and impartial jury by requiring
           the 201 prospective jurors to fill out a one-page questionnaire asking the panel
26         members whether they had ever heard of the case, and if so, to name their source.
           [Citation] Of the jurors eventually selected to serve, eight told the court they had
27         never heard of defendant's case, were not familiar with counsel, and either did not
           subscribe to or did not read on a consistent basis the Bakersfield Californian. In
28         addition, pursuant to further questioning by the court, four of these jurors

indicated they did not believe everything they read in the newspaper.

Two other jurors who acknowledged they read the Bakersfield Californian observed that they had never heard of defendant's case.

Two of the twelve jurors selected had prior knowledge of defendant's case, but their voir dire responses clearly indicated that their exposure to the newspaper articles about defendant's case was limited to an awareness of the general facts and circumstances of the Bocanegra and Tatman murders. Their knowledge of the case did not include any specific information regarding Toton's pending disbarment. Thus, it appears that the trial court acted well within its discretion in proposing the general question of the jurors' knowledge of Toton's pending disbarment without unnecessarily educating the jury about that matter. The trial court's strategy thus avoided informing the jury of Toton's troubles, while assuring defendant a fair and impartial jury. [Citation] Under these facts, we find the trial court did not err in limiting voir dire to general questions concerning pretrial publicity. [Citation]

Sanchez, 12 Cal.4th at 61-63.  The record demonstrates that defense counsel Toton agreed, reasoning that questioning jurors about the publicity was likely to be more prejudicial than that publicity itself.  (SHCP Ex. 137, ¶ 29).  This Court finds the tactic not unreasonable.

The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury. Skilling, 561 U.S. at 377-78; Irvin, 366 U.S. at 722.  Nevertheless, "juror impartiality, we have reiterated, does not require ignorance."  Skilling, 561 U.S. at 381 (citing Irvin, 366 U.S. at 722) (jurors are not required to be "totally ignorant of the facts and issues involved.").  To merit relief for violation of his due process rights due to pretrial publicity, Petitioner must demonstrate that the case is one in which prejudice is presumed, or he must demonstrate actual prejudice. Skilling, 561 U.S. at 379, 385.

"A presumption of prejudice . . . attends only the extreme case."  Id. at 381.  The Supreme Court has determined that pretrial publicity so manifestly tainted a criminal prosecution that prejudice must be presumed in only three cases: Rideau v. Louisiana, 373 U.S. 723, 726-27 (1963) (televised confession); Estes v. Texas, 381 U.S. 532, 536 (1965) (massive pretrial media interference); and Sheppard v. Maxwell, 384 U.S. 333, 355-356 (1966) (months of virulent pretrial publicity).

"To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside."  United States v. Sherwood, 98 F.3d

402, 410 (9th Cir. 1996). When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." Mu'Min, 500 U.S., at 427. Appellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges. Skilling, 561 U.S. at 386.

Petitioner contends that neither the trial court nor defense counsel asked prospective jurors about newspaper the articles appearing in the Bakersfield Californian two weeks before jury selection that discussed the impending debarment of lead defense counsel Toton. He maintains there was no tactical reason for not questioning jurors about these newspaper articles and that jurors prejudiced thereby may have been empaneled.

Petitioner's case is immediately distinguishable from Estes and Sheppard. He does not allege, nor is there any evidence, that media coverage of attorney disciplinary proceedings interfered with his right to a fair trial. See Skilling, 561 U.S. at 382 n.14 ("Skilling's reliance on Estes and Sheppard is particularly misplaced; those cases involved media interference with courtroom proceedings during trial. [Citation] Skilling does not assert that news coverage reached and influenced his jury after it was empaneled."). Rideau is the only case in which the Supreme Court overturned a conviction based on pretrial publicity.

Petitioner's case also is readily distinguished from Rideau. See Sanchez, 12 Cal.4th at 61-63. Here, during voir dire, the following eight jurors indicated they had never heard of the case, did not know counsel, and did not subscribe to and did not usually read the Bakersfield Californian: juror Jones (CT 258; RT 594, 596-597, 606); juror Mooney (CT 256, RT 647, 664); juror Roberts (CT 237, RT 1170); juror Stell (CT 184, RT 1882); juror G. Clark (CT 229, RT 2120); juror P. Clark (CT 228; RT 2140-2141); juror O'Toole (CT 220, RT 2401-2402, 2406); and juror Raymond (CT 217, RT 2438-2439).

Two jurors, Crowder and Zamora, regularly read the Bakersfield Californian but were

1   unaware of the case and of counsel.  (CT 207; RT 1342-1343 regarding juror Crowder; CT 213;

2   RT 2554, 2563 regarding juror Zamora.)

3        Only two of the jurors selected, Razo and Rodriguez, stated they had heard of the case.

4   (RT 1814-1815; 2458-2460, 2471-2472.)  Neither of these jurors mentioned having hearing of

5   Toton; both indicated they did not believe everything they read in newspapers and could put

6   what they had heard out of mind while deliberating.  Id.  Petitioner has not made an evidentiary

7   showing that these juror statements were untrue.

8        "[P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an

9   unfair trial." Nebraska Press Assn. v. Stuart, 427 U.S. 539, 554 (1976).  In the rare case that

10  prejudice is presumed, there will have been a "'barrage of inflammatory publicity immediately

11  prior to trial,' [Citation], amounting to a 'huge . . . wave of public passion.'"  Patton v. Yount,

12  467 U.S. 1025, 1033 (1984) (quoting Murphy v. Florida, 421 U.S. 794, 798 (1975) and Irvin,

13  366 U.S. at 728).  The coverage in this case was neither all pervasive nor constant leading up to

14  trial.  Certainly there was no barrage of inflammatory publicity immediately prior to trial or in

15  the six months leading up to trial.  Based on the foregoing, the state court reasonably could have

16  concluded that this was not an extreme case wherein prejudice should be presumed from pretrial

17  publicity.

18       As discussed above and in claim 55, *post*, the trial judge considered the impact of pretrial

19  publicity on the jurors who served on Petitioner's case.  None of the twelve selected jurors had

20  been exposed to media accounts of Toton's disciplinary problems.  Sanchez, 12 Cal.4th at 61-63.

21  Only two jurors had heard of the case.  Id.  It is well-established that "juror impartiality . . . does

22  not require ignorance."  Skilling, 561 U.S. at 381 (citing Irvin, 366 U.S. at 722) (Jurors are not

23  required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best

24  qualified to serve as jurors will not have formed some impression or opinion as to the merits of

25  the case."); Reynolds, 98 U.S. at 155–156 ("[E]very case of public interest is almost, as a matter

26  of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any

27  one can be found among those best fitted for jurors who has not read or heard of it, and who has

28

152

not some impression or some opinion in respect to its merits.").

Petitioner's suggestion that the manner in which Toton conducted voir dire was self-interested is unsupported by the evidence for reasons discussed in claims 21-24, *ante*. Moreover, even if defense counsel's failure to request voir dire about attorney discipline publicity was deficient performance, nothing in the evidentiary record suggests presumed or actual prejudice. The noted substantial evidence against Petitioner suggested no reasonable probability of a more favorable outcome even had defense counsel requested voir dire about publicity from Toton's disciplinary proceeding.

The state court could reasonably have concluded that Petitioner failed to establish that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S., at 687-694. For the reasons above, this Court agrees with the state court that there was no reasonable likelihood that Petitioner did not receive a fair trial despite the limited voir dire regarding pretrial publicity.

Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, viewed most favoring the prosecution. Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

Claim 49 is denied.

### i.     Review of Claim 50

Petitioner next claims ineffective assistance by counsel's failure to object to prosecutorial misconduct during closing argument.

The California Supreme Court summarily denied claim 50 (SPet. Claim SS) raised in Petitioner's state petition for habeas corpus. In re Sanchez, S049502 (DD).

That court also considered and rejected the claim on direct appeal, finding that:

In his closing argument, co-counsel Frank consistently pointed out the prosecution's inaccurate statements to the jury, reminding it of the evidence presented. Counsel's performance in demonstrating for the jury the prosecutor's

153

1
2
3

> improper argument reveals counsel's attention to detail rather than incompetence. Counsel's careful references during the prosecutor's misstatements demonstrates that defense counsel was aware of the misstatements and, in exercising reasonable professional judgment, chose not to object for tactical reasons. In any event, we find no reasonable probability that defense counsel's failure to object prejudiced defendant's case.

4

5   Sanchez, 12 Cal.4th at 71.

6       Petitioner faults defense counsel's failure to object when prosecutor Ryals argued in
7   closing that Petitioner killed Mr. Tatman, suggesting the jury was sentencing Petitioner for the
8   Tatman homicide, and argued that the Bocanegras would not have been killed but for the actions
9   of Petitioner.

10      However, the state court, based on the record before it, could have found it reasonable for
11  the defense not to object in such circumstances. (See claim 42; see also Flieger v. Delo, 16 F.3d
12  878, 886 (8th Cir. 1994) (reasonable trial strategies do not amount to ineffective assistance even
13  where unsuccessful).

14      The Tatman conviction was presented to the jury as evidence in aggravation and the jury
15  appropriately admonished and instructed in this regard.  Prosecution argument that Petitioner had
16  a principal role in the Tatman killing, and that the Bocanegras would not have been killed
17  without his assistance, did not in all reasonable likelihood mislead the jury or affect the death
18  sentence imposed.  The weight of evidence against Petitioner as an aider and abettor of the
19  homicides was substantial.  Evidence showed that Petitioner grabbed and held Mr. Bocanegra
20  while Joey got a knife (RT 2843, 2853-54); that Petitioner beat Mr. Bocanegra while Joey
21  stabbed him (RT 2696-2706, 2719-21, 2725, 2843-44, 2854, 2858); that Petitioner rushed Mrs.
22  Bocanegra and told Joey to "shut her up" (RT 2844, 2858); that Petitioner pushed Mrs.
23  Bocanegra into a back room and hit her on the head with a bar while Joey stabbed her (RT 2710-
24  14, 2720-21, 2725, 2752, 2844), and that while this occurred Mrs. Bocanegra's hands were
25  bound and she was likely gagged (RT 2708, 2723, 2749-51, 2754-55, 2774-2775).

26      Moreover, the jury certainly was made well aware that Mr. Tatman's stabbing wounds
27  were non-fatal injuries and that Petitioner's conviction for Mr. Tatman's murder was based on

28

1   his aiding and abetting Reyes.  (Id.; RT 2693-94.)  Generally, counsel are "given latitude in the

2   presentation of their closing arguments, and courts must allow the prosecution to strike hard

3   blows based on the evidence presented and all reasonable inferences therefrom."  Ceja, 97 F.3d

4   at 1253–1254 (quoting Baker, 10 F.3d at 1415).

5        Petitioner has not made a sufficient showing he was prejudiced by defense counsel's

6   failure to object to alleged prosecutorial misconduct during closing argument. The evidence

7   against Petitioner was not insubstantial considering the multiple murder special circumstance in

8   the Bocanegra murders and the substantial evidence in aggravation presented during the penalty

9   phase. There is no reasonably likelihood the outcome would have been different absent the

10  alleged prosecutorial misconduct. See Donnelly, 416 U.S. at 643 (improper jury argument by the

11  state does not present a claim of constitutional magnitude unless it is so prejudicial that the

12  petitioner's trial was fundamentally unfair . . . [t]o establish prejudice, the petitioner must

13  demonstrate either persistent and pronounced misconduct or that the evidence was so

14  insubstantial that, in all probability, but for the remarks, no conviction would have occurred).

15       The state court could reasonably have concluded that Petitioner failed to establish that

16  defense counsel's performance fell below an objective standard of reasonableness and that, but

17  for counsel's unprofessional errors, the result of the proceeding would have been different.

18  Strickland, 466 U.S., at 687-694.

19       Accordingly, the state court's rejection of this claim was not contrary to, or an

20  unreasonable application of, clearly established federal law, or an unreasonable determination of

21  the facts in light of the evidence presented in the state court proceeding, viewed most favoring

22  the prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

23       Claim 50 is denied.

24       **j.      Review of Claim 51**

25       In his next claim, Petitioner alleges ineffective assistance by counsel during penalty

26  phase closing Argument.

27       The California Supreme Court summarily denied claim 51 (SPet. Claim TT) raised in

28

1   Petitioner's state petition for habeas corpus.   In re Sanchez, S049502 (DD).  In this case, "the

2   habeas petitioner's burden still must be met by showing there was no reasonable basis for the

3   state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

4   arguments or theories supported or . . . could have supported, the state court's decision; and then

5   it must ask whether it is possible fair-minded jurists could disagree that those arguments or

6   theories are inconsistent with the holding in a prior decision of this Court."   Id. (emphasis

7   added).

8        Generally, counsel are "given latitude in the presentation of their closing arguments, and

9   courts must allow the prosecution to strike hard blows based on the evidence presented and all

10  reasonable inferences therefrom." Ceja, 97 F.3d at 1253–1254 (quoting Baker, 10 F.3d at 1415);

11  see also Molina, 934 F.2d at 1445 (prosecutor has wide latitude during closing argument to make

12  reasonable inferences based on the evidence).

13       Petitioner contends that defense counsel's closing argument failed to respond to the

14  prosecutor's improper argument regarding Petitioner's involvement in the Tatman and

15  Bocanegra homicides.  To this end, Petitioner repeats his allegations in claims 7, 42 and 50, ante,

16  that defense counsel failed to point out evidence discrediting prosecution informant Hernandez

17  (RT 2842, 2847-2848, 3051), and that Petitioner never told Hernandez that he (Petitioner) had

18  stabbed anyone, (RT 2847-2848), and that he (Petitioner) did not inflict the fatal stab wounds

19  upon the Bocanegras,   (RT 2846), and that he (Petitioner) had no robbery motive.  (RT 2852.)

20  Nonetheless, for the reasons stated in claims 7, 42 and 50, the state court could reasonably have

21  found that the performance of defense counsel was not deficient and did not prejudice the

22  outcome of trial proceedings.

23       The trial judge appropriately admonished the jury that argument is not evidence.  As to

24  the evidence, the state court could reasonably have found it weighed substantially against the

25  Petitioner as an aider and abettor of the homicides.  The murders occurred about one month after

26  Petitioner's release from prison for the 1982 assaults. (RT 2877-2879 2973-2974.)  The evidence

27  reasonably showed that Petitioner grabbed and held Mr. Bocanegra while Joey got a knife (RT

28

1  2843-2854), beat Mr. Bocanegra while Joey stabbed him (RT 2696-2706, 2719-2721, 2725,

2  2843-2844, 2854, 2858), rushed Mrs. Bocanegra and told Joey to "shut her up" (RT 2844, 2858),

3  pushed Mrs. Bocanegra into a back room while Joey stabbed her, hitting her on the head with a

4  bar (RT 2710-2714, 2720-2721, 2725, 2752, 2844), and that Mrs. Bocanegra's hands were bound

5  and she was likely gagged (RT 2708, 2723, 2749-2751, 2754-2755, 2774-2775).

6      The state court also could have reasonably determined there was no basis upon which

7  Petitioner could have effectively impeached Hernandez.   Petitioner has not shown that

8  Hernandez gave contradictory, inconsistent or false testimony, or that Hernandez was motivated

9  by an undisclosed plea bargain.   No facts or discrepancies between the testimony and the

10 physical evidence establish or compel the conclusion that Hernandez, by virtue of his alleged

11 substance addition, his plea deal, or otherwise, was motivated to and did testify falsely or

12 inaccurately.  (SPet. Ex. 900, pp. 4, 11; SResp. Ex. B.)  Having cross-examined Hernandez at the

13 preliminary hearing, Toton determined on that basis not to interview him.  (SPet. Ex. 137, p. 4.)

14 During cross-examination at the guilt and special circumstance phase, Hernandez's testimony

15 was consistent with Petitioner's statements and the physical evidence that he had not been

16 offered any disposition of then pending criminal matters prior to agreeing to testify at the

17 Petitioner prosecution.   (CT 576-577.)   During cross-examination at the penalty phase,

18 Hernandez admitted a deal on a then pending charge in exchange for his testimony in Petitioner.

19 (RT 2850-2851.)   Petitioner has not demonstrated that Hernandez's testimony was false or

20 misleading, or that defense counsel acted unreasonably in not interviewing Hernandez.

21      Petitioner goes on to argue that defense counsel failed to explain the Bocanegra and

22 Tatman evidence and verdicts, and failed to dispel the suggestion Tatman homicide was a capital

23 crime for which they would sentence Petitioner (RT 3055), and failed to support the "lingering

24 doubt" defense (RT 3063-3082). Petitioner points out that, as discussed in claim 42, prosecutor

25 Ryals improperly argued that the jury was to decide whether Petitioner killed Mr. Tatman.  (RT

26 3034-3036.)   However, the record reflects that defense counsel pointed out improper argument

27 and reminded the jury of the evidence presented in favor of the lingering doubt defense.  (RT

28

1   3063-3082.)

2          As with the claims above, the jury was made well aware that Mr. Tatman's stabbing

3   wounds were non-fatal injuries and that Petitioner's conviction for Mr. Tatman's murder was

4   based on his aiding and abetting Reyes.  (RT 235, 2693-2695.)   Defense counsel made his

5   argument to the jury that Petitioner did not intend to kill Mr. Tatman (CT 109; RT 2695), and the

6   Bocanegras (CT 479, 500; see SHCP Ex. 419), and that there may have been a third assailant in

7   the Bocanegra murders.  (Pet. Exhs. 121, p. 2; 417, pp. 1-2; SHCP Ex. 137, Att. A.)          Given

8   Petitioner's desire to plead guilty to the Bocanegra murders, (SPet. Exhs. 520, p. 2; 700), the

9   unrebutted evidence presented at the penalty phase, the admonitions of the trial judge that

10  argument is not evidence, and the potential aggravating and mitigating effects of circumstances

11  surrounding the Tatman murder, it is not reasonably probable that even had defense counsel

12  further responded to Ms. Ryals's closing statements, a different sentence would have been

13  returned.

14         Accordingly, it could reasonably be found that the prosecution arguments were not so

15  prejudicial as to make trial fundamentally unfair.  See Donnelly, 416 U.S. at 643 (improper jury

16  argument by the state does not present a claim of constitutional magnitude unless it is so

17  prejudicial that the petitioner's trial was fundamentally unfair . . . [t]o establish prejudice, the

18  petitioner must demonstrate either persistent and pronounced misconduct or that the evidence

19  was so insubstantial that, in all probability, but for the remarks, no conviction would have

20  occurred); see also Furman, 190 F.3d at 1006 (rejecting habeas claim where, although some of

21  prosecutor's arguments were improper, jury was told comments were not evidence, and evidence

22  against defendant was substantial).

23         The state court could have reasonably concluded that Petitioner failed to establish that

24  defense counsel's performance fell below an objective standard of reasonableness and that, but

25  for counsel's unprofessional errors, the result of the proceeding would have been different.

26  Strickland, 466 U.S., at 687-694.

27         A fair-minded jurist could therefore reasonably conclude that   Petitioner failed to

28

                                                   158

1   establish rejection of the claim was contrary to, or an unreasonable application of, clearly

2   established federal law,  or an  or an unreasonable determination of the facts in light of the

3   evidence presented in the state court proceeding, viewed most favoring the prosecution.  Jackson,

4   443 U.S. at 319. See 28 U.S.C. § 2254(d).

5          Claim 51 is denied.

6          **k.      Review of Claim 52**

7          Petitioner claims cumulative ineffectiveness during the penalty phase, citing to claims 43-

8   51, which he contends demonstrate defense counsel's failure to present evidence of Petitioner's

9   minimal culpability, mitigating factors and defenses to the Tatman and Bocanegra homicides.

10          The California Supreme Court summarily denied claim 52 (SPet. Claim UU) raised in

11   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).

12          The California Supreme Court considered this issue on direct appeal and rejected it,

13   finding that:

14          Defendant claims that in combination, the errors at the penalty phase caused
             cumulative prejudice warranting a reversal of penalty. After review of the record,
15          we disagree. Any prosecutorial misconduct that did occur did not significantly
             influence the fairness of defendant's trial or detrimentally affect the jury's
16          determination of the appropriate penalty. [Citation]

17

18   Sanchez, 12 Cal.4th at 84.

19          For the reasons discussed in claims 43-51, the state court could reasonably have

20   determined that Petitioner failed to establish in those claims that defense counsel was ineffective

21   at penalty phase.  These claims are insubstantial when considered cumulatively.  See Karterman,

22   60 F.3d at 580; Rupe, 93 F.3d at 1445.

23          Respondent contends claim 52 is not cognizable because it creates and retroactively

24   applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

25   Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

26   under Teague, but rather on grounds the claim lacks merit for the reasons stated.

27          Accordingly, this Court does not find Petitioner has established that defense counsel's

28

159

1  cumulative performance at penalty phase fell below an objective standard of reasonableness and

2  that, but for counsel's unprofessional errors, the result of the proceeding would have been

3  different.  Strickland, 466 U.S., at 687-694.

4        The state court's rejection of this claim was not contrary to, or an unreasonable

5  application of, clearly established federal law, or an unreasonable determination of the facts in

6  light of the evidence presented in the state court proceeding, viewed most favoring the

7  prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

8        Claim 52 is denied.

9     **l.    Review of Claim 53**

10       In this claim, Petitioner alleges ineffective assistance of counsel due to conflict of interest

11 arising from publicity about defense counsel Toton's pending disbarment.

12       The California Supreme Court summarily denied claim 53 (SPet. Claim VV) raised in

13 Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  In this case, "the

14 habeas petitioner's burden still must be met by showing there was no reasonable basis for the

15 state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

16 arguments or theories supported or . . . could have supported, the state court's decision; and then

17 it must ask whether it is possible fair-minded jurists could disagree that those arguments or

18 theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

19 added).

20       The Sixth Amendment provides that a criminal defendant shall have the right to "the

21 Assistance of Counsel for his defense."  As a general matter, a defendant alleging a Sixth

22 Amendment violation must demonstrate "a reasonable probability that, but for counsel's

23 unprofessional errors, the result of the proceeding would have been different." Strickland, 466

24 U.S. at 694.  An exception exists for cases in which counsel actively represents conflicting

25 interests.  Mickens, 535 U.S. at 166; Cuyler, 446 U.S. at 345-50.  In such a case, prejudice is

26 presumed.  Id.  However, Petitioner must establish that "an actual conflict of interest actually

27 affected the adequacy of [defense counsel's] representation."  Sullivan, 446 U.S. at 348-49.

28

1  Thus, "until a defendant shows that his counsel *actively represented* conflicting interests, he has

2  not established the constitutional predicate for his claim of ineffective assistance." Id., at 350

3  (emphasis in original).

4         Petitioner cites to the facts in claims 23, 24 and 43 and alleges that lead defense counsel

5  Toton's disbarment publicity placed Toton in an actual conflict of interest of a personal and

6  financial nature, preventing his effective assistance at penalty phase in ways not fully disclosed

7  to Petitioner.  The trial judge, according to Petitioner, did not adequately inquire into the matter

8  and thereby allowed Toton to remain on the case.  Petitioner alleges the trial judge never

9  questioned Toton specifically about the debarment (Sealed RT July 26, 1988, at pp. 80-84),

10 never obtained a copy of the debarment hearing decision, and agreed to Toton's proposal to have

11 co-defense counsel Frank talk to Petitioner about the debarment.  (Id., at p. 82-84.)  Petitioner

12 asserts that Toton sought to avoid the issue of debarment. Toton refused to appear at the

13 debarment hearing.  (SHCP Ex. 517, p. 8.)  He refused to comment to reporters about the issue.

14 (SCHP Exhs. 703, 704.)

15        This Court finds it unlikely that Toton's pending debarment influenced his actions as

16 defense counsel, for reasons discussed by the state court.  See Sanchez, 12 Cal.4th at 45-48,

17 summarized as follows.  Toton's refusal to allow Petitioner to plead guilty lengthened rather than

18 shortened the duration of this proceeding.   Toton participated in arrangements for defense

19 investigation and engaged in pre-trial preparation.  (RT [5/16/88] 3-4.)   He conducted pre-trial

20 discovery (CT 649-663, 769), made preemptory challenges (CT 836-840) filed evidentiary

21 motions (CT 841-45, 846-53, 854-58, RT 80, 97-113), conducted vigorous witness examination

22 and cross-examination (CT 518-625; RT 2664-2670), and made a reasoned closing argument

23 (RT 169-196).  The evidentiary record simply does not suggest the pace, manner and method of

24 Toton's representation was influenced by the disciplinary proceedings.  Toton was not disbarred

25 until eight months after the court and defendant learned of the proceedings against him, and

26 several month after completion of the penalty phase of defendant's trial.  Sanchez, 12 Cal.4th at

27 45-48.

28

1    Even if there were a conflict, Petitioner was aware of the possible problems with Toton's

2    continued representation and his right to conflict free representation, having discussed these

3    matters with co-counsel Frank for approximately an hour and he expressly waived any such

4    conflict.  Sanchez, 12 Cal.4th at 46; RT [7/27/88] 4-10.  Based thereon, the state supreme court

5    could reasonably have found that Petitioner validly waived any such conflict on the record and

6    decided to keep Toton as counsel.  See Sanchez, 12 Cal.4th at 37-39, 45-46.

7    Petitioner alleges that it was likely that one or more jurors was aware of Toton's adverse

8    publicity and, given Toton's failure to withdraw, was prejudiced by it.  However, he offers no

9    evidentiary predicate supporting the allegation.  The evidence does not suggest the trial court's

10   failure to question juror's about Toton's debarment rendered trial "fundamentally unfair."  (See

11   RT 591-609 (juror Jones), RT 647-669 (juror Mooney), RT 1168-1183 (juror Roberts), RT 1338-

12   1355 (juror Crowder), RT 1813-1831 (juror Razo), RT 1879-1892 (juror Stell), RT 2117-2136

13   (juror G. Clark), RT 2137-2155 (juror P. Clark), RT 2401-2412 (juror O'Toole), RT 2435-2448

14   (juror Raymond), RT 2454-2472 (juror Rodriguez), RT 2554-2566 (juror Zamora)).  For reasons

15   more fully discussed in claims 49 *ante*,  and 55, *post*, this Court agrees with the California

16   Supreme Court's determination that there was "no showing the jury was unfair or biased."

17   Sanchez, 12 Cal. 4th at 62, n.6.  As noted by that court, during voir dire only two of the jurors

18   selected, Razo and Rodriguez, had heard of the case.  (RT 1814-1815; 2458-2460, 2471.)

19   Neither of those two jurors mentioned having hearing of Toton.  Both of those jurors indicated

20   they could put what they had heard out of mind while deliberating.  Id.  Petitioner proffers no

21   evidence these statements were somehow untrue.  The state court could have reasonably

22   determined that none of the jurors selected were exposed to media coverage of Toton's

23   disciplinary matters.  Sanchez, 12 Cal.4th at 61; claim 55, *post*.  Moreover, the state court could

24   reasonably find that questioning jurors about the publicity was likely to be more prejudicial than

25   that publicity itself.  (SHCP Ex. 137, ¶ 29.)

26   Petitioner has not established that defense counsel's performance at the penalty phase fell

27   below an objective standard of reasonableness and that, but for counsel's unprofessional errors,

28

1    the result of the proceeding would have been different.  Strickland, 466 U.S., at 687-694.  It was

2    not objectively unreasonable for the state court to find there was no reasonable probability any

3    juror was aware of the debarment proceeding and influenced by it. See Sanchez, 12 Cal.4th at 61.

4          Accordingly, the Court finds that a fair-minded jurist could have found that Petitioner

5    failed to establish that the state court rejection of the claim was contrary to, or an unreasonable

6    application of, clearly established federal law, or an or an unreasonable determination of the facts

7    in light of the evidence presented in the state court proceeding, viewed most favoring the

8    prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

9          Claim 53 is denied.

10         **m.    Review of Claim 54**

11         In his next claim, Petitioner alleges that juror George Razo was not an impartial juror.

12         The California Supreme Court summarily denied claim 54 (SPet. Claim KK) raised in

13   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).  In this case, "the

14   habeas petitioner's burden still must be met by showing there was no reasonable basis for the

15   state court to deny relief," Richter, 562 U.S. at 98, and this Court "must determine what

16   arguments or theories supported or . . . could have supported, the state court's decision; and then

17   it must ask whether it is possible fair-minded jurists could disagree that those arguments or

18   theories are inconsistent with the holding in a prior decision of this Court."  Id. (emphasis

19   added).

20         "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of

21   impartial, 'indifferent' jurors."  Irvin, 366 U.S. at 722; see also Skilling, 561 U.S. at 377-78.

22   "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to

23   identify unqualified jurors."  Morgan v. Illinois, 504 U.S. 719, 729 (1992).  "Voir dire 'is

24   conducted under the supervision of the court, and a great deal must, of necessity, be left to its

25   sound discretion.'"  Ristaino v. Ross, 424 U.S. 589, 594 (1976) (quoting Connors v. United

26   States, 158 U.S. 408, 413 (1895)).  "[T]he trial court retains great latitude in deciding what

27   questions should be asked on voir dire."  Mu'Min, 500 U.S. at  424.  No hard-and-fast formula

28

163

1   dictates the necessary depth or breadth of voir dire, see United States v. Wood, 299 U.S. 123,

2   145–146 (1936), and "[t]he Constitution . . . does not dictate a catechism for voir dire, but only

3   that the defendant be afforded an impartial jury." Morgan, 504 U.S. at 729.  A trial court's failure

4   to ask certain questions does not violate the Constitution unless it "render[s] the defendant's trial

5   fundamentally unfair."  Mu'Min, 500 U.S. at 426.

6       Petitioner contends that, during voir dire, Razo admitted his exposure to a news article

7   about this case and stated that the murder of his cousin four years earlier would not affect his

8   deliberations (RT 1815, 1822), but after the trial, Razo stated to a defense investigator that his

9   cousin's murder may have had some impact on him in Petitioner's case.  (SPet. Exhs. 124, App.

10  B, ¶ 5; 124, ¶ 13.)

11      The record before the state court shows that juror Razo stated during voir dire that he

12  recalled reading an article in the Bakersfield Californian that included Petitioner's picture and

13  stated his involvement in a number of alleged criminal activities.  (RT 1814-1816.)  Razo stated

14  that the article and the murder of his cousin four years earlier would not affect his deliberations.

15  (RT 1821-1822.)  The evidence in the record suggests it unlikely that Razo's deliberation was

16  affected by the article.  (See claim 49, ante.)  Nor are Razo's post-trial hearsay and unsigned

17  statements competent evidence that he was other than truthful during voir dire concerning his

18  cousin's murder.  See Fed. R. Civ. P. 802; Fed. R. Evid. 606(b); Cal. Evid. Code § 1150.

19      In addition, Petitioner has not demonstrated prejudice, i.e., that the error had a

20  "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S.

21  at 638.  For the reasons just discussed, the state court could reasonably have concluded that

22  Razo's deliberations were unaffected by the article.

23      Accordingly, it was not objectively unreasonable for the State Supreme Court to find

24  there was no reasonable probability juror Razo was other than an impartial juror.  28 U.S.C. §

25  1746; Ortiz v. INS, 179 F.3d 1148, 1153-54 (9th Cir. 1994) (no ineffective assistance where no

26  demonstration of prejudice).

27      The state court could reasonably have concluded that Petitioner failed to establish that the

28

1    performance of defense counsel at the penalty phase fell below an objective standard of

2    reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding

3    would have been different.  Strickland, 466 U.S., at 687-694.

4          The Court finds that a fair-minded jurist could have found that Petitioner failed to

5    establish that the state court rejection of the claim was contrary to, or an unreasonable

6    application of, clearly established federal law, or an unreasonable determination of the facts in

7    light of the evidence presented in the state court proceeding, viewed most favoring the

8    prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

9          Claim 54 is denied.

10         **n.      Review of Claim 55[9]**

11         In this claim, Petitioner alleges court error by failure to voir dire the jury regarding

12   publicity about defense counsel's pending disbarment.

13         The California Supreme Court considered this claim on appeal and found that the defense

14   had not objected on this ground or sought a curative admonition at trial and thus waived the issue

15   on appeal.  Sanchez, 12 Cal.4th 61-62.  That court also found that there was "no showing the jury

16   was unfair or biased", Sanchez, 12 Cal. 4th at 62, n.6, and that "the trial court's voir dire

17   adequately insured an impartial jury, without unnecessarily exposing the jury to the very

18   information defendant found could prejudice his case." Sanchez, 12 Cal.4th at 62.

19         "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of

20   impartial, 'indifferent' jurors."  Irvin, 366 U.S. at 722; see also Skilling, 561 U.S. at 377-78.

21   "[T]he trial court retains great latitude in deciding what questions should be asked on voir dire."

22   Mu'Min, 500 U.S. at 424.  A trial court's failure to ask certain questions does not violate the

23   Constitution unless it "render[s] the defendant's trial fundamentally unfair."  Mu'Min, 500 U.S.

24   at 426.

25         Two specific inquires of voir dire are constitutionally compelled: inquiries into racial

26   prejudice against a defendant charged with a violent crime against a person of a different racial

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [9] The legal basis of the Eighth Amendment was stricken as unexhausted.  ECF No. 60 at 9:5.

group, id., at 424; and, in a capital case, inquiries into a juror's views on capital punishment. Morgan, 504 U.S. at 730-732.   Petitioner does not raise such a basis for compelled inquiry in this claim.  Instead he claims that the voir dire questionnaire, the trial court, and defense counsel all failed to inquire whether prospective jurors had heard anything about the attorneys in this case.

The Court is unpersuaded by this claim for reasons discussed in claim 49, *ante*.  During voir dire, the following eight jurors indicated they had never heard of the case, did not know counsel, and did not subscribe to and did not usually read the Bakersfield Californian: juror Jones (CT 258; RT 594, 596-597, 606); juror Mooney (CT 256, RT 647,  664); juror Roberts (CT 237, RT 1170); juror Stell (CT 184, RT 1882); juror G. Clark (CT 229, RT 2120); juror P. Clark (CT 228; RT 2140-2141); juror O'Toole (CT 220, RT 2401-2402, 2406); and juror Raymond (CT 217, RT 2438-2439).  Two jurors, juror Crowder (CT 207; RT 1342-1343) and juror Zamora (CT 213; RT 2554, 2563) regularly read the Bakersfield Californian but were unaware of the case and did not know counsel.

Only two of the jurors selected, Razo and Rodriguez, stated they had heard of the case. (RT 1814-1815; 2458-2460, 2471-2472.)  Neither mentioned having hearing of Toton; both indicated they did not believe everything they read in newspapers and could put what they had heard out of mind while deliberating.  Id. Petitioner proffers no evidence these juror statements were untrue. The state court could reasonably have found that prospective jurors were properly voir dired regarding any pretrial publicity without exposing them to the allegedly prejudicial information.

Based on the record, the state court could reasonably have found that specific voir dire regarding Toton's disbarment proceeding was unnecessary and could serve to education the jurors on the potentially prejudicial information.  See Mu'Mun, 500 U.S. at 425-428 (1991) (trial court's failure to ask questions must "render the defendant's trial fundamentally unfair" and may be overturned only for "manifest error.").

Nor has Petitioner pointed to evidence that demonstrates prejudice, i.e., that the error had

1    a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507

2    U.S. at 638 (1991).  For the reasons just discussed, the state court could reasonably have

3    concluded that, despite the limited voir dire regarding Toton's pretrial publicity, Petitioner

4    received a fair trial.

5        Accordingly, the state court could reasonably have concluded that Petitioner failed to

6    establish that defense counsel's performance fell below an objective standard of reasonableness

7    and that, but for counsel's unprofessional errors, the result of the proceeding would have been

8    different.  Strickland, 466 U.S., at 687-694.

9        The state court rejection of the claim was not contrary to, or an unreasonable application

10   of, clearly established federal law, or an unreasonable determination of the facts in light of the

11   evidence presented in the state court proceeding, viewed most favoring the prosecution.  Jackson,

12   443 U.S. at 319. See 28 U.S.C. § 2254(d).

13       Claim 55 denied.

14       **o.    Review of Claim 56**

15       In his next claim, Petitioner alleges prejudicial and misleading victim photos were

16   erroneously admitted at trial.  He complains of autopsy photographs, excluded at the guilt phase,

17   and admitted over defense objection at the penalty phase, and of crime scene victim photographs

18   not objected to by the defense that were admitted during the penalty phase.  According to

19   Petitioner, these photos were cumulative of other testimony and misleading as to Petitioner's

20   culpability in the homicides as they showed injuries not inflicted by Petitioner.  He claims the

21   photographs had an impact on jurors.

22       The California Supreme Court summarily denied claim 56 (SPet. Claim NN) raised in

23   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).

24       Additionally, the state supreme court found on direct appeal that admission of autopsy

25   photographs was not prejudicial error:

26       We have examined [the autopsy photographs] and have determined "they are not so
27       horrific or shocking that we can conclude the trial court abused its discretion in
         admitting them." [Citation] The jury was familiar with the facts of the crime, and
28       the photographs had substantial probative value in demonstrating defendant's

culpability as an aider and abettor, and as corroborative of Hernandez's testimony implicating defendant in the crimes. Moreover, the probative value of the photographs was not diminished simply because the scalp wounds alone were not fatal to the victims. The photographs corroborated the testimonial evidence and were "relevant to a determination of the appropriateness of the death penalty." [Citation]

Defendant's claim that there was no dispute as to the circumstances of the murders is not supported by the facts. Defense counsel Frank argued at the penalty phase that defendant should be spared the death penalty if the jury had a "lingering doubt" about the extent of defendant's participation in the Bocanegra killings.

. . . [T]he autopsy photographs depicting the Bocanegras' scalp wounds were clearly probative of (i) the manner in which the victims were wounded, (ii) defendant's culpability as an aider and abettor, (iii) the malice and aggravation of the crime, and (iv) the appropriate ultimate penalty. [Citation] . . . [T]he court did not err in admitting the autopsy photographs at the penalty phase.

Sanchez, 12 Cal.4th 64-65.

A due process claim can be stated where graphic photos of victims make the trial fundamentally unfair. Jammal, 926 F.2d at 919. However, photos that are relevant to the crime charges and elements thereof are admissible. See Villafuerte, 75 F.3d at 1343. Under California law, "photographs which disclose the manner in which the victim was wounded are relevant on the issues of malice and aggravation of the crime and the penalty." Thompson, 50 Cal.3d at 182.

The Court finds that, based on the evidentiary record, and for the same reasons discussed in claim 45, the state court could reasonably have found that the two autopsy photos of Mr. Bocanegra and Mrs. Bocanegra's scalp wounds (People's Exhs. 13, 14), and the victim and crime scene photos (People's Exhs. 5-9, 15-43 and 55-66) served to corroborate testimony as to circumstances of the murders, defense counsel arguments of diminished culpability (see RT 3051-3055), and were relevant and probative as aggravation evidence and going to penalty selection. Autopsy photographs of scalp wounds to Mr. Bocanegra and Mrs. Bocanegra were properly admitted as relevant to expert testimony and issues of aggravation and penalty and were not unnecessarily gruesome. The crime scene and autopsy photographs could reasonably be seen by the state court as relevant to circumstances of the murders, identities of murders and murders' states of mind.

It appears unlikely that Petitioner was subjected to prejudice from defense counsel's

1  failure to object to the introduction of crime scene photographs depicting the wounds of the

2  Bocanegras and Mr. Tatman.   The trial court did not find the photographs prejudicial as

3  depicting a "blood and guts type of thing. . . ." (RT 2881-2882.)  The California Supreme Court

4  could reasonably have found the photographs relevant and probative of charges and elements

5  including intent to kill, aggravation and penalty, such that defense counsel's failure to object did

6  not necessarily demonstrate ineffective assistance.  See Nefstad, 66 F.3d 335, at *3 (holding no

7  violation of due process where prosecutor during closing argument shows photographs of victim

8  before and after murder because relevant to intent).

9          Admission of the photographs did not render trial "fundamentally unfair." Batchelor v.

10  Cupp, 693 F.2d 859, 865 (9th Cir. 1982) (admission of photographs lies largely within the

11  discretion of the trial court, whose ruling will not be disturbed . . . unless the admission of the

12  photographs rendered the trial fundamentally unfair).   Defense counsel Frank argued his

13  lingering doubt theory, (RT 3048-3072), that Petitioner did not intend to kill or assist in killing

14  Mr. Tatman (id.,), and that Petitioner had no criminal intent when he went to the Bocanegra

15  residence (id.).

16          Additionally, even without the photographs, it is not reasonably probable the jury would

17  have returned a sentence less than death.   The evidence in aggravation including the

18  circumstances surrounding the murders of the Bocanegras and Mr. Tatman, and Petitioner's 1982

19  assaults on Ammarie and Pena, was not insubstantial. (RT 2863-2874.)

20          Accordingly, the state court could have found that Petitioner failed to establish that

21  defense counsel's performance at penalty phase fell below an objective standard of

22  reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding

23  would have been different.  Strickland, 466 U.S., at 687-694.

24          This Court does not find that the state court rejection of the claim was contrary to, or an

25  unreasonable application of, clearly established federal law, as determined by the Supreme

26  Court, or that the state court's ruling was based on an unreasonable determination of the facts in

27  light of the evidence presented in the state court proceeding, viewed most favoring the

28

1   prosecution, Jackson, 443 U.S. at 319.  See 28 U.S.C. § 2254(d).

2       Claim 56 is denied.

3       **p.    Review of Claim 57**

4       Petitioner next claims that the trial court erred by inadequately and erroneously

5   explaining the guilt verdicts and by improperly restricting defense counsel's closing argument

6   regarding the guilt verdicts.

7       The California Supreme Court summarily denied this claim (SPet. Claim II) raised in

8   Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).

9       The state supreme court also considered and rejected this claim on direct appeal.  That

10  court found that Petitioner failed to meet the state procedural requirement of timely objection and

11  thus waived the issue on appeal and was procedurally barred on collateral review, noting that:

12       [C]ounsel did not object to the court's incorrect reading of the multiple-murder
13       special-circumstances verdict. Hence, if any error occurred, it was waived.
         [Citation] Moreover, even if counsel had objected, we would find any error the
14       court made in reading incorrectly the multiple-murder special-circumstance
         findings, or any confusion caused by the court's verdict as to the Tatman charges,
15       could have been rendered harmless by an admonition to the jury.

16  Sanchez, 12 Cal.4th at 75.

17       The state supreme court went on to consider the trial court's verdict misstatement and

18  defense attorney Frank's argument to the jury clarifying and arguing the Tatman verdict, as

19  follows:

20       Prior to penalty phase arguments, at defense counsel Frank's request, the trial
         court read the information and summarized the guilt verdict, including the special
21       circumstances findings, for the jury. In summarizing the verdict, the court
         purported to read from the August 3, 1988, minute order which . . . found true the
22       multiple-murder special circumstance with respect to the Bocanegra murders only
         and did not include the Tatman murder in the special-circumstance disposition.
23       Purporting to read from the August 3 minute order, the court inexplicably
         included Tatman as part of the [special circumstance] finding when it summarized
24       the verdict to the jury. That finding is not in the record copy of the minute order.

25       Also during penalty phase argument, Frank explained to the jury the meaning of
         the felony-murder charges in the Tatman verdict, and discussed defendant's role as
26       an accomplice in the Tatman robbery and murder in an apparent attempt to clarify
         the court's allegedly inconsistent verdicts finding defendant guilty of the first
27       degree murder and robbery of Tatman, but finding not true the robbery-murder
         special circumstance. Frank's explanation of the felony-murder verdict was

28

interrupted by Ryals's successful objection. Defendant now complains that the court's erroneous inclusion of the Tatman murder as part of the multiple-murder special-circumstance finding in the Bocanegra murders, and its failure to explain (or allow counsel to adequately explain) its allegedly inconsistent verdict and special-circumstance finding in the Tatman murder verdicts amounted to "the use of false or misleading evidence in capital sentencing" in violation of defendant's Fourteenth Amendment right to due process, and the Eighth Amendment right to a fair trial. [Citation]

In addition, Frank's penalty phase argument explained to the jury the meaning of the Tatman verdict: "The significance of what [defendant] was and wasn't convicted of, I would submit to you, establishes a lot of facts, number one, that he himself did not kill Woodrow [Wilson] Tatman. You heard the evidence. I think you can infer from the evidence, from the verdicts that it was not Ted Sanchez who killed Mr. Tatman, it was Robert Reyes. I submit to you that you can logically infer from what you've heard that Ted Sanchez did not kill Mr. Tatman nor did he share in Robert Reyes' intent to kill Mr. Tatman. Ted's role in that tragic incident was limited to removing some of Mr. Tatman's property. You heard the evidence. Mr. Tatman was not supposed to even have known that his property had been taken . . . ."

Frank next repeated to the jury: "Robert Reyes took it upon himself to kill, but Ted had no part in that." Frank then explained the multiple-murder special-circumstance findings and argued the circumstances of the Bocanegra murders as a mitigating factor. . . .
"Now let's turn to the charges involving the Bocanegras. Teddy was charged in count two of the Information with having killed Mr. Bocanegra and in count three of the Information with having killed Mrs. Bocanegra. Each count carried with it the special circumstance that the murder had been committed during the course of a robbery. Although he was found guilty of the murders of Mr. and Mrs. Bocanegra, the special circumstance that the murders occurred during the course of a robbery were not found true. In addition, he was found not guilty of robbing the Bocanegras as was alleged in count five.

"I submit to you that the importance of all this is that you can infer that when Ted-that when Ted went over to the Bocanegra house he did not do so with the intent to rob him. In fact, I would submit that you can infer that when he went over to that house he didn't intend to commit any criminal acts against the Bocanegras, and that it wasn't until after Joey and his father started fighting that Teddy thought about engaging in any criminal activity.

"Now, I bring all this to your attention because the law says that you can take into account the circumstances of the crimes when you deliberate on the issue of penalty . . . .

"Now this factor is general, looked upon as being an aggravating factor, one that doesn't usually contain any mitigating value, but I submit to you that, in this case, if you look closely at the facts and circumstances of what transpired at the Tatman and Bocanegra residence[s], you will find significant mitigating values there."

Frank thereafter told the jury that it was Reyes, not defendant, who killed Tatman, and that defendant "had no criminal intent when he went over to [the Bocanegras'] house." He also argued that these same facts could be interpreted as mitigating evidence . . . Frank's argument likely clarified for the jury any misperceptions about the verdict that occurred in light of the court's statement of the verdict.

Sanchez, 12 Cal.4th at 74-76.   The state court, upon considering the foregoing found the misstatement to be alternatively procedurally barred and harmless:

> We conclude any error the court made in the court's verdict statement was harmless. Defendant requested the court read the verdict and special circumstance findings, and failed to correct the court or offer clarifying instructions in order to remedy any misperceptions the jury may have had about the verdict. Moreover, counsel's explanation of the verdict to the jury during argument more than clarified any potential confusion the jury may have experienced following the court's explanation. The prosecutor did not mention the erroneous verdict, or capitalize on its inclusion. Defendant was convicted of three counts of first degree murder, including one supportable special-circumstance allegation, as well as two counts of use of a deadly weapon, and one count of robbery. Under these circumstances, there is no reasonable possibility that consideration of the court's potentially confusing reading of the guilt phase verdict could have improperly influenced the jury. [Citation]

Sanchez, 12 Cal.4th at 76.

Petitioner contends that the trial court misled the jury, telling them Petitioner was guilty of Mr. Tatman's first degree murder, and guilty of robbery of Mr. Tatman, but not guilty of the robbery special circumstance under California Penal Code section 190.2(a)(17).   In Petitioner's view, the jury was unaware the verdict implicitly found that Petitioner was not Mr. Tatman's actual killer and that Petitioner was found not to have intended the killing of Mr. Tatman.

The Court finds, however, that the state supreme could reasonably have determined that the trial court reading of the guilt verdicts was adequately clarified by defense counsel's penalty phase argument.   Defense attorney Frank pointed out to the jury where the evidentiary record supported inference from the verdicts that Petitioner did not intend to kill Mr. Tatman and did not kill him.   Sanchez, 12 Cal.4th at 74-77.   Frank's argument was sufficient to make harmless any error by the trial court in explaining the verdicts.

Petitioner contends the trial court errantly explained the verdict regarding the "multiple murder" special circumstance, stating such was predicated on the murders of  Mr. Tatman and Mr. Bocanegra  when in fact it was predicated on the murders of Mr. & Mrs. Bocanegra. Petitioner claims this misled the jury into believing the Tatman murder was a capital crime and as such was an aggravating factor.  Here as well, the state supreme court could reasonably have

1    found defense counsel Frank's argument and the court's admonitions and instructions to be

2    sufficiently clarifying of misstatement by the trial court.   Frank argued at penalty phase that,

3    based on the evidence, Petitioner had no criminal intent when he arrived at the Bocanegra home,

4    and explained to the jury the meaning of the felony-murder charges in the Tatman verdict, and

5    discussed defendant's role as an accomplice in the Tatman murder and robbery.   Id.; RT 3052-

6    3072.   These defense arguments sufficiently clarified the trial court's allegedly inconsistent

7    verdicts finding defendant guilty of the first degree murder and robbery of Mr. Tatman but

8    finding not true the robbery-murder special circumstance.

9           Petitioner contends that the trial court improperly restricted Frank's closing argument

10   regarding the Tatman conviction and felony murder rule, on grounds the rule was not part of the

11   evidence.   Petitioner maintains this was error in that the prosecution had argued to the jury that

12   Petitioner killed Mr. Tatman, treating the first degree felony-murder conviction as a capital

13   crime. However, as Respondent correctly notes, the felony murder rule was not in evidence or

14   part of the jury instructions.   Defense counsel Frank was not restricted in arguing the

15   circumstances surrounding the Tatman murder and verdict.   Petitioner was able to argue the

16   inference that he did not intend to kill Mr. Tatman and did not kill him.  Defense counsel Frank's

17   closing argument stated and clarified the specific charges levied and those upon which Petitioner

18   was convicted and argued for mitigation based on the facts and circumstances in the evidentiary

19   record.  (RT 3050-3072.)

20          The state record does not reasonably suggest the likelihood that the trial court verdict

21   statement improperly influenced the jury.   Any error in the trial court's statement of the verdicts,

22   that the multiple murder circumstance was based on the murders of Mr. Tatman and Mr.

23   Bocanegra, was harmless because, based on Frank's penalty phase and closing arguments (RT

24   3050-3072) and the instructions given (RT 2611-2616, 3082-3097; CT 979-1021), there is no

25   reasonable probability the jury mistakenly believed Tatman was a capital crime.

26          Accordingly, Petitioner has not established that defense counsel's performance at penalty

27   phase fell below an objective standard of reasonableness and that, but for counsel's

28

1  unprofessional errors, the result of the proceeding would have been different.  Strickland, 466

2  U.S., at 687-694.

3       This Court does not find that the state court rejection of the claim was contrary to, or an

4  unreasonable application of, clearly established federal law, as determined by the Supreme

5  Court, or that the state court's ruling was based on an unreasonable determination of the facts in

6  light of the evidence presented in the state court proceeding, viewed most favoring the

7  prosecution, Jackson, 443 U.S. at 319.  See 28 U.S.C. § 2254(d).

8       Claim 57 is denied.

9       **q.    Review of Claim 58[10]**

10      In his next claim, which includes multiple subclaims, Petitioner alleges inadequate and

11  unconstitutional jury instructions at the penalty phase.  The subclaims are reviewed separately.

12      *i.    Lingering Doubt*

13      Petitioner alleges that the trial court rejected his "lingering doubt" instruction even

14  though California law mandates mitigating consideration of lingering doubt and defense counsel

15  argued discrepancies in Hernandez's testimony created lingering doubt as to Petitioner's guilt.

16      The state supreme court reached and rejected this subclaim on direct appeal, finding that

17  the trial court did not err in rejecting Petitioner's specific instruction on lingering doubt:

18      Defendant's proposed instruction asked the jury to "consider as a mitigating factor
        residual or lingering doubt as to Mr. Sanchez's guilt for the crimes of which he has
19      been convicted."  Although defendant recognizes that the state and federal
        Constitutions do not require a residual doubt instruction, he asserts the instruction
20      should have been given in this case because it was warranted by the evidence. He
        relies on section [California Penal Code §] 190.3, factor (f), which gives the judge
21      discretion to instruct the jury "on any points of law pertinent to the issue," and
        case law that holds section 190.3, factor (f) may require a court to give the
22      "residual doubt" instruction should the evidence warrant it. [Citation] Claiming
        that the evidence was insufficient to find him guilty of the first degree murders of
23      Mr. and Mrs. Bocanegra, defendant contends "residual doubt" was "a
        circumstance of the capital crimes that could be considered by the jury under both
24      [section] 190.3, factors (a) and (k)."

25      We find no error. It is true, as defendant claims, that the jury's consideration of
        residual doubt is proper; defendant may assert his possible innocence to the jury
26      as a factor in mitigation under section 190.3, factors (a) and (k). [Citation] But

27

28  [10] The legal basis of the Fifth Amendment, and the legal basis of the Sixth Amendment except with regard to the
    lingering doubt instruction was stricken as unexhausted.  ECF No. 60 at 9:6-8.

there is no requirement, under either state or federal law, that the court specifically instruct the jury to consider any residual doubt of defendant's guilt. [Citation]

Here, the trial court instructed the jury that it could consider "[t]he circumstances of the crime of which defendant was convicted in the present proceeding and the existence of any special circumstance found to be true" (§ 190.3, factor (a)), and "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial" (Id., factor (k)). These instructions on the scope of mitigating circumstances sufficiently encompassed the concept of residual doubt about defendant's guilt. [Citation]

In addition, as we have observed, defense counsel told the jury that the circumstances of the crimes could be viewed as mitigating evidence of defendant's intent to kill. He also emphasized to the jury that section 190.3, factor (k) allows it to "consider any aspect of the defendant's character or record that he offers as a basis for a sentence less than death," and asked the jury whether it had "some lingering doubts about what [it] would have seen" if it had been inside the Bocanegra residence at the time of the murders. In light of the proper instructions given to the jury, and counsel's argument, we conclude the trial court did not err in rejecting defendant's specific instruction on lingering doubt. [Citation]

Sanchez, 12 Cal.4th at 77-83.

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. 586 at 604; Eddings v. Oklahoma, 455 U.S. 104, 113-114 (1982) (adopting rule in Lockett). "The standard against which we assess whether jury instructions satisfy the rule of Lockett and Eddings was set forth in Boyde, 494 U.S. 370 (1990)." Johnson v. Texas, 509 U.S. 350, 367-68 (1993). In Boyde, the Supreme Court held that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" Boyde, 494 U.S. at 377 (quoting Franklin, 487 U.S. at 181 (plurality opinion)).

In evaluating the instructions, the "reviewing court must determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" Johnson, 509 U.S. at 367 (quoting

Boyde, 494 U.S. at 380).  "[W]e do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'"  Id., at 368 (quoting Boyde, 494 U.S. at 381).  Further, a single instruction "may not be judged in artificial isolation," but must be considered in light of the instructions as a whole and the entire trial record."  Estelle v. McGuire, 502 U.S. 62, 72 (1991).

The failure to identify whether factors are aggravating or mitigating is plainly not contrary to or an unreasonable application of Supreme Court authority.  In Pulley v. Harris, the Supreme Court reviewed California's sentencing system, including the manner in which the jury considered relevant factors in deciding the penalty.  Pulley, 465 U.S. at 51.  The Supreme Court noted that the 1977 law (like the 1978 law applicable in this case) did not identify or separate the aggravating or mitigating factors.  Id. at 53 n.14.  The Court found California's death penalty law to be constitutional.  Id. at 51 ("Assuming that there could be a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review, the 1977 California statute is not of that sort.").

In Tuilaepa v. California, the Supreme Court again considered California's death penalty sentencing scheme.  The Supreme Court rejected the argument that California's "single list of factors" was unconstitutional.  The Court stated:

> This argument, too, is foreclosed by our cases. A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision. In California v. Ramos, for example, we upheld an instruction informing the jury that the Governor had the power to commute life sentences and stated that "the fact that the jury is given no specific guidance on how the commutation factor is to figure into its determination presents no constitutional problem." 463 U.S., at 1008–1009, n. 22, 103 S. Ct., at 3457–3458, n. 22. Likewise, in Proffitt v. Florida, we upheld the Florida capital sentencing scheme even though "the various factors to be considered by the sentencing authorities [did] not have numerical weights assigned to them." 428 U.S., at 258, 96 S. Ct., at 2969. In Gregg, moreover, we "approved Georgia's capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." Zant, 462 U.S., at 875, 103 S. Ct., at 2742. We also rejected an objection "to the wide scope of evidence and argument" allowed at sentencing hearings. 428 U.S., at 203–204, 96 S. Ct., at 2939. In sum, "discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. McCleskey v. Kemp, 481 U.S.

279, 315, n. 37, 107 S. Ct. 1756, 1779, n. 37, 95 L.Ed.2d 262 (1987). "Once the
jury finds that the defendant falls within the legislatively defined category of
persons eligible for the death penalty ... the jury then is free to consider a myriad
of factors to determine whether death is the appropriate punishment." Ramos,
supra, 463 U.S., at 1008, 103 S. Ct., at 3457. Indeed, the sentencer may be given
"unbridled discretion in determining whether the death penalty should be imposed
after it has found that the defendant is a member of the class made eligible for that
penalty." Zant, supra, 4[62] U.S., at 875, 103 S. Ct., at 2742; see also Barclay v.
Florida, 463 U.S. 939, 948–951, 103 S. Ct. 3418, 3424–3425, 77 L.Ed.2d 1134
(1983) (plurality opinion). In contravention of those cases, petitioners' argument
would force the States to adopt a kind of mandatory sentencing scheme requiring
a jury to sentence a defendant to death if it found, for example, a certain kind or
number of facts, or found more statutory aggravating factors than statutory
mitigating factors. The States are not required to conduct the capital sentencing
process in that fashion. See Gregg, supra, 428 U.S., at 199–200, n. 50, 96 S. Ct.,
at 2937–2938, n. 50.

Tuilaepa, 512 U.S. at 975.  The Court finds that, based on the state  record, the  jury was
adequately instructed that it could consider the circumstances of the convictions in the present
proceeding including any special circumstance found to be true and any other mitigating
circumstances under § 190.3, factor (k), encompassing the concept of residual or lingering doubt
about Petitioner's guilt.

There is no persuasive argument that the instruction given in this case in any way
foreclosed the jury from considering any relevant mitigating evidence.  As noted by Respondent,
the Supreme Court has examined the language in California's jury instruction on mitigation
multiple times, and upheld it against constitutional challenges every time.   See Ayers v.
Belmontes, 549 U.S. 7 (2006); Brown v. Payton, 544 U.S. 133, 141, 142 (2005); Boyde, 494
U.S. 370.  Thus, the state court rejection of the claim was reasonable.  Even if constitutional trial
error did occur, Petitioner is not entitled to relief because any such error did not have a
"substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S.
at 638.

The trial court's use of the standard penalty phase instruction, California Criminal Jury
Instruction, (CALJIC), No. 8.84.1 (1986 rev.), regarding California Penal Code § 190.3 factor
(k), is adequate to permit jurors to consider relevant mitigating evidence.  Boyde, 494 U.S. 370
at 381-382; Lockett, 438 U.S. at 604.  The Eighth Amendment does not require that a jury be
instructed on particular statutory mitigating factors.  Buchanan v. Angelone, 522 U.S. 269, 275-

1    77 (1998).

2         Petitioner then failed to established that defense counsel's performance at the penalty

3    phase fell below an objective standard of reasonableness and that, but for counsel's

4    unprofessional errors, the result of the proceeding would have been different.  <u>Strickland</u>, 466

5    U.S., at 687-694.

6         Respondent contends this subclaim is not cognizable because it creates and retroactively

7    applies a "new rule" of constitutional law within <u>Teague v. Lane</u>, 489 U.S. 288.  However, the

8    Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

9    under <u>Teague</u>, but rather on grounds the claim lacks merit for the reasons stated.

10        The Court finds the state court rejection of the subclaim was not contrary to, or an

11   unreasonable application of, clearly established federal law, or an unreasonable determination of

12   the facts in light of the evidence presented in the state court proceeding, viewed most favoring

13   the prosecution.  <u>Jackson</u>, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

14             This subclaim is denied.

15        *ii.*    *California Penal Code § 190.3 Sentencing Factors*

16        Petitioner next alleges that the trial court's use of CALJIC No. 8.84.1 (1986 rev.), which

17   includes (Cal. Pen. Code § 190.3) sentencing factors "a" (consideration of current offense), "b"

18   (consideration of violent criminal activity), and "c" (consideration of prior felony conviction),

19   erroneously allowed the jury to inflate the aggravating weight of Petitioner's guilt phase crimes.

20   Petitioner contends the jury improperly applied sentencing factors regarding presence of "violent

21   criminal activity" and "prior felony convictions" to the charged offenses and to Petitioner's 1982

22   assaults on store owner Hassan Ammarie and friend Arturo Pena.

23        The state supreme court reviewed this subclaim on direct appeal and rejected it, providing

24   that:

25

26        [California Penal Code] Section 190.3 requires the jury to consider the
          circumstances of the offense (§ 190.3, factor (a)), the presence of violent criminal
27        activity, (id., factor (b)), and prior felony convictions (id., factor (c)). The jury
          was instructed in the statutory language. [Citation] Defendant now claims the
28        court erred by failing to clarify the differences between the above factors, thus

                                              178

1

2

allowing the jury to give multiple consideration to the aggravating evidence under all these factors. He also asserts that the instructions erroneously permitted the jury to consider defendant's prior assaults under both factors (b) and (c), and improperly inflated the weight the jury should have given to either prior crime.

3

4

5

6

7

8

9

10

We have noted that section 190.3, factor (b), concerns crimes other than those for which defendant is being prosecuted [Citation], and we have directed that courts should give clarifying instructions "to avoid any confusion" that may be caused by the above factors. [Citation.] But we have consistently found that the absence of clarifying instructions is harmless [Citation], and that the standard instructions do not "inherently encourage 'double-counting' under section 190.3." [Citation] Therefore, "even if one or more jurors mistakenly consider a particular criminal incident under the wrong factor, there is little risk that a reasonable jury will give a single incident duplicative consideration." [Citation] Moreover, both the prosecutor and defense counsel separately explained the proper use of the evidence under the separate factors. Thus, any potential confusion the jury may have faced in light of the instructions was adequately addressed by both counsel's arguments. Accordingly, given the arguments and the absence of any improperly admitted evidence, we find that the court's failure to clarify the scope of each factor did not affect the outcome of the trial.

11

Sanchez, 12 Cal.4th at 79.

12

13

14

15

The legal standard for review of penalty phase instructions is also set forth in the subclaim above, to wit, "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380.

16

17

Petitioner's allegations lack merit. It is plainly not contrary to Supreme Court precedent to instruct the jury with all sentencing factors. The Supreme Court stated in Gregg v. Georgia:

18

19

20

21

22

The petitioner objects, finally, to the wide scope of evidence and argument allowed at [penalty] hearings. We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. So long as the evidence introduced and the arguments made at the [penalty] hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

23

Gregg, 428 U.S. at 203-204 (citations omitted).

24

25

26

27

The Court finds there is no reasonable likelihood the jury misinterpreted the instruction by inflating aggravation from the guilt phase crimes. It is well established that a sentencing court need not identify which factors are aggravating and which are mitigating. Pulley, 465 U.S. at 51 and 53 n.14; Tuilaepa, 512 U.S. at 979-80.

28

179

1    The state court could reasonably have found that the prosecution guilt phase argument

2  was relevant only under the first sentencing factor.  In fact, defense counsel Frank argued as

3  much to the jury, that the guilt phase crimes should be considered only with regard to the first

4  sentencing factor,  (RT 3066-3067), ameliorating any juror confusion as to the current offense

5  factor "a".

6    The Ninth Circuit has found the second factor, which refers to crimes for which the

7  defendant has not been convicted, not to be unconstitutionally vague, Bonin v. Calderon, 59 F.3d

8  815, 848 (9th Cir. 1995), and that the third factor on its face aggravates for prior felony

9  convictions  precluding any reasonable probability the jury aggravated for the charged offenses.

10  Id.  The penalty phase evidence was relevant only to the second and third factors.  The jury then

11  could properly have considered the 1982 assaults under both the second and third factors, and

12  that the prosecution's argument in this regard was not improper.  People v. Melton, 44 Cal.3d

13  713, 764 (1988) (no constitutional obstacle to separate consideration of properly distinct aspects

14  of the penalty determination, even when those aspects happen to coexist in a single incident).

15    Additionally, any error was harmless given the substantial weight of evidence in

16  aggravation.  Clemons v. Mississippi, 494 U.S. 738, 753 (1990) ("what is important . . . is an

17  individualized determination on the basis of the character of the individual and the circumstances

18  of the crime.").

19    Respondent contends this subclaim is not cognizable because it creates and retroactively

20  applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

21  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

22  under Teague, but rather on grounds the claim lacks merit for the reasons stated.

23    The Court finds that the state court rejection of the subclaim was not contrary to, or an

24  unreasonable application of, clearly established federal law, or an unreasonable determination of

25  the facts in light of the evidence presented in the state court proceeding, viewed most favoring

26  the prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

27    This subclaim is denied.

28

iii.     *Instructing Which Sentencing Factors were Aggravating/Mitigating*

Petitioner next alleges that the trial court improperly rejected defense instructions addressing which sentencing factors were aggravating and which were mitigating, (CT 1078-83), allowing the jury to improperly consider the absence of a mitigating factor as itself an aggravating factor.

The state supreme court considered and rejected this subclaim on direct appeal:

> Defendant claims the prosecutor improperly implied that the absence of mitigating evidence under [California Penal Code] section 190.3, factors (e) and (f) should be considered as aggravating evidence. [Citation] We find no error. The prosecutor simply told the jury that there "was no evidence" of factor (e), and also argued that she could not recall hearing any factor (f) evidence, but that if the jury heard it the evidence could be considered in mitigation. Moreover, the jury was specifically instructed, pursuant to defendant's request, that the "absence of any particular factor in mitigation is not to be treated as any factor in aggravation." It is presumed that the jury followed the court's instruction. [Citation]

Sanchez, 12 Cal.4th at 77-83.

The legal standard for review of penalty phase instructions is also set forth in the subclaim above, to wit, "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380.

The Court finds it clearly established that a sentencing court need not identify which factors are aggravating and which mitigating. Pulley, 465 U.S. at 51 and 53 n.14; Tuilaepa, 512 U.S. at 979-80. The failure to identify whether factors are aggravating or mitigating is not contrary to or an unreasonable application of Supreme Court authority. Pulley, 465 U.S. at 53 n.14; Tuilaepa, 512 U.S. at 975-80. This is fatal to Petitioner's subclaim, since he cannot show that the state court rejection of his claim was contrary to or an unreasonable application of Supreme Court precedent.

The Ninth Circuit arrived at the same conclusion in Williams v. Calderon: "The death penalty statute's failure to label aggravating and mitigating factors is constitutional." Williams v. Calderon, 52 F.3d 1465, 1484-1485 (9th Cir. 1995). The Ninth Circuit has found California's

1   death penalty statute does not violate due process by failure to label factors as aggravating or

2   mitigating.  See Williams, 52 F.3d at 1148-1485.

3        Respondent contends this subclaim is not cognizable because it creates and retroactively

4   applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

5   Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

6   under Teague, but rather on grounds the claim lacks merit for the reasons stated.

7        The Court finds that the state court rejection of the subclaim was not contrary to, or an

8   unreasonable application of, clearly established federal law, or an unreasonable determination of

9   the facts in light of the evidence presented in the state court proceeding, viewed most favoring

10  the prosecution.  Jackson, 443 U.S. at 319; see 28 U.S.C. § 2254(d).

11       This subclaim is denied.

12       *iv.*    *Deleting Inapplicable Mitigating Factors*

13       Petitioner alleges in this subclaim that the trial court erred in rejecting instructions

14  deleting mitigating factors (Cal. Pen. Code § 190.3 (e) and (f)) which were not claimed by

15  Petitioner and thus not relevant this case, i.e., factors that "victims participated in, or consented

16  to their own deaths" or that Petitioner's actions were "morally justified." (CT 1078-1079.)

17  Petitioner alleges that the prosecution argued the absence of evidence supporting these claims

18  and thereby implied an illusory aggravating factor.

19       The state supreme court considered this claim on direct appeal and rejected it, noting that:

20       Defendant contends the court erred when it rejected his request to delete
21       inapplicable mitigating factors (e) (whether victim participated in crime) and (f)
         (moral justification for crime) of [California Penal Code] section 190.3 from its
22       standard statutory instructions, and injected irrelevant considerations into the
         jury's penalty deliberations, depriving him of his right to a fair and reliable penalty
23       determination under the Eighth and Fourteenth Amendments.

24       The jury, however, was properly instructed to consider all the factors "if
         applicable" and later told to "take into account and be guided by" the applicable
25       factors. [Citation] As we have in previous cases, we assume the jury properly
         followed the instruction and concluded that mitigating factors not supported by
26       evidence were simply not "applicable." [Citation]

27  Sanchez, 12 Cal.4th at 79.

28
                                              182

The Court finds this subclaim to be unavailing.  As noted in discussion of the subclaims above, the jury was instructed with CALJIC No. 8.84.1.  That instruction allowed the jury to "consider" each factor "if applicable", (CT 994-995; RT 3087-3089), precluding any reasonable probability Petitioner's rights were violated by a failure to delete sentencing factors (Cal. Pen. Code § 190.3 (e) and (f)).

The legal standard for review of penalty phase instructions is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380.  In this instance, it was not contrary to Supreme Court precedent to instruct the jury with all sentencing factors where the instructions expressly indicated that the jury was to consider each factor only if applicable.  The Supreme Court stated in Gregg v. Georgia:

> The petitioner objects, finally, to the wide scope of evidence and argument allowed at [penalty] hearings. We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. So long as the evidence introduced and the arguments made at the [penalty] hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

Gregg, 428 U.S. at 203-04.  In Williams v. Calderon, the Ninth Circuit stated:

> Williams argues that it was error to read to the jury the entire list of factors the state considered relevant to the sentencing decision, even when some did not apply. To the contrary, the jury instructions expressly indicated that the jury was to consider each factor only "if applicable." Moreover, "[i]t seems clear ... that the problem [of jury inexperience] will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." Gregg v. Georgia, 428 U.S. 153, 192, 96 S. Ct. 2909, 2934, 49 L.Ed.2d 859 (1976) (plurality opinion). The reading of the complete list gave the jury more guidance, not less. We find nothing in the Constitution prohibiting the very practice Gregg encouraged.

Williams, 52 F.3d 1465 at 1481.

Consistent with the foregoing, this Court finds that the state court could reasonably have found it unlikely that the jury applied the challenged instruction in a way that prevented

1   consideration of constitutionally relevant evidence. There was no requirement that a trial court

2   redact the instructions to include only those factors deemed applicable.   Moreover, the

3   instruction itself advises the jury to consider the factors "if applicable."  In Bonin v. Calderon,

4   the Ninth Circuit again rejected the argument posited by Petitioner.  Bonin, 59 F.3d at 847-48.

5   The Bonin court noted that "the cautionary words 'if applicable' warned the jury that not all of

6   the factors would be relevant and that the absence of a factor made it inapplicable rather than an

7   aggravating factor." Id.

8         Respondent contends this subclaim is not cognizable because it creates and retroactively

9   applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

10  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

11  under Teague, but rather on grounds the claim lacks merit for the reasons stated.

12        The Court finds that that the state court rejection of the subclaim was not contrary to, or

13  an unreasonable application of, clearly established federal law,  or an  or an unreasonable

14  determination of the facts in light of the evidence presented in the state court proceeding, viewed

15  most favoring the prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

16        This subclaim is denied.

17        *v.*      *Limiting Aggravation*

18        Petitioner next alleges that the trial court erred by failing to instruct the jury it could not

19  consider aggravating factors not included in the instructions.  He claims this potentially allowed

20  unrestricted aggravation.  (RT 3087-3089, 3095.)

21        The state supreme court considered and rejected this subclaim on direct appeal, finding

22  that there was no violation of state law:

23        Defendant also asserts the trial court erred by failing to instruct the jury not to
          consider non-statutory aggravating evidence in determining penalty. We have
24        repeatedly rejected this contention, and defendant has not persuaded us to
          reconsider our conclusion. [Citation] Nor was the trial court required to label
25        various factors as exclusively aggravating or mitigating. [Citation]

26

27  Sanchez, 12 Cal.4th at 79-80.

28

184

1    The legal standard for review of penalty phase instructions is as set forth in the subclaim

2    above, to wit, "whether there is a reasonable likelihood that the jury has applied the challenged

3    instruction in a way that prevents the consideration of constitutionally relevant evidence."

4    Boyde, 494 U.S. at 380.

5    This Court agrees with the state court's rejection of the subclaim.  At bottom, "what is

6    important at the selection stage is an individualized determination on the basis of the character of

7    the individual and the circumstances of the crime."  Zant, 462 U.S. at 879.  There is no

8    constitutional prohibition against non-statutory aggravating factors.  Harris v. Pulley, 692 F.2d

9    1189, 1193-94 (1982), overruled on other grounds, 465 U.S. 37 (1984); Zant, 462 U.S. at 878-79.

10   As noted, California's death penalty scheme allows for a sufficiently individualized sentence

11   determination.  Tuilaepa, 512 U.S. at 975.  The trial court's failure to instruct the jury that it

12   could not consider non-statutory aggravating factors is plainly not contrary to or an unreasonable

13   application of Supreme Court authority.  Pulley, 465 U.S. at 51, 53 n.14; Tuilaepa, 512 U.S. at

14   975-80.

15   The California Supreme Court found the specific instructions given allowed a fully

16   individualized evaluation of aggravating and mitigating evidence.  Sanchez, 12 Cal.4th at 79-80,

17   citing People v. Hawthorne, 4 Cal.4th 43 at 74-74.  Petitioner's citation to People v. Boyd, 38

18   Cal.3d 762 (1985) is not authority otherwise.  Nor is it "the province of a federal habeas court to

19   re-examine state court determinations on state law questions."  Estelle, 502 U.S. at 67-68.

20   Furthermore, as the Supreme Court stated in Gregg v. Georgia:

22       The petitioner objects, finally, to the wide scope of evidence and argument
     allowed at [penalty] hearings. We think that the Georgia court wisely has chosen
23   not to impose unnecessary restrictions on the evidence that can be offered at such
     a hearing and to approve open and far-ranging argument. So long as the evidence
24   introduced and the arguments made at the [penalty] hearing do not prejudice a
     defendant, it is preferable not to impose restrictions. We think it desirable for the
25   jury to have as much information before it as possible when it makes the
     sentencing decision.

27   Gregg, 428 U.S. at 203-04.

28
                                                 185

1    Respondent contends this subclaim is not cognizable because it creates and retroactively

2  applies a "new rule" of constitutional law within <u>Teague v. Lane</u>, 489 U.S. 288.  However, the

3  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

4  under <u>Teague</u>, but rather on grounds the claim lacks merit for the reasons stated.

5    The Court finds that the state court rejection of the subclaim was not contrary to, or an

6  unreasonable application of, clearly established federal law, or an unreasonable determination of

7  the facts in light of the evidence presented in the state court proceeding, viewed most favoring

8  the prosecution.  <u>Jackson</u>, 443 U.S. at 319; see 28 U.S.C. § 2254(d).

9    This subclaim is denied.

10    *vi.*    <u>*Limiting Modifiers*</u>

11    Petitioner alleges that the trial court erred in denying his requested special instruction that

12  sought to delete the adjective "extreme" from the reference in [mitigation factor] (d) to being

13  under the influence of mental or emotional disturbance, and the adjective "substantial" from the

14  reference in [mitigation factor] (g) to being under the domination of another person.  He claims

15  this prevented presentation of his mitigation evidence. (CT 1078-1079.)

16    The state supreme court considered and rejected this claim on direct appeal, finding that:

17    Defendant contends the trial court violated the Eighth Amendment by refusing his
18    requested deletion of the adjectives "extreme" and "substantial" in instructions
      given in the language of section 190.3, factors (d) (whether defendant was under
      the influence of extreme mental or emotional disturbance at time of offense), and
19    (g) (whether defendant acted under extreme duress or substantial domination of
      another person). We have rejected this argument in numerous cases, and
20    defendant has failed to persuade us that we should reconsider these decisions.
      (See <u>Turner</u>, supra, 8 Cal.4th at pp. 208-209, and cases cited [catchall provision of
21    section 190.3, factor (k) referring to "any other circumstance which extenuates the
      gravity of the crime" allows consideration of non-extreme mental or emotional
22    conditions when read in conjunction with instructions on factors (d) and (g)].)

23

24  <u>Sanchez</u> 12 Cal. 4th at 80.

25    The jury, however, was properly instructed to consider all the factors "if
      applicable" and later told to "take into account and be guided by" the applicable
26    factors. [Citation] As we have in previous cases, we assume the jury properly
      followed the instruction and concluded that mitigating factors not supported by
27    evidence were simply not "applicable." [Citation]

28
                                    186

1  Sanchez, 12 Cal.4th at 79.

2      The Constitution requires that the jury must "not be precluded from considering, as a

3  mitigating factor, any aspect of a defendant's character or record and any of the circumstances of

4  the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438

5  U.S. at 604.  The test is "whether there is a reasonable likelihood that the jury has applied the

6  challenged instruction in a way that prevents the consideration of constitutionally relevant

7  evidence." Boyde, 494 U.S. at 380.  Further, a single instruction "may not be judged in artificial

8  isolation," but must be considered in light of the instructions as a whole and the entire trial

9  record. Estelle, 502 U.S. at 72.

10     Here, the Court finds that the trial court's use of CALJIC No. 8.84.1 (1986 rev.),

11 regarding California Penal Code § 190.3 factor (k), was adequate to permit jurors to consider

12 relevant mitigating evidence. Boyde, 494 U.S. at 381-82 (1990).  The state supreme court

13 rejected this subclaim, finding sufficient the trial court's instruction that (Cal. Pen. Code §

14 190.3(k)) includes:

15

16     [A]ny other circumstance which extenuates the gravity of the crime, even though
       it is not a legal excuse for the crime, and any sympathetic or other aspect of the
17     defendant's character or record that the defendant offers as a basis for a sentence
       less than death, whether or not related to the offense for which he is on trial.

18

19     The Ninth Circuit has rejected Petitioner's argument where, as here, the jury was advised

20 it could consider any other mitigating matter.  See Hendricks v. Vasquez, 974 F.2d 1099, 1109

21 (9th Cir. 1992). Moreover, as noted by the California Supreme Court, factors (d) and (g) cannot

22 be read in isolation.  It is clear that factor (k) on its face allows the jury to consider non-extreme

23 and non-substantial mental or emotional conditions when read in conjunction with instructions

24 on factors (d) and (g). See Sanchez, 12 Cal. 4th at 80.

25     The Supreme Court has stated that factor (k) directed the jury to consider "any other

26 circumstance that might excuse the crime. . . ." Boyde, 494 U.S. at 382.  Nothing suggests the

27 instruction in issue here precluded the jury from considering the mitigating evidence proffered

28

1  by Petitioner.  See e.g., Id. at 378.  The Supreme Court has found that "[t]he factor (k) instruction

2  is consistent with the constitutional right to present mitigating evidence in capital sentencing

3  proceedings."  Ayers, 549 U.S. at 24.

4          In addition, the Supreme Court has reviewed this instruction on several occasions.  It has

5  rejected claims that the instruction restricts the jury's consideration of mitigating evidence in

6  every instance.  See, e.g., Ayers, 549 U.S. at 7; Brown, 544 U.S. at 133; Boyde, 494 U.S. 370.

7          Respondent contends this subclaim is not cognizable because it creates and retroactively

8  applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

9  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

10  under Teague, but rather on grounds the claim lacks merit for the reasons stated.

11          The Court finds that the state court rejection of the subclaim was not contrary to, or an

12  unreasonable application of, clearly established federal law, or an unreasonable determination of

13  the facts in light of the evidence presented in the state court proceeding, viewed most favoring

14  the prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

15          This subclaim is denied.

16          *vii.*      *"Pinpoint" Mitigation Instructions*

17          In this subclaim, Petitioner alleges that the trial court erred in denying his requested

18  special "pinpoint" instructions relating to the defense theory of mitigating childhood and family

19  facts and circumstances.  He argues that without the pinpoint instruction there is a reasonable

20  likelihood the jury did not understand the defense and could consider all factors in the

21  instructions as mitigation.

22          The state supreme court considered and rejected this subclaim on direct appeal, stating

23  that:

24          Defendant complains that the court erred in rejecting his instructions discussing
          his childhood and background, that were required to augment the section 190.3,
25          factor (k) instruction. We disagree. The jury was fully aware that it could consider
          defendant's childhood in mitigation under factor (k); it was further instructed that
26          this factor allowed the jury to consider "any sympathetic or other aspect of the
          defendant's character or record that the defendant offers as a basis for a sentence
27          less than death." In addition, the jury was instructed that it was "free to assign
          whatever moral or sympathetic value you deem appropriate to each and all of the

28

1   various factors" and that [t]o return a judgment of death, each of you must be
    persuaded that the aggravating evidence and/or circumstances is so substantial in
2   comparison with the mitigating circumstances that it warrants death instead of life
    without parole." These instructions, combined with the arguments of Ryals
3   (informing the jury it could consider as mitigating defendant's background and
    character) and Frank (telling jury that factor (k) includes any evidence of
4   defendant's character or background that he offers), lead us to conclude that there
    is no possibility the jury misunderstood its sentencing obligation to consider
5   defendant's background and character in determining the appropriate penalty.
    [Citation]

6

7   Sanchez, 12 Cal.4th at 82.

8        As recited above, in reviewing penalty phase instructions, the test is "whether there is a

9   reasonable likelihood that the jury has applied the challenged instruction in a way that prevents

10  the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380.  Further, a

11  single instruction "may not be judged in artificial isolation," but must be considered in light of

12  the instructions as a whole and the entire trial record. Estelle, 502 U.S. at 72.

13       Here, the state court could reasonably have found that the jury was not precluded from

14  considering mitigating evidence including childhood and family evidence.   The trial court

15  rejected Petitioner's proffered special instruction, using instead CALJIC No. 8.84.1 (1986 rev.),

16  which advised the jury to consider the circumstances of the present conviction (pursuant to Cal.

17  Pen. Code § 190.3(a)) and any other extenuating circumstance and aspect of the defendant's

18  character or record (pursuant to Cal. Pen. Code § 190.3(k)).   (CT 994-995; RT 3087-3089.)

19  Additionally, the prosecution argued to the jury that it was not precluded from considering

20  mitigating evidence. (RT 3043-3044.)  Defense counsel Frank did the same. (RT 3053-3060).

21       At the time Petitioner's conviction became final on October 7, 1996, it was established

22  that use of CALJIC No. 8.84.1 was adequate to permit jurors to consider relevant mitigating

23  evidence. Boyde, 494 U.S. at 381-82 (1990).   The Ninth Circuit has rejected Petitioner's

24  argument where, as here, the jury was advised it could consider any other mitigating matter. See

25  Hendricks, 974 F.2d at 1109.   The Supreme Court has never required a sentencing court to

26  instruct a jury on how to weigh and balance factors in aggravation and mitigation.  As discussed

27  in the subclaims above, in Tuilaepa v. California, the Supreme Court stated, "[a] capital

28

1     sentencer need not be instructed how to weigh any particular fact in the capital sentencing

2     decision." Tuilaepa, 512 U.S. at 979.  Similarly, in Kansas v. Marsh, the Supreme Court stated:

3

4         In aggregate, our precedents confer upon defendants the right to present
sentencers with information relevant to the sentencing decision and oblige

5         sentencers to consider that information in determining the appropriate sentence.
The thrust of our mitigation jurisprudence ends here. *"[W]e have never held that

6         a specific method for balancing mitigating and aggravating factors in a capital
sentencing proceeding is constitutionally required.*"

7

8    Marsh, 548 U.S. at 175 (quoting Franklin, 487 U.S. at 179) (citing Zant, 462 U.S. at 875–876,

9    n.13).  Petitioner has not made any sufficient evidentiary showing otherwise.

10       Respondent contends this subclaim is not cognizable because it creates and retroactively

11    applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

12    Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

13    under Teague, but rather on grounds the claim lacks merit for the reasons stated.

14       For the reasons stated, the Court is persuaded  the state court rejection of the subclaim

15    was not contrary to, or an unreasonable application of, clearly established federal law, or an  or

16    an unreasonable determination of the facts in light of the evidence presented in the state court

17    proceeding, viewed most favoring the prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. §

18    2254(d).

19       This subclaim is denied.

20       *viii.*     *Aggravation "Beyond a Reasonable Doubt" Instruction*

21       Petitioner alleges in the next subclaim that the trial court erred in denying his requested

22    special instructions requiring the jury to find aggravation outweighed mitigation beyond a

23    reasonable doubt and that a death sentence was appropriate beyond a reasonable doubt. The trial

24    court instead gave the statutory instruction, CALJIC No. 8.84.2 (1986 rev.), renumbered CALJIC

25    No. 8.88 (1989 rev.).

26       The state supreme court considered and rejected this claim on appeal, stating that:

27

28       Defendant contends the trial court violated the federal Constitution by rejecting

his instruction that would have required the jury unanimously to find the existence of an aggravating factor before considering it and to find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors before choosing the penalty of death. Instead, the court instructed the jury pursuant to former CALJIC No. 8.84.2, which informed the jury it must "be guided by the applicable factors of aggravating and mitigating circumstances upon which [it] had been instructed." The instruction also emphasized to the jury that the penalty determination did not involve a mere mechanical weighing process, but required an individual assessment of the aggravating and mitigating circumstances (and assignment of "whatever moral or sympathetic value" it deemed appropriate) in determining the sentence. Defendant claims CALJIC No. 8.84.2 failed to inform the jury it must find that the aggravating factors outweighed the mitigating factors and that, if it found mitigating factors outweighed aggravating factors, it must impose a sentence of life without parole. We have previously rejected these contentions, and defendant has failed to persuade us to reconsider our decisions. [Citation]

As we have previously recognized, nothing in the federal Constitution requires the jury unanimously to find the existence of an aggravating factor, or to find beyond a reasonable doubt that the People proved each aggravating factor, that the aggravating circumstances outweighed the mitigating ones, or that death is appropriate. [Citation] Unlike the determination of guilt, "the sentencing function is inherently moral and normative, not factual" [Citation] and thus "not susceptible to a burden-of-proof quantification." [Citation] . . . Former CALJIC No. 8.84.2 adequately conveyed to the jury the seriousness of its obligation in determining the appropriate penalty, and we find no error in giving the instruction. [Citation]

Sanchez, 12 Cal.4th at 80-81.

Petitioner could correctly argue that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). In California, for a defendant to be eligible for the death penalty, the jury must, beyond a reasonable doubt, find him guilty of murder in the first degree, and must find true one of the special circumstances set forth in Cal. Penal Code § 190.2. Tuilaepa, 512 U.S. at 975.

However, once a defendant is convicted, "the prosecution has no burden of proof that death is the appropriate penalty, or that one or more aggravating factors or crimes exist, in order to obtain a judgment of death." People v. Anderson, 25 Cal. 4th 543, 589 (2001). Instead, the clearly established law at the time Petitioner's conviction became final vested the jury with

1    "unbridled discretion in determining whether the death penalty should be imposed after it has

2    found that the defendant is a member of the class made eligible for that penalty." Tuilaepa, 512

3    U.S. at 979-80.

4           There is no Supreme Court authority which constitutionally requires that a jury be

5    instructed on a burden of proof in the sentence selection phase in a capital case.  Further, "[t]he

6    United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is

7    required when determining whether a death penalty should be imposed." Harris, 692 F.2d at

8    1195.  Nor is there any Supreme Court authority which would require a burden of proof or

9    persuasion be assigned to any of the jury's penalty phase determinations.  On the contrary, the

10   Supreme Court has held that no "specific method for balancing mitigating and aggravating

11   factors in a capital sentencing proceeding is constitutionally required." Marsh, 548 U.S. at 175.

12   California's death penalty sentencing scheme has been consistently upheld as constitutional by

13   the Supreme Court.  Tuilaepa, 512 U.S. at 975-80; Pulley, 465 U.S. at 53.

14          The Court finds the statutory instruction, CALJIC 8.84.2, did appropriately advise the

15   jury to consider the applicable factors of aggravating and mitigating circumstances and that to

16   find for death each juror must be persuaded that the aggravating evidence and/or circumstances

17   is so substantial in comparison with the mitigating circumstances that it warrants death instead of

18   life without parole.  (CT 1018; RT 3095-3096.)  Due process requires no more. Harris, 692 F.2d

19   at 1194.  California is not required to adopt specific standards for instructing the jury on

20   consideration of aggravating and mitigating circumstances. Zant, 462 U.S. at 890.

21          The state court then could reasonably find the requirement under California's death

22   penalty statute, that the jury weigh aggravating and mitigating factors before imposing the death

23   penalty, adequately guarantees the jury's discretion will be guided and its considerations

24   deliberate.

25          Respondent contends this subclaim is not cognizable because it creates and retroactively

26   applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

27   Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

28

1    under Teague, but rather on grounds the claim lacks merit for the reasons stated.

2         The Court finds that the state court rejection of the subclaim was not contrary to, or an

3    unreasonable application of, clearly established federal law, or an unreasonable determination of

4    the facts in light of the evidence presented in the state court proceeding, viewed most favoring

5    the prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

6         This subclaim is denied.

7         ix.      *Written Aggravation Findings*

8         Petitioner alleges in his next subclaim that the trial court erred in not instructing the jury

9    to make written findings as to aggravating and mitigating factors, denying him due process and

10   meaningful appellate review under the Eighth Amendment.

11        The state supreme court reviewed and rejected this claim on direct appeal, noting that:

12

13        Defendant contends the trial court erred by failing to require the jury to render
          written findings on the aggravating factors it selected. We have repeatedly held
          that such findings are not required, and accordingly, find no error. [Citation]
14

15        Federal law is in accord. See Harris, 692 F.2d at 1195, overruled on other grounds
          465 U.S. 37 (1984).

16   Sanchez, 12 Cal.4th at 82.

17        The state court decision is not contrary to Supreme Court precedent.  See Harris, 692

18   F.2d at 1195–96.  Moreover, the California procedure provides a sufficient record for appellate

19   review by requiring the judge to provide a written statement upholding or overturning the jury's

20   verdict without requiring written findings by the jury on the aggravating circumstances.   In

21   Proffitt v. Florida, the Supreme Court upheld the Florida death penalty statute which was

22   comparable to California's procedure.  428 U.S. 242, 250-251 (1976).  In the Florida statute, the

23   jury is required to make a penalty recommendation to the trial judge, unaccompanied by any

24   specific findings, and thereafter the judge determines the actual sentence and specifies in writing

25   the reasons in support of the sentence.  Id. at 249-250.  In interpreting the Florida law, the

26   Supreme Court emphasized, "Since . . . the trial judge must justify the imposition of a death

27   sentence with written findings, meaningful appellate review of each such sentence is made

28

                                          193

possible . . . ."  Id. at 251.  In a similar way, the California procedure provides for meaningful

appellate review with respect to the disclosure of the reasons supporting a sentence of death.

The California procedure was approved by the Supreme Court in Pulley v. Harris, where

it was stated:

> If the jury finds the defendant guilty of first degree murder and finds at least one special circumstance, the trial proceeds to a second phase to determine the appropriate penalty. Additional evidence may be offered and the jury is given a list of relevant factors. § 190.3.  "After having heard all the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole." Ibid. If the jury returns a verdict of death, the defendant is deemed to move to modify the verdict. § 190.4(e). The trial judge then reviews the evidence and, in light of the statutory factors, makes an "independent determination as to whether the weight of the evidence supports the jury's findings and verdicts." Ibid. The judge is required to state on the record the reasons for his findings. Ibid. If the trial judge denies the motion for modification, there is an automatic appeal. §§ 190.4(e), 1239(b). The statute does not require comparative proportionality review or otherwise describe the nature of the appeal. [Footnote omitted.] It does state that the trial judge's refusal to modify the sentence "shall be reviewed." § 190.4(e). This would seem to include review of the evidence relied on by the judge. As the California Supreme Court has said, "*the statutory requirements that the jury specify the special circumstances which permit imposition of the death penalty, and that the trial judge specify his reasons for denying modification of the death penalty, serve to assure thoughtful and effective appellate review, focusing upon the circumstances present in each particular case*." People v. Frierson, 25 Cal.3d 142, 179, 158 Cal. Rptr. 281, 302, 599 P.2d 587, 609 (1979).
>
> . . .
>
> The jury's "discretion is suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg, 428 U.S., at 189, 96 S. Ct., at 2932. Its decision is reviewed by the trial judge and the State Supreme Court. On its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under Furman and our subsequent cases.

Pulley, 465 U.S. at 51-53 (emphasis added).

Respondent contends this subclaim is not cognizable because it creates and retroactively

applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

under Teague, but rather on grounds the claim lacks merit for the reasons stated.

For the reasons stated, the Court finds that the state court rejection of the subclaim was

194

1   not contrary to, or an unreasonable application of, clearly established federal law, or an  or an

2   unreasonable determination of the facts in light of the evidence presented in the state court

3   proceeding, viewed most favoring the prosecution.  <u>Jackson</u>, 443 U.S. at 319. See 28 U.S.C. §

4   2254(d).

5            This subclaim is denied.

6            *x.   Proportionality*

7            Petitioner next alleges that the California death penalty statute fails to require intra-case

8   and inter-case proportionality and to provide for meaningful proportionality review, denying him

9   protection from arbitrary imposition of the death penalty and denying him equal protection with

10  non-capital felons and preventing the jury from considering all mitigation factors.

11           The state supreme court considered and rejected this subclaim on appeal, finding that:

12

13           Defendant complains that the lack of intra-case and inter-case proportionality
             review in this case renders the 1978 sentencing scheme under California's death
             penalty law arbitrary under the Eighth Amendment and in violation of his equal
14           protection rights because such review is afforded to noncapital defendants. We
             have rejected the argument in numerous cases. [Citation]

15

16  <u>Sanchez</u>, 12 Cal.4th 83.

17           Generally, errors of state law are not cognizable on federal habeas. <u>Estelle</u>, 502 U.S. at

18  67.   If a challenged instruction, viewed in the context of the overall charge, shows a denial of

19  due process which renders the trial unfair, habeas relief may lie.  See <u>Cupp</u>, 414 U.S. at 147;

20  <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1976).   A claim that instructional error violates a

21  defendant's constitutional rights depends on the evidence and the overall instructions.

22  <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th Cir. 1997).

23           In this instance, the state court could reasonably find Petitioner's intra-case and inter-case

24  proportionality subclaim to be foreclosed by the Supreme Court's decision in <u>Pulley</u>, 465 U.S.

25  37.  In <u>Pulley</u>, the high court reviewed California's death penalty procedure, and in particular,

26  considered the fact that California did not require any sort of comparative proportionality review.

27  <u>Id.</u>  The Supreme Court found that the Eighth Amendment did not require a "state appellate

28

195

1  court, before it affirms a death sentence, to compare the sentence in the case before it with the

2  penalties imposed in similar cases if requested to do so by the prisoner." Id. at 43-44.  Further,

3  the Supreme Court held that "[o]n its face, [California's] system, without any requirement or

4  practice of comparative proportionality review, cannot be successfully challenged under Furman

5  [v. Georgia, 408 U.S. 238 (1972)] and our subsequent cases." Id. at 53.

6          In order to satisfy constitutional requirements, a death penalty law must narrow the class

7  of death-eligible defendants, and provide for individualized penalty determination.  McCleskey

8  v. Kemp, 481 U.S. 279, 308 (1987).   California's 1978 death penalty meets these requirements,

9  People v. Rodriguez, 42 Cal.3d 730, 777-779 (1986), and has been upheld as constitutional by

10 the United States Supreme Court.  Ramos, 463 U.S. at 993-94.  The federal court has rejected

11 proportionality review, Pulley, 465 U.S. at 53.  So has the California Supreme Court.  People v.

12 Cox, 53 Cal.3d 618, 692 (1991), disapproved on other grounds by People v. Doolin, 45 Cal.4th

13 390, 417 (2009).

14         Respondent contends this subclaim is not cognizable because it creates and retroactively

15 applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

16 Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

17 under Teague, but rather on grounds the claim lacks merit for the reasons stated.

18         The Court finds that the state court rejection of the subclaim was not contrary to, or an

19 unreasonable application of, clearly established federal law, or an unreasonable determination of

20 the facts in light of the evidence presented in the state court proceeding, viewed most favoring

21 the prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

22         This subclaim is denied.

23         *xi.*    *Conclusions*

24         For the reasons discussed in the subclaims above, the state court could reasonably have

25 found that Petitioner failed to establish state court rejection of claim 58 was contrary to, or an

26 unreasonable application of, clearly established federal law, or an or an unreasonable

27 determination of the facts in light of the evidence presented in the state court proceeding, viewed

28

1    most favoring the prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

2        Claim 58, including all its subclaims, is denied.

3        **r.    Review of Claim 59[11]**

4        In his next claim, Petitioner alleges that the trial court, during the (Cal. Pen. Code §

5    190.4(e)) automatic motion to independently review the evidence, erred by failing to consider

6    mitigating evidence when imposing death.

7        The state supreme court considered and rejected this claim on direct appeal, stating that:

8

9        Defendant contends the trial court committed prejudicial error in denying his
         automatic motion for modification of the death sentence (§ 190.4, subd. (e))
         because it failed to consider mitigating evidence of defendant's dysfunctional
10       family and his kindness to his siblings (§ 190.3, factor (k)). We are not persuaded.

11       After reviewing section 190.3, factors (a)-(i), and concluding that several statutory
         mitigating factors did not apply to defendant, (the court did note that defendant
12       may have been high on PCP during the murders pursuant to factor (h)), the court
         asked: "Are there other circumstances that mitigate against the aggravation of the
13       [defendant], I think not." Moreover, before denying the modification motion, the
         court stated that it had considered defendant's motion to reduce penalty and the
14       People's response, both of which referred to defendant's mitigating evidence.
         Thus, although the court did not specifically mention defendant's mitigating
15       evidence of his family life, the court's statement regarding section 190.3, factor
         (k) evidence shows it considered all pertinent penalty phase evidence, including
16       testimony about defendant's family life and his behavior toward his siblings, but
         merely found it unpersuasive. The record is clear that in ruling on the motion for
17       modification, the trial court independently assessed the weight of the evidence
         under each factor, and stated its reasons for denying defendant's motion. [Citation]
18       We conclude on this record that all constitutional and statutory considerations
         were observed in the court's ruling. [Citation]

19

20   Sanchez, 12 Cal.4th at 83.

21       At the time Petitioner's conviction became final, Cal. Penal Code § 190.4(e) provided

22   that:

23       In every case in which the trier of fact has returned a verdict or finding imposing
         the death penalty, the defendant shall be deemed to have made an application for
         modification of such verdict or finding pursuant to Subdivision 7 of Section 11. In
24       ruling on the application, the judge shall review the evidence, consider, take into
         account, and be guided by the aggravating and mitigating circumstances referred
25       to in Section 190.3, and shall make a determination as to whether the jury's
         findings and verdicts that the aggravating circumstances outweigh the mitigating
26       circumstances are contrary to law or the evidence presented. The judge shall state
         on the record the reasons for his findings.

27

28   _____
     [11] The legal basis of the Fifth and Sixth Amendment were stricken as unexhausted. ECF No. 60 at 9:9-10.
                                              197

1
2
3
4

> The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes. The denial of the modification of the death penalty verdict pursuant to subdivision (7) of Section 1181 shall be reviewed on the defendant's automatic appeal pursuant to subdivision (b) of Section 1239. The granting of the application shall be reviewed on the People's appeal pursuant to paragraph (6).

5  Cal. Penal Code § 190.4(e).

6      Petitioner alleges that the trial court, during the (Cal. Pen. Code § 190.4(e)) automatic
7  motion to modify and independently review of the evidence, did not mention and thus ignored
8  much 190.3(k) mitigating evidence of his abysmal childhood, adolescence in an alcoholic,
9  violent and dysfunctional family and his love and loyalty toward siblings, when it imposed the
10  death penalty following its independent review.  (CT 1103; RT [10/ 27-31, 1988] at pp. 2-16.)
11  He claims the trial judge was not guided by aggravating and mitigating circumstances in
12  upholding death and thus failed to comply with the mandate of California Penal Code § 190.4(e).

13      The death penalty is constitutional if it "is imposed only after a determination that the
14  aggravating circumstances outweigh the mitigating circumstances present in the particular crime
15  committed by the particular defendant, or that there are no such mitigating circumstances."
16  Blystone, 494 U.S. at 305.  To the extent automatic modification under California's capital
17  sentencing statute was part of the manner by which California fulfills its constitutional duty to
18  tailor and apply its death sentencing scheme in a rational manner, see Pulley, 465 U.S. at 52, the
19  evidentiary record shows the trial court reviewed the verdict, considered and discussed the
20  aggravating and mitigating circumstances and factors and made an individualized determination
21  of whether death was the proper punishment.  RT [10/31/88] pp. 7-10; see Turner v. Calderon,
22  281 F.3d 851, 871 (9th Cir. 2002).  The California Supreme Court's conclusion that the trial
23  court's review was proper under state law is binding on this Court.  Wainwright v. Goode, 464
24  U.S. 78, 84 (1983) (per curiam).

25      The Court finds this claim raises solely an issue of state law without any claimed
26  constitutional error, Estelle, 502 U.S. at 68, leaving the federal court unable to review it.  As
27  noted, habeas relief does not lie for errors of state law.  Estelle, 502 U.S. at 67; Pulley, 465 U.S.

28

1  at 41 ("A federal court may not issue the writ on the basis of a perceived error of state law.").

2  Petitioner's claim that the trial court incorrectly conducted its review of the jury's sentencing

3  verdict is not cognizable on federal habeas.  See Turner, 281 F.3d at 871.  The Supreme Court

4  has not held that such a review is required, and the high court has found California's review

5  procedure to be constitutional.  Pulley, 465 U.S. at 51-53.

6       Respondent contends this claim is not cognizable because it creates and retroactively

7  applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.  However, the

8  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

9  under Teague, but rather on grounds the claim lacks merit for the reasons stated.

10      For the reasons stated, the Court finds that the state court rejection of the claim was not

11 contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable

12 determination of the facts in light of the evidence presented in the state court proceeding, viewed

13 most favoring the prosecution.  Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

14      Claim 59 is denied.

15      **s.    Review of Claim 60**

16      In his penultimate claim, Petitioner alleges that the cumulative effect of constitutional

17 error during the penalty phase warrants habeas relief.  He cites to and incorporates claims 36-59

18 and argues cumulative error therefrom.

19      The state supreme court considered and rejected this claim on direct appeal, stating that:

20

21      Defendant claims that in combination, the errors at the penalty phase caused
        cumulative prejudice warranting a reversal of penalty. After review of the record,
22      we disagree. Any prosecutorial misconduct that did occur did not significantly
        influence the fairness of defendant's trial or detrimentally affect the jury's
23      determination of the appropriate penalty. [Citation]

24 Sanchez, 12 Cal.4th at 84.

25      The California Supreme Court also summarily denied claim 60 (SPet. Claim WW) as

26 raised in Petitioner's state petition for habeas corpus.  In re Sanchez, S049502 (DD).

27      Claims 36-59, *ante*, each fail for the reasons discussed above.  Petitioner then cannot

28

1  make a sufficient showing that he was prejudiced by defense counsel's cumulative

2  ineffectiveness during the penalty phase.   The state court could reasonably have found that

3  Petitioner failed to show the cumulative effect of alleged penalty phase errors deprived him of

4  due process.   These claims are insubstantial when considered cumulatively.   See Karterman, 60

5  F.3d at 580; see also Rupe, 93 F.3d at 1445.

6         Respondent contends this claim is not cognizable because it creates and retroactively

7  applies a "new rule" of constitutional law within Teague v. Lane, 489 U.S. 288.   However, the

8  Court finds the claim fails not because Petitioner seeks to apply a new rule of criminal procedure

9  under Teague, but rather on grounds the claim lacks merit for the reasons stated.

10        Accordingly, the Court finds that a fair-minded jurist could have found that Petitioner

11  failed to establish that the state court rejection of the claim was contrary to, or an unreasonable

12  application of, clearly established federal law, or an or an unreasonable determination of the facts

13  in light of the evidence presented in the state court proceeding, viewed most favoring the

14  prosecution.   Jackson, 443 U.S. at 319. See 28 U.S.C. § 2254(d).

15        Claim 60 is denied.

16        **t.    Review of Claim 61**

17        In his final claim, Petitioner alleges that his death sentence is grossly disproportionate

18  given his actions, his merely vicarious culpability as an aider and abetter, and his severe

19  neurological and psychiatric impairments, violating his rights under the Eighth and Fourteenth

20  Amendments.

21        The state supreme court considered and rejected this claim on direct appeal, stating that:

22

23        Defendant contends his death sentence is disproportionate to his culpability under
          the Eighth Amendment and article I, section 17 of the California Constitution,
24        which preclude punishment that is disproportionate to a defendant's individual
          culpability. [Citation] Defendant complains that the constitutional proscription
25        against a disproportionate penalty has been especially violated in this case because
          his accomplices in the murders received either 25 years to life pursuant to a
26        negotiated plea (Robert Reyes), or had the charges dismissed on insufficient
          evidence grounds (Joey Bocanegra).

27        Defendant relies on People v. Dillon (1983) 34 Cal.3d 441, 479, in which the
          court reduced a life sentence imposed on a 17-year-old with no prior convictions
28

for a noncapital first degree felony murder to a sentence for second degree murder. But, as we have subsequently stated, <u>Dillon</u> does not mandate the type of intra-case proportionality review sought by defendant. See <u>People v. Hill</u>, 3 Cal.4th 959, 1013 (1992).

As the People observe, intra-case proportionality review is "an examination of whether defendant's death sentence is proportionate to his individual culpability irrespective of the punishment imposed on others." <u>People v. Adcox</u>, 47 Cal.3d 207, 274 (1987). "The Eighth Amendment to the federal Constitution does not require us to incorporate into our proportionality determination any comparison of defendant's sentence with that of another culpable person, whether charged or uncharged." <u>Hill</u>, 3 Cal.4th at p. 1014; <u>Pulley</u>, 465 U.S. 37, 53 (1984) [upholding California's absence of comparative proportionality review].)

Accordingly, we reject defendant's plea for "intra-case proportionality." The evidence shows that he committed three brutal first degree murders of innocent and defenseless victims as an accomplice, only thirty-three days after he was released from state prison on parole from an eight-year prison term imposed for two violent assaults. In light of the evidence presented at trial, the penalty is proportionate to defendant's culpability. [Citation]

<u>Sanchez</u>, 12 Cal.4th at 84-85.

The California Supreme Court also denied claim 61 (SHCP Claim XX) raised in Petitioner's state petition for habeas corpus.  <u>In re Sanchez</u>, S049502 (DD).

Petitioner purports to question the viability of <u>Pulley</u>.  Yet he does not explain how and why the <u>Pulley</u> decision is infirm, or provide any authority showing that it is.  Instead he argues simply that <u>Pulley</u> should not be applied to him because his liability was only vicarious and he is actually innocent of the charged murders.

The claim is not persuasive.  Petitioner does not provide any sufficient basis for questioning the holding in <u>Pulley</u> or its application in his proceeding.  <u>Pulley</u> was clearly established authority at the time Petitioner's conviction became final on October 7, 1996.

Petitioner does not distinguish or limit application of <u>Pulley</u> based on facts of this case. Petitioner alleges his death sentence is disproportionate because the more culpable Reyes and Joey were not sentenced to death.  However, this argument cannot succeed given that there is no federal proportionality requirement.  <u>Pulley</u>, 465 U.S. 37.  The Supreme Court held that "[o]n its face, [California's] system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under <u>Furman [v. Georgia</u>, 408 U.S. 238 (1972)] and our subsequent cases."  <u>Id.</u> at 53.  California's 1978 death penalty has been upheld as

1  constitutional by the United States Supreme Court.  Ramos, 463 U.S. at 993-94.  The federal

2  court has rejected proportionality review, Pulley, 465 U.S. at 53, as has the California Supreme

3  Court.  Cox, 53 Cal.3d at 692.  Moreover, the state court could reasonably find Petitioner's death

4  sentence is not disproportionate to his culpability given the facts and circumstances of the crimes

5  and his involvement in the crimes. (See claims 1-4 and subclaim "x" of claim 58, *ante*.)

6      Petitioner alleges that his death sentence is disproportionate given California's

7  extraordinarily large death pool.  The Eighth Amendment requires that a state capital sentencing

8  system must: "1) rationally narrow the class of death-eligible defendants; and 2) permit a jury to

9  render a reasoned, individualized sentencing determination based on a death-eligible defendant's

10  record, personal characteristics, and the circumstances of his crime."  Marsh, 548 U.S. at 173-74.

11  As noted in claim 58, subclaim "x", it was established at the time Petitioner's conviction became

12  final that California's system complied with these requirements.  Pulley, 465 U.S. at 53-54.

13  Petitioner has not shown that Pulley does not control this case.

14      Petitioner's re-argument of actual innocence fails for the reasons discussed in claims 2

15  and 4, *ante*.

16      In sum, the Court finds this claim is entirely foreclosed by Pulley.  Therein, the Supreme

17  Court determined that the Eighth Amendment did not require a "state appellate court, before it

18  affirms a death sentence, to compare the sentence in the case before it with the penalties imposed

19  in similar cases if requested to do so by the prisoner."  Pulley, 465 U.S. at 43-44.  The California

20  Supreme Court, applying state law, rejected Petitioner's intra-case proportionality argument,

21  stating that:

22

23      The evidence shows that he committed three brutal first degree murders of
        innocent and defenseless victims as an accomplice, only thirty-three days after he
24      was released from state prison on parole from an eight-year prison term imposed
        for two violent assaults. In light of the evidence presented at trial, the penalty is
25      proportionate to defendant's culpability.

26  Sanchez, 12 Cal.4th at 84-85.  The Bocanegra murders in which Petitioner participated were

27  violent, progressed over a period of time, and were bloody.  (RT 2731, 2733, 2735-2736, 2739-

28

1  2741, 2747-2749, 2752-2753, 2756, 2790-2797, 2799-2806, 2808-2820, 2829-2830, 2833-2834.)

2  The Tatman murder in which Petitioner participated involved massive blunt force blows to the

3  chest during a violent assault and stabbing.  (RT 2646, 2650-2651, 2655, 2688-2695, 2718, 2842,

4  2846-2848, 2860.)   Petitioner has not shown a reasonable probability that his sentence was

5  grossly disproportionate to the crimes, see Hamelin v. Michigan, 501 U.S. 957, 959 (1991), so as

6  to deny him a fair trial and a more favorable outcome.

7       Accordingly, for the reasons discussed above, the Court finds that the state court rejection

8  of the claim was not contrary to, or an unreasonable application of, clearly established federal

9  law, or an  or an unreasonable determination of the facts in light of the evidence presented in the

10  state court proceeding, viewed most favoring the prosecution.  Jackson, 443 U.S. at 319; see 28

11  U.S.C. § 2254(d).

12      Claim 61 is denied.

13                                   **VII.**

14                    **MOTION FOR EVIDENTIARY HEARING**

15      On March 18, 2003, Petitioner filed a motion seeking an evidentiary hearing on claims 2,

16  4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 24, 25, 28, 30, 31, 32, 33, 34, 36, 37,

17  38, 40, 43, 44, 45, 46, 47, 48, 50, 51, 52, 54 and 60.  (ECF No. 120.)  Petitioner alleges in his

18  motion that the state supreme court denied him a full and fair evidentiary hearing to resolve the

19  following facts showing prejudice, facts that were not presented at trial because of ineffective

20  assistance of counsel and prosecutorial misconduct:

21      1)  Jailhouse informant Seeley's statements, disclosed to the defense prior to trial but not

22  presented at trial by either side, that Reyes, the third person at the Bocanegra crime scene,

23  confessed to a more culpable role in Mr. Bocanegra's murder, that Petitioner played no part in

24  killing Mr. Bocanegra, and that Reyes admitted being the initial aggressor against Mrs.

25  Bocanegra.

26      2)  Inconsistencies between the physical evidence and jailhouse informant Hernandez's

27  testimony at trial where he wanted to trade information for favorable treatment, exaggerated the

28

                                      203

1    amount of time he spoke to Petitioner about the crime, failed to admit he was arrested for being

2    under the influence of heroin, and failed to admit he had been a heroin addict for over five years.

3    3)  Principal perpetrator Joey Bocanegra's violent temper, substance abuse through the

4    night and early morning before killing his parents, history of requesting money for drugs from

5    his parents and becoming violent if they refused his request.

6    4)  Testimony by prosecution witnesses, the crime scene analyst and the forensic

7    pathologist, supporting Petitioner's defense that Reyes was Joey's main assistant in the

8    Bocanegra murders.

9    5)  Petitioner's severe organic brain damage, low IQ, and serious psychiatric disorders,

10   known to defense counsel before trial but not investigated and presented at trial.

11   6)  Defense counsel's unreasonable acquiescence in the prosecution's use of statements

12   Petitioner made to Detectives Stratton and Boggs which should have been excluded under

13   Miranda, and to reporter Trihey which should have been placed in context and shown they were

14   inconsistent with an inference that he intended to kill.

15   Respondent filed his opposition on July 18, 2003, arguing that an evidentiary hearing is

16   not warranted because the claims lack merit, there is no sufficient offer of proof, and the new

17   evidence presented by Petitioner does not cast doubt on the California Supreme Court's finding

18   that Petitioner failed to set forth facts which constitute a constitutionally cognizable claim.  (ECF

19   No. 137.)  Petitioner filed a reply on September 19, 2003, re-arguing his position on the motion.

20   (ECF No. 140.)

21   Section 2254(d), as amended by the AEDPA, provides:

22   An application for a writ of habeas corpus on behalf of a person in custody
     pursuant to the judgment of a State court shall not be granted with respect to any

23   claim that was adjudicated on the merits in State court proceedings unless the
     adjudication of the claim--

24

25   (1) resulted in a decision that was contrary to, or involved an unreasonable
     application of, clearly established Federal law, as determined by the
     Supreme Court of the United States; or

26

27   (2) resulted in a decision that was based on an unreasonable determination
     of the facts in light of the evidence presented in the State court proceeding.

28

1    28 U.S.C. § 2254(d).

2          In Cullen v. Pinholster, the Supreme Court held that "review under § 2254(d)(1) is

3    limited to the record that was before the state court that adjudicated the claim on the merits," and

4    thus "evidence introduced in federal court has no bearing on § 2254(d)(1) review."  Pinholster,

5    131 S. Ct. at 1398, 1400.  Although the central holding of Pinholster pertained to § 2254(d)(1),

6    the Supreme Court observed that "§ 2254(d)(2) includes the language 'in light of the evidence

7    presented in the State court proceeding,'" providing "additional clarity" that review under §

8    2254(d)(2) is also limited to the record before the state court.  Id. at 1400 n.7.  Therefore, for

9    claims that were adjudicated on the merits in state court, Petitioner can only rely on the record

10   that was before the state court to satisfy the requirements of § 2254(d).  See Landrigan, 550 U.S.

11   at 474.

12         Petitioner seeks an evidentiary hearing on the forty-one claims set forth above.  All of

13   those claims were adjudicated on the merits in the state court.  See Richter, 562 U.S. at 99

14   ("[w]hen a federal claim has been presented to a state court and the state court has denied relief,

15   it may be presumed that the state court adjudicated the claim on the merits in the absence of any

16   indication or state-law procedural principles to the contrary).  For the reasons stated above,

17   Petitioner fails to demonstrate that any of the forty-one claims overcomes the limitation of §

18   2254(d).  Thus, Pinholster effectively bars a habeas court from any further factual development

19   on these claims.  Id. at 1411 n.20.

20         Petitioner further claims that he is entitled to a hearing under 28 U.S.C. § 2254(e)(2).

21   Pinholster suggests this is not so.  "Section 2254(e)(2) continues to have force where §

22   2254(d)(1) does not bar federal habeas relief."  Id. at 1401.  Analysis of the claims under §

23   2254(d) must precede the granting of an evidentiary hearing under § 2254(e)(2).  Id.  Thus, only

24   if Petitioner overcomes § 2254(d) can the Court consider a hearing under § 2254(e)(2).  As

25   Justice Breyer stated: "If the federal habeas court finds that the state-court decision fails [§

26   2254](d)'s test (or if [§ 2254](d) does not apply), then an [§ 2254](e) hearing may be needed."

27   Id. at 1412 (Breyer, J., concurring in part and dissenting in part).

28

1    As discussed above, § 2254(d) applies to all forty-one claims since they were adjudicated

2    on the merits, and Petitioner fails to overcome § 2254(d) with respect to any of the forty-one

3    claims.

4        For the reasons stated, Petitioner's motion for evidentiary hearing shall be denied.

5                                                **VIII.**

6                **MOTION AND RENEWED MOTION TO PRESERVE TESTIMONY**

7        On June 25, 2014, Petitioner filed a motion to preserve testimony by deposing the

8    following seven witnesses:

| Name | Case Relation | Age |
|------|---------------|-----|
| Theodore S. Donaldson | Trial Defense Psychiatrist | 87 |
| Eugene F. Toton | Lead Trial Defense Attorney | 78 |
| Patricia L. McGregor | Trial Defense Investigator | 70 |
| Maria E. Valenzuela | Friend of victim, Mrs. Bocanegra | 68 |
| Susan M. Peninger | Trial Defense Investigator | 67 |
| Jeri A. Doane | Post-conviction Psychologist | 67 |
| David V. Foster | Post-conviction Psychologist | 67 |

17   Each of these individuals previously filed a declaration in support of the instant petition.  (ECF

18   No. 150.)

19       Petitioner argues good cause to preserve evidence because these witnesses are of

20   advanced age and their proposed testimony will be probative of the claimed ineffective

21   assistance of counsel, mental defenses, and Petitioner's actions and lack of culpability, as alleged

22   in the petition.  Respondent filed his opposition on August 27, 2014, arguing there is no good

23   cause for such relief because Petitioner is not entitled to an evidentiary hearing, and even if he

24   were, there is no showing of the probity of proposed testimony or that these witnesses would be

25   unavailable.  (ECF No. 154.)  Moreover, Respondent states his need for further discovery should

26   the motion be granted.  Petitioner replied on September 3, 2014, re-arguing good cause to

27   preserve testimony relating to declarations of these aged witnesses already on file, and stating

28

1   that further discovery needs of Respondent can be litigated after the motion to preserve evidence

2   is granted.

3          On May 1, 2015, Petitioner filed a motion renewing the pending motion to preserve

4   testimony.  (ECF No. 160.)

5          A judge may authorize discovery and may limit it under the Federal Rules of Civil

6   Procedure upon a showing of the reasons for the request and good cause.  Rules Governing §

7   2254 Cases, Rule 6.  Discovery should be allowed if it will help illuminate issues underlying

8   applicant's claim.   Gaitan-Campanioni v. Thornburgh, 777 F. Supp. 1355, 1356 (E.D. Tex.

9   1991).  Availability of discovery during habeas is vested in the sound discretion of the district

10   court. Campbell v. Blodgett, 982 F.2d 1356, 1358, (9th Cir. 1993).

11          Federal Rule of Civil Procedure 27 provides in pertinent part that:

12

13          The court where a judgment has been rendered may, if an appeal has been taken
            or may still be taken, permit a party to depose witnesses to perpetuate their
14          testimony for use in the event of further proceedings in that court.

15          The party who wants to perpetuate testimony may move for leave to take the
            depositions, on the same notice and service as if the action were pending in the
16          district court. The motion must show:

17          (A) the name, address, and expected substance of the testimony of each deponent;
            and

18          (B) the reasons for perpetuating the testimony.

19          If the court finds that perpetuating the testimony may prevent a failure or delay of
            justice, the court may permit the depositions to be taken and may issue orders like
20          those authorized by Rules 34 and 35. The depositions may be taken and used as
            any other deposition taken in a pending district-court action.
21

22          This Rule does not limit a court's power to entertain an action to perpetuate testimony and

23   may be used in habeas proceedings.   Calderon v. U.S. Dist. Court for Northern Dist. of

24   California, 144 F.3d 618, 621 (9th Cir. 1998); accord Martin v. Reynolds Metals Corp., 297 F.2d

25   49, 55 (9th Cir. 1961) (court has the power to order taking of deposition for purpose of

26   perpetuating evidence).

27          Good cause under Rule 27 may be found "[w]here specific allegations before the court

28
                                            207

1   show reason to believe that the petitioner may, if the facts are fully developed, be able to

2   demonstrate that he is . . . entitled to relief . . . ." Bracy v. Gramley, 520 U.S. 899, 908-09 (1997),

3   citing Harris v. Nelson, 394 U.S. 286, 300 (1969).

4          Here, the Court finds that Petitioner has not made a sufficient factual showing to establish

5   good cause as required by Habeas Corpus Rule 6(a).  Apart from age, Petitioner offers no facts

6   suggesting unavailability of these witnesses or reasons why this testimony will be lost if not

7   preserved.  See Penn. Mut. Life Ins. Co., v. U.S., 68 F.3d 1371, 1373 (C.A.D.C. 1995).  While

8   age of the deponent may be relevant in determining whether there is sufficient basis to perpetuate

9   testimony, Penn. Mut. Life Ins. Co., 68 F.3d at 1375, this Court, for purposes of this proceeding,

10  does not find age alone a sufficient basis to grant relief.  Even if it were, Petitioner supports

11  probity of the proposed testimony only by citing generally to proposed deponents' declarations

12  in the record.  Petitioner does not state with sufficient specificity the expected substance of the

13  testimony and how it would lead to evidence, admissible under AEDPA, relevant to claims in his

14  petition and entitlement to relief.  Petitioner has not made a sufficient showing that the proposed

15  discovery would lead to relevant evidence likely to be lost.  See Martin, 298 F.2d at 55.

16         In sum, nothing reasonably suggests a basis to believe the proposed testimony would lead

17  to factual development showing entitlement to relief, and that the proposed testimony might

18  otherwise be lost.  See Bracy, 520 U.S. at 908-09; see also Gilday v. Callahan, 99 F.R.D. 308,

19  309 (D.C. Mass. 1983) (no "good cause" under Rule 6 where the facts petitioner seeks to dispute

20  had been resolved by state court).

21         For the reasons stated, Petitioner's motion to preserve evidence, as renewed, shall be

22  denied.

23                                              **IX.**

24                    **MOTION FOR CASE MANAGEMENT CONFERENCE**

25         On May 1, 2015, Petitioner filed a motion requesting a case management conference to

26  discuss any assistance the Court might require to resolve the pending motion for evidentiary

27  hearing.  (ECF No. 159.)

28

1    However, there is no need for a case management conference given the discussion above

2  denying the motion for evidentiary hearing.  The motion for case management conference shall

3  be denied.

4                                               **X.**

5  **REQUEST TO SEAL AND PROTECT SUPPLEMENTAL LODGED DOCUMENTS**

6    On June 23, 2015, Respondent filed a request that the following documents be filed under

7  seal and protected from disclosure: (1) the Request to Seal the November 25, 1987 Reporter's

8  Transcript & Penal Code Section 987.9 Materials, totaling two (2) pages, (2) the November 25,

9  1987 Reporter's Transcript (conditionally sealed Lodged Document # II), totaling Seven (7)

10 pages, (3) all Penal Code Section 987.9 Materials (conditionally sealed Lodged Document #

11 QQ), totaling ninety-five (95) pages, and (4) a [Proposed] Order Sealing the conditionally sealed

12 Lodged Documents # II and # QQ), totaling one (1) page.

13    Respondent argues that these documents, sealed state court records, contain confidential

14 information that should be protected from disclosure in this proceeding.  Local Rule 141;

15 California Penal Code Section 987.9(d).

16    The Court notes that Petitioner has been served with copies of these supplemental record

17 documents.  He has not opposed Respondent's request and the time for doing so has passed.

18 Local Rule 141(c).

19    Documents may be sealed only by written order of the Court, upon the showing required

20 by applicable law.  Local Rule 141(a).  Confidential information may be protected by a

21 protective order.  Local Rule 141.1(a)(1).

22    The Court has reviewed the request to seal and protect documents and the supplemental

23 lodged documents, and based thereon finds good cause to grant the request.

24    The supplemental lodged documents, sealed and unsealed, were not considered by the

25 Court in its analysis and disposition of the foregoing claims.  The Court notes that these

26 documents, to the extent they are evidence of trial counsel's defense of Petitioner, do nothing but

27 support effective assistance by trial counsel and the Court's above analysis and disposition.  (See

28

[Sealed] Supplemental Lodged Documents #II and #QQ.)

## XI.

### CERTIFICATE OF APPEALABILITY

Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a Certificate of Appealability ("COA"). Accordingly, the Court has sua sponte evaluated the claims within the petition for suitability for the issuance of a COA.  See 28 U.S.C. § 2253(c); Turner, 281 F.3d at 864–65 (9th Cir. 2002).

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller–El, 537 U.S. at 335–36 (2003).  The controlling statute in determining whether to issue a COA is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The court may issue a COA only "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of

1  his case, he must demonstrate "something more than the absence of frivolity or the existence of

2  mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

3      In the present case, the Court finds that, with respect to the following claims, reasonable

4  jurists could disagree with the Court's resolution or conclude that the issues presented are

5  adequate to deserve encouragement to proceed further:

6      1)    Claim 8: Whether defense counsel provided ineffective assistance by failure to

7  investigate and present testimony of jailhouse informant Charles Seeley.

8      2)    Claim 59: Whether the trial court failed to consider Petitioner's mitigations

9  evidence when it imposed the death penalty.

10     3)    Claim 61: Whether imposition of the death penalty is constitutionally

11  disproportionate as to Petitioner.

12  Therefore, a certificate of appealability is granted as these three claims.

13     As to the remaining claims and requests for evidentiary hearing and to preserve

14  testimony, the Court concludes that reasonable jurists would not find the Court's determination

15  that Petitioner is not entitled to relief debatable, wrong, or deserving of encouragement to

16  proceed further.  Petitioner has not made the required substantial showing of the denial of a

17  constitutional right.  He has not demonstrated good cause to preserve testimony.  Accordingly,

18  the Court hereby declines to issue a COA as to the remaining claims and requests for evidentiary

19  hearing and to preserve testimony.

20                                    **XII.**

21                                  **ORDER**

22     Accordingly, for the reasons stated, it is HEREBY ORDERED that:

23     1.    The Petition for Writ of Habeas Corpus (ECF No. 38) is DENIED,

24     2.    Petitioner's motion for evidentiary hearing (ECF No. 120) is DENIED,

25     3.    Petitioner's motion to preserve testimony (ECF No. 150) and renewed motion to

26           preserve testimony (ECF No. 160) are DENIED,

27     4.    Petitioner's motion for a case management conference (ECF No. 159) is

28

1    DENIED.

2    5.    Respondent's request to seal and protect supplemental lodged documents (ECF

3          No. 162) is GRANTED such that:

4          a.    The Clerk of the Court is directed to file under seal, (1) Petitioner's Request

5                to Seal November 25, 1987 Reporter's Transcript & Penal Code Section 987.9

6                Materials, totaling two (2) pages, (2) the November 25, 1987 Reporter's

7                Transcript (conditionally sealed Lodged Document # II), totaling Seven (7)

8                pages, (3) all Penal Code Section 987.9 Materials (conditionally sealed

9                Lodged Document # QQ), totaling ninety-five (95) pages, and (4) a

10               [Proposed] Order Sealing Supplemental Lodged Documents # II and # QQ),

11               totaling one (1) page,

12         b.    The above documents filed under seal and the information therein constitute

13               confidential information which shall not be disclosed, in whole or part, to any

14               person other than the Court and Court staff and individually named counsel

15               for the parties for their use solely in connection with litigation of the habeas

16               petition pending before this Court,

17         c.    No publicly filed document shall include the above documents and/or the

18               information therein unless authorized by the Court to be filed under seal, and

19         d.    All provisions of this order shall continue to be binding after the conclusion

20               of this habeas corpus proceeding and specifically shall apply in the event of a

21               retrial of all or any portion of Petitioner's criminal case, except that either

22               party maintains the right to request modification or vacation of this order.

23   6.    A Certificate of Appealability is ISSUED as to the Court's resolution of claims 8,

24         59 and 61,

25   7.    A Certificate of Appealability is DECLINED as to claims 1-7, 9-58, and 60, and

26         as to the requests for evidentiary hearing and to preserve testimony,

27   8.    Any and all scheduled dates are VACATED, and

28

9.    The Clerk of the Court is directed to substitute RON DAVIS, acting Warden of San Quentin State Prison, as the Respondent warden in this action, and to enter judgment accordingly.

IT IS SO ORDERED.

Dated:  __July 22, 2015__            _____

                                      SENIOR  DISTRICT  JUDGE